<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF TEXAS

 3                         WACO DIVISION

 4   UNITED STATES OF AMERICA      *
                                   *
 5                                 *
     VS.                           * CRIMINAL ACTION NO. W-11-CR-182
 6                                 *
     NASER JASON ABDO              *    May 21, 2012
 7
         BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
 8                           PRETRIAL HEARING
                                VOLUME 1
 9
     APPEARANCES:
10
     For the Government:          Mark Frazier, Esq.
11                                Gregg N. Sofer, Esq.
                                  Lawrence Schneider, Esq.
12                                Assistant United States Attorneys
                                  PO Box 828
13                                Waco, Texas 76701

14   For the Defendant:           Zachary L. Boyd, Esq.
                                  PO Box 870
15                                Copperas Cove, Texas 76522
                                  – and –
16                                Michael F. White, Esq.
                                  1103 N. Gray
17                                Killeen, Texas 76541

18   Court Reporter:              Kristie M. Davis
                                  United States District Court
19                                PO Box 20994
                                  Waco, Texas 76702-0994
20

21

22       Proceedings recorded by mechanical stenography, transcript

23   produced by computer-aided transcription.

24

25
</pre>

1    (May 21, 2012, 9:08, defendant present.)

2        MS. WILLIS:  Pretrial hearing in Criminal Action

3    No. W-11-CR-182 styled United States of America vs. Naser Jason

4    Abdo.

5        MR. FRAZIER:  Mark Frazier, Gregg Sofer and Larry

6    Schneider for the United States, Your Honor.

7        MR. BOYD:  Zachary Boyd and Michael White for Mr. Abdo,

8    Your Honor.

9        THE COURT:  Good morning, Counsel.

10       MR. BOYD:  Good morning.

11       THE COURT:  We have three motions for limine up here.  And

12   what's the government -- does the government object to any of

13   them, Mr. Frazier?

14       MR. FRAZIER:  Yes, Your Honor.  We at least have arguments

15   to present to the Court very briefly.

16       THE COURT:  All right.  Let's start with the one involving

17   the charges of -- the charge of both child pornography and

18   being AWOL.  Are those -- what they are?

19       MR. FRAZIER:  We don't intend to go into that.  As far as

20   him being previously charged with child pornography or AWOL,

21   we'll make reference to it during the trial as either other

22   matters or other charges or something like that, but we don't

23   have any desire to go into those, that matter of mentioning it

24   specifically.

25       THE COURT:  That motion in limine will be granted then.

1          The next one would be involving the use of the word

2     "terrorism," "terrorist" or words derivative of that.

3          MR. FRAZIER:  Judge, we're not going to emphasize that.

4     There's some instances where I just don't know how we can avoid

5     it if the witness was part of the Joint Terrorism Task Force

6     or, you know, there's witnesses who are going to testify that a

7     terrorism alert would have arisen at Fort Hood had this bomb

8     actually gone off.  I mean, to that extent I think we have to

9     mention --

10         THE COURT:  I think you can do it without using the word

11    "terrorism."  You can say that an alert would have gone off and

12    that kind of thing.

13         MR. FRAZIER:  Okay.  Yes, sir.

14         MR. BOYD:  Thank you, Your Honor.

15         THE COURT:  That will be granted to that extent then.

16         Last one?

17         MR. FRAZIER:  Well, I have two.  There's a --

18         THE COURT:  Wait.  Let's -- I was taking care of the

19    defendant's first.  I didn't know you had anything.

20         MR. FRAZIER:  Oh, no.  These are defendant's.  There is

21    only one more.  Well, the -- I thought there was an objection.

22    There was a motion in limine regarding expert testimony.

23         THE COURT:  That's the one I'm looking at.

24         MR. FRAZIER:  Okay.  Your Honor, our position on the

25    fact -- our position on the -- that particular motion is that

1   the expert in this case is not only going to testify that the

2   components of the destructive device were present but --

3        THE COURT:  That's part of your --

4        MR. FRAZIER:  It's part of our case.

5        THE COURT:  Part of your case.  One of your elements.

6        MR. FRAZIER:  More than one of the counts and that's my

7   point is that we really -- really there's no way to prohibit

8   this type of testimony and there is a -- there was a recreation

9   a substantially similar device of one way it could have been

10  created based on the instructions and the materials the

11  defendant had and we intend to use that as an exhibit in

12  addition to his testimony to -- as part of the evidence to

13  those counts.

14       THE COURT:  Mr. Boyd, I don't think that can be avoided.

15  I mean, that's an element of the government's necessary proof

16  it seems to me.

17       MR. BOYD:  Your Honor, with respect to their ability to

18  prove their case, yes.  With respect to them speculating as to

19  a device, my expert who I had and who I'm unable to use would

20  have testified directly opposite to what this -- what the

21  prosecution is saying and specifically they didn't build the

22  device based off of the article.  They didn't build the device

23  based off of the knowledge that Mr. Abdo would have had

24  available to him.  They built the device based off expertise.

25  They used a completely different triggering mechanism.  They

1  never assembled a device that would be a fair representation

2  because anything they would show the jury would be harmful in

3  that it is complete and total speculation.  They can't really

4  even establish that it would have gone off that way, Your

5  Honor, because my expert would opine if I had him available

6  that it probably would not have gone off.

7      THE COURT:  I hear you and it sounds like you're well

8  prepared for cross-examination of the government's expert.

9  That will be overruled.  Anything else?

10     MR. FRAZIER:  The last one that I had to do has to do with

11  events occurring outside the Western District of Texas.  I

12  believe there's a motion in limine asking us not to go into

13  matters that occurred in Kentucky and in Tennessee in early

14  July of 2011.  That specifically is mentioned in the indictment

15  in Count Two.  We've started in or about July 2011 in the

16  Western District of Texas and elsewhere.  These acts are acts

17  that are a part of the intent, the preparation of the

18  defendant.

19     THE COURT:  I don't even have that motion.

20     MR. FRAZIER:  Okay.

21     MR. BOYD:  Your Honor, that should have been the -- it was

22  filed.  It should have been one of the ones that said motion in

23  limine in regards to other alleged bad acts and events

24  occurring outside.

25     THE COURT:  Okay.  Since it was just filed within the last

1    hour, I haven't had any chance to read it very carefully.

2         Go ahead, Mr. Frazier.

3         MR. FRAZIER:  Basically, Judge, part of our evidence that

4    we're going to start with this afternoon involves an incident

5    that occurred -- or incidents that occurred in Kentucky on July

6    3rd and 4th of 2011 that the defendant later acknowledged in a

7    statement was part of a plan to kidnap and kill a U.S. soldier.

8    That's all -- that's part of Count Two because we've included

9    it in our indictment.  Count Two of the indictment goes back to

10   July -- July of 2011 up to and including July 27th in the

11   Western District and elsewhere and that was specifically

12   included that way because it is part of the defendant's

13   preparation, part of the plan, his intent.  It all goes to show

14   what his intent was regarding his plot to kill U.S. soldiers.

15   And the plot may have started earlier than July, but our

16   evidence is going to show that at least as of July 3rd and 4th

17   when -- and on July 4th when the defendant disposed of evidence

18   in a Dumpster in Oak Grove, Kentucky that it relates to Count

19   Two of the indictment, and the only reason that our evidence

20   would show that he did not complete that act was because he was

21   interrupted by the fact that he was called back to post and

22   basically he made a U-turn and went AWOL.  And so our --

23        THE COURT:  We're not going to use the term "AWOL,"

24   correct?

25        MR. FRAZIER:  Well, Judge, and I may have misspoke on

1    that.  We'll approach the bench if we could before doing that,

2    but AWOL is what he did and so that sort of is part of the

3    evidence in this particular case.  At the time we put on the

4    witness we may approach the bench because that is going to be

5    part of the evidence regarding why the defendant went missing,

6    but other than that it won't be mentioned again.

7         THE COURT:  That's what a motion in limine is all about.

8         MR. FRAZIER:  Okay.

9         THE COURT:  Response?

10         MR. BOYD:  Your Honor, my concern is the government

11    intends to offer intent evidence and motive elements evidence

12    and I have attempted to subpoena Katherine Sematrano,

13    Lieutenant Colonel Jeff Lavarnick and Reginald Sampson to deal

14    with the intent issue and to deal with the motive issue.  And I

15    was unable to get those witnesses subpoenaed by the U.S.

16    Marshals and they are key to my defense in terms of motive.

17         THE COURT:  Those witnesses you wanted were going to deal

18    with totally irrelevant matters in my opinion.  That's why that

19    was denied.

20         Are you calling a witness from Tennessee?

21         MR. FRAZIER:  Yes, sir.

22         THE COURT:  Okay.  Well, you mentioned something about

23    what you intended to put on this afternoon.  I'll be pleased if

24    we're able to get a jury selected by this afternoon, and let me

25    explain to you the way I intend to do that.

1        MR. FRAZIER:  Yes, sir.

2        THE COURT:  I have not seen as much publicity about a case

3    since the Branch Davidian case, including I understand

4    reporting over the weekend that -- not only about the case but

5    about the defendant's confessing to it.

6        Anyway, my intention is to qualify the jury on all of the

7    aspects we usually go into without ever mentioning this

8    specific case and then mentioning the case enough that they can

9    know what it's about, asking them how many of them have heard

10   anything about it, identifying all of them, sending them back

11   to the jury room and bringing them in one at a time to ask them

12   what they've heard otherwise.  When they explain what they've

13   heard, everybody will hear what they've heard.  I don't know if

14   we can possibly get a jury of people who haven't heard anything

15   about this case or not.  We may have 12 deaf mutes on the jury

16   who can't read, but we'll do our best.

17       MR. FRAZIER:  Yes, sir.  That's all we have, Your Honor.

18       THE COURT:  Mr. Boyd?

19       MR. BOYD:  Your Honor, I had one motion a verbal motion

20   that I feel compelled to bring at this time.

21       Your Honor, I've done a lot of thinking since our last

22   court hearing and I understand the Court's intent and I respect

23   the Court's intent.  At school I was taught to stand up for the

24   harder ride over the easy or wrong and I'm at one of those

25   moments right now where I've got to make the Court aware of my

1   feelings.  With respect to my client sitting here wearing a

2   mask, I think it denies him due process.  I don't think that's

3   the Court's intent, but I think that that's the effect.  I

4   think that if we tell the jury anything other than you can't

5   hold it against him in terms of guilt/innocence, then we do a

6   disservice to the process.  I understand the concern about if

7   that's all we say it can't possibly undo the appearance of a

8   man sitting behind counsel table with a mask on and that it

9   looks like it denies due process and I get that dilemma.  I get

10  that what the Court is trying to balance.  I understand that.

11  But, you know, it is -- it is possible for this Court to in

12  effect impart instruction and give commands in such a way that

13  we can get through this in a manner such that Mr. Abdo will

14  behave during trial.  And he has no -- he has no reason to

15  misbehave because we're added.  We're knocking on that door and

16  if he does, he hurts his own case and no one else does.  He has

17  assured me that he is going to behave in this courtroom and I

18  am the man sitting next to him and I ask this Court to remove

19  the mask and if he acts out then we ramp it up at that point.

20  I think due process demands it and I leave it to the Court's

21  discretion.

22       THE COURT:  Well, we have to remember the fact that all of

23  this was brought about by Mr. Abdo's actions, not by anybody

24  else's.  So I'm not going to grant that at this point in time.

25       MR. BOYD:  Yes, Your Honor.

1       THE COURT:  Anything further?

2       MR. BOYD:  No, Your Honor.

3       MR. FRAZIER:  No, sir.

4       THE COURT:  Let's get our jury in and give it a try then.

5       LAW CLERK:  All rise.

6       Court will stand in recess.

7       (A break was taken from 9:20 to 9:30.)

8       LAW CLERK:  All rise.

9       THE COURT:  Be seated, everyone.

10      MS. WILLIS:  Jury selection and trial proceedings in

11  Criminal Action No. W-11-CR-182 styled United States of America

12  vs. Naser Jason Abdo.

13      MR. FRAZIER:  Mark Frazier, Gregg Sofer and Larry

14  Schneider for the United States, Your Honor.

15      MR. BOYD:  Your Honor, Zachary Boyd and Mr. Michael White

16  for Mr. Abdo.

17      (Voir dire proceedings took place.)

18      THE COURT:  Members of the jury, would you stand and raise

19  your right hand, please, so the clerk can administer the

20  juror's oath?

21      (The jury was sworn.)

22      THE COURT:  Be seated, ladies and gentlemen.

23      Ladies and gentlemen of the jury, when you take that oath

24  you become officers of this Court just as I am and just as the

25  attorneys are.  As such there are certain rules that you have

1   to follow in doing your job just as there are certain rules

2   that we have to follow in doing ours.  So I want to read you

3   some brief instructions now concerning your service on this

4   case as jurors.

5        Ladies and gentlemen, you and you alone as jurors are now

6   the judges of the facts.  By your verdicts you will decide the

7   disputed issues of fact.  I will decide all questions of law

8   that arise during the trial, and before you retire to

9   deliberate at the close of the case I will instruct you on the

10  rules of law that you must follow and apply in deciding upon

11  your verdict.

12       Nothing that I may say or do during the course of the

13  trial is intended to indicate nor should be taken by you as

14  indicating what your verdicts should be.  Your verdicts should

15  be based on your independent assessments of the facts in this

16  case as applied to the law on which I instruct you at the

17  conclusion of the evidence.

18       The evidence from which you will find the facts will

19  consist of the testimony of witnesses, documents, other

20  tangible things received into the record as exhibits and any

21  facts the lawyers agree or stipulate to or that I instruct you

22  to find.

23       Certain things are not evidence and mustn't be considered

24  as such.  First, statements, arguments and unanswered questions

25  by the lawyers are not evidence.  Second, objections to

1   questions are not evidence.  The lawyers have an obligation to

2   their client to make an objection whenever they believe

3   evidence is being offered improperly.  You should not be

4   influenced by the objections or by my rulings on them.  If the

5   objection is sustained, ignore the question.  If it is

6   overruled, treat the question and answer like any other.  If

7   you're instructed that some item of evidence is received for a

8   limited purpose only, you must follow that instruction.

9   Testimony that I exclude or tell you to disregard is not

10  evidence and mustn't be considered as such.  And lastly

11  certainly anything you may see or hear outside the courtroom is

12  not evidence and must be disregarded.  You are to decide the

13  case solely on the evidence presented here in the courtroom.

14      Remember there are two kinds of evidence:  Direct evidence

15  and circumstantial evidence.  Direct evidence is simply direct

16  proof of a fact such as testimony of an eyewitness.

17  Circumstantial evidence is proof of facts from which you may

18  infer or conclude that other facts exist.  I will give you

19  further instructions on these as well as other matters at the

20  end of the case, but bear in mind that you may consider both

21  kinds of evidence and that each has the same weight in a court

22  of law.

23      It is strictly up to you to decide which witnesses to

24  believe, which witness not to believe and how much of any

25  witness' testimony to accept or reject.  I will also give you

13

1   some guidelines for determining the credibility of witnesses at

2   the end of the case.

3       You should give careful attention to the testimony and

4   evidence presented for your consideration during the trial, but

5   you should not form or express any opinion about the case one

6   way or the other until you have heard all the evidence and have

7   had the benefit of the closing arguments of the lawyers and my

8   instructions on the applicable law.

9       Although the exhibits which are admitted into evidence

10  will be available to you for your inspection and review during

11  your deliberations, under normal circumstances no written

12  transcript of the testimony of witnesses can be made available

13  to you while you're deliberating, nor under normal

14  circumstances can all or any significant portion of a witness'

15  testimony be read to you while you're deliberating.  For those

16  reasons it is very important that you pay close attention to

17  the testimony given by each witness during the trial.

18      During the trial you shouldn't discuss the case among

19  yourselves or with anyone else and you must not permit anyone

20  to attempt to discuss it with you or in your presence.  And

21  insofar as the lawyers are concerned as well as others whom you

22  may come to recognize as having some connection with the case,

23  you're instructed that in order to avoid even the appearance of

24  impropriety you should have no conversation whatever with those

25  persons while you're serving on the jury except for casual

1    greetings.

2        If you would like to take notes during the trial, you may

3    do so.  You're not required to take notes if you prefer not to.

4    Steno pads and pencils have been provided for your use if you

5    do choose to take notes.  If you do that, be careful not to get

6    so involved in notetaking that you become distracted from the

7    ongoing proceedings.  Your notes should be used only as memory

8    aids.  You should not give your notes precedence over your

9    independent recollection of the evidence.  And if you do not

10   take notes, you should rely upon your own independent

11   recollection of the proceedings and you should not be unduly

12   influenced by the notes of other jurors.

13       You'll notice that we do have an official court reporter

14   making a record of the trial, but we will not have typewritten

15   transcripts of this record available for your use in reaching a

16   decision in this case.

17       You should avoid reading any newspaper articles that might

18   be published about the case now that the trial is in progress

19   and you should avoid listening to or observing any broadcast

20   news programs on either television or radio that concerns the

21   case.  The reasons for these cautions of course lies in the

22   fact that it will be your duty to decide this case solely on

23   the basis of the testimony and evidence presented during the

24   trial without consideration of any other matters whatsoever.

25       From time to time during the trial I may be called upon to

1   make rulings of law on motions or objections made by the

2   lawyers.  You should not infer or conclude from any ruling I

3   may make that I have any opinions on the merits of the case

4   favoring one side or the other, and if I sustain an objection

5   to a question that goes unanswered, you should not speculate on

6   what the answer might have been nor should you draw any

7   inferences or conclusions from the question itself.

8       During the trial it may be necessary for me to confer with

9   the lawyers from time to time concerning questions of law or

10  procedure that require consideration by me alone.  On some

11  occasions you may even be excused from the courtroom as a

12  convenience to you and to us while we discuss such matters.  We

13  will try to limit such interruptions as much as possible, but

14  you should remember at all times the importance of the matters

15  you're here to determine and should be patient even though the

16  case may seem to you to be going slowly.

17      The trial is now about to begin.  The lawyers for each

18  side will be given an opportunity to make opening statements in

19  which they may explain the issues in the case and summarize the

20  facts they expect the evidence will show.  First, the

21  government will make an opening statement, which again is

22  simply an outline to help you understand the evidence the

23  government's attorneys expect to present.  Next, the

24  defendant's attorneys may elect to make an opening statement.

25  They may elect to wait until the government has rested.

1    Sometimes that's waived entirely.  The government will then

2    present its witnesses and the attorneys for the defendant will

3    have the right to cross-examine them.  Following the

4    government's evidence the defendant may, if he elects, present

5    witnesses and the government would have the opportunity to

6    cross-examine them.  After that the government could decide to

7    present rebuttal witnesses.  After all the testimony and

8    evidence has been presented, the lawyers will then be given a

9    last opportunity to address you and make their summations or

10   final arguments.  Remember that the statements the lawyers make

11   in opening as well as the arguments they present at the end of

12   the trial are not to be considered by you either as evidence in

13   the case, which comes only from the witnesses and exhibits, or

14   as your instructions on the law which will come only from me.

15   Nevertheless, these statements and arguments are intended to

16   help you understand the issues and the evidence as it comes in

17   as well as the positions taken by both sides.

18       Counsel, would I assume correctly that the rule will be

19   invoked in this case?

20       MR. BOYD:  Yes, Your Honor.

21       THE COURT:  That simply means that the witnesses will have

22   to remain outside the courtroom while they're awaiting their

23   turn to testify and they're not to talk with anyone concerning

24   what their testimony has been or will be except for the

25   attorneys who are exempt from that rule and of course the

1   government's case agents will be exempt, also.

2       Ladies and gentlemen, it's almost ten minutes till 5:00.

3   We don't have time for opening statements this afternoon.  So

4   we're going to take off at this point and resume at 9:00

5   o'clock in the morning.  Please remember the instructions I

6   just gave you not to -- to try your best to insulate yourself

7   from any news reports.  I know it's a temptation to want to see

8   what's reported on television and reported in radio and in the

9   newspaper in a case in which you're involved.  We ask you

10  please to not do that because we want you to make a decision

11  based strictly on what's here in the courtroom and not what's

12  presented in the media.

13      If you will be here shortly before 9:00 o'clock.  If

14  you'll go now this way, the Marshal will show you where the

15  jury room is where you should report in the morning and we'll

16  be ready to proceed promptly at 9:00 a.m.  Have a pleasant

17  evening.  Drive safely going home.

18      LAW CLERK:  All rise.

19      (Jury exited the courtroom at 4:50.)

20      LAW CLERK:  Court will stand in recess till 9:00 o'clock

21  tomorrow morning.

22      (A break was taken from 4:50 to 4:51.)

23      LAW CLERK:  All rise.

24      MR. FRAZIER:  I'm sorry, Judge.  I just wanted to clarify

25  about the length of time we have for opening statements.  Could

1   we ask for 15 minutes?

2   　　THE COURT:  Yes, sir.

3   　　MR. FRAZIER:  Okay.  The other thing is, Judge, I wanted

4   to clarify and I failed to do this this morning.  We have a

5   procedure that we're going to use a photograph of the defendant

6   to show the witnesses to identify him with since he's wearing a

7   mask here in court to replace an in court identification.  We

8   marked it as an exhibit.  We're going to have a witness testify

9   to it that that is in fact the defendant so another witness can

10  come in and identify him.  They'll use the photo to identify

11  the defendant as opposed to an in court identification.  And I

12  wanted to make sure the Court was okay with that.

13  　　THE COURT:  Any objection, Mr. Boyd?

14  　　MR. BOYD:  Your Honor, looking at the photograph that

15  they're trying to use does not resemble my client nowadays.

16  　　MR. FRAZIER:  Well, right.  It's a photo made at the time

17  he was arrested.  So that'd be a more accurate representation

18  then of the defendant.

19  　　MR. BOYD:  I don't think it's an appropriate

20  identification.

21  　　MR. FRAZIER:  I could have the witness to -- ask the

22  witness if he doesn't look the same here in court today.  I

23  don't think that -- if Mr. Boyd would prefer that, that'd be

24  fine.

25  　　THE COURT:  Would you prefer that, Mr. Boyd?

1      MR. BOYD:  No, Your Honor.

2      THE COURT:  Okay.

3      MR. FRAZIER:  The final thing, Judge, is I want to clarify

4  the motion in limine ruling this morning.  The fact that the

5  defendant went AWOL is a part of our case.  The fact that the

6  warrant was issued I recognize is not.  And so would it be

7  permissible for our witnesses to say because the defendant

8  himself in some of the evidence we're going to be presenting

9  says I went AWOL.  Are we allowed to present that type of

10  evidence as opposed to -- and just leave out the fact that

11  there was a warrant issued for his arrest for absent without

12  leave unless we of course approach the bench first if it

13  becomes relevant somehow?

14      MR. BOYD:  Your Honor, I think there's a concern in the

15  military system with whether or not the Article 32 hearing had

16  occurred and then contemporaneous with the subject to the

17  Article 32 hearing whether or not there was actually an

18  arraignment after that investigation.

19      THE COURT:  I have no idea what you're talking about,

20  Mr. Boyd, or what relevance it has to anything.

21      MR. BOYD:  Your Honor, it has direct relevance on whether

22  or not there was an outstanding fugitive from justice.

23      MR. FRAZIER:  We're not going to allege that.

24      THE COURT:  They're not suggesting that.  They're

25  suggesting that he left the military without being on leave.

1   Isn't that what AWOL means?

2       MR. FRAZIER:  Yes, sir.

3       MR. BOYD:  Your Honor, it's a criminal charge.

4       THE COURT:  It's a term also that is used in regular

5   parlance that the jury would understand without being lawyers

6   or military lawyers in particular.  So I see no problem with

7   using that, Mr. Frazier.

8       MR. FRAZIER:  Okay.  And the final thing is there are two

9   statements the defendant makes that we intended to offer during

10  evidence where he uses the word "terrorist," but says he's not

11  a terrorist.  We're going to go back and excise based on the

12  Court's ruling but we wanted to check with Mr. Boyd to verify

13  he wanted us to excise those portions of the statements the

14  defendant had made in recorded phone calls that were sort of

15  exculpatory statements that we had included, but I wanted to

16  verify that before we go back tonight and take those statements

17  out.

18      MR. BOYD:  Your Honor, I don't know specifically what

19  statements he's talking about.

20      MR. FRAZIER:  They're in the jail phone calls between his

21  mother and the defendant where his mother makes reference to

22  the fact that she doesn't like that word.  Defendant says

23  "terrorist" and he responds later, I'm not a terrorist, Mom.

24  And the second was in another recorded phone call at the jail

25  where he denies being a terrorist to -- I think it was to his

1   mother in the second phone call.  But we're prepared to take

2   those out but I wanted to make sure that it wasn't going to run

3   afoul of something Mr. Boyd wanted based on the ruling -- the

4   motion he had this morning.

5        MR. BOYD:  Your Honor, I just -- I don't think that's

6   relevant at all and I don't want the word "terrorist."

7        MR. FRAZIER:  We'll be happy to excise and take it out.

8   That's all we have.

9        THE COURT:  I have one last thing.

10       MR. FRAZIER:  Yes, sir.

11       THE COURT:  Now that the jury's been selected, this is

12   just a simple trial involving bombs and attempted bomb making

13   and all of that.  I don't know how many witnesses you have, but

14   I bet you don't need half of them, Mr. Frazier.

15       MR. FRAZIER:  We're not going to call most of those,

16   Judge.  Most of those are on there just in case somebody got

17   sick or ill or something like that.  But we're not calling 43

18   witnesses for the trial.

19       THE COURT:  Right.

20       MR. FRAZIER:  Yes, sir.

21       THE COURT:  Okay.  We'll stand in recess till 9:00 o'clock

22   in the morning.

23       (Hearing adjourned at 4:57.)

24

25

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TEXAS

3                    WACO DIVISION

4   UNITED STATES OF AMERICA      *
                                   *
5                                  *
    VS.                            * CRIMINAL ACTION NO. W-11-CR-182
6                                  *
    NASER JASON ABDO               *    May 22, 2012

7
       BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
8                    JURY TRIAL PROCEEDINGS
                          VOLUME 2
9
    APPEARANCES:
10
    For the Government:          Mark Frazier, Esq.
11                               Gregg N. Sofer, Esq.
                                 Lawrence Schneider, Esq.
12                               Assistant United States Attorneys
                                 PO Box 828
13                               Waco, Texas 76701

14  For the Defendant:           Zachary L. Boyd, Esq.
                                 PO Box 870
15                               Copperas Cove, Texas 76522
                                 – and –
16                               Michael F. White, Esq.
                                 1103 N. Gray
17                               Killeen, Texas 76541

18  Court Reporter:              Kristie M. Davis
                                 United States District Court
19                               PO Box 20994
                                 Waco, Texas 76702-0994
20

21

22      Proceedings recorded by mechanical stenography, transcript

23  produced by computer-aided transcription.

24

25

1   (May 22, 2012, 9:01, defendant present.)

2       LAW CLERK:  All rise.

3       THE COURT:  Be seated, everyone.

4       Do you have something you need to take up real quickly,

5   Counsel?

6       MR. BOYD:  Yes, Your Honor.  Very quickly.  Your Honor,

7   I'm developing or am continuing to have concerns about the

8   restraints on Mr. Abdo.  It is apparent to me as it was

9   reported on widely yesterday that the efforts that the Marshals

10  are making are simply not of such a nature that they are

11  passive and they are impacting the trial such that I don't

12  believe my trial can -- my client can, you know, get a fair

13  trial.  If the jury sees the Marshals with all these protective

14  devices -- I mean, the eyeglasses, I understand why they want

15  them.  I respect why they want them.  I also understand there's

16  a mask on my client's face so that it'd be pretty prohibitive

17  for him to get anything into their eyes.  So while the jury is

18  present I would ask that there be no eyeglasses unless they are

19  prescription eyeglasses available or in the courtroom or used

20  by the Marshals.

21      Furthermore, you know, as I'm sitting here right now my

22  client is being held forward in his chair with the Marshals'

23  foot pushed up against it that is visible to anybody sitting in

24  the gallery.  I can't have that and have a fair trial, Your

25  Honor.

1          THE COURT:  All right.  I have no control over that.

2     Let's bring the jury in and begin the trial.  Actually I'll

3     talk to the chief Marshal about the glasses.  I agree that's

4     ridiculous.

5          THE BAILIFF:  All rise.

6          (The jury entered the courtroom at 9:03.)

7          THE COURT:  Be seated, everyone.

8          Good morning, ladies and gentlemen.  We're ready for

9     opening statements.  The government has the opportunity to

10    either do that first and each side's been allotted 15 minutes.

11         Counsel?

12              OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

13         MR. SOFER:  May it please the Court, ladies and gentlemen

14    of the jury, defense counsel.

15         On July 27th, 2011 at approximately 1:00 o'clock in the

16    afternoon Naser Jason Abdo, the defendant in this case, was at

17    the end of a long road which for him was a mission to kill

18    United States soldiers.  The evidence in this case will show

19    the defendant who was an active duty member of the United

20    States Army stationed at Fort Campbell, Kentucky had been

21    staying at the America's Best Value Inn in Killeen, Texas here

22    in the Western District of New York (sic) Waco Division.  He

23    was there since the early morning hours of July 26th less than

24    two days.

25         There in his room and rooms, you'll hear, he was actively

1   working on accomplishing his mission.  He was building a bomb.

2   And he was not -- and he was at most, ladies and gentlemen,

3   only hours away from finishing its construction.

4        The evidence will prove that the defendant's plan actually

5   began well before July 27th.  In early July of 2011 the

6   defendant attempted to purchase a weapon, a pistol, in

7   Tennessee near the Fort Campbell Army base where he was

8   stationed.  You'll learn that on July 3rd, 2011 the defendant

9   walked into Quantico Tactical, a gun store in nearby Tennessee,

10  and asked which pistols had the most knockdown power.

11       You'll learn that he wore his sunglasses the whole time he

12  was in the store, something that he did repeatedly throughout

13  his attempt to commit murder.  And his behavior in that shop,

14  importantly, caused store employees enough concern that they

15  notified the authorities.

16       When the defendant's superiors in the Army learned of his

17  attempt to purchase a pistol, they tried to bring him back onto

18  the base.  It was July 4th of 2011.

19       When the defendant realized he was being summoned back to

20  his base, he fled.  He fled Fort Campbell.  The evidence will

21  prove, and it's a recurring theme throughout this case, that

22  the actions of concerned citizens prevented disaster.  By

23  notifying the defendant's superiors and causing them to summon

24  him back to the base, the defendant's first attempt to murder a

25  U.S. soldier were interrupted.

You'll learn that the gun that he tried to buy was only one of several items that he wanted and needed to kill.  As it turns out, ladies and gentlemen, he had already acquired a body bag, a stun gun, a cattle prod, garbage bags, a shovel, handcuffs, clothing to hide his appearance and bleach to clean up with.  When he fled Fort Campbell, he dumped all of those items and you're going to see them here in the courtroom.  All as a result again of a concerned citizen's telephone call.

You're going to learn that on July 4th, 2011 after deciding to flee from Fort Campbell he threw most of these items out in a Dumpster behind a truck stop in Oak Grove, Kentucky and then he abandoned his car on a street outside of Waffle House right across the street from where the Dumpster was.  In his abandoned car he left all the important documents that one would collect during their life.  He left his social security number card.  He left his birth certificate.  He left his school and military records among other records.  He also left behind his Army hat with the name Abdo on the back.  He left his car keys in the car.  He took his backpack and he took off never to return.

But even though he fled Fort Campbell, he continued on his mission.  He still wanted a gun and on July 7th, 2011 he succeeded in buying one that was advertised on the internet.  The evidence will show that before leaving the defendant stole his roommate's identification and he used that stolen

1    identification under the name Asher Pluto who was his roommate

2    to purchase a gun from a man named Abraham Wherry outside a UPS

3    store in Nashville, Tennessee where he had traveled.  The gun

4    was a Springfield 40-caliber pistol.

5        The evidence will prove that the defendant actually left

6    Tennessee eventually and headed to Texas.  You'll learn that

7    during his travels he tried his best to hide his identity and

8    prevent any authorities from tracking him.

9        Having been interrupted back in Kentucky, the defendant

10   was executing the same mission but he had a different plan.

11   The evidence will show that he had already acquired an article

12   which explained how to build a bomb, and like before he now

13   went about methodically acquiring all the tools and components

14   that you would need to build one.  You will actually see the

15   defendant on surveillance video as he stopped to purchase most

16   of these items and materials, all the things that he would need

17   to build a working explosive device sometimes called an

18   improvised explosive device or IED.

19       The evidence will prove that on the evening of July 25th

20   and into the early morning hours of July 26th, 2011 he stopped

21   at a Walmart store in Plano, Texas and he purchased many of

22   these items to include two pressure cookers, a drill, batteries

23   and clocks.  He also bought 100 rounds of ammunition for the

24   gun that he had bought.  The video will show that he's dressed

25   in tan nursing scrubs, another -- and with a lanyard, another

1    attempt to hide his identity.

2        From Plano he traveled south by cab to Killeen, Texas

3    where he arrived at the America's Best Value Inn at about 3:30

4    in the morning on July 26th, 2011.  He checked into the hotel

5    using the ID that he had previously stolen from his roommate

6    Asher Pluto and began unloading the items that he had purchased

7    to build the bomb.  But he still needed a few more items to

8    complete the shopping list that he had made to build the bomb

9    and you'll see that shopping list.

10       Among other things he needed explosive powder.  The

11   evidence will show that in the early afternoon of July 26, 2011

12   the defendant went to the Guns Galore store in Killeen, Texas.

13   There he bought six pounds of smokeless powder and another

14   magazine for his pistol.  He already had three magazines.  He

15   also purchased shotgun ammunition which the evidence will show

16   he wanted to use the little pellets inside as shrapnel in the

17   bomb.

18       You'll learn that again he wore his sunglasses inside the

19   store and again his behavior inside the store like his behavior

20   in the gun store in Tennessee attracted the attention of the

21   Guns Galore employees.  The questions that he asked, his

22   behavior and demeanor is captured on the store video

23   surveillance which you'll see.  It caused them to call the

24   police.  And importantly, ladies and gentlemen, the evidence in

25   this case will establish that but for that telephone call the

1    defendant's attempt to kill a United States soldier or soldiers

2    would not have been interrupted.

3         After Guns Galore the evidence will show that the

4    defendant went to an Army Surplus store in Killeen called

5    Surplus City.  There he bought an Army combat uniform, a name

6    patch with the name Smith on it and a First Cavalry patch which

7    he believed would be consistent with some of the units at Fort

8    Hood.  Again he wore his sunglasses.  Again his actions caused

9    store employees concern.  You'll hear from those store

10   employees particularly when he didn't even know what unit he

11   was assigned to at Fort Hood.

12        The evidence will show that he put the Army uniform with

13   the name Smith name tag on it on right there in the store and

14   then he left.  And you're going to learn that he purchased that

15   uniform so he'd fit in better in Fort Hood because it's

16   populated by so many soldiers.

17        From Surplus City the evidence will show the defendant

18   went to Lowe's where he bought additional items needed for

19   building the bomb.  He bought, among other things, glue, tape,

20   outdoor lights on a string like Christmas lights and two

21   cardboard boxes.  Again he wore his sunglasses.  Again

22   surveillance captured him shopping.  You'll hear from expert

23   witnesses what those components are used for in order to build

24   an IED or improvised explosive device.

25        Meanwhile, and thankfully, by the late afternoon of the

1   26th of July the Killeen Police Department was investigating

2   the report that they had received from the Guns Galore gun

3   store.  KPD Sergeant Eric Bradley and others were trying to

4   identify the person who had purchased six pounds of an

5   explosive material in the gun store.  Sergeant Bradley was able

6   to identify the taxi cab that had dropped the defendant off at

7   the gun store and he was able to learn that the taxi had picked

8   the defendant up from the America's Best Value hotel and that

9   night he went to the hotel, but you'll hear he was unable to

10  locate or identify the defendant at that time.

11        The evidence will show that on the morning of July 27th,

12  2011 Sergeant Bradley continued his investigation and he

13  learned about the defendant's trip to the Surplus City store

14  and the suspicious purchase of the uniform.  And you're going

15  to learn that in combination with the information he already

16  knew, this caused him great concern and he and others went back

17  to the America's Best Value hotel to search for the man that

18  turned out to be the defendant.  They still didn't have his

19  name.  They still didn't have his ID but they had still

20  photographs which you will see from the Surplus City video

21  surveillance system.

22        At about 1:00 o'clock on the 27th Sergeant Bradley who was

23  standing in the lobby of the hotel saw the defendant walking

24  through the lobby.  He matched the description of the pictures

25  that he had.  The defendant was wearing a black backpack, and

1   given everything that Sergeant Bradley had learned, he feared

2   there could be an explosive device in the backpack.  The

3   defendant was stopped and he was detained and his plans were

4   once again, ladies and gentlemen, interrupted, disrupted.  His

5   mission incomplete this time by good police work.

6        In the defendant's backpack you'll hear that authorities

7   recovered two clocks, his loaded 40-caliber pistol, the article

8   with the instructions on how to build a bomb, a shopping list

9   of some of the items needed to build a bomb and other documents

10  and items that linked him to the crimes charged in this case.

11       The evidence will show the defendant was not just sitting

12  idly by in his room during his short stay.  He wasn't sitting

13  there watching TV.  A search of his hotel room revealed that he

14  had acquired all of the necessary components to build a bomb

15  and that he had begun the process of building a device.  You

16  will hear from expert witnesses who will explain the defendant

17  was at most hours away from the assembly of a working

18  improvised explosive device.

19       Finally, ladies and gentlemen, you will hear the

20  defendant's own description of his intentions and motivations

21  for these crimes.  You will learn that the defendant planned to

22  hide the bomb in a box and place it in a Chinese restaurant

23  frequented by soldiers.  He intended that bomb would explode in

24  the restaurant and kill occupants, soldiers eating inside.  The

25  defendant planned to wait outside that restaurant and there he

1    would shoot with the gun and ammunition he had bought surviving

2    soldiers.

3         In short, this man intended to commit mass murder in

4    Killeen, Texas.  That, in summary, ladies and gentlemen, is

5    what the evidence in this case will prove.  At the conclusion

6    of the evidence we will return again and speak with you and ask

7    you to return a verdict based on the evidence and only upon

8    that evidence a verdict of guilty.  Thank you very much.

9         THE COURT:  Mr. Boyd, did you wish to make an opening

10   statement at this point?

11        MR. BOYD:  Yes, Your Honor.

12            OPENING STATEMENT ON BEHALF OF THE DEFENDANT

13        MR. BOYD:  May it please the Court, ladies and gentlemen

14   of the jury, prosecutors.

15        An analogy.  Attempting suicide by a knife, a decision

16   gets made, an item has to be purchased to accomplish suicide by

17   knife.  And what's going to end up happening is just the

18   purchase of a knife is not going to end up being attempted

19   suicide.  What the evidence is going to show is that things

20   were purchased.  Lawful things were purchased.  No attempt was

21   made.

22        Let's take it a little further with that.  And I want the

23   jury to focus on not just the evidence.  I am going to ask the

24   jury to focus on the evidence and the law because that's very

25   important in this case.  It's important because you're probably

1   not going to like the evidence, but we have a system of laws.

2   The law, if you follow it, the government can't get there in

3   this case.

4       A destructive device means any explosive, incendiary or

5   poisonous gas bomb or any combination of parts either designed

6   or intended for use in converting any device into any

7   destructive device and -- and this is very important -- from

8   which a destructive device may readily be assembled.  Readily

9   be assembled.

10      Count One requires that a person without lawful authority

11  attempt to use a weapon of mass destruction.  There was no

12  device ever constructed.  There was no device ever built.  It

13  just wasn't there.

14      They're going to point to Mr. Abdo when he is caught

15  leaving the hotel motel America's Best Value Inn and they're

16  going to ask you to pass judgment based on that.  There was no

17  bomb.  There was no device.  There was nothing built.  Over and

18  over and over again no matter what the government says they're

19  not going to be able to get around that fact.

20      Count Two requires them to prove attempt to kill.  Again,

21  there was no attempt made.  It just didn't happen.

22      Count Three relies on the proof of attempt in the first

23  two counts.

24      Same with Count Four, same with the rest of the counts.

25  Government can't prove its case.

1        They in effect are going to be asking you, going back to

2   the analogy and I'll use the same analogy as suicide.  If a

3   person decides to kill themself and commits suicide by blowing

4   themselves up, if you're going to follow the government's logic

5   throughout this case, they're going to ask you to find that the

6   attempt happened with the first item purchased.  That's not the

7   case.  Common sense tells us otherwise because the attempt in

8   the first suicide example wouldn't happen until you took the

9   knife and put it on your skin and started to cut.  That's what

10  attempted suicide is.  And the attempt in the second suicide

11  example wouldn't have happened until a device got built and

12  something could have happened.  Make the government prove the

13  case.  Make the government prove the case beyond a reasonable

14  doubt and make the government prove the case to you not just

15  beyond a reasonable doubt based on the evidence as they told

16  you they would do.  Make them do it based on the evidence and

17  the law and at the end of this jury I'm going to -- this jury

18  trial I'm going to stand up and I'm going to ask each one of

19  you to return a verdict of not guilty.  Thank you very much.

20       THE COURT:  Ready to call your first witness?

21       MR. SOFER:  Yes, Your Honor.  Government calls Charles

22  Michael Owens.

23       (The witness was sworn.)

24                        DIRECT EXAMINATION

25  BY MR. SOFER:

Direct Examination of Charles Owens by Mr. Sofer

1    Q.   Good morning, Agent Owens.

2    A.   Good morning, sir.

3    Q.   Would you please tell the jury -- you go by the name

4    Mike?

5    A.   Yes, sir.

6    Q.   Would you please tell the jury how you are employed?

7    A.   I'm a special agent with the FBI in Austin, Texas.

8    Q.   And how long have you been with the FBI?

9    A.   Almost two and a half years.

10   Q.   Prior to joining the FBI what did you do?

11   A.   I was in the Army for five years.

12   Q.   And what were your duties in the Army?

13   A.   I was a signal intelligence operator and Arabic

14   linguist.

15   Q.   And when you say Arabic linguist, can you describe

16   your training and experience in that position?

17   A.   Yes, sir.  I spent 63 weeks at the Defense Language

18   Institute in Monterey, California.  Graduated in 2006.

19   Q.   Okay.  And during the course of your time in the Army

20   did you have further testing and instruction in that area?

21   A.   Yes, sir.  There was a yearly -- an annual exam we

22   had to pass to stay current on our language.  It was the

23   defense language proficiency test.

24   Q.   Have you attended college?

25   A.   Yes, sir.

Direct Examination of Charles Owens by Mr. Sofer

1    Q.   And can you tell the jury what degree you received,

2    if any?

3    A.   Yes, sir.  I received a bachelor of science in

4    criminal justice with a minor in psychology.

5    Q.   What are your current assignments with the FBI?

6    A.   I'm currently assigned to a task force that

7    investigates matters of national security.

8    Q.   And what was your assignment in 2011?

9    A.   I'm sorry?

10   Q.   What was your assignment in July of 2011?

11   A.   In July of 2011 I was assigned to the task force.

12   Q.   Okay.  Did there come a time when you were asked to

13   travel to Killeen, Texas as part of your duties in the FBI on

14   or about July 27th, 2011?

15   A.   Yes, sir.

16   Q.   And why was that?

17   A.   We were advised that there was an incident in

18   Killeen, Texas and an individual was in custody who had

19   allegedly planned to attack soldiers in the Fort Hood area.

20   Q.   Okay.  Did you drive up from Austin?

21   A.   Yes, sir.

22   Q.   And did you travel to Killeen?

23   A.   Yes, sir.

24   Q.   Was that here in the Western District of Texas -- I

25   think I might have said New York -- in the Waco Division?

Direct Examination of Charles Owens by Mr. Sofer                    37

1        A.   Yes, sir.

2        Q.   There is no Waco in New York, right?

3        Did you know when you left what you were going to be doing

4   when you arrived in Killeen?

5        A.   Not initially.  No.  But however later on -- later --

6   early in the evening about 6:00 o'clock I was informed by my

7   supervisor that I would be interviewing the individual.

8        Q.   Okay.  And did you know where that interview was to

9   take place?

10       A.   Yes, sir.  The Killeen Police Department.

11       Q.   Did you travel straight there?

12       A.   Yes, sir.

13       Q.   Did there come a time when you did interview that

14   individual?

15       A.   Yes, sir.

16       Q.   Do you recall approximately what time the interview

17   began?

18       A.   6:45 p.m.

19       Q.   And you can -- can you describe for the members of

20   the jury where the interview took place?

21       A.   Yes, sir.  It occurred in an interview room at the

22   Killeen Police Department.

23       Q.   Do you see the man who you interviewed here in the

24   courtroom today?

25       A.   Yes, sir.

Direct Examination of Charles Owens by Mr. Sofer

1      Q.   Could you please point him out?

2      A.   The defendant.

3      MR. SOFER:   Indicating the defendant, Your Honor?

4      THE COURT:  Yes, sir.

5  BY MR. SOFER:

6      Q.   I want to show you what's been marked Government

7  Exhibit No. 153A and B.  Do you recognize 153A?  And I'm going

8  to show you 153B now as well.

9      A.   Yes, sir.

10     Q.   Do you recognize those two?

11     A.   Yes, sir.

12     Q.   What are they?

13     A.   That's Naser Jason Abdo.

14     Q.   Those are pictures, right?

15     A.   Yes.

16     Q.   The person depicted in those pictures is the same

17  person sitting here in the courtroom today?

18     A.   Yes, sir.

19     MR. SOFER:  Your Honor, at this time government moves 153A

20  and B into evidence.

21     MR. BOYD:  Your Honor, I'm going to object on failure to

22  lay the proper predicate.

23     THE COURT:  Objection overruled.  They're admitted.

24     (Exhibit(s) admitted:  G153A, G153B)

25  BY MR. SOFER:

1      Q.    Did you bring the defendant to the interview room?

2      A.    Yes, sir.  Myself and a Killeen detective -- I

3   believe it was a Killeen detective went down to the holding

4   area on one of the lower levels of the jail and escorted

5   Mr. Abdo into the interview room.

6      Q.    What, if anything, did you do when you brought him to

7   the interview room?

8      A.    The first thing we did was remove the cuffs and

9   instructed him to have a seat.  Then I -- you know, I asked him

10  if he was all right, if he needed anything to eat or drink, if

11  he needed a break.

12     Q.    And what was his response?

13     A.    He said he didn't need anything.

14     Q.    Did you talk to him?

15     A.    Yes, sir.

16     Q.    For approximately how long did you talk to him that

17  day?

18     A.    The first interview lasted a little over six hours.

19     Q.    Does he speak English?

20     A.    Yes.

21     Q.    Did there come a time when you read the defendant his

22  Miranda rights, commonly -- the Miranda rights or his

23  constitutional warnings?

24     A.    Yes, sir.  Roughly ten minutes into the interview.

25     Q.    And did you read them from a particular place?

Direct Examination of Charles Owens by Mr. Sofer ———40

1     A.   Yes, sir.  From the FD395 which is the FBI's advice

2  of rights form.

3     Q.   Show you what's been marked Government Exhibit No. 1.

4  Can you see that?

5     A.   Yes, sir.

6     Q.   Can you tell the members of the jury what Government

7  Exhibit No. 1 is?

8     A.   It's an FD395.  It was the -- the FD395 that I

9  presented to him on the 27th.

10    Q.   Okay.  And is your signature located on that

11 document?

12    A.   Yes, sir.  I'm the first witness.

13    Q.   And did the defendant sign it as well?

14    A.   Yes, sir.

15    MR. SOFER:  At this time the government moves Government

16 Exhibit No. 1 for identification into evidence.

17    MR. BOYD:  No objection.

18    THE COURT:  It's admitted.

19    (Exhibit(s) admitted:  G1)

20 BY MR. SOFER:

21    Q.   After advising the defendant of his rights, did he

22 indicate to you whether or not he understood them?

23    A.   Yes, sir.  He said he understood them.

24    Q.   Did he agree to answer your questions?

25    A.   Yes, sir.

Direct Examination of Charles Owens by Mr. Sofer

1    Q.    And did you proceed to ask him questions?

2    A.    Yes, sir.  I did.

3    Q.    Were you -- were breaks taken during the course of

4   this fairly lengthy interview?

5    A.    Yes, sir.  We offered him breaks to go to the rest

6   room.  We got him something to eat, offered him something to

7   drink and we gave him an opportunity to smoke in the brig.

8    Q.    Did there come a time when you interviewed the

9   defendant again?

10    A.    Yes.  We conducted a secondary interview on July 28th

11   the following day.

12    Q.    Okay.  In the same location?

13    A.    Yes, sir.

14    Q.    Did you read him his rights once again?

15    A.    Yes, sir.

16    Q.    Did you read those from a particular place?

17    A.    Yes, sir.  I read them from the FD395 and had him

18   sign it again.

19    Q.    Show you what's been marked Government Exhibit No. 2.

20   Do you see that document?

21    A.    Yes, sir.

22    Q.    Can you tell the members of the jury what it is?

23    A.    It's the FD395 read to Mr. Abdo on the 28th.

24    Q.    And is that your signature on there?

25    A.    Yes, sir.  Again I'm the first witness on this.

Direct Examination of Charles Owens by Mr. Sofer

1    Q.   And did he sign it as well?

2    A.   Yes, sir.

3    MR. SOFER:  Government moves Government Exhibit No. 2 for

4    identification into evidence, Your Honor.

5    MR. BOYD:  No objection.

6    THE COURT:  It's admitted.

7    (Exhibit(s) admitted:  G2)

8    BY MR. SOFER:

9    Q.   Did you proceed to interview the defendant on the

10   28th of July 2011?

11   A.   Yes, sir.

12   Q.   Approximately how long did that interview last?

13   A.   Just over five hours.

14   Q.   Again were breaks taken in that lengthy interview?

15   A.   Yes, sir.

16   Q.   Were there other agents or officers present during

17   either or both of the interviews?

18   A.   Yes, sir.  In both interviews it was myself and

19   Detective Sheldon Askew who is assigned to the task force, same

20   task force I am.  And there were two Army Criminal

21   Investigative Division agents Albert Hazzard and Kevin Brooks.

22   Q.   Okay.

23   A.   They were -- we were either in the room with him or

24   if not in the observation room watching what was going on.

25   Q.   Can you please describe for the jury the defendant's

Direct Examination of Charles Owens by Mr. Sofer

1   attitude and demeanor throughout the two interviews that took

2   place?

3       A.   Yes, sir.  He appeared pretty calm.  He seemed

4   willing to talk and seemed to answer the questions in a very

5   calculative manner.  Several times when I asked a question he

6   would pause.  Give me the feeling he was trying to decide the

7   best way to answer it.  He appeared to want to be in control at

8   times of the interview as well.

9       Q.   Did he ever indicate that he did not want to talk to

10  you anymore during the interview?

11      A.   No, sir.  There was an incident on the second day

12  when he got angry with one of the other investigators,

13  threatened to end the interview.  His words were, either you

14  get out or the interview's over.  The issue was resolved.  That

15  particular investigator stepped out of the room and we

16  continued on with the investigation.

17      Q.   Okay.  Now, in substance the defendant talked to you

18  with what -- about what he was doing in his time in Fort

19  Campbell?

20      A.   Yes, sir.  We spoke about his past, where he was

21  from, said he was from Dallas, Texas, born and raised in the

22  Dallas area, said he enlisted into the Army in 2009 with the

23  military occupational specialty of infantry and after basic

24  training he was assigned to a company with the 101st Airborne

25  Division in Fort Campbell, Kentucky.  We asked him about his

1    experiences in the Army.  He made a couple of statements about

2    how he really had no friends.  He mentioned having to put up

3    with some ridicule from other soldiers based on his religious

4    preference.  He said he was a Muslim.  And being a Muslim,

5    people -- he felt like people looked at him like he required

6    special treatment because he was supposed to pray five times a

7    day and he talked about how difficult it was to be a Muslim in

8    the American Army because he was not allowed to grow a beard.

9    It was hard for him to eat.

10        Q.   Okay.  You said he was assigned to Fort Campbell.

11   Can you tell -- have you been to Fort Campbell?

12        A.   Yes, sir.

13        Q.   Can you just tell the jury geographically where it

14   is?

15        A.   Yes, sir.  It's on the Kentucky side of the Kentucky

16   Tennessee border roughly 45 minutes or an hour north of

17   Nashville.  A lot of soldiers I know who are assigned to Fort

18   Campbell actually live in Tennessee.  So, I mean, it's right on

19   the state line.

20        Q.   And you were saying that the defendant experienced

21   some trouble with fellow soldiers in the Army.  And did there

22   come a time when he applied for something in particular that

23   changed his status?

24        A.   Yes, sir.  He -- he was enrolled in a posture

25   language course at the time and he made it known to his company

1    commander that even though he joined the Army and thought it

2    was the right thing to do at the time, he had had second

3    thoughts and he told his company commander that he wanted to

4    apply for conscientious objector status.

5         Q.   Okay.  And did that cause him further issues?

6         A.   Yes, sir.  When that news got out, his first sergeant

7    at the time threatened to have him removed from the language

8    course and sent to Afghanistan.

9         Q.   This is what he told you, correct?

10        A.   Yes, sir.  That's what he told me.

11        Q.   Can you tell us whether the defendant stated

12   something about what he did around 4th of July?

13        A.   Yes, sir.  On 4th of July the defendant left Fort

14   Campbell.

15        Q.   Okay.  And did he tell you some of the circumstances

16   before he had done that?

17        A.   Prior to that day?

18        Q.   Did he indicate that he tried to purchase anything?

19        A.   Yes, sir.  He -- on a couple of different occasions

20   he had attempted to purchase a firearm --

21        Q.   Okay.

22        A.   -- in the Fort Campbell area.

23        Q.   And did he describe to you the circumstances in which

24   he tried to purchase a firearm?

25        A.   Yes, sir.  He was not able to.

Direct Examination of Charles Owens by Mr. Sofer

1    Q.   You said there were a couple instances?

2    A.   Yes, sir.

3    Q.   Can you describe them as he described them to you?

4    A.   Yes, sir.  He -- at one point he attempted to

5    purchase a firearm using the name Asher Pluto.  When he went to

6    pick up the firearm, he provided his identification which was

7    Naser Abdo and it was -- caused a conflict at that point and he

8    explained that he commonly used the name Asher Pluto or a

9    different name on Craig's List.

10   Q.   Did he indicate where he got the name Asher Pluto

11   from?

12   A.   Yes, sir.  At the time in Fort Campbell he was living

13   with an individual named Asher Pluto and he stated that this

14   person had two different identification cards and that he had

15   taken one.

16   Q.   Did he indicate that he tried to purchase a weapon on

17   another occasion?

18   A.   Yes, sir.  He mentioned going into a gun store,

19   trying to purchase a weapon and they -- they wanted proof of

20   residence.  So I believe it was a copy of his orders showing

21   that he was assigned to a unit at Fort Campbell, Kentucky.  I

22   don't really recall why he was not able to purchase one that

23   day.  I believe there was an argument that ensued between Mr.

24   Abdo and the employees.  Mr. Abdo left and apparently left his

25   orders with the gun store and an employee with the gun store

Direct Examination of Charles Owens by Mr. Sofer ———47

1  contacted Fort Campbell who tracked down Mr. Abdo's unit and

2  Mr. Abdo stated he received a call from his first sergeant

3  asking why he was trying to obtain a weapon.

4      Q.   Okay.  And what happened next?

5      A.   Mr. Abdo stated that he wanted it for personal

6  protection.  His unit that he was originally assigned to was

7  about to return from Afghanistan and he was afraid that there

8  would be a lot of resentment from other soldiers.

9      Q.   This is what he told his first sergeant according to

10 him?

11     A.   Yes, sir.

12     Q.   Okay.  What'd he say happened next?

13     A.   A short time later Mr. Abdo was informed to return to

14 his company area at Fort Campbell and on the way to the base he

15 called his lawyer and he just wanted to know why that they

16 would want him at Fort Campbell and his lawyer advised him it

17 was likely they were going to place him in some kind of

18 confinement or watch.

19     Q.   And what did he do when he learned this?

20     A.   He left.  He left the area.

21     Q.   Did he tell you where he was going?

22     A.   He traveled to Nashville by way of taxi.

23     Q.   Okay.  Now, before he left did the defendant explain

24 to you anything about a -- anything in particular that he had

25 planned in the Fort Campbell area before he decided to leave?

1      A.   Yes, sir.  During the interviews he explained that --

2  we questioned him about some suspicious materials that were

3  found inside of his car that he had left in the Fort Campbell

4  area.

5      Q.   Had you learned that before interviewing him?

6      A.   No.  We learned that after we had started -- we

7  had -- we were -- people were calling in with information

8  things that were found.

9      Q.   Okay.  Go ahead.

10      A.   And, you know, we questioned him as to what these

11  materials were used for.  They were materials such as

12  handcuffs, a cattle prod, a shovel, bleach, a black sheet, I

13  think a plastic bag.  And during the interview he explained

14  that he had planned on offering an unidentified soldier a ride

15  in his car and incapacitating the soldier and murdering the

16  soldier.  We -- we asked him several times if he had any

17  particular person in mind and he said not really.  There was

18  no -- no one particular person that he had pinpointed.  He

19  explained that he wanted to videotape it as well.  Videotape

20  the murder and during the murder he wanted to recite the names

21  of Muslims who he felt had been wronged by the United States

22  government.

23      Q.   Did he give you any particular names?

24      A.   Yes, sir.  Nidal Hasan who's a suspect -- suspected

25  shooter in Fort Hood in 2009 as well as a 14-year-old female

Direct Examination of Charles Owens by Mr. Sofer

1  who was raped and murdered by members of the 101st Airborne

2  Division.  I believe her name was Abeer Qasam Al-Jonabi.

3      Q.  Did he describe, other than what you've described so

4  far, what items he was going to use?  Did he say anything else

5  further about the items that you recall?

6      A.  Yes, sir.  He -- he said he planned to videotape it.

7  The shovel would be used to get rid of the evidence.  The

8  bleach as well would be used to bleach the crime scene to get

9  rid of any evidence that would be left behind.

10     Q.  Did he tell you what he had done with the items?  Did

11 he explain what he had done with the items?

12     A.  Yes, sir.  He said he ditched them.  He said he had

13 also ditched his car, left his car at a Waffle House near Fort

14 Campbell before he left.

15     Q.  Did you ask the defendant whether he would have gone

16 through with the plan --

17     A.  Yes, sir.

18     Q.  -- had he not fled?

19     A.  Yes, sir.  I did ask him, you know, if circumstances

20 were that he had not left the Fort Campbell area did he feel

21 like he would actually have gone through with that and he

22 stated yes.  He would have.

23     Q.  Okay.  Now, did -- you said the defendant told you he

24 went to where after he fled that area?

25     A.  Nashville, Tennessee.

Direct Examination of Charles Owens by Mr. Sofer

1    Q.   Okay.  And did he tell you how he traveled there?

2    A.   Yes, sir.  By taxi.

3    Q.   Did he say anything to you about whether he ever

4  intended to return to Fort Campbell or not?

5    A.   Several times he stated that it was never his

6  intention to return to Fort Campbell.

7    Q.   Did he say he took anything with him?

8    A.   Yes, sir.  He said he kept a contingency bag like a

9  backpack in his car on the off chance that he would have to

10 leave the area quickly.  He described that he had some clothes

11 and a Gerber tool inside the contingency bag.

12   Q.   And what was that -- what kind of bag was it?

13   A.   I believe he said it was a backpack.

14   Q.   Okay.  Did the defendant tell you that he arrived in

15 Nashville?

16   A.   Yes, sir.

17   Q.   And did he tell you what he did there?

18   A.   He said he attended the mosque while he was there.

19 We also discovered in the second interview that he had in fact

20 purchased a firearm while he was there.

21   Q.   Okay.  And can you describe the circumstances as the

22 defendant related them to you as to how it is he bought a gun

23 in the Nashville area?

24   A.   Yes, sir.  He stated that he had found the firearm

25 online on Craig's List and contacted the owner, met with the

1    owner and purchased the firearm for approximately $200.

2        Q.    Did you ask him whether there was a record or not of

3    that transaction?

4        A.    Yes, sir.  We asked him if there was any proof and he

5    said he had received a bill of sale.

6        Q.    Okay.  Did you tell him what kind of gun he bought?

7    I'm sorry.  Did he tell you what type of gun?

8        A.    Yes, sir.  A Springfield XD .40.

9        Q.    Did he tell you how much it cost?

10       A.    Roughly $200.

11       Q.    Did the defendant tell you where that gun was at the

12   time he was apprehended on July 27th of 2011?

13       A.    It was in his backpack.

14       Q.    Did the defendant tell you how long he stayed in the

15   Nashville area?

16       A.    We never got a definitive number of days but he said

17   a few days.

18       Q.    Okay.  And did he say where he stayed there?

19       A.    He stayed in the hotel.

20       Q.    Did the defendant indicate where he went next?

21       A.    Yes, sir.  He traveled to -- from Nashville to

22   Memphis, Tennessee by Greyhound bus.

23       Q.    And did he tell you where he was staying or what he

24   did in Memphis, Tennessee?

25       A.    He said initially he stayed with a gentleman.  He

Direct Examination of Charles Owens by Mr. Sofer

1   didn't provide us a name but the gentleman gave him a place in

2   his home to sleep.  He said after a few days he found a room in

3   sort of a boarding house that he rented out after he left this

4   gentleman's house.

5        Q.   By the way, did the defendant tell you how he paid

6   for his expenses during his travel and the gun and the other

7   things that he purchased?

8        A.   Yes, sir.  He said he paid in cash and/or like gift

9   cards.

10       Q.   Did he indicate how long he stayed in Memphis?

11       A.   He said approximately two weeks.

12       Q.   Did he tell you that he left Memphis or not?

13       A.   Yes, sir.

14       Q.   Did he tell you how he traveled?

15       A.   He said he left on a Greyhound bus.

16       Q.   Did he indicate where he went?

17       A.   To Dallas, Texas.  Yes, sir.

18       Q.   Did the defendant indicate to you why he went to

19   Dallas, Texas?

20       A.   During the interview he made it clear that -- at

21   first, you know, he said it was either get to a safe house or

22   martyr myself.  He spoke of his father being in Jordan overseas

23   in Jordan and he considered trying to make his way out of the

24   country and to Jordan to be with his father.  He wanted to go

25   to Edinburg, Texas which is in South Texas.  He remembered

1    Edinburg, Texas because when he was younger his father was in a

2    prison in South Texas near the City of Edinburg and he traveled

3    to Edinburg three different times and he was taken in by a

4    gentleman -- an elderly gentleman in Edinburg, Texas and he

5    thought maybe if he could get there he could lay low for awhile

6    and consider his next course of action.  And Dallas was the

7    obvious route between Memphis and Edinburg, Texas.

8         Q.   Did he -- did he know anyone in Dallas?

9         A.   Yes, sir.  Being from the area, you know, he knew

10   several people.  He actually stated that he met with two

11   individuals two friends in Dallas.  He stated that he was

12   hoping he could get some help from them like shelter and a

13   place to stay.  He explained a situation that -- of why he had

14   left Fort Campbell.  He mentioned that there was an operation

15   he was considering.  He didn't really go into details about

16   that at that time; however, he said his friends were not eager

17   to help him and he got scared at that point and thought that

18   they would contact authorities and turn him in.

19        Q.   Okay.  When you say operation, what did you take that

20   to mean?

21        A.   Some kind of attack.

22        Q.   Okay.  And you said that once they wouldn't help him

23   he felt he had to leave immediately?

24        A.   Yes, sir.

25        Q.   Before leaving did he tell you whether he went

1  anywhere?

2      A.    Yes, sir.  He said he went to Walmart.

3      Q.    Did he explain how he traveled to Walmart?

4      A.    By taxi.

5      Q.    Did he state what he was doing at Walmart?

6      A.    Yes, sir.  He said he had to buy some items.  He also

7  purchased a computer.  He stated that he had returned a

8  computer that he had in Memphis before he left and when he got

9  to Dallas before he left Dallas he went to Walmart and

10 purchased another computer and some other items.  We found out

11 later in the interview he purchased the pressure cooker.

12     Q.    Okay.

13     A.    Pressure cookers.

14     Q.    Among other things?

15     A.    Yes, sir.

16     Q.    Did he also purchase telephones of any kind?

17     A.    Yes, sir.  He said he would often purchase the

18 prepaid cellular phones.

19     Q.    Did he say why he was returning computers and buying

20 multiple phones?

21     A.    Yes, sir.  I mean, his exact words were, you guys are

22 good at what you do.  I mean, the government is good at what

23 they do.  He was afraid he could be tracked if he used the same

24 cell phone too long or computer.

25     Q.    Okay.  Did the defendant explain how he paid for the

Direct Examination of Charles Owens by Mr. Sofer ——— 55

1    items at Walmart?

2        A.    Yes.  Cash.  He explained that before he left Fort

3    Campbell he had received his final installment of his

4    enlistment bonus, roughly $3,000, and taken money out of his

5    bank account.  And he said he also purchased gift cards, $100

6    gift cards and used those as well.

7        Q.    Used those to purchase the items?

8        A.    Uh-huh.

9        Q.    Okay.  Did he explain to you where the computer that

10   he purchased at Walmart was when he was apprehended on July

11   27th, 2011?

12       A.    Yes, sir.  It was in his backpack as well.

13       Q.    Did you ask the defendant whether he had any credit

14   cards that he could use?

15       A.    Yes, sir.  He indicated he did have a credit card

16   through the Navy Federal Credit Union.  I think he might have

17   had another one, too.

18       Q.    Okay.  Did he indicate why he wasn't using his credit

19   cards?

20       A.    Yes, sir.  He was afraid if he used his credit cards

21   he could be tracked and could be found.

22       Q.    Did the defendant indicate whether or not he did in

23   fact leave Dallas?

24       A.    Yes, sir.  He left.

25       Q.    And did he explain where he wanted to go next?

1       A.   He -- he -- he explained that the same taxi cab

2  driver that drove him to Walmart was with him and he asked the

3  taxi driver if he could get Mr. Abdo to Edinburg, Texas.  The

4  taxi cab driver said he could get him only --

5       MR. BOYD:  Your Honor, I'm going to object as to hearsay.

6       THE COURT:  Ask the question again, Counsel.

7  BY MR. SOFER:

8       Q.   Did he indicate to you where he was going next and

9  why?

10      A.   Yes, sir.  He said he was going to go to Killeen.

11      Q.   Okay.  Did he explain how it is he decided to go to

12 Killeen?  You don't have to relate what other people had said

13 to him.

14      A.   Okay.  He told me that he was unable to get -- to

15 make his way down to Edinburg.  He didn't want to go to Austin

16 because there was nothing for him in Austin.  He looked at a

17 map and noticed that the City of Killeen was between Dallas and

18 Austin.

19      Q.   Okay.  And what did he notice or recognize about the

20 City of Killeen, if anything?

21      A.   He said he had recognized the name of the city from

22 being in the news, specifically the publicity it got regarding

23 the attacks at Fort Hood in 2009.

24      Q.   So what did you understand it to mean that he decided

25 to go there?

1      A.   He stated that at that point he decided to go to

2   Killeen and martyr himself.

3      Q.   Okay.  And when you say martyr himself, what did you

4   understand that to mean?

5      A.   Conduct an attack and continue until he was dead.

6      Q.   Did he tell you whether he made it to Killeen?

7      A.   Yes, sir.

8      Q.   And did he indicate when he arrived in Killeen?

9      A.   He stated the same day that he checked into the

10   Best -- America's Best Value Inn.

11      Q.   Did he indicate which room or rooms he stayed in

12   while at the hotel?

13      A.   He stated initially he was in Room 248 which was a

14   double and he moved into -- he later moved into Room 230

15   because he just wanted a single not a double.

16      Q.   And did you ask the defendant why it was that he came

17   to Killeen?  Did you ask him that?

18      A.   Yes, sir.  When I first asked him, you know, why he

19   was here, he stated he made it clear and the press didn't

20   really understand what that meant.  But the defendant stated

21   that he came here to martyr himself to -- he stated that he

22   wanted to attack soldiers at a local Chinese buffet restaurant,

23   detonate a bomb, follow that up with gunfire until he was

24   either killed or subdued.

25      Q.   Did you ask him why not attack Fort Campbell from

1   where he came?

2        A.   Yes.  I did.

3        Q.   Do you recall his answer?

4        A.   I'm sorry?

5        Q.   Do you recall his answer?

6        A.   Not right off.  If I could look at my notes I can

7   tell you.

8        Q.   Okay.  We'll come back to that.  Did the defendant

9   describe to you what he meant by becoming a martyr?

10       A.   One more time.  I'm sorry.

11       Q.   Did he describe to you what he meant by the term

12  "martyr"?  Did he discuss martyrdom with you?

13       A.   Yes, sir.  He -- he broke it down.  He started

14  talking about for martyrdom to be accepted in Islam you have to

15  do it for the right reasons.  He stated that he wanted to do it

16  for the sake of the men, women and children of Iraq and

17  Afghanistan who felt he -- who felt had been wronged.  He spoke

18  about atrocities committed against them by the United States

19  government and he also said that he -- he decided to do it in

20  Killeen rather than Fort Campbell because he wanted to give

21  faith to brethren Nidal.  I took that to mean Nidal Hasan.  He

22  said referring to Nidal he said people think he's crazy.  He's

23  not crazy.  I came here to remind the people.

24       Q.   Did you ask the defendant with any particularity how

25  he intended to fulfill his wish to die a martyr?

1    A.   Yes, sir.  He -- during the course of both interviews

2    we were able to put together that he wanted to build an

3    explosive device out of a pressure cooker and disguise it in a

4    gift box and wrap it up and take it into an unidentified

5    Chinese restaurant in the Killeen area and he then would wait

6    outside for the bomb to detonate and at that point he would

7    follow it up with gunfire on the remaining survivors until like

8    I said he was either killed or subdued.

9    Q.   Did he say anything in particular to you about

10   Chinese restaurants why he chose that and what he was looking

11   to do there?

12   A.   Yes, sir.  He said based on his experience in the

13   military soldiers like to eat at Chinese buffets and he

14   explained that he planned on conducting the attack between

15   11:00 a.m. and 2:00 p.m. because again based on his experience

16   those -- those areas are filled with American soldiers.

17   Q.   Did he indicate to you where the items were that he

18   was using to build the bomb?  Where they were -- where they had

19   been stored?

20   A.   Yes, sir.  In his hotel room.

21   Q.   Okay.  Did he indicate whether or not he chose to do

22   the attack on or off the base and why he made that decision?

23   A.   Yes, sir.  We asked him if he had -- if he decided --

24   you know, if he had intended to do it on or off post and he

25   said that it was never his intention to go on post.  He wanted

1   to do it at an off post restaurant.  We asked him why and he

2   said, number one, he was unfamiliar with the area and he was

3   afraid that he would be stopped at the main gate and not

4   allowed entry.

5       Q.   Did he indicate to you anything about purchasing a

6   uniform?

7       A.   Yes, sir.  He said he had purchased an Army combat

8   uniform at a surplus store off post.

9       Q.   Did he say why?

10      A.   Yes, sir.  He said he was in a military town and it

11  was necessary to fit in.

12      Q.   Had he indicated to you anything about when this

13  attack was going to take place?

14      A.   Okay.  On the 27th the first day I asked him that

15  question and he stated that he was going to build the device on

16  that day on the 27th and his plan was to get that -- conduct

17  the attack on the 28th.  He laughed and then he said his

18  intention was actually -- his initial intention was to do it

19  yesterday which would have been the 26th.

20      Q.   Did he indicate to you whether or not he was

21  concerned about killing anyone other than soldiers?

22      A.   Yes, sir.  We spoke about the fact that there would

23  be civilians working at that restaurant possibly eating there,

24  too.

25      Q.   How did he refer to those civilians?

1        A.    He said he understood and he referred to civilians as

2   collateral damage.  He said in a time of war innocent people

3   are sometimes killed and he referred to them as collateral

4   damage.

5        Q.    Did you ask him whether or not he had any help in

6   doing this?

7        A.    Yes, sir.  Several occasions we -- that was probably

8   our biggest fear that there might have been somebody else and

9   he was adamant the whole time that he acted alone.  He stated

10  that, you know, he was just a Muslim trying to fulfill his

11  Islamic duties.

12       Q.    Now, did you ask him anything about the -- with any

13  specificity about how he was going about building the bomb?

14       A.    Yes, sir.  He stated that he intended to put shrapnel

15  and gun powder inside of a pressure cooker, connect wires to a

16  light, connect it to the battery and a clock and with a timer

17  and when the timer -- when the clock wound down, the circuit

18  would close causing the bomb to detonate under the pressure of

19  the pressure cooker.

20       Q.    Okay.  And again did he indicate what he was going to

21  be doing during that time?

22       A.    Yes, sir.  He stated that he would be waiting

23  outside.

24       Q.    To do what?

25       A.    Wait for the explosion and then after the explosion

Direct Examination of Charles Owens by Mr. Sofer

1    follow up and shoot the remaining survivors until he was killed

2    or subdued.

3        Q.   Did you ask him whether or not he had any

4    instructions about how to build the device?

5        A.   Yes, sir.  He said he got the recipe for making the

6    explosive device from Inspire magazine.

7        Q.   Okay.  And did he indicate where he got that Inspire

8    magazine from?  Did you ask him about that?

9        A.   He said he downloaded Inspire magazine a total of six

10   times.  He stated that while in Nashville he had actually

11   printed a copy out at a public library but in Killeen -- once

12   he got to Killeen he download the same issue again because he

13   needed the color copy because he needed to look at the wiring

14   diagram on the color copy.

15       Q.   Did he ever -- did he indicate that was what he was

16   using to build the bomb or what?

17       A.   Yes, sir.

18       Q.   Okay.  And did he ever indicate that he was building

19   more than one device to you or not?

20       A.   We asked him why there were two pressure cookers

21   found inside the room and he stated that he initially planned

22   to make two explosive devices; however, they were different

23   evidences.  One was eight quart and I believe the other one was

24   16 quarts and he didn't have enough gun powder to build two.

25       Q.   Did he indicate to you what he was doing or where he

1   was going at or near the time he was actually apprehended by

2   the police?

3       A.   Yes, sir.  He explained that was actually -- the 27th

4   was actually a recon date or reconnaissance day.  He was going

5   to go -- he said he had to go to Walmart and buy a few things

6   or return a few things and that he was going to go eat at a

7   Chinese buffet and kind of scout it out.

8       MR. SOFER:  One moment, Your Honor, please.

9       (Conference between government counsel.)

10  BY MR. SOFER:

11      Q.   Just to clarify, you had stated before that the

12  defendant planned to shoot survivors.

13      A.   Uh-huh.

14      Q.   Were those surviving soldiers?

15      A.   Yes.

16      Q.   Okay.

17      A.   That's what I took it to mean.  Yes.

18      Q.   And again to be clear we're talking about a

19  restaurant that was in Killeen, Texas within the Western

20  District of Texas, Waco Division; is that correct?

21      A.   Yes, sir.

22      MR. SOFER:  Pass the witness, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. BOYD:

25      Q.   Good morning.

1      A.   How are you doing?  Good morning.

2      Q.   Did you have the opportunity to write a report?

3      A.   Yes, sir.

4      Q.   Where in the report does it state he was going to use

5  the 27th as a day to recon?

6      A.   It doesn't say that in the report.

7      Q.   So you just added that today for the first time?

8      A.   No, sir.  It was in the notes.

9      Q.   Okay.  Isn't it true he wasn't using the 27th for a

10  scouting day?

11      A.   No.  He told us it was a recon day in the interview.

12      Q.   Didn't he actually admit to you in your report on

13  Page 13 that he did not have enough materials to construct a

14  bomb?

15      A.   No.  He said he didn't have enough materials to make

16  two bombs.

17      MR. BOYD:  Your Honor, may I approach the witness?

18      THE COURT:  Yes, sir.

19  BY MR. BOYD:

20      Q.   Does that document help to refresh your recollection?

21      A.   Yes, sir.

22      Q.   And does it state that he admitted to you that he did

23  not have enough materials to construct a bomb?

24      A.   Yes, sir.  That's what this says; however, in the

25  interview --

Cross-Examination of Charles Owens by Mr. Boyd          65

1          MR. BOYD:  Your Honor, I'm going to object as

2     nonresponsive.

3          THE COURT:  Sustained.

4     BY MR. BOYD:

5          Q.   The first time you answered Mr. Sofer's question

6     regarding my client supposedly hanging around, you didn't

7     mention soldiers and it was only at his prompting that you

8     subsequently added that?

9          A.   And I stated that's how I took it to mean.

10         Q.   Right.  But that was only after his prompting, right?

11         MR. SOFER:  Objection, Your Honor.  The jury was here to

12    hear the question.

13         THE COURT:  If that was an objection, it's overruled.

14    BY THE WITNESS:

15         A.   That's the way I took it the first time he said it.

16    BY MR. BOYD:

17         Q.   But you didn't offer it the first time he said it?

18         A.   I'm sorry?

19         Q.   But you didn't offer that the first time he said it?

20         A.   No, sir.  What do you mean?  The first time who said

21    it?

22         Q.   You didn't offer any information about the soldiers

23    the first time you were asked the question, did you?

24         A.   No, but, I mean, that's the way I took it.  That's --

25    from the day that he said it from the 27th of July that's what

1    I intended him to mean -- or that's what I thought he intended

2    to mean.

3         Q.   There's no charges pending for anything that happened

4    outside of the State of Texas with regards to anything

5    recovered at a Waffle House, is there?

6         MR. SOFER:  Objection to relevance, Your Honor.

7         THE COURT:  Overruled.

8    BY THE WITNESS:

9         A.   I'm sorry?

10   BY MR. BOYD:

11        Q.   There's no charges with respect to anything that

12   happened outside of Texas at the Waffle House in either the

13   Kentucky or Tennessee area, is there?

14        A.   I'm not sure.  I don't know.

15        Q.   No device had been built, had it?

16        A.   At the time I had no idea.  I later learned through

17   the investigation that it looked like he had started to build

18   the device.

19        Q.   So there was a device in the backpack?

20        A.   No, sir.  No.  The materials were in his room.

21        Q.   Okay.  There was a device in the room?

22        A.   I'm sorry?

23        Q.   So there was a device or a partially built device in

24   the room?

25        A.   The materials to build the device were in the room

Cross-Examination of Charles Owens by Mr. Boyd          67

1    and I've seen pictures and it looked like he had began to put

2    shrapnel in one of the pressure cookers.

3         Q.   But you're aware, aren't you -- you've seen the

4    pictures, right?

5         A.   Some.

6         Q.   And you're aware and you've had a chance to review

7    all the evidence, right?

8         A.   Uh-huh.

9         Q.   And you're also --

10        A.   Not all the evidence.  No.

11        Q.   You're also aware that the EOD team moved everything

12   in that room before the pictures were taken, aren't you?

13        A.   I have no idea what happened in that room.  I wasn't

14   there.

15        Q.   So you really don't know if a device had even been

16   started?

17        A.   I've seen the photos of the device or the pressure

18   cooker in the room with what appears to be shrapnel inside of

19   it.

20        Q.   He never specifically told you how a device was going

21   to be built, did he?

22        A.   He -- not down to the specifics, but he -- yeah.  He

23   explained that he intended to put shrapnel and gun powder

24   inside of a pressure cooker.

25        Q.   But you took some -- you took some liberty with

1   your -- with your testimony previously because what you did was

2   you added what you had read from the Inspire magazine to what

3   he told you, right?

4       A.   No, sir.  Huh-uh.  I had not -- I didn't see the

5   Inspire magazine article until a good time after I wrote the

6   302.

7       Q.   A couple more questions.  Towards the end of your

8   direct you indicated that the 27th was a recon day?

9       A.   Uh-huh.

10      Q.   Which wasn't contained in your report but that came

11  out today, right?

12      A.   Right, but I can explain.

13      Q.   But previous to that you stated that he was going to

14  be building the device on the 27th.  So which was it?

15      A.   The way he said it is we asked him when he was going

16  to conduct the operation and he stated he intended to construct

17  the bomb today, being the 27th, and conduct the attack

18  tomorrow, which would have been the 28th, and then he left and

19  said he intended to do it yesterday.  That's exactly how that

20  dialogue went.

21      Q.   And so then there was another one that said --

22  according to you that he said the 26th the day before?

23      A.   Yes.  That's what I just said, sir.

24      Q.   So --

25      A.   I was just reiterating.  I'm sorry?

1        Q.    You would agree with me that's an impossibility?

2        A.    No.    I mean, I can see where it could be confusing;

3    however, that is exactly the way that Mr. Abdo explained it to

4    us.    When I asked him when he planned on conducting the attack,

5    he said he planned on constructing the bomb today -- or the

6    explosive device -- being the 27th, conduct the operation on

7    the 28th which -- or the -- tomorrow which would have been the

8    28th.    Then he laughed and he said my intention was to do it

9    yesterday which would have been the 26th.    I know that sounds

10   convoluted, but regardless, that's exactly what he told me.

11       Q.    He also told you that he was upset about the way the

12   Army had treated him, didn't he?

13       A.    Yes, sir.    Yeah.    He said that he -- he didn't have

14   any friends and he was upset that his CO or his conscientious

15   objector status was taking so long or had taken so long.

16       Q.    And in fact that it had been granted?

17       A.    Yes, sir.

18       Q.    Did he tell you how long it had taken?

19       A.    I'm sure he did, but I don't remember.

20       Q.    Did he tell you anything else he was upset about?

21       A.    Like I said in -- initially he talked about the

22   14-year-old Muslim girl who had been raped and murdered by

23   members of the 101st Airborne.

24       Q.    Lastly you talked about this mysterious Chinese food

25   restaurant.

1       A.   Uh-huh.

2       Q.   What Chinese food restaurant are we talking about?

3       A.   I don't know.  I don't remember him ever specifically

4    saying which one, but he did say a Chinese food -- Chinese

5    buffet near Fort Hood.

6       Q.   Then how were you going to attack something that you

7    don't know what it is?  Could you --

8       A.   He said the 27th was a recon day and he said that he

9    was going to a Chinese buffet to eat, possibly to scout out.

10      Q.   Could you attack something that you don't know what

11   it is?

12           MR. SOFER:  Objection as to relevance, Your Honor.

13           THE COURT:  Sustained.

14           MR. SOFER:  No further questions from the government,

15   Judge.

16           THE COURT:  You may step down, sir.

17           Next witness?

18           MR. FRAZIER:  Elizabeth Gilliland will be our next

19   witness.

20           (The witness was sworn.)

21                          DIRECT EXAMINATION

22   BY MR. FRAZIER:

23      Q.   And would you please introduce yourself to the ladies

24   and gentlemen of the jury?

25      A.   Yes.  I'm Elizabeth Ann Gilliland.

1      Q.    And, Ms. Gilliland, how are you currently employed?

2      A.    I currently work for ███████████████.  We walk

3  around and do presets and resets small arms and optics.

4      Q.    Okay.  And do you -- is that a contracting agency?

5      A.    Yes.  It's a contracting agency.

6      Q.    Who do you normally work for, provide services for?

7      A.    The U.S. military ███████████████.

8      Q.    Okay.  If you could pull the microphone maybe a

9  little closer to you.  That will slide over to you.

10      A.    Right here?

11      Q.    A little bit closer.  That's good.

12      A.    All right.

13      Q.    Back in July of last year specifically around July

14  the 3rd of last year where did you work?

15      A.    I worked for Quantico Tactical.

16      Q.    And where is that located at?

17      A.    It is located in Kentucky.

18      Q.    Where in Kentucky?

19      A.    Fort Campbell, Kentucky.

20      Q.    Okay.  Is it located actually on the military

21  installation?

22      A.    No, sir.  It's outside of Gate 4.

23      Q.    All right.  And what type of business is Quantico

24  Tactical?

25      A.    They sell firearms and tactical equipment for the

Direct Examination of Elizabeth Gilliland by Mr. Frazier -72

1   military and police.

2       Q.   All right.  And that particular day July the 3rd what

3   day of the week was that?

4       A.   That was a Sunday.

5       Q.   And in Tennessee are firearms places or, you know,

6   places that sell firearms, things of that nature open on

7   Sundays?

8       A.   Yes.  They're open on Sunday.

9       Q.   And is Quantico Tactical what's known as a federally

10  licensed firearm dealer?

11      A.   Yes.  They have an FFL.  Yes.

12      Q.   Okay.  And how long had -- as of July the 3rd had you

13  worked there and had been selling firearms?

14      A.   Selling firearms for a year.

15      Q.   Okay.  And prior to that what else did you do for

16  Quantico Tactical?

17      A.   I did the internet sales.

18      Q.   All right.  And are you familiar with weapons, how

19  they're used, capabilities, in other words, have a familiarity

20  with weapons such that you can answer the questions of

21  customers who inquire about them?

22      A.   Yes.  And if I don't, I had the resources to follow

23  through with any questions they might have.

24      Q.   All right.  I'm going to direct your attention to

25  July 3rd.  On that date did you come into contact with a person

1    who came in that you were later able to identify?

2        A.   Yes.

3        Q.   Okay.  I'm showing you what's been previously

4    introduced into evidence as Government's Exhibit No. 153A and

5    153B.  Do you recognize that photo?

6        A.   Yes, sir.

7        Q.   Did -- at the time this person came into your -- is

8    this the person who came into your store on this date?

9        A.   Yes.  Yes.

10       Q.   Tell us about what time this person depicted in the

11   photograph came into your store.

12       A.   It was sometime between 12:00 and 1:00 o'clock.

13       Q.   Okay.  Did you later learn that person's name to be

14   Naser Jason Abdo?

15       A.   Yes, sir.  Later in the day I did.

16       Q.   All right.  Now, what happened when this person

17   Mr. Abdo first came into your store?

18       A.   He came in and was asking about different firearms,

19   magazine capacity, which -- how many rounds of a bullet will

20   the gun hold.  He had mentioned black powder at one point in

21   time.  He seemed very unfamiliar with the weapons so we gave

22   him all the information we thought he might need to be able to

23   better understand and he pretty much left with that.  We...

24       Q.   All right.  What particular type of weapons was

25   Mr. Abdo interested in?

1      A.   We showed him three different types:  A nine, a .40

2   and a .45.  He seemed very interested in the .45 for the amount

3   of rounds it could hold and what we would call a knockdown

4   power or the force that it hits a person and damage that it

5   causes.

6      Q.   Okay.  And you mentioned that these were -- I don't

7   know if you used the term "high capacity."  What does --

8      A.   High capacity.  They --

9      Q.   What does that mean?

10     A.   Most .45s only hold six to seven rounds.  The ones he

11  was interested in holds 13 rounds in the magazine plus one in

12  the chamber.  So we could call that 13 plus one.

13     Q.   All right.  And when you say high knockdown power,

14  what does that mean?

15     A.   It's going to cause an incredible amount of damage.

16  A 9-millimeter would not be as damaging as a -- a .40 would be

17  more damaging and a .45 would be a much more higher round,

18  would cause more bodily damage.

19     Q.   All right.  How was Mr. Abdo dressed when he came

20  into the store?

21     A.   As a civilian.

22     Q.   Okay.  Was he wearing anything on his face?

23     A.   He was wearing sunglasses which he never took off.

24     Q.   Okay.  And what was his demeanor when you were

25  dealing with Mr. Abdo in the store?

1        A.    A little bit arrogant.  He just seemed a little

2   suspicious.  Nothing I really caught onto until later, but as

3   things happened, his behavior was very alarming, cautioning,

4   just caused a bunch of flags.  I didn't feel good about the

5   whole thing.

6        Q.    All right.  You said something about black powder.

7   He asked about black powder.  What did he ask?

8        A.    He did ask about black powder did we have any.  We

9   didn't.  We did not sell black powder.  We gave him information

10  on how to get it, maybe some other stores to reference to and

11  there's an internet company in Clarksville and -- but they were

12  not open that day and you would have to go to the company,

13  order it and then wait.

14       Q.    Now, did that strike you as odd at all that he asked

15  about black powder?

16       A.    It's something we didn't sell.  Yeah.  It was kind of

17  odd that we -- that's not something we deal in very often and

18  it's not asked for a whole lot --

19       Q.    Was black powder --

20       A.    -- especially since he didn't seem to know a whole

21  lot for someone to be asking about black powder is unusual

22  because most people who load their own ammo wouldn't ask things

23  like that.

24       Q.    And would black powder be something in any way

25  associated with 45-caliber or 40-caliber?

Direct Examination of Elizabeth Gilliland by Mr. Frazier -76-

1      A.   No, sir.  Not that -- not unless he was doing it

2  himself.

3      Q.   So how did the visit end with Mr. Abdo on that

4  date -- that first visit with Mr. Abdo, how did that end?

5      A.   The first visit he left like he was going to --

6      Q.   But before he left did you talk to him about going to

7  other places, things of that nature?

8      A.   Oh, yes.  I do my job well.  Very good customer

9  service oriented.  I gave him many places to go talk to, to

10 visit, to maybe fire weapons at so he could get better training

11 in the area and then he left.

12     Q.   Was that because of his lack of knowledge?

13     A.   Yes.  That was because of his lack of knowledge.

14     Q.   Okay.  Now, when he left the store -- how long was he

15 there the first time?

16     A.   He was there probably 20, 25 minutes.

17     Q.   Okay.  And after -- would there come a time -- did he

18 come back in the same -- to your store later the same day?

19     A.   Yes.  He did come back into our store.  On Sundays

20 we're open 12:00 to 5:00.  He came in about 4:30 and was very

21 adamant and in a hurry.  I want to get the weapon and I'm

22 ready, you know, like he wanted to get it right then and walk

23 out.

24     Q.   Okay.

25     A.   And I slowed things down because at this point you

1    have paperwork you have to fill out, a 4473 which is a form

2    where the -- that we run a background check through the NICS

3    which is who eventually tells you yes or no, that they can get

4    the gun.

5        Q.   Okay.  Did you in fact take over the sale for another

6    coworker?

7        A.   At that point I took over the sale because we had

8    already discussed how neither one of us felt very good about

9    the situation and how he was behaving.

10       Q.   Okay.  So when you took over the sale and you got the

11   paperwork, what was the first thing you did?  What step did you

12   take?

13       A.   In the State of Kentucky if you're military and you

14   have your orders bringing you to Kentucky, you can purchase a

15   firearm.

16       Q.   What's the purpose of that?  Why do you have to have

17   orders?

18       A.   Because he's not a resident and he wouldn't be a

19   resident.  So if they have their orders sending them to

20   Kentucky, you can sell them if they have proof.  So I took his

21   orders bringing him to Kentucky, his picture ID and we began

22   the paperwork.

23       Q.   Okay.  Did there come some point in the paperwork

24   where that stopped the -- when you say the paperwork, who fills

25   out the paperwork?

Direct Examination of Elizabeth Gilliland by Mr. Frazier -78

1       A.   The person purchasing the firearm has to fill out the

2   paperwork.  I give very minimum help because the questions that

3   are asked have to be answered by the person buying the firearm.

4       Q.   Okay.  And in fact there's a -- and this is the 4473

5   we're talking about?

6       A.   Yes, sir.  This is a 4473.

7       Q.   Does a 4473 contain instructions to help customers

8   answer questions in case they have a question?

9       A.   Right.  If at any point in time they have a question

10  on it there's explanations in the back of the questionnaire

11  that in detail explain any question asked on the 4473.

12      Q.   At some point during the transaction did Mr. Abdo

13  stop at one of the questions having a concern -- or a question

14  for you, rather, not a concern, a question for you about how or

15  to -- or interpretation of the question?

16      A.   Yes, sir.  He did and he -- I showed him the

17  reference that would explain to him what his questions were.

18      Q.   Okay.  And that's in the back page of this?

19      A.   That's in the back pages.

20      Q.   Okay.  And why is it that you do that?

21      A.   I don't want to influence anybody's answer on a -- on

22  the 4473.  They -- it asks questions about mental stability,

23  just all kinds of background.  So I don't want to influence

24  anybody's answer --

25      Q.   Okay.

1    A.    -- whatsoever.

2    Q.    So without going into the actual question, at some

3  point on one of the questions he paused?

4    A.    He paused.  And...

5    Q.    You pointed him to the directions?

6    A.    Asked me to explain.  So I pointed him to the

7  directions and he became very agitated because I wouldn't

8  answer the question for him.  I wouldn't answer the question or

9  help him answer the question.  It was something that he had to

10  do.

11    Q.    Okay.  When you say he became very agitated, describe

12  that demeanor for the jury, please.

13    A.    He just kept asking, well, what does it mean?  How do

14  I answer it?  You know, just -- he wanted me basically to

15  explain something that I can't explain to him without answering

16  the question for him.

17    Q.    Okay.  What happened after that?

18    A.    After that he continued to get more agitated and at

19  that point in time I told him that I could not sell him the

20  firearm.

21    Q.    What happened after that?

22    A.    He got really upset with me.  Come across -- I mean,

23  came to my face like this and said, you need to lower your

24  voice.  I took a few steps back.  I said, I cannot sell you the

25  firearm and you need to leave.  And he just got a little bit

Direct Examination of Elizabeth Gilliland by Mr. Frazier -80-

1    more agitated and said, you should have known what I was doing.

2    You should have known why I was here.  At that point in time I

3    grabbed the ammo and the gun off the counter, took steps back

4    and there were other soldiers and other customers in the store.

5    And I told him in a very loud stern voice, you need to leave.

6    And they all looked.  He turned around and left.

7         Q.   Okay.  And let me stop you there for just a second.

8    You said it was a gun and ammo on the counter.  He was buying

9    ammo as well?

10        A.   Yes, sir.

11        Q.   Was there anything with the particular weapon that he

12   was picking out that came with it that was part of the deal?

13        A.   Oh, in the package you -- when you bought the weapon

14   you also got three magazines along with it which that's an

15   unusual -- usually it was a -- like a promotion they were

16   doing.

17        Q.   All right.  Were these high capacity magazines?

18        A.   Yeah.  They were all 13 rounds.

19        Q.   And do you recall how many rounds of ammunition he

20   was attempting to purchase?

21        A.   I do not recall.  I know I grabbed one box.  There

22   may have been more.

23        Q.   All right.  Now, after you did -- now we'll go back

24   on track again.  After you raised your voice and heads turned

25   toward the counter, what happened then?

1    A.   He did leave.

2    Q.   Did he take something with him?

3    A.   He left his --

4    Q.   No.  Did he take something with him?

5    A.   Oh, he took the form that he was filling out the

6    4473.  He wouldn't allow me to get that.

7    Q.   All right.

8    A.   He did take that.

9    Q.   Did he leave the store?

10   A.   He left the store, but when he left the store he left

11   his orders bringing him to Fort Campbell.  I immediately went

12   and made a copy on the copy machine, sat his original copy on

13   the counter and I told everybody that was in the store if he

14   was to come back do not approach him.  Do not talk to him.

15   Stay away from him.

16   Q.   Okay.  And what did you do after you made the copy?

17   A.   After I made the copy I put it on the counter, told

18   everybody to stay away and at that point in time the MP

19   commander had been in the store the day before and I had his

20   name in our database.  He's the only person that I knew I

21   could -- I knew I needed to do something right away.  So I

22   called him immediately.

23   Q.   Okay.  And after you called him, without going into

24   what was said, what action did you take upon talking to him?

25   Did you relay to him what had happened?

1      A.   Basically.  Yes.

2      Q.   Okay.  And did you have at this point a copy of the

3   orders?

4      A.   Yes, sir.

5      Q.   Now, before you made the phone call, did Mr. Abdo

6   come back into the store?

7      A.   Yes.  He did come back in and I'd left the orders on

8   the counter.  Nobody talked to him, encountered him or anything

9   and he just walked right back out.

10      Q.   Did he take the orders with him?

11      A.   Uh-huh.

12      Q.   Is that --

13      A.   Yes, sir.

14      Q.   Okay.  I want to show you what's been marked for

15   identification as Government's Exhibit No. 3.  Do you recognize

16   this?

17      A.   Yes.  I do.

18      Q.   What is it?

19      A.   Those are his orders bringing him from Fort Benning

20   to Fort Campbell.

21      Q.   It's a copy -- it's the copy that --

22      A.   It is a copy.

23      Q.   A copy of the copy that you made?

24      A.   Yes, sir.

25      MR. FRAZIER:  We'll offer Government's Exhibit No. 3 into

1    evidence.

2        MR. BOYD:  As to hearsay contained within the document I

3    have that objection but as to not for proof of the matter

4    concerned within the document itself no objection.

5        MR. FRAZIER:  Well, that would be my response to the

6    hearsay objection.  It's not being offered for the truth of the

7    matter asserted but the association.

8        THE COURT:  I didn't understand the objection.  The

9    exhibit is admitted.

10        (Exhibit(s) admitted:  G3)

11   BY MR. FRAZIER:

12       Q.   So the jury can see, is this the first point that you

13   associated the name with the person who was there in the store?

14   Or I'm sorry.  You already had seen the person's name, correct?

15   Mr. Abdo's name.  Had you already seen it?

16       A.   No.  This is the first time I had seen his name when

17   he asked for us to process the paperwork.

18       Q.   Okay.  And this is what you made a copy of,

19   Government's Exhibit No. 3?

20       A.   Yes, sir.

21       Q.   Okay.  And it contains the name and has the duty

22   assignment to Fort Campbell, Kentucky, the required paperwork

23   he would need to make a purchase of a firearm?

24       A.   Yes, sir.  Shows where assigned, the date.  It has

25   Fort Campbell, Kentucky and it has the order number in the

Direct Examination of Elizabeth Gilliland by Mr. Frazier -84-

1  upper left-hand corner.

2      Q.  Okay.  All right.  Now, after -- it was after this

3  when you recovered this that you called the MP on post?

4      A.  Yes, sir.

5      Q.  And after -- without saying what was said when you

6  called the MP, what were you -- what did you do?  What actions

7  did you take upon having a conversation with that MP?

8      A.  He asked for me to hand it to a military personnel.

9      Q.  And did you do that?

10     A.  Yes.

11     Q.  Okay.  Then what did you do after that after you made

12  that contact?

13     A.  After I made that contact I then was worried that he

14  might try to go to other gun companies in the area.  I

15  contacted the other gun shops in the area.

16     Q.  And told them what?

17     A.  I gave them the name and that he had just tried to

18  purchase a firearm and I didn't feel that he should have one,

19  that he really had become -- he really scared me.

20     Q.  All right.

21     A.  He really did.

22     Q.  What other steps did you take?

23     A.  I also called the NICS because I'd never made that

24  phone call but I wanted to call and let them know that if he

25  did go into another gun shop that they would be aware and not

1   allow it to be sold to him.

2       Q.   What is the NICS so the jury knows?

3       A.   The NICS is the background check that you do with the

4   form, the 4473.  They -- once a firearm is being sold, you have

5   the paperwork filled out with the appropriate information, you

6   call them and they give you the final say-so.

7       Q.   Okay.  And NICS is part of the FBI?

8       A.   Yes, sir.

9       Q.   Okay.

10      A.   I called the NICS and then they referenced me to also

11  the Kentucky -- to call for the Kentucky I guess it'd be the

12  FBI and I called them.  Called all the other gun shops in the

13  area.  Called my boss.

14      Q.   Okay.

15      A.   Called everybody I could think of.

16      Q.   Okay.  And do you know what form of payment Mr. Abdo

17  was going to make when making the purchase?

18      A.   Yes, sir.  He did have cash.

19      Q.   I failed to ask you this question, ma'am.  Do you

20  know what black powder is?

21      A.   Black powder -- to me black powder I use in a muzzle

22  loader.  It's -- you can fire it.  It does explode.  It's

23  flammable.  That's as far as -- I mean, the way it -- to me I

24  associate powder with a muzzle loader.

25      Q.   All right.  Thank you very much.

1    A.   Okay.

2    MR. FRAZIER:  Nothing further.  Pass the witness.

3    THE COURT:  We'll take our morning recess at this point,

4    ladies and gentlemen.

5    LAW CLERK:  All rise.

6    (Jury exited the courtroom at 10:29.)

7    THE COURT:  Be seated, everyone.

8    You may step down, ma'am.

9    Be seated, folks.

10   How many of you out there are sketch artists?  I know at

11   least one.  Is there just one?

12   Sir, we're happy to have you here applying your trade with

13   one exception.  We don't want any sketches of the jury to be

14   shown until I say it's okay.  We had at least one, I think two

15   ladies on the jury panel who were excused because of their

16   concern for their own safety regarding this trial which I think

17   was unfounded but they felt that way and we do have eight women

18   on the jury.  So I'd prefer that their sketches not be shown

19   during the trial for their own -- so that they're not concerned

20   themselves.

21   Any reason why the Marshals can't just put those glasses

22   in their pockets when the jury's in the courtroom?  You look

23   like members of the Noze Brotherhood and some people who live

24   in Waco might wonder why we have Noze Brotherhood members in

25   the courtroom.

1        All right.  That'll be done.  We'll take our recess.

2        LAW CLERK:  All rise.

3        Court will stand in recess for 15 minutes.

4        (A break was taken from 10:30 to 10:51.)

5        LAW CLERK:  All rise.

6        (The jury entered the courtroom at 10:51.)

7        THE COURT:  Be seated, everyone.

8        Mr. Boyd?

9                         CROSS-EXAMINATION

10   BY MR. BOYD:

11       Q.   Good morning, Ms. Gilliland.  I'm Zachary Boyd.  It's

12   nice to meet you.

13       A.   Good morning.

14       Q.   Now, previously you testified that you spoke with

15   someone and gave a report in this matter?  Did you speak with

16   someone and give a report in this matter?

17       A.   At one point in time?  When I called the FBI?  When I

18   called the NICS?

19       Q.   Did you speak with the FBI sometime in July?

20       A.   There had been an officer that called me in Kentucky.

21   He had called me.

22       Q.   And was that a Special Agent Wood?

23       A.   I don't recall his name.  I'm sorry.

24       Q.   And at that time you didn't report anything about

25   black powder, did you?

1      A.   At that point in time he was speaking to me and

2  another employee.

3      Q.   And you didn't report anything about black powder,

4  did you?

5      A.   Not that I recall, sir.  I'd have to...

6      Q.   And in fact you didn't develop this stuff about black

7  powder until later?

8      A.   Sir, I was very upset when everything went down.

9      Q.   And in fact nothing that you have to offer in court

10  today has anything to do with what happened in Texas, does it?

11      MR. FRAZIER:  I'm going to object.  That calls for a

12  conclusion, Your Honor.  The witness is not qualified to answer

13  the question.

14      THE COURT:  Sustain the objection.

15  BY MR. BOYD:

16      Q.   Did you sell him a firearm?

17      A.   No, sir.  I did not sell him the firearm.

18      Q.   Did you sell him anything?

19      A.   No, sir.  I did not.

20      Q.   Did you sell him black powder?

21      A.   No, sir.

22      Q.   You reported that he drove away in a Pontiac?

23      A.   No, sir.

24      Q.   Is that correct?

25      A.   I did not report that.

Cross-Examination of Elizabeth Gilliland by Mr. Boyd ——89

1      Q.   You did not?

2      A.   No, sir.

3      Q.   So how would it get in a police report?

4      MR. FRAZIER:  If he's attempting to impeach the witness,

5  Your Honor, I object because it's improper.

6      THE COURT:  It's not improper to try and impeach the

7  witness, Counsel.  Overruled.

8  BY MR. BOYD:

9      Q.   How would it get there?

10     A.   I did not report that he drove away in a Pontiac.

11     MR. BOYD:  Okay.  Nothing further.

12     MR. FRAZIER:  Nothing further, Your Honor.

13     THE COURT:  You may step down, ma'am.

14     THE WITNESS:  Thank you.

15     THE COURT:  May this witness be excused?

16     MR. FRAZIER:  Yes, sir.

17     MR. BOYD:  No objection.

18     THE COURT:  You're excused, ma'am.

19     MR. SCHNEIDER:  The government calls Gregory Eldridge.

20     (The witness was sworn.)

21                       DIRECT EXAMINATION

22  BY MR. SCHNEIDER:

23     Q.   Good morning, Captain Eldridge.

24     A.   Good morning.

25     Q.   By whom are you employed?

1          A.   The United States Army.

2          Q.   And how long have you been employed by the United

3     States Army?

4          A.   Almost ten years.

5          Q.   What is your current rank within the Army?

6          A.   I'm a captain.

7          Q.   How long have you been a captain?

8          A.   Just over six years.

9          MR. BOYD:  Your Honor, may we briefly approach?

10         THE COURT:  Yes, sir.

11         (On-the-record bench conference, to wit:

12         MR. BOYD:  Your Honor, I just want to make sure that he's

13    in compliance with the federal laws regarding testimony by a

14    service member.  He would have had to have been requested and

15    sought approval from the litigation division.

16         THE COURT:  That's not our concern in this courtroom, Mr.

17    Boyd.  That may be a military matter that you -- he may be

18    concerned with, the military might be, but I'm not.

19         MR. BOYD:  But, Your Honor, I believe --

20         THE COURT:  Step back.

21         (End of bench conference.)

22    BY MR. SCHNEIDER:

23         Q.   What is your current assignment, Captain?

24         A.   Currently I'm assigned to Fort Meade, Maryland in

25    First Army Division East.

1      Q.   And in July of 2011 where were you assigned?

2      A.   I was assigned to First Brigade 101st in Fort

3  Campbell, Kentucky.

4      Q.   And when you were assigned in Fort Campbell, Kentucky

5  last July, what were your responsibilities?

6      A.   I was the company commander for HHC First Brigade.  I

7  was responsible for the health, welfare, training and morale of

8  a 200 person organization.

9      Q.   And did that number of soldiers include the defendant

10 in this case Naser Jason Abdo?

11     A.   Yes, sir.

12     Q.   At the time of July 2011 did you know Naser Jason

13 Abdo?

14     A.   Yes, sir.

15     Q.   And what was his rank at that time?

16     A.   He was a private first class E-3.

17     Q.   Did you have any type of personal interaction with

18 him at that time?

19     A.   A few times I'd run into him during inventories while

20 I was walking around the company area.

21     Q.   Okay.  And I'd like to show you Government's Exhibit

22 153A and B already in evidence.  Do you recognize that picture?

23     A.   Yes, sir.

24     Q.   And what is it a picture of?

25     A.   PFC Abdo.

1      Q.   And is that a fair and accurate picture of the way he

2    looked when you knew him in July of 2011?

3      A.   Yes, sir.

4      Q.   Okay.  And that's 153A and 153B.

5      Now, directing your attention to Monday, July 4th of 2011.

6    Were you working that day?

7      A.   No, sir.

8      Q.   Were you off because of the July 4th holiday?

9      A.   I was.

10      Q.   Did anything happen that you had to attend to any

11    matters regarding the defendant Abdo?

12      A.   Yes.  At roughly 10:00 o'clock in the morning on 4th

13    of July brigade staff duty called my work cell phone and

14    informed me that PFC Abdo --

15      MR. BOYD:  Your Honor, I'm going to object as to hearsay.

16      MR. SCHNEIDER:  I'll rephrase the question, Your Honor.

17      THE COURT:  Objection sustained.

18    BY MR. SCHNEIDER:

19      Q.   What was the general topic of the call that you

20    received?

21      MR. BOYD:  Your Honor, I'm going to renew my objection.

22    It still calls for hearsay.

23      THE COURT:  That would be overruled.

24    BY THE WITNESS:

25      A.   About Abdo buying a weapon or attempting to purchase

1  a weapon.

2  BY MR. SCHNEIDER:

3      Q.   And who did you receive that call from?

4      A.   The staff duty NCO.

5      Q.   And where were you when you received the call?

6      A.   On my back deck in Clarksville, Tennessee.

7      Q.   Was that the back deck of your home?

8      A.   Yes.

9      Q.   So after receiving that call from staff duty what, if

10  anything, did you do next?

11      A.   I notified my first sergeant about it and then we

12  went to the company headquarters at Fort Campbell, Kentucky.

13      Q.   And when you got to company headquarters did you meet

14  with anyone or discuss the matter with anyone?

15      A.   I talked with again First Sergeant Morton and Staff

16  Sergeant Middlesworth about it.

17      Q.   And why did you go into your office after receiving

18  that call?

19      A.   Because it was my intent to speak to PFC Abdo about

20  the weapon.

21      Q.   Was there anything that you were concerned about that

22  made you go into the office that day?

23      A.   His belligerence with the staff when he attempted to

24  purchase the weapon.

25      Q.   And what was your specific intent once you got to the

1    office and you spoke to PFC Abdo?

2        A.   I wanted to counsel him, basically speak to him.  I

3    was going to refer him to mental health and limit his liberty.

4        Q.   And in terms of limiting his liberty, what did that

5    entail?

6        A.   I was going to give him a -- he lived off post at the

7    time.  So I was going to give him a room in the barracks and

8    restrict him to the room in the barracks, the dining facility,

9    the PX and his place of worship only under escort until the 6th

10    of July.

11        Q.   So it would have been two days of restriction?

12        A.   Yes, sir.

13        Q.   And then what would happen after two days?

14        A.   I would revisit -- I would have revisited the issue

15    and then changed it as I saw fit.

16        Q.   Now, when you met with the first sergeant and the

17    staff sergeant, did you task them to do anything?

18        A.   I don't know if I asked Sergeant Middlesworth to call

19    Abdo or if I did it first.  I didn't task them anything

20    directly.

21        Q.   Do you know if either the first sergeant or the staff

22    sergeant spoke to Abdo?

23        A.   I know Sergeant Middlesworth did.

24        Q.   Did there come a time when you spoke with PFC Abdo?

25        A.   I did.

1      Q.    And when was that?

2      A.    Roughly 10:30, 11:00 o'clock.

3      Q.    And is that in the morning?

4      A.    Yes.

5      Q.    And can you tell us what the substance of that phone

6    call was?

7      A.    I told PFC Abdo that he needed to report to the

8    company headquarters and that I needed to talk to him.

9      Q.    And what did he tell you, if anything?

10     A.    He said he'd be there roughly at like 12:30 or

11   something.

12     Q.    Okay.  And in between that phone call at 10:30 in the

13   morning and the expected time of 12:30 in the afternoon, what,

14   if anything, did you do next?

15     A.    I received a phone call from a lawyer -- it turned

16   out to be PFC Abdo's lawyer.  I don't remember his name -- in

17   reference to what I was bringing him in for and I explained the

18   situation to him and he said that it was completely lawful and

19   that he'd call Abdo back and tell him to report.

20     Q.    So based on having that phone call with Abdo's

21   attorney, did you expect any different outcome at 12:30 in the

22   afternoon?

23     A.    I did not.

24     Q.    So did you still expect that PFC Abdo would show up

25   as reported?

```
 1        A.   I did.

 2        Q.   And when he showed up, what was your plan of action

 3   if he were to show up as directed?

 4        MR. BOYD:  Your Honor, I'm going to object as to unduly

 5   repetitious.

 6        THE COURT:  Overruled.

 7        MR. SCHNEIDER:  I'll withdraw the question.

 8   BY MR. SCHNEIDER:

 9        Q.   Did there come a time that you spoke to Abdo again

10   later that same day?

11        A.   No.

12        Q.   Did you attempt to speak to Abdo?

13        A.   Yes.

14        Q.   And how did you attempt that?

15        A.   We started to try to call his -- his phone started

16   going directly to voicemail and then I went to his home

17   residence.

18        Q.   At what point in the day did you go to his residence?

19        A.   I don't remember.  In the afternoon.

20        Q.   Would that have been after 12:30?

21        A.   Yes.

22        Q.   So at 12:30 in the afternoon did Abdo ever show up?

23        A.   No.

24        Q.   And you said you went to his residence?

25        A.   Yes.
```

1    Q.   Did you speak with anyone at the residence?

2    A.   Yes.  I spoke to his roommate's last landlord.

3    Q.   And was Abdo at the residence?

4    A.   He was not.

5    Q.   Did anything else happen that day in regards to PFC

6  Abdo?

7    A.   No.

8    Q.   Did you take any other action with regards to Abdo

9  not showing up as you directed him to?

10    A.   I just started the AWOL paperwork.  That's it.

11    MR. BOYD:  Your Honor, I'm going to object.  May we

12  approach?

13    THE COURT:  Yes, sir.

14    (On-the-record bench conference, to wit:

15    MR. BOYD:  Your Honor, we've got a motion in limine

16  regarding this and what the government's trying to do is go

17  into legal orders regarding AWOL as opposed to a layperson's

18  understanding.

19    MR. SCHNEIDER:  Your Honor, the Court ruled yesterday that

20  we can go into the AWOL -- the fact that there was an AWOL

21  paperwork started and we had agreed not to discuss the fact

22  that there was a warrant.  That was the only limitation on the

23  AWOL issue.

24    MR. BOYD:  Your Honor, it was specifically represented to

25  the Court it was a layperson's understanding.

1    THE COURT:  That's correct.  You don't need to go into all

2  that detail.

3    MR. SCHNEIDER:  Yes, sir.

4    MR. BOYD:  Your Honor, just for the record I'd ask for a

5  mistrial at this time.

6    THE COURT:  Overruled.

7    (End of bench conference.)

8  BY MR. SCHNEIDER:

9    Q.  When was PFC Abdo next required to report for regular

10  duty work?

11    A.  I don't remember the specific day.  It was after --

12  it was a four day weekend.  So it was directly following the

13  four day weekend.

14    Q.  And did the defendant Abdo ever show up for his

15  regular duty work?

16    A.  He did not.

17    MR. SCHNEIDER:  I have nothing further, Your Honor.  Pass

18  the witness.

19    MR. BOYD:  No questions, Your Honor.

20    THE COURT:  You may step down, sir.

21    MR. FRAZIER:  Our next witness would be Jason Bo Campbell.

22    (The witness was sworn.)

23                        DIRECT EXAMINATION

24  BY MR. FRAZIER:

25    Q.  And would you please introduce yourself to the ladies

Direct Examination of Bo Campbell by Mr. Frazier

1   and gentlemen of the jury?

2        A.    My name is Bo Jason Campbell.

3        Q.    And where do you live, sir?

4        A.    ██████████████████.

5        Q.    And how long have you lived in ████████████?

6        A.    Almost three years.

7        Q.    Back in July of last year were you living there?

8        A.    Yes, sir.

9        Q.    And were you working at a place in ██████████?

10       A.    Yes.  I was.

11       Q.    Where were you employed?

12       A.    ██████████████████.

13       Q.    Okay.  And how long had you worked at ████████████

14   ██████ in ████████████?

15       A.    For two and a half years.

16       Q.    Okay.  I want to direct your attention to July the

17   4th of last year.  Do you remember that day?

18       A.    Yes.  I do.

19       Q.    Were you -- tell us what you were doing on that day

20   in relation to your business ████████████████████.  Were you

21   working that day?

22       A.    No, sir.  We were actually closed that day for the

23   4th.

24       Q.    All right.  Did you happen to be in the area where

25   the ████████████████████ is located at?

1    A.    I was.  I was out getting lunch and driving by the

2    truck wash.

3    Q.    Did you notice anything unusual as you were driving

4    by the truck wash?

5    A.    I did.

6    Q.    About what time of day was this?

7    A.    It was around lunch, 12:00, 12:30, somewhere around

8    there.

9    Q.    All right.  What did you notice unusual?

10    A.    Well, there was a car parked behind the truck wash

11    and a gentleman going back and forth from the side of the

12    building from the Dumpster back to the back of the building

13    and -- which was odd because like I said we were closed.

14    Q.    Okay.

15    A.    I was curious to find out what he was doing there.

16    Q.    All right.  And how was the gentleman moving between

17    the vehicle and the Dumpster?

18    A.    He was -- I wouldn't say he was running but he was --

19    he was moving quickly.  He was in a hurry.

20    Q.    Okay.  Did you see him do anything at the Dumpster?

21    A.    Yes, sir.  He was -- he was throwing something away.

22    I didn't know what at the time.

23    Q.    Okay.  Did he make more than one trip back and forth?

24    A.    He did.

25    Q.    How many trips do you recall?

Direct Examination of Bo Campbell by Mr. Frazier ———— 101 ———

1      A.   I saw two trips.

2      Q.   All right.  So -- and what type of vehicle was the

3 gentleman driving?

4      A.   It was a blue Cadillac.

5      Q.   All right.  And where was the vehicle parked in

6 relation to the Dumpster?

7      A.   He was actually not parked close to the Dumpster.  He

8 was parked behind the truck wash.

9      Q.   Okay.  And behind the truck wash.  Where would that

10 be in relation to the main road that runs in front of the truck

11 wash?  That doesn't make sense.  Let me rephrase that question.

12 I'm sorry.

13      Where did the -- was the vehicle parked in relation to the

14 main roadway?  In other words could you see his vehicle from --

15      A.   Coming -- as I was leaving -- I was coming from

16 McDonald's and the red light I was sitting at I could see

17 across a field to the -- I could see the entire truck wash and

18 his car was parked behind the building.  So he was running down

19 the side of the building --

20      Q.   Okay.

21      A.   -- from his car to the Dumpster.

22      Q.   So what did you do when you saw that?

23      A.   Well, I -- like I said I was curious to know what he

24 was doing there as we were closed and I pulled in to find out

25 who he was, you know, what he was doing.

1    Q.   Okay.  And did you see him when you pulled in?

2    A.   I did.

3    Q.   Where did you see him?

4    A.   As I was pulling into the truck wash, he was pulling

5    out.

6    Q.   And where did he go?

7    A.   He went -- he pulled up to the Waffle House which is

8    directly in front of our truck wash.

9    Q.   Okay.  It's across the main road there?

10   A.   Actually it's not across the road.  It's right --

11   it's across a small field.

12   Q.   Is it on the same side of the road then?

13   A.   Yes, sir.  Yes, sir.

14   Q.   All right.  And did you make eye contact with the

15   person?

16   A.   I did.

17   Q.   At what point was that that you made eye contact with

18   him?

19   A.   As I was pulling in and he was pulling out.

20   Q.   All right.  Show you what's been previously admitted

21   as Government's Exhibit No. 153A.  Do you recognize that

22   photograph?

23   A.   I do.

24   Q.   And what do you recognize that photo as?

25   A.   That's the gentleman that was at the truck wash.

Direct Examination of Bo Campbell by Mr. Frazier

1      Q.    The person running back and forth between the car

2    putting things in your Dumpster?

3      A.    Yes, sir.

4      Q.    Okay.  Now, when you saw the vehicle go over to the

5    Waffle House, what did you -- what else did you see when the

6    vehicle got there?

7      A.    He got out of the vehicle and he went into the Waffle

8    House.

9      Q.    Did he have anything with him when he went inside?

10     A.    He did.  He had a gray or a dark colored backpack as

11   he went into the Waffle House.

12     Q.    Okay.  So what did you do when you got to the

13   Dumpster?

14     A.    I was curious to know what he was doing there so I

15   looked to see what he was throwing away.

16     Q.    Okay.  And did you have to go into the Dumpster to

17   see?

18     A.    I didn't go into the Dumpster myself but I opened it

19   up and the objects he threw away were right there on top.

20     Q.    Had the Dumpster been recently emptied to your

21   knowledge?

22     A.    It had been emptied two days before.

23     Q.    And in addition to the objects that was in it, was

24   there anything else?

25     A.    There was a small amount of trash but not -- not very

1  much.

2      Q.   Okay.  Did you recognize the trash as trash of your

3  business?

4      A.   Yes, sir.

5      Q.   Okay.  I'm -- sir, I want to show you some -- and

6  when you looked inside the Dumpster were there several objects

7  that you recognized?

8      A.   Yes, sir.

9      Q.   Okay.  I want to show you first Government's Exhibit

10 No. 4 and No. 5.  Do you recognize these?

11     A.   I do.

12     Q.   What are they?

13     A.   They're two brand new pairs of gloves that were in

14 the Dumpster.

15     Q.   All right.  Government's Exhibit No. 6.  Do you

16 recognize this?

17     A.   I do.

18     Q.   And what is it?

19     A.   It is a shovel that was also in the Dumpster.

20     Q.   Was it wrapped in the manner that it was --

21     A.   It was -- yes, sir.

22     Q.   Except for it being opened; is that right?

23     A.   Right.

24     Q.   Okay.  Did it appear to you to be brand new?

25     A.   Yes, sir.

1     Q.   Government's Exhibit No. 7.  Do you recognize this?

2     A.   I do.

3     Q.   And what is it?

4     A.   I thought it was a body bag.

5     Q.   All right.  Was it in the Dumpster as well?

6     A.   It was.

7     Q.   Government's Exhibit No. 8.  Do you recognize this?

8     A.   I do.

9     Q.   Where was it found?

10     A.   It was also in the Dumpster.

11     Q.   Government's Exhibit No. 9.  Do you recognize this?

12     A.   Yes.

13     Q.   What is it?

14     A.   It's a hoodie.

15     Q.   And where did you --

16     A.   It was also in the Dumpster.  Yes.

17     Q.   Government's Exhibit Nos. 11 and 12.  Do you

18 recognize these?

19     A.   I do.

20     Q.   And what are they?

21     A.   They are bags -- I believe they're sheets, but as --

22 they were in the Dumpster as well.

23     Q.   Packaged in the way they are now?

24     A.   Right.  Yes, sir.

25     Q.   Government's Exhibit No. 13.  Do you recognize this?

1        A.    Yes.

2        Q.    What is this?  Or what did you think it was at the

3   time?

4        A.    Another body bag is what I was assuming it was at the

5   time.

6        Q.    Where did you find it?

7        A.    It was in the Dumpster as well.

8        Q.    Government's Exhibit No. 16, two plastic bags.  Do

9   you recognize those?

10        A.    Yes, sir.

11        Q.    And what -- where did you recognize these from?

12        A.    There were two jugs of bleach that were inside of

13   those bags.

14        Q.    Show you first what's been marked as Government's

15   Exhibit No. 17.  Do you recognize that?

16        A.    Yes, sir.

17        Q.    What is it?

18        A.    That's the bleach that was in there.

19        Q.    Okay.  Except was it --

20        A.    Well, that plastic was not on it.  No, sir.

21        Q.    It was just the bottle of bleach?

22        A.    Yes.

23        Q.    Contained inside one of the black plastic bags marked

24   Government's --

25        A.    Yes, sir.

Direct Examination of Bo Campbell by Mr. Frazier          107

1      Q.   Government's Exhibit No. 18.  Do you recognize that?

2      A.   Yes.

3      Q.   What is that?

4      A.   That is the other jug of bleach.

5      Q.   Other than the packaging?

6      A.   Yes.

7      Q.   And finally Government's Exhibit No. 19.  Do you

8  recognize that?

9      A.   I do.

10     Q.   And what is that?

11     A.   That is a digital camera that was also in the

12  Dumpster.

13     Q.   All right.  After you saw all these items, what did

14  you do?

15     A.   Well, I called the owner of the truck wash to find

16  out what I should do because the items that I found were a

17  little curious.  I mean, it didn't look good.  I mean, I was a

18  little worried that something may be wrong.  I wasn't sure what

19  he was doing so I called the owner to find out what I should

20  do.

21     Q.   And after you called the owner, did somebody appear

22  at the scene?

23     A.   Yes, sir.

24     Q.   Who was that?

25     A.   One of the owners showed up and then he called the

1  police department.

2      Q.   And did the police department arrive?

3      A.   Yes.

4      Q.   And who was the officer that arrived there at the

5  scene?

6      A.   Officer Lynch.

7      Q.   And did you see the vehicle again -- during your time

8  there -- you stayed there until Officer Lynch arrived, correct?

9      A.   Yes.  I did.

10      Q.   And did you stay with these items you've just

11  described?

12      A.   I did.

13      Q.   And did you see what happened to the person who went

14  inside the Waffle House after -- the person you identified as

15  Mr. Abdo went inside?

16      A.   After he went into the Waffle House, that was the

17  last I saw him.

18      Q.   Okay.  Now I want to show you what's been marked as

19  Government's Exhibit No. 15 some photos.  First of all can you

20  see Government's Exhibit No. 15A?  Hold on just a second and

21  I'll -- can you see Government's Exhibit No. 15A?

22      A.   Yes.

23      Q.   Do you recognize what that is?

24      A.   That is the truck wash that I was working for.

25      Q.   B.  Do you recognize that photograph?

1    A.   That is the Dumpster where I found the items.

2    Q.   C.  Do you recognize that photograph?

3    A.   Yes, sir.

4    Q.   And what --

5    A.   That's the same Dumpster.

6    Q.   D.  Do you recognize that photograph?

7    A.   Yes, sir.

8    Q.   And then I'm going to show you the photographs marked

9    Government's Exhibit No. E through P rather quickly and then

10   I'll ask you a question after you've seen them.  Do you see E?

11   A.   Yes, sir.

12   Q.   You see F?

13   A.   Yes, sir.

14   Q.   G?

15   A.   Yes, sir.

16   Q.   H?

17   A.   Yes, sir.

18   Q.   I?

19   A.   Yes, sir.

20   Q.   J?

21   A.   Yes, sir.

22   Q.   K?

23   A.   Yes, sir.

24   Q.   L?

25   A.   Yes, sir.

1      Q.   That's L.  I'll turn it another way.

2      A.   Right.

3      Q.   M?

4      A.   Yes, sir.

5      Q.   N?

6      A.   Yes, sir.

7      Q.   O?

8      A.   Yes.

9      Q.   And P?

10     A.   Yes, sir.

11     Q.   Do all the photographs I've shown you in Government's

12  Exhibit No. 15A through P, do they fairly depict the scene as

13  it appeared there at the truck wash and at the Dumpster both

14  before and during and after the time you removed certain items

15  from the Dumpster?

16     A.   Yes.

17     Q.   And you did in fact go into the Dumpster after you

18  opened it to retrieve these items?

19     A.   I did.

20     MR. FRAZIER:  All right.  We'll offer Government's Exhibit

21  No. 15 into evidence at this time.

22     MR. BOYD:  No objection.

23     THE COURT:  15 is admitted.

24     (Exhibit(s) admitted:  G15)

25  BY MR. FRAZIER:

1    Q.   Now, this is the -- is this -- describe what

2  Government's 15A shows.

3    A.   That is the front of the truck wash.

4    Q.   Is this the part that would face the main

5  thoroughfare there?

6    A.   Yes, sir.

7    Q.   And what is the name of the roadway that runs in

8  front of Turtle's Truck Wash?

9    A.   It is 41A.

10    Q.   Is it more commonly called something there local?

11    A.   Fort Campbell Boulevard.

12    Q.   B.  Tell the jury what that is.

13    A.   That is the Dumpster that I found the items in.

14    Q.   Now, was it open when you approached it?

15    A.   It was closed when I -- when I got there.  It had

16  been closed back.

17    Q.   Photograph C.  What is that a picture of?

18    A.   That is the Dumpster as well.

19    Q.   And D.  What are we looking at in this photograph?

20    A.   The same Dumpster.

21    Q.   What else is pictured around the Dumpster?

22    A.   The items that I pulled out of the Dumpster.

23    Q.   Okay.  That would be the bleach over here?

24    A.   Yes, sir.

25    Q.   What you've described as a body bag here?

1    A.   Correct.

2    Q.   And the shovel back here?

3    A.   Yes.  It is.

4    Q.   E.  Is that a close-up of some of those same items?

5    A.   Yes, sir.

6    Q.   And what's -- in addition now in Photograph No. F

7   what are we looking at that's in this area here?

8    A.   Those are the gloves and the two packages of sheets.

9    Q.   Photograph G?

10    A.   That is the bleach and the turtle -- a neck cover.

11   I'm not sure what it's called.

12    Q.   All right.  Photograph H?

13    A.   That is the...

14    Q.   And I are close-ups of the gloves and sheets again?

15    A.   Yes.  They are.

16    Q.   Same with J?

17    A.   Yes.

18    Q.   Photograph No. K.  What is this protruding from the

19   garbage bag?

20    A.   That is the -- what I thought was another body bag.

21    Q.   Government's Exhibit 13?

22    A.   Yes, sir.

23    Q.   And was it wrapped up in this trash bag as the way

24   that it's depicted in this photo?

25    A.   Yes, sir.

1      Q.   Except was it completely closed?

2      A.   It was -- no, sir.

3      Q.   Was it open or closed?

4      A.   It was -- we tore it open to see what was in it.

5      Q.   When you say we, you waited until --

6      A.   Officer Lynch.  Yes, sir.

7      Q.   Okay.  L.  What is that a picture of?

8      A.   That is the shovel.

9      Q.   And I'm going to skip M and go to N.  What is that a

10   picture of?

11     A.   That is the camera -- digital camera that was in

12   there.

13     Q.   Okay.  And O and P are just basically overviews of

14   what we've already seen before, correct?

15     A.   Yes.

16     MR. FRAZIER:  All right.  We'll pass the witness, Your

17   Honor.

18                        CROSS-EXAMINATION

19   BY MR. BOYD:

20     Q.   You told the police that you saw someone by the

21   Dumpster, correct?

22     A.   Actually he was running -- going -- I didn't see him

23   just by the Dumpster.  He was going from the back of the

24   building up to the Dumpster and back and forth.

25     Q.   Okay.  You didn't see anything going into the

1    Dumpster?

2         A.   Yes, sir.  He was carrying items back and forth to

3    the Dumpster.

4         Q.   But you didn't tell that to the police, did you?

5         A.   Yes.

6         Q.   You did?

7         A.   Yes.

8         Q.   Isn't it true the only thing you told the police was

9    that you noted an individual near the Dumpster at the truck

10   wash when no one should have been on the premises?

11        A.   No, sir.

12        Q.   And at no point did he go into the Waffle House, did

13   he?

14        A.   Yes.  I saw him go into the Waffle House.

15        MR. BOYD:  Nothing further.

16        MR. FRAZIER:  No further questions, Your Honor.

17        THE COURT:  You may step down, sir.

18        MR. FRAZIER:  Government's next witness will be Victor

19   Lynch.

20        THE COURT:  May this witness also be excused?

21        MR. FRAZIER:  Yes, Your Honor.  This witness may be

22   excused.

23        MR. BOYD:  Yes, Your Honor.

24        THE COURT:  You may be excused, sir.

25        (The witness was sworn.)

1          DIRECT EXAMINATION

2    BY MR. FRAZIER:

3        Q.   And would you please introduce yourself to the ladies

4    and gentlemen of the jury?

5        A.   My name is Victor Lynch.  I'm a sergeant with the Oak

6    Grove Police Department, Oak Grove, Kentucky just outside of

7    Fort Campbell.

8        Q.   And how long have you been employed with the Oak

9    Grove Police Department?

10       A.   I've been employed with the Oak Grove Police

11   Department since September of 2005.

12       Q.   And what prior law enforcement experience do you

13   have?

14       A.   I spent approximately about two years with the

15   Christian County Sheriff's Department.

16       Q.   All right.  And were you in the military prior to

17   that?

18       A.   I spent 25 and a half years in the military retired.

19       Q.   And what did you do for the U.S. military?  What

20   position were you in?

21       A.   I was in the aviation maintenance.

22       Q.   And I want to ask you if back on July the 4th, 2011

23   you were working at the Oak Grove Police Department?

24       A.   That's correct.

25       Q.   And on that date did you receive a call to go to

1    Turtle's Truck Wash on Fort Campbell Boulevard?

2        A.   Yes.  I did.

3        Q.   About what time of day was that?

4        A.   It was approximately 12:15, 12:40, somewhere around

5    there.

6        Q.   And what was the purpose of your dispatch to that

7    location?  What did you expect to find when you got there?

8        A.   I was dispatched because one of the owners had found

9    some property that didn't belong to the truck wash in the

10   Dumpster there.

11       Q.   All right.  And when you arrived at the location,

12   what did you -- who did you find there and what did you see?

13       A.   When I arrived to the truck stop I found I believe it

14   was Mr. Cullen and Mr. Campbell and several items that was

15   removed from the Dumpster.

16       Q.   Okay.  Now, you've previously had a chance to look at

17   the photographs marked Government's Exhibit No. 15A through P,

18   correct?

19       A.   That's correct.

20       Q.   Do these fairly and accurately depict the scene as it

21   appeared back on that date when you arrived?

22       A.   That is correct.

23       Q.   And in fact you're the person who made these

24   photographs; is that --

25       A.   That's absolutely correct.

Direct Examination of Victor Lynch by Mr. Frazier ——117

1      Q.   Okay.  I want to show you some exhibits and basically

2   of the exhibits that were there that were removed from the

3   Dumpster, Mr. Campbell had removed -- had Mr. Campbell already

4   removed some items by the time you got there or did you arrive

5   and then some items were removed?

6      A.   He'd already removed some of the items.  That's

7   correct.

8      Q.   Okay.  And so did you basically -- once you

9   determined the nature of these items, did you take custody of

10  them?

11     A.   Yes.  I did.

12     Q.   Okay.  I want to show you what's been marked for

13  identification as Government's Exhibit Nos. 4 and No. 5.  Do

14  you recognize these?

15     A.   Yes.  I do.

16     Q.   And are these -- and all these items I'm about to

17  show you did you take custody of?

18     A.   Yes.  I did.

19     Q.   Government's Exhibit No. 6.  Do you see that?

20     A.   Yes.  I do.

21     Q.   Government's Exhibit No. 7.  Did you take custody of

22  that?

23     A.   Yes.  I did.

24     Q.   Government's Exhibit Nos. 8 and No. 9.  Did you take

25  custody of those?

1      A.   Yes.  I did.

2      Q.   Government's Exhibit No. 11 and 12?

3      A.   Yes.  I did.

4      Q.   Did you take custody of those?

5      A.   Yes.  I did.

6      Q.   Government's Exhibit No. 13.  Did you take custody of

7  that?

8      A.   Yes.  I did.

9      Q.   Government's Exhibit No. 16 which is two trash bags.

10  Did you take custody of that as well?

11      A.   Yes.  I did.

12      Q.   And were those trash bags wrapped around these items

13  Government's Exhibit Nos. 17 and No. 18?

14      A.   Yes.  They were.

15      Q.   Did you take custody of those as well?

16      A.   Yes.  I did.

17      MR. FRAZIER:  At this time, Your Honor, we move to

18  introduce into evidence Government's Exhibit Nos. 4, 5, 6, 7

19  and 8, 9, 11 and 12, 13, 16 and 17 and 18.  Move to introduce

20  those into evidence.

21      MR. BOYD:  No objection, Your Honor.

22      THE COURT:  They're admitted.

23      (Government's Exhibit(s) admitted:  4 thru 9, 11, 12, 13,

24      (16 thru 18

25  BY MR. FRAZIER:

1      Q.   And likewise did you take custody of Government's

2    Exhibit No. 19?

3      A.   Yes.  I did.

4      Q.   Okay.  In addition did you yourself recover -- I'm

5    going to show you Government's Exhibit No. 10.  Do you

6    recognize that?

7      A.   Yes.  I do.

8      Q.   And what is that?

9      A.   That is a cord attaches to the camera USB cord.

10     Q.   Okay.  And did you take -- locate this item yourself?

11     A.   Yes.  I did.

12     Q.   Where did you locate it?

13     A.   That was in the Dumpster.

14     MR. FRAZIER:  Okay.  We'll move Government's Exhibit No.

15   10 and No. 19 into evidence at this time.

16     MR. BOYD:  No objection.

17     THE COURT:  They'll be admitted.

18     (Exhibit(s) admitted:  G10, G19)

19   BY MR. FRAZIER:

20     Q.   Officer Lynch, when you saw all these items in the

21   Dumpster and took custody of them, what was going through your

22   mind?

23     A.   My heart was racing.  I was seriously thinking that

24   somebody was in danger.

25     Q.   Okay.  Had you already been told about the

1  circumstances of the person at the Dumpster and that the

2  vehicle had been moved to the Waffle House?

3      A.  Yes.  I was.

4      Q.  Okay.  So what actions did you take after -- or

5  during the time you either took custody of the exhibits or what

6  was the next steps that you took?

7      A.  Located the vehicle over at -- that was in question

8  that was described to me that's leaving the scene and was next

9  door to the Waffle House business.  Went over and identified

10  the vehicle.

11      Q.  Okay.  Did you find the person associated with the

12  vehicle that you'd been told about?

13      A.  No, sir.

14      Q.  Was anyone either in the business or around the

15  business that either matched the description or anything of

16  that nature?

17      A.  No, sir.

18      Q.  Okay.  Now, did you run the tags on the vehicle?

19      A.  Yes.  I did.

20      Q.  When you say run the tags, what does that mean?

21      A.  I got on my radio and called the operations

22  dispatcher that we have and gave her the tag numbers that was

23  on the vehicle.

24      Q.  And did you find who the vehicle was registered to?

25      A.  The vehicle came back registered to a Mr. Abdo.

Direct Examination of Victor Lynch by Mr. Frazier          121

1          Q.    Mr. Naser Jason Abdo?

2          A.    That's correct.

3          Q.    Likewise were there some other identifying marks on

4    the vehicle that you had ran to verify this ownership?

5          A.    On the vehicle there is a Department of Defense tag

6    that's on the windshield.

7          Q.    And do you have the ability to check that as well?

8          A.    Once we contacted the provost marshal at Fort

9    Campbell, Kentucky.

10          Q.    Okay.  And who did you find out that tag was

11    registered to?

12          A.    To Mr. Abdo.

13          Q.    Okay.  Now, what steps did you take before actually

14    doing anything inside the vehicle?

15          A.    We took a good look inside the vehicle and based on

16    the items that were found at the truck stop that came out of --

17    that we believed belonged with the vehicle I contacted the

18    County attorney who's -- we deal with on a daily basis and

19    advised them of the situation and got permission to enter the

20    vehicle.

21          Q.    Okay.  What was it -- the vehicle at this point was

22    abandoned?

23          A.    That's correct.

24          Q.    What were you hoping to -- not hoping to find but

25    what were you looking for?  What were you investigating at this

1    point?

2    A.   Wanted to make sure that there was nobody in the car

3    that was hurt or in the vehicle itself.

4    Q.   Okay.  And you -- did you look in the vehicle then

5    after that?

6    A.   Yes.  I did.

7    Q.   And what did you find?

8    A.   We found several items in the vehicle but we didn't

9    find anybody in the vehicle.

10   Q.   No bodies or persons injured or anything of that

11   nature?

12   A.   That's correct.

13   Q.   All right.  I'm going to show you -- you've

14   previously had a chance to see what's been marked as

15   Government's Exhibit No. 42.  Can you see that on your screen

16   there?

17   A.   Yes, sir.

18   Q.   And that's Government's Exhibits 42A through N some

19   photographs; is that correct?

20   A.   That's correct.

21   Q.   Does Government's Exhibits 42A through N fairly and

22   accurately depict the scene at the Waffle House where this

23   vehicle that you looked into was located at?

24   A.   That is correct.

25   Q.   And in fact the photographs, were they made by you?

Direct Examination of Victor Lynch by Mr. Frazier

1      A.    That is absolutely correct.

2      MR. FRAZIER:  We'll offer Government's Exhibit No. 42A

3  through N into evidence at this time.

4      MR. BOYD:  No objection, Your Honor.

5      THE COURT:  The exhibits are admitted.

6      (Exhibit(s) admitted:  G42A thru G42N)

7  BY MR. FRAZIER:

8      Q.    42A.  If you can explain to the jury what that's a

9  picture of.

10      A.    That's a picture of the vehicle that was parked at

11  the Waffle House and abandoned.

12      Q.    The one that was registered to Mr. Abdo?

13      A.    That is correct.

14      Q.    B.  Is that just another angle of the same picture?

15      A.    That's correct.

16      Q.    Same angle of the view of the automobile is what I

17  meant to say.  Sorry.

18      C.  What is that photo of?

19      A.    That's going to be a photograph of the rear of the

20  vehicle including the license plates.

21      Q.    D.  What is that a picture of?

22      A.    That's a picture of the Department of Defense decal

23  that goes on the windshield of the vehicle.

24      Q.    This is the same decal that you indicated you ran

25  with the provost marshal?

Direct Examination of Victor Lynch by Mr. Frazier

1     A.   That is correct.

2     Q.   Photograph E.   What is that a picture of?

3     A.   That's a photograph of the interior front portion of

4   the vehicle taken from the passenger side.

5     Q.   F.   Can you tell the jury what that's a picture of?

6     A.   That's a photograph of the front passenger -- taken

7   from the front passenger side of the vehicle.

8     Q.   Okay.   In particular can you tell the jury what this

9   item is here that's seated in the passenger seat?

10    A.   That item is a cattle prod battery operated

11  electrical device.

12    Q.   Photo G.   Can you tell us what that's a photograph

13  of?

14    A.   That's a photograph of a military meal card that's

15  with Mr. Abdo's name on it.

16    Q.   H.   What is that a picture of?

17    A.   H is a box of handcuffs.

18    Q.   I.   Can you tell us what that's a photo of?

19    A.   I is a photograph of the front passenger front area

20  of the vehicle taken from the drivers side.

21    Q.   Okay.   What is this in the drivers seat area right

22  there that I just circled on the photograph?

23    A.   Those are two C cell batteries.

24    Q.   Does the cattle prod that I showed you a picture of

25  earlier do you know what type of batteries it takes?

Direct Examination of Victor Lynch by Mr. Frazier

1    A.   C cell.

2    Q.   Photo J.  What is that a picture of?

3    A.   This is a picture of the passenger side of the -- I

4    believe the vehicle -- of the vehicle in the front.

5    Q.   All right.  What is in this photograph in this bag

6    right here?  Can you tell from looking at it?

7    A.   No.

8    Q.   Let me zoom in a little bit.

9    A.   That's going to be another box.  A handcuff box.

10   Q.   Okay.  Photo K.  What is that a picture of?

11   A.   Handcuff box.

12   Q.   Where's it located at in the vehicle?

13   A.   That's in the front of the floor of the vehicle.

14   Q.   Photograph L.  Do you recognize that?

15   A.   That's going to be the rear seat of the vehicle.

16   Q.   Photograph M.  What is that a photo of?

17   A.   This is going to be in the trunk compartment of the

18   vehicle.

19   Q.   Photograph N.  What is that a photo of?

20   A.   This is also the trunk compartment of the vehicle.

21   Q.   Inside the vehicle -- inside the photographs that we

22   saw in the vehicle were several items.  I'm going to show you

23   some items, ask you if you recognize them.  First Government's

24   Exhibit No. 34.  Do you recognize this item?

25   A.   That's right.  These are handcuff boxes.

1    Q.    How many of them in the exhibit?

2    A.    Three.

3    Q.    Government's Exhibit No. 35.  Do you recognize this?

4    A.    Yes.  I do.

5    Q.    What is this?

6    A.    That's going to be the cattle prod that was in the

7  front seat of the vehicle.

8    Q.    Government's Exhibit No. 36.  Can you identify this?

9    A.    Yes.  I can.

10   Q.    What is it?

11   A.    Those are covers for binoculars.

12   Q.    Do you remember where these were in the vehicle?

13   A.    Those were in the front seat of the vehicle.

14   Q.    Government's Exhibit No. 37.  Do you recognize this?

15   A.    Yes, sir.  Those are the keys.

16   Q.    Where were they found?

17   A.    They were in the front seat of the vehicle.

18   Q.    Government's Exhibit No. 38.  Do you recognize this?

19   A.    That's a hat.  I believe that was in the trunk of the

20  vehicle.

21   Q.    Does it have the name Abdo on the back?

22   A.    That's correct.

23   Q.    Government's Exhibit No. 39.  Do you recognize this?

24   A.    Yes, sir.  Those are packages of trash bags.

25   Q.    Okay.  Do you recognize anything unusual --

1  noteworthy about these particular trash bags?

2      A.   They were in the trunk of the vehicle rolled up.

3      Q.   Were they similar to any other trash bags?

4      A.   They were similar to all the trash bags the other

5  items were in.

6      Q.   Including Government's Exhibit No. 6, the shovel?

7      A.   That's correct.

8      Q.   And Government's Exhibit Nos. 17 and 18, the bleach?

9      A.   That is correct.

10     Q.   Government's Exhibit No. 7.  Can you see that from

11  where you sit?

12     A.   Yes, sir.

13     Q.   What is it?

14     A.   It's a body bag carrier.

15     Q.   And Government's Exhibit No. 13.  What is that?

16     A.   It's body bags.

17     Q.   What are these used for if you know?

18     A.   They're used to carry people that are deceased.

19     Q.   So after you looked inside the vehicle what did you

20  do at that point?

21     A.   After we checked the vehicle and realized that there

22  was nobody in the vehicle or anybody harmed in the vehicle, we

23  secured the -- closed the vehicle and stopped going through the

24  vehicle at that time.

25     Q.   All right.  And then what did you do after that?

1    A.   I contacted -- at that point in time I contacted my

2 supervisor who in turn contacted the Fort Campbell CID and also

3 the FBI.

4    Q.   All right.  Was that because of the -- why was that?

5 Why was CID and FBI contacted?

6    A.   The CID was contacted because Mr. Abdo was also in

7 the military and they contacted the FBI based on the items that

8 we found.

9    Q.   All right.  And was that because of the reasons you

10 stated earlier about what these items were used for?

11   A.   That's correct.

12   Q.   Or could be used for?

13   A.   That's correct.

14   Q.   All right.  And what about the vehicle itself?  Did

15 it stay at the Waffle House parking lot or what happened to the

16 vehicle once you were through with it?

17   A.   The proprietor of the Waffle House asked what we were

18 going to do with the vehicle at which point in time we told him

19 it was on private property and they had the choice of take and

20 have it removed at which time they did.

21   Q.   All right.  So it was moved to an impound lot?

22   A.   Correct.

23   Q.   Okay.  And before a vehicle like that is impounded,

24 what's done with the vehicle?

25   A.   It's inventoried.

Direct Examination of Victor Lynch by Mr. Frazier

1    Q.   And who inventoried this particular vehicle?

2    A.   At the time was Captain Alter.

3    Q.   Okay.  And what was done -- after law enforcement was

4    contacted, were steps taken to look for Mr. Abdo in the area?

5    A.   That's correct.  After Mr. Abdo was not located in

6    the area, an attempt to locate bulletin was placed to locate

7    Mr. Abdo.

8    Q.   Okay.  And what type of steps did your police

9    department take to look for him in the area?

10   A.   We checked the -- there's several truck stops in the

11   area, several hotels and fast food restaurants and gas stations

12   and we checked each one to include vehicles and parking lots.

13   Q.   Okay.  Did you find Mr. Abdo at all?

14   A.   There was negative contact.

15   Q.   Okay.  And did you have some -- did you have some way

16   of verifying that he in fact left the Waffle House?

17   A.   There was a video from the Waffle House that showed a

18   male subject walking from the vehicles around the back out the

19   Waffle House towards the US 41A.

20   Q.   And although you did not see Mr. Abdo yourself, did

21   that person that you saw in the video resemble anything that

22   you had inside of Mr. Abdo's vehicle?

23   A.   Yes.  It did.

24   Q.   And what was that?

25   A.   There was a photograph of Mr. Abdo in the trunk of

1    the vehicle.

2        Q.   Okay.  And that was the person depicted on the video?

3        A.   That's correct.

4        Q.   All right.  In the paperwork that was in the trunk,

5    you didn't actually go through any of that paperwork yourself,

6    correct?

7        A.   No.  I did not.

8        Q.   That would be the responsibility of Captain Alter who

9    did the inventory?

10       A.   Yes.  He did.

11       MR. FRAZIER:  Okay.

12       We'll pass the witness at this time.

13                         CROSS-EXAMINATION

14   BY MR. BOYD:

15       Q.   Good morning, sir.  I'm Zachary Boyd.

16       A.   Good morning.

17       Q.   Did you ever file charges against Mr. Abdo?

18       A.   No, sir.

19       Q.   Was anything you located illegal?

20       A.   No, sir.

21       MR. BOYD:  Nothing further.

22       MR. FRAZIER:  No further questions, Your Honor.

23       THE COURT:  You may step down, sir.

24       MR. FRAZIER:  And may this witness be excused?

25       THE COURT:  Yes, sir.

1     MR. FRAZIER:  Next witness will be Jozef Alter.

2     THE COURT:  Mr. Boyd, you have no objection to him being

3  excused, I assume?

4     MR. BOYD:  No, Your Honor.

5     (The witness was sworn.)

6                       DIRECT EXAMINATION

7  BY MR. FRAZIER:

8     Q.   And would you please introduce yourself to the ladies

9  and gentlemen of the jury?

10    A.   Jozef A. Alter.  I'm the captain in charge of patrol

11 for Oak Grove Police Department.

12    Q.   And that's in Oak Grove, Kentucky, correct?

13    A.   Yes, sir.

14    Q.   And how long have you been employed there?

15    A.   Since 2001.

16    Q.   And what did you do prior to working as a police

17 officer there?

18    A.   I was in the U.S. Army.

19    Q.   Okay.  How long were you in the U.S. Army?

20    A.   23 years.

21    Q.   And what did you do with the U.S. Army?

22    A.   I was with special forces.

23    Q.   Okay.  I want to direct your attention to the date of

24 July 4th of last year.  On that date were you working at the

25 Oak Grove Police Department?

Direct Examination of Jozef Alter by Mr. Frazier

1    A.   I was at the police department but I was actually off

2    that day.

3    Q.   Okay.  What were you doing on that day at the police

4    department?

5    A.   I was actually cooking out for patrol officers for

6    the -- feeding them lunch and dinner.

7    Q.   That's for the 4th of July activities?

8    A.   Yes, sir.

9    Q.   Okay.  Did you receive a call at some time that day

10   from another officer causing you to have to take some action?

11   A.   I did.  Normally when there's something bad or good

12   going on in the city they call me and notify me what's going on

13   and the officer said -- called me, said you need to come out

14   here right away.

15   Q.   And where were you called to go?

16   A.   To the Waffle House.

17   Q.   Okay.  Is that the Waffle House there on Fort

18   Campbell, Kentucky Boulevard?

19   A.   Yes, sir.  It's on 41A Fort Campbell Boulevard.

20   Q.   Okay.  And when you got to the Waffle House, what did

21   you see?

22   A.   Obviously patrol officers were there.  Couple of CID

23   agents were there and a blue Cadillac was parked in the parking

24   lot of Waffle House.

25   Q.   Now, had you already been briefed by other officers

Direct Examination of Jozef Alter by Mr. Frazier

1    concerning something that had been found in a Dumpster next

2    door at the Turtle's Truck Wash?

3        A.   That was the first thing they briefed me on is the

4    events that occurred earlier prior to me showing up.

5        Q.   Did you have a chance to see the items that were

6    actually --

7        A.   No.  I did not.

8        Q.   -- from the Dumpster?

9    But you were told about what they were?

10       A.   I was told what they were.

11       Q.   Okay.  So after you got to the Waffle House and had

12   your meeting, briefing about what had happened, what did you

13   do?

14       A.   We immediately called the County attorney, let them

15   know what we had, that we had possibly evidence of a crime or a

16   crime that's about to happen.  And we proceeded to check the

17   rest of the vehicle to see if there was any other -- if there

18   was any other crimes that were committed or about to be

19   committed.

20       Q.   And did you find any bodies or anything of that

21   nature in the vehicle?

22       A.   We did not find any human bodies or any human

23   evidence inside the vehicle.

24       Q.   Okay.  So after that -- after you found there was

25   nobody in the vehicle, what did you do?

1      A.   We obviously looked in the vehicle.  We found some

2  items that were in plain view.  Cattle prod in the front seat,

3  some loose batteries, some other loose items that -- not normal

4  for anybody that would -- that would have inside of a vehicle.

5      Q.   Okay.  So what did you do at that point when you saw

6  those things?

7      A.   We spoke to the CID agents who were already on the

8  scene.  CID agents told us that --

9      Q.   Let's not go into what they said.

10      A.   Okay.

11      Q.   Just what happened?  What was the steps that were

12  taken?

13      A.   Again we called the County attorney.  The County

14  attorney said --

15      MR. BOYD:  Your Honor, I'm going to object as to hearsay.

16  BY MR. FRAZIER:

17      Q.   Without going into what the County attorney said,

18  what did you do after that phone call?  What did you do?

19      A.   Well, the manager of the store told us he wanted that

20  vehicle off of his property because it was blocking --

21      MR. BOYD:  Your Honor, I'm going to again say now the

22  witness is still testifying to hearsay.  So I'd object.

23      MR. FRAZIER:  That's not hearsay.

24      THE COURT:  Overrule the objection.

25  BY MR. FRAZIER:

Direct Examination of Jozef Alter by Mr. Frazier

1    Q.   So what did you do?

2    A.   The manager said he wanted the vehicle off the

3  property it was blocking.

4    MR. BOYD:  Your Honor, I renew my hearsay objection.

5    THE COURT:  It's overruled again.  Same objection, same

6  ruling.

7  BY THE WITNESS:

8    A.   So I -- we called a towing truck on the request of

9  the owners of the business and had the vehicle towed.  It was

10  blocking their business, their Dumpster and their oil

11  dispensary.

12  BY MR. FRAZIER:

13    Q.   Okay.  And before that's done, there's some steps you

14  have to take as part of your department policy?

15    A.   Yes, sir.  I have to inventory the vehicle, make sure

16  we account for all the items that are in the vehicle.

17    Q.   All right.  I'm going to show you what's previously

18  been introduced into evidence as Government's Exhibit No. 42.

19  These are Photographs A through N.  Have you had a chance to

20  see these previously before coming into court?

21    A.   Yes, sir.

22    Q.   And are these photographs basically of the vehicle

23  that was inventoried and the items that were in the vehicle?

24    A.   That's correct.

25    Q.   Now, during your inventory did you notice -- I want

1    to show you some items.  I'm just going to show you these items

2    and ask you if these are items that you noted and made a note

3    of in your inventory of the vehicle there at the scene before

4    it was impounded.  Okay?

5         A.   Yes, sir.

6         Q.   First show you Government's Exhibit No. 20.  Do you

7    recognize that?

8         A.   I do.  It looks like the passport that was --

9         Q.   And Government's Exhibit No. 21.  Do you recognize

10   what that is?

11        A.   Yes, sir.  It was a social security card that was

12   located with -- it was in the vicinity of the passport.

13        Q.   Government's Exhibit No. 22.  Do you recognize that?

14        A.   Yes, sir.  That was the marriage certificate that was

15   also located at the same location.

16        Q.   23.  Do you recognize that?

17        A.   Yes, sir.  I do.  Birth certificate.

18        Q.   25.  Do you recognize that?

19        A.   Yes, sir.  It was school transcripts that were also

20   located in the same box.

21        Q.   26.  Do you recognize that item?  Let me zoom out a

22   little bit.  Do you recognize that item?

23        A.   Yes, sir.  That was also located inside the box.

24        Q.   And when you say the box, you're talking about

25   something inside the vehicle?

1     A.    Yes, sir.  Inside the vehicle.

2     Q.    Where was it in the vehicle?

3     A.    Those items were in the back trunk of the vehicle.

4     Q.    Government's 27.  Do you recognize that?

5     A.    That was in the front of the vehicle.

6     Q.    And Government's Exhibit No. 28.  Do you recognize

7  that?

8     A.    Yes, sir.  It was a military driver's license.

9     Q.    Government's Exhibit No. 29.  Do you recognize these

10  documents?

11    A.    Yes, sir.  There were more documents inside the box

12  of the -- where the other documents were located.

13    Q.    Government's Exhibit No. 30.  Do you recognize that?

14    A.    Yes, sir.  There's some personal certificates of

15  achievements that were also located with those personal items.

16    Q.    And Government's 31.  Do you recognize that?

17    A.    Yes, sir.  It's a diploma for the Air Assault course

18  at Fort Campbell.

19    Q.    Was it also there in the box?

20    A.    It was also in the box.  Yes, sir.

21    Q.    Government's 32.  Do you recognize that?

22    A.    Yes, sir.  That was actually in the back seat or in

23  the pocket of the front seat of the car.

24    Q.    Okay.  And finally Government's Exhibit No. 33.  Do

25  you recognize that?

1      A.   The receipt for the handcuffs that was located in a

2   plastic bag on the drivers -- the passenger side of the front

3   of the vehicle.

4      MR. FRAZIER:  All right.  We'll offer Government's Exhibit

5   Nos. 20 to 23, then 25 through 33 into evidence at this time.

6   We are not offering Government's 24.

7      MR. BOYD:  No objection, Your Honor.

8      THE COURT:  They're admitted.

9      (Government's Exhibit(s) admitted:  20 thru 23,

10     (25 thru 33

11  BY MR. FRAZIER:

12     Q.   Government's No. 20 being the passport for whom, sir?

13     A.   Mr. Abdo.

14     Q.   Government's 21 being the social security card in the

15  name of whom?

16     A.   Mr. Abdo, sir.

17     Q.   Government's Exhibit No. 22.  A marriage certificate

18  bearing the names of who?

19     A.   Mr. Abdo.

20     Q.   Government's 23, the birth certificate bearing the

21  name of who?

22     A.   Mr. Abdo again, sir.

23     Q.   25 you've previously described as school records

24  bearing whose name?

25     A.   Mr. Abdo.

Direct Examination of Jozef Alter by Mr. Frazier          139

1        Q.    And Government's Exhibit No. 26.  Let me zoom out a

2   little bit on this.  What is Government's Exhibit No. 26?  Do

3   you recognize that?

4        A.    Let me take a look closer.  I'm getting old.

5        Q.    Let me zoom in.

6        A.    This is a certificate of school.  Attending school.

7        Q.    Basically like a State Department certificate --

8        A.    That's correct.

9        Q.    -- of school records?

10       A.    Yes, sir.

11       Q.    And whose names are in the school records?  Whose

12   school record?

13       A.    Mr. Abdo.

14       Q.    Government's 27, the temporary vehicle pass.  Whose

15   name is on 27?

16       A.    Mr. Abdo.

17       Q.    And Government's Exhibit No. 28, this temporary

18   permit.  And whose name is on that certificate?

19       A.    Mr. Abdo.

20       Q.    Government's Exhibit No. 29.  What type of paperwork

21   is Government's Exhibit No. 29?

22       A.    Those are military records basically.

23       Q.    Like enlistment and reenlistment records?

24       A.    That's correct.  Yes.

25       Q.    Whose name is on those records?

1    A.   Mr. Abdo.

2    Q.   Government's Exhibit No. 30.  What is that?

3    A.   It's a certificate of training.

4    Q.   In whose name?

5    A.   Mr. Abdo.

6    Q.   And these are from the U.S. Army, correct?

7    A.   That's correct.  Yes, sir.

8    Q.   And Government's 31?

9    A.   That's a certificate for the Air Assault course.

10   Q.   And whose name is it?

11   A.   Mr. Abdo.

12   Q.   Government's 32?

13   A.   Insurance policy.

14   Q.   And whose name is on the insurance policy?

15   A.   Mr. Abdo.

16   Q.   And is it for the insurance policy for that vehicle?

17   A.   It was.  Yes, sir.

18   Q.   Now, do you recognize -- you've had a chance to look

19  at Government's Exhibits 34 through 41 previously prior to

20  coming into court today, correct?

21   A.   Yes, sir.

22   Q.   Government's Exhibit No. 34.  Do you recognize this?

23   A.   Yes, sir.  Those appear to be the same boxes that

24  were in the front seat or on the floorboard the passenger side.

25   Q.   In fact are they also depicted in the photographs?

1      A.   They are.

2      Q.   Have you had a chance to view previously Government's

3  Exhibit No. 40?

4      A.   Yes, sir.  They are in the photographs.

5      Q.   Okay.  What is Government's Exhibit No. 35?

6      A.   That's the cattle prod that was located in between

7  the passenger and driver side seat.

8      Q.   36?

9      A.   Binocular holders.

10      Q.   Like covers?

11      A.   Covers.  I'm sorry.

12      Q.   Where were they located at in the vehicle?

13      A.   I don't recall where those were located.  Again I

14  wouldn't take a guess because there were so many items.  I

15  think they were in the back seat of the vehicle.

16      Q.   But they were in the vehicle?

17      A.   They were inside the vehicle.  Yes, sir.

18      Q.   Government's Exhibit No. 37?

19      A.   Keys that were located on the passenger side seat.

20      Q.   Okay.  Were these like the keys to the vehicle?

21      A.   It looks like the same keys that were laying on the

22  unsecured vehicle.

23      Q.   Government's Exhibit No. 38?

24      A.   Mr. Abdo's hat.  Military hat.

25      Q.   Do you recall where this was?

1      A.    In the back seat.

2      Q.    Government's Exhibit No. 39.  Do you recognize this?

3      A.    Just trash bags?

4      Q.    Yes.

5      A.    And they were in the trunk.

6      Q.    Government's Exhibit No. 40.  Do you recognize this?

7      A.    Plastic ties.  They were located inside the toolbox

8  in the trunk.

9      Q.    And Government's Exhibit No. 41?

10      A.    They were in a toolbox also in the trunk.

11      Q.    And what is 41?

12      A.    Electrical tape.

13      MR. FRAZIER:  Okay.  Your Honor, we'll offer into evidence

14  at this time Government's Exhibit Nos. 34 through 41 into

15  evidence.

16      MR. BOYD:  No objection.

17      THE COURT:  They're admitted.

18      (Exhibit(s) admitted:  G34 thru G41)

19  BY MR. FRAZIER:

20      Q.    If I didn't previously, I want to verify.

21  Government's Exhibit No. 33 is -- you described as a receipt

22  for handcuffs?

23      A.    Yes, sir.  U.S. Cavalry.

24      Q.    And from your training and experience in the military

25  do you know what Government's Exhibit Nos. 7 and No. 13 are?

Direct Examination of Jozef Alter by Mr. Frazier

1     A.    That's the body bag and a body bag liner.

2     Q.    Do you see these in your experience frequently as a

3  law enforcement officer?

4     A.    I have never seen it in my law enforcement career or

5  on the streets.

6     MR. FRAZIER:  Pass the witness, Your Honor.

7                      CROSS-EXAMINATION

8  BY MR. BOYD:

9     Q.    Did you ever cause any charges to be filed against

10  Mr. Abdo?

11    A.    No, sir.  I did not.

12    MR. BOYD:  Nothing further.

13    MR. FRAZIER:  We have no further questions, Your Honor.

14  May this witness be excused?

15    THE COURT:  Objection, Counsel?

16    MR. BOYD:  None, Your Honor.

17    THE COURT:  You may step down, sir, and you may be

18  excused.

19    We'll recess for lunch at this point until 1:30, ladies

20  and gentlemen.

21    Members of the jury, let me caution you that you -- I've

22  told you that you should not talk about the case with each

23  other or anyone.  You're certainly free to eat lunch together

24  if you wish.  Just talk about the beautiful weather we're

25  having and don't talk about the testimony you've heard,

Direct Examination of Stephen Hauck by Mr. Frazier ——144

1    anything related to the case and certainly you should not use

2    any electronic media to try to gain any information from the

3    case, any cell phone, iPhone computers, anything of that

4    nature.  We'll recess until 1:30.  Be back in the jury room

5    shortly before then.  We'll be ready to proceed.

6         LAW CLERK:  All rise.

7         (Jury exited the courtroom at 11:59.)

8         LAW CLERK:  Court will stand in recess until 1:30.

9         (A break was taken from 12:00 to 1:31.)

10        LAW CLERK:  All rise.

11        (The jury entered the courtroom at 1:31.)

12        THE COURT:  Be seated, everyone.

13        Mr. Frazier?

14        MR. FRAZIER:  We'll call Stephen Hauck as our next

15   witness.

16        Just so you know, Your Honor, this is a witness that's out

17   of order.  It's out of the regular order.  The next witness

18   Mr. Mothershead will be the same way and I've already informed

19   defense counsel.

20        (The witness was sworn.)

21                          DIRECT EXAMINATION

22   BY MR. FRAZIER:

23        Q.   Would you please introduce yourself to the ladies and

24   gentlemen of the jury?

25        A.   My name's Stephen C. Hauck.  I'm an agent with the

Direct Examination of Stephen Hauck by Mr. Frazier

1    Federal Bureau of Investigation.

2         Q.   Are you assigned in Austin, Texas?

3         A.   Yes, sir.

4         Q.   Okay.  And did you -- as part of your job with the

5    FBI did you take samples of certain items to be sent to the FBI

6    crime lab in Quantico, Virginia?

7         A.   Yes, sir.  I did.

8         Q.   Okay.  I'll show you what's been marked for

9    identification purposes as Government's Exhibit Nos. 90 through

10   95.  They're all contained in this bag and they're all

11   canisters marked 90 through 95 in this manner, correct?

12        A.   Yes, sir.  As I received them, they were 1B20 from

13   the search.

14        Q.   Okay.  That's an FBI lab number that's -- or not lab

15   number but a case number that's assigned to items that were --

16   that are seized?

17        A.   Yes, sir.

18        Q.   And just so the record -- this is Government's

19   Exhibit No. 90, 91, 92, 93, 94 and 95?

20        A.   Yes, sir.

21        Q.   Okay.  Were these -- where were these items seized

22   from if you know?

23        A.   As I understand it it was from the hotel room in

24   Killeen, Texas.

25        Q.   That'd be Room 230 of America's Best Value Inn and

Direct Examination of Stephen Hauck by Mr. Frazier

1    Suites in Killeen, Texas?

2         A.   Yes, sir.

3         Q.   Okay.  And after they came into your custody, what

4    did you do with the items marked 90 through 95?

5         A.   I obtained samples from those items and packaged

6    them, provided them to our evidence technician who then shipped

7    them to the FBI laboratory.

8         Q.   Okay.  And that would be to the FBI crime laboratory

9    in Quantico, Virginia, correct?

10        A.   Yes, sir.

11        Q.   Okay.  And do the samples bear your initials?

12        A.   Yes, sir.

13        Q.   Did likewise 90 through 95 bear your initials as

14   opening and taking samples from those?

15        A.   Yes, sir.

16        Q.   I show you what's been marked as Government's Exhibit

17   No. 119.  Can you see that?

18        A.   Yes, sir.

19        Q.   And Government's Exhibit No. 120.  Do you see that?

20        A.   Yes, sir.  I do.

21        Q.   Have you had a chance to see it before coming into

22   court today?

23        A.   I have.

24        Q.   And what are -- Government's Exhibit Nos. 119 and

25   120, where did these come from?

1    A.   The one in the manila envelope --

2    Q.   120?

3    A.   -- came from a pressure cooker that was found in the

4    same room as the powder.

5    Q.   Okay.  90 through 95 that you just identified?

6    A.   Yes, sir.

7    Q.   Okay.  And specifically this item that's marked Q49,

8    what was done with this item?

9    A.   A sample was taken.  It was packaged, provided to an

10   evidence technician who then shipped it to the FBI laboratory.

11   Q.   And this would be the Quantico laboratory, correct?

12   A.   Yes, sir.

13   Q.   And ultimately the entire item went to the Quantico

14   laboratory?

15   A.   As I understand, yes, sir.

16   Q.   Okay.  And finally next Government's Exhibit No. 119.

17   What did you do with Government's Exhibit 119?

18   A.    I took a sample of that item, packaged it and sent it

19   to the FBI laboratory in Quantico, Virginia.

20   Q.   And did you likewise make markings on both these

21   exhibits indicating that you had taken a sample or done some

22   type of processing for it to be forwarded to the FBI crime lab

23   in Quantico, Virginia?

24   A.   Yes, sir.

25   MR. FRAZIER:  Pass the witness, Your Honor.

1                          CROSS-EXAMINATION

2     BY MR. BOYD:

3          Q.   So all you did was -- and the only knowledge that you

4     have is in regards to taking samples and sending them off to

5     Quantico, Virginia?

6          A.   In terms of this case?

7          Q.   Well, in terms of regarding these items that you were

8     just looking at.

9          A.   Yes, sir.  I just took the samples and provided them

10    to the evidence technician for further shipment.

11         Q.   And you don't know -- you weren't at the scene at

12    all?

13         A.   Yes, sir.  I was.

14         Q.   You were?

15         A.   Yes, sir.

16         Q.   So did you recover any of these items?

17         A.   I did not.

18         Q.   Did you view these items while they were at the

19    scene?

20         A.   I did.

21         Q.   Okay.  So you saw the physical locations.  Now, the

22    stuff at the scene, was that before or after the items got

23    moved by EOD?

24         A.   I came in behind EOD.

25         Q.   So EOD had already moved everything in the room?

1    A.   I can't say -- I can't testify to what they did or

2    did not do.

3    Q.   So you didn't review any of the reports to see

4    whether or not they had?

5    A.   I did not.

6    Q.   Have you ever appeared behind EOD before?

7    A.   Have I ever followed in behind EOD?

8    Q.   Yes.

9    A.   I have.

10   Q.   Is it their practice to move things?

11   A.   I do not know for a fact whether they do or not.

12   MR. BOYD:  Nothing further.

13   MR. FRAZIER:  Nothing further, Your Honor.

14   THE COURT:  You may step down, sir.

15   Any objection to the witness being excused?

16   MR. BOYD:  No, Your Honor.

17   MR. FRAZIER:  No, sir.

18   THE COURT:  You may be excused, sir.

19   MR. FRAZIER:  Robbie Mothershead will be the government's

20   next witness.

21   (The witness was sworn.)

22                    DIRECT EXAMINATION

23   BY MR. FRAZIER:

24   Q.   Would you please introduce yourself to the ladies and

25   gentlemen of the jury?

Direct Examination of Robert Mothershead by Mr. Frazier -150-

1      A.   Yes.  My name is Robert Mothershead.  The last name

2  is spelled M-o-t-h-e-r-s-h-e-a-d.

3      Q.   And how are you employed?

4      A.   I'm employed by the Federal Bureau of Investigation.

5      Q.   And what do you do for the FBI?

6      A.   I'm a forensic chemist examiner in the FBI's

7  laboratory division.

8      Q.   And what type of specialty do you have within the FBI

9  in the forensic examination area?

10     A.   I'm a member of the explosive units and my work

11 focuses on explosives chemistry, the residues of explosives as

12 well as ignitable liquids which are things like gasoline,

13 kerosene, diesel that are used in arson cases.

14     Q.   All right.  And what qualifies you for that position?

15     A.   I have a bachelors degree in chemistry.  I have a

16 masters degree in marine science.  I have also completed an

17 extensive training program at the FBI laboratory in the area of

18 explosives analysis.  This included going through analyzing

19 practice samples all under the supervision of a qualified

20 examiner, passing competency tests in each of the types of

21 methods and procedures that we use for that analysis.  I then

22 continued to analyze actual samples in casework.  I have passed

23 annual proficiency tests in the area of explosives analysis for

24 each year that I have done that.  I've studied the literature

25 on explosives as well as their analysis.  I've taken

Direct Examination of Robert Mothershead by Mr. Frazier -151-

1    specialized coursework on the instruments and the machines in

2    the lab that I use for this analysis and I have over nine years

3    of experience analyzing explosives and explosive residues.

4         Q.   And how many cases in your career have you --

5    approximately is it -- let me rephrase the question.

6         Would it be safe to say that you've investigated or you've

7    given an opinion based on your examination of explosive

8    material in hundreds of cases during that time?

9         A.   I've analyzed hundreds of samples.  I've written

10   perhaps 100 reports.  I don't have an exact number for you on

11   that.

12        Q.   That's what I'm asking you about.  So are you

13   qualified based on your training and experience to take an

14   unknown substance, analyze it and determine what that substance

15   is and determine whether or not it's an explosive or not or

16   what type of action it may have based on the chemical analysis

17   you do?

18        A.   Yes, again focused on explosives.

19        Q.   Okay.  And have you done that on few or many

20   occasions in the years you've been an analyst doing explosives

21   work?

22        A.   Yes.  Many.

23        Q.   Okay.  I want to ask you if you received from the FBI

24   Austin office from an evidence technician samples that were

25   submitted by Stephen Hauck from six bottles of what was

Direct Examination of Robert Mothershead by Mr. Frazier -152

1    represented to be smokeless powder?

2        A.   Yes.  Evidence came into the laboratory and then I

3    was presented the samples for analysis.

4        Q.   Okay.  I want to ask you first of all -- and so I'm

5    clear on this I'm going to follow your lab numbers.  They're a

6    little bit different than my exhibit numbers, but I want to

7    make sure we're talking about the same thing.  Okay?

8        A.   Okay.

9        Q.   Q16 is a sample from a Hogdon brand 4350 canister; is

10   that correct?

11       A.   That's how it was reported in the incoming

12   information.

13       Q.   I'm showing you what's been marked as Government's

14   Exhibit No. 94 for identification purposes only.  Would that be

15   a container that you have a photograph of that accompanied the

16   exhibits you received?

17       A.   I received photographs of a similar bottle.  I can't

18   tell you if that's the exact one.

19       Q.   That's not what I -- I'm sorry.  Let me rephrase the

20   question.  It's similar to -- it's the same bottle -- not the

21   same bottle but it's the same type of bottle that's depicted in

22   the photographs?

23       A.   For that bottle.  Yes, sir.

24       Q.   And the sample that you submitted had that type of

25   reference number the Hogdon brand 4350, correct?

Direct Examination of Robert Mothershead by Mr. Frazier -153-

1      A.   It was handwritten on the bag that the sample was

2   contained in.

3      Q.   Okay.  Government's Exhibit No. 95, your Q17 -- or

4   I'm going to ask you to compare it to Q17.  A Hogdon brand HS7

5   canister.

6      A.   Yes.

7      Q.   Okay.  Is that what was represented in the

8   photographs that was submitted to you as well?

9      A.   That was represented in the photographs.

10     Q.   Government's Exhibit No. 90, an IMR 4198 canister.

11  Was that likewise depicted in the photographs associated with

12  the sample that was submitted to you?

13     A.   Yes.

14     Q.   Government's Exhibit No. 92, Hogdon H414 canister.

15  Is that also depicted in the photographs submitted to you with

16  the sample that was also submitted?

17     A.   Yes.

18     Q.   And that's your Q19.  And in Q20, Government's

19  Exhibit No. 91, a canister marked Hogdon brand HS6 canister.

20  Was that likewise a photograph submitted of that along with the

21  sample represented from -- to be from this canister?

22     A.   Yes.

23     Q.   And finally your Q No. 21, Government's Exhibit No.

24  93, a sample from Hogdon brand Lil'Gun canister.  Was a

25  photograph of this canister likewise submitted to you along

Direct Examination of Robert Mothershead by Mr. Frazier -154-

1    with a -- what was purported to be a sample?

2        A.   Yes.

3        Q.   Okay.  When you received these samples into your lab

4    and these photographs, tell the ladies and gentlemen of the

5    jury what you did.

6        A.   Because these samples were purported to be from cans

7    of smokeless powder, I conducted the analysis that we do for

8    smokeless powder.  That's fairly unique, low explosive

9    material.  It has particular types of shape of form to it which

10   I can see very clearly under a microscope.  So the very first

11   thing I do if I get in a gray powder, which is what smokeless

12   powder looks like, is to look under the microscope, see if I

13   see any of those recognizable shapes.  Those shapes can be

14   referred to as flakes or disks almost like slices of pepperoni

15   or they can be in little balls or the balls can be squashed

16   somewhat so they'll have flat surfaces or they can be like

17   squares that are cut on an angle.  So I look for these

18   characteristic shapes and forms.  If I see that, I then proceed

19   to the chemical analysis.  Smokeless powders are a -- similar

20   to what you would think of as pasta.  They're a dough that's

21   blended with lots of chemicals in together and I look to see if

22   I can identify the chemicals that are in it if those chemicals

23   are the chemicals that are used in smokeless powder.  And

24   that's the procedure we use for that.

25       Q.   Okay.  And as to each of the exhibits, your marked

Direct Examination of Robert Mothershead by Mr. Frazier -155-

1    Q16 through Q21, my Government's Exhibits 90 through 95 that I

2    just showed you the canisters of, what as to each of those

3    samples were you able to make a determination?  First as to

4    Q16, Government's Exhibit No. 94?

5        A.   That sample that I received was smokeless powder and

6    I also compared that to a reference collection of data that we

7    have in the lab on like, make and models of smokeless powder

8    that we've analyzed and it also matched to that make and model.

9    The chemistry and the physical shape were a match to that as

10   well.

11       Q.   Meaning it was similar to -- in size and shape and

12   characteristics to Hogdon H4350 rifle powder?

13       A.   It was consistent in both the physical and the

14   chemical characteristics with that make and model of smokeless

15   powder.

16       Q.   Next Government's Exhibit No. 95, your sample No.

17   Q17, the sample that you received.  Tell the jury what the

18   results of your analysis was on that.

19       A.   Again it was identified as a smokeless powder.

20   Comparing it to our reference collection for that make and

21   model, it was physically and chemically consistent.

22       Q.   Okay.  And meaning it would be consistent with Hogdon

23   HS7 pistol powder?

24       A.   As labeled.  Yes.

25       Q.   Next Government's Exhibit No. 90, sample submitted

Direct Examination of Robert Mothershead by Mr. Frazier -156 —

1  referenced IMR 4198.  Can you tell the jury what the results of

2  your tests were on that sample?

3     A.   Yes.  It was identified as a smokeless powder.  Again

4  it was physically and chemically consistent with our reference

5  collection material that is similar to that make and model of

6  powder on the label.

7     Q.   Meaning IMR 4198?

8     A.   Correct.

9     Q.   Next your Q19, Government's Exhibit No. 92.  Can you

10  tell the jury what the result was of your analysis of that

11  sample?

12     A.   Yes.  That was identified as a smokeless powder.

13  Again the chemistry and the physical form are consistent with

14  that H414 from our reference collection and as depicted on the

15  label.

16     Q.   All right.  And finally Government's Exhibit No.

17  91 -- no.  I'm sorry.  Next Government's Exhibit No. 91, your

18  reference No. Q20.  Tell us what the results of your tests were

19  on the sample that was submitted.

20     A.   Again the contents were identified as a smokeless

21  powder and it was physically and chemically consistent with our

22  reference collection data for that make and model of material.

23     Q.   That would be Hogdon HS6?

24     A.   Correct.

25     Q.   Finally Government's Exhibit No. 93.  The sample from

1    the -- the sample submitted from this particular bottle or

2    represented to be from this particular bottle.  What was your

3    analysis of that sample, your Q No. 21?

4        A.    It was identified as a smokeless powder.  Again it

5    was physically and chemically consistent with our reference

6    collection Exhibit 4 Lil'Gun which is the same as the labeling

7    on that.

8        Q.    That would be Hogdon Lil'Gun?

9        A.    Hogdon Lil'Gun.  Yes.

10       Q.    So then do you have an opinion then as to what is

11   contained in each of the items taken Government's Exhibit

12   Nos. 90 through 95?

13       A.    The samples that I received in the lab each were

14   smokeless powder and each were consistent physically and

15   chemically with the labeling that was purported to be on the

16   bottle that they were taken from.

17       Q.    Okay.  What is smokeless powder?  I think you've

18   generally described the chemistry of it.  What is smokeless

19   powder used for?

20       A.    Smokeless powder is used as a propellant in

21   ammunition.  So it's designed to burn at a controlled rate

22   creating gas and that gas is then used to push or propel a

23   bullet or a shotgun load or in large ammunition a rocket or

24   something along its way.

25       Q.    Does it have other uses other than just for

1    ammunition?

2        A.    It's ammunition.  In large scale military

3    applications it can be fairly large shells.

4        Q.    But in addition those are the uses other than what

5    it's intended for.  In other words uses other than just for

6    ammunition.  Is it explosive and can it be used to build

7    destructive devices?

8        A.    It is classified as a low explosive, meaning it burns

9    instead of instantaneously going away.  It builds up that gas.

10   It can build up pressure.  If there's not a way to release that

11   pressure as would normally happen in a gun where the bullet

12   leaves the barrel and the pressure is finally released out of

13   the end, that pressure builds up.  That can cause an explosion.

14       Q.    All right.  Thank you.

15       You've had a chance before coming into court today to see

16   Government's Exhibit No. 119, your Q No. 35, and Government's

17   Exhibit No. 120, your Q No. 49?

18       A.    Correct.

19       Q.    Okay.  And can you tell us what analysis you

20   performed on Government's Exhibit No. 119 first of all?

21       A.    Again can you cite the Q number?

22       Q.    Q No. 35.  Excuse me.

23       A.    Q35 I looked at that under the microscope.  I did not

24   see when I held it up to my naked eye any dark gray material

25   which is what smokeless powder looks like.  So I looked at it

Direct Examination of Robert Mothershead by Mr. Frazier -159-

1    on the microscope.  I did not see any of the shape, form or

2    color of material that would look like smokeless powder.  So at

3    that point I stopped all examinations.  No further chemical

4    testing was done on that.

5        Q.   Okay.  Did you later try to identify what the white

6    what looks like powder or pellets inside -- first of all, Q35

7    contains what looks like BBs or shot and some small white

8    granules in it, correct?

9        A.   Right.  There was small metal balls looked like BBs

10   and then there was also a sort of white or opaque kind of off

11   white plastic looking material grains in there.  Almost looked

12   like rice grains.

13       Q.   Were you able to identify what at least one of the

14   ingredients was?

15       A.   I did not do chemical testing on that particular

16   item.

17       Q.   Okay.  What does this appear to you to be?

18       A.   It appears as to be a small grain of a plastic

19   material.  Since conducting this analysis --

20       Q.   Right.

21       A.   -- I have done some research into what possibly can

22   come out of ammunition.  There is a possible candidate of the

23   buffer material that is used in some shotgun shells mixed in

24   with the shot to make a tighter target essentially of the shot

25   coming out.

1    Q.   All right.

2    A.   That's a possibility.

3    Q.   Correct.

4    Now I'm showing you Government's -- your Q49, Government's

5    Exhibit No. 120.  Do you recognize this?

6    A.   I believe so.  It's a little far away actually.

7    MR. FRAZIER:  May I approach the witness briefly, Your

8    Honor?

9    THE COURT:  Yes, sir.

10   BY THE WITNESS:

11   A.   Yes.  I recognize that.

12   BY MR. FRAZIER:

13   Q.   Tell us what Government's Exhibit No. 120 -- you

14   performed an analysis on that as well, correct?

15   A.   I did.  And the first step was to look at it under

16   the microscope.  I could tell that there was some dark material

17   in there.  When I looked at it under magnification, I could see

18   some of the shapes, those disks or flakes that I mentioned that

19   were characteristic of possible smokeless powder.  I then

20   proceeded to do chemical testing on that dark material.  Again

21   identified it as smokeless powder.

22   Q.   Okay.  And the other items that are in there with the

23   dark powder, what are those?  What do those appear to be?

24   A.   So there appeared again to be BBs, small metal

25   spheres.  There also appeared to be again those white rice

1    grain type looking materials in which case I did test one of

2    those since they were mixed in with the smokeless powder just

3    to make sure it wasn't an explosive and also to see if it was

4    going to have any chemistry that would potentially contaminate

5    or conflict with my analysis for the smokeless powder

6    particles.

7         Q.   And what did your analysis reveal those white grains?

8         A.   I did a quick test just to see what the bulk material

9    was.  The test indicated a very strong possibility for

10   polyethylene which is a plastic.

11        Q.   Okay.  Is polyethylene an ingredient in some

12   buffering of shotgun shells?

13        A.   It's -- I found it listed as an ingredient in some of

14   the -- some of the buffer materials.

15        Q.   For shotgun ammunition?

16        A.   Correct.

17        Q.   Okay.  And so basically then do you have an opinion

18   then of what is contained in Government's Exhibit No. 120, the

19   black powder?

20        A.   The black powder was smokeless powder.

21        Q.   Okay.  And did you do an analysis like you did a

22   reference to try to reference the sample to see maybe where it

23   originated or where it could have come from based on your

24   library of materials?

25        A.   Not specifically.  The chemistry of that material was

1    very similar as well as the physical form to one of the earlier

2    items that was introduced.  It was our Q21.  So again in

3    looking through the database I found several different examples

4    of smokeless powders in our over 700 and some references that

5    have similar chemistry and physical shape.  So it could be any

6    of those particular ones or it could be others that we simply

7    haven't analyzed yet in our lab.

8         Q.   For instance it could be gun powder out of a shotgun

9    shell?

10        A.   That's certainly possible.  Yes.

11        Q.   But you -- that's not something you would analyze

12   for?

13        A.   I analyze for the smokeless powder.  You can get the

14   smokeless powder out of shotgun shells or you can buy it across

15   the counter at retailers that sell smokeless powder for

16   reloading purposes.

17        Q.   Okay.  Now, did you also receive from the FBI office

18   in Austin, Texas Government's Exhibit No. 137, your Q No. 45?

19        A.   Yes.  I did.

20        Q.   This being a metal plate with what looks like a

21   melted razor on it, correct?

22        A.   There were several things in there including the

23   melted plate.  There was a plastic bag or film material.

24   Adhered to that was -- appeared to be some melted plastic which

25   contained -- it looked like a disposable blue plastic razor

1    that was caught up in that melt.

2         Q.   Okay.  Did you perform an analysis on 137?

3         A.   I did.  Again I looked at the item under a microscope

4    to see if there were any dark grains that were stuck in that

5    and found some that were adhered both lightly to the plastic as

6    well as embedded in some of the -- what appeared to be melted

7    plastic to me and some loose materials that were again dark

8    grain.

9         Q.   Okay.  And what -- did you perform an analysis on any

10   of the dark grains?

11        A.   I did.

12        Q.   And what did you do?

13        A.   I conducted the smokeless powder analysis that I

14   discussed earlier, again looking at them noting the shape and

15   form and then conducting the chemistry analysis on them.

16        Q.   Okay.  What -- do you have an opinion as to what

17   those black grains were?

18        A.   They were smokeless powder.

19        Q.   Okay.  Were you able to compare them as being similar

20   to anything else you had analyzed in this particular case?

21        A.   Again they had the same physical form and the same

22   chemical makeup as both the smokeless powder that was in Q21.

23        Q.   Which is Government's Exhibit No. 93?

24        A.   Okay.  And they also had the same physical form and

25   composition as what was the smokeless powder particles in Q49.

1      Q.   Which is Government's Exhibit No. 120?

2      A.   Okay.

3      Q.   And this particular plastic that's here that -- in

4  addition to the -- what appears to be a melted razor that --

5  what -- the white plastic there, was that consistent with

6  anything that you -- or that you observed in your analysis of

7  these items?

8      A.   Yes.  Because the smokeless powder particles were

9  embedded and in direct contact with that, again I took a small

10  sampling of that -- a shaving of that melted material and did a

11  quick analysis just to see what sort of background chemicals

12  might be present.  The testing I did indicated again a strong

13  possibility that material was polyethylene.

14      Q.   Would that be similar -- polyethylene be similar to

15  the analysis you did on the white or rice like items in

16  Government's Exhibit No. 120, your Q49?

17      A.   It was the same analysis and the same results.

18  That's not a final identification of polyethylene.  A polymer

19  chemist in the explosives -- or in the FBI laboratory would

20  have had to make the final identification of polyethylene.  But

21  it was consistent with that based on my initial analysis.

22      Q.   Okay.  And would that be consistent then with --

23  could it be consistent rather with gun powder and buffering and

24  shot that came from a shotgun shell?

25      A.   It was polyethylene.  Polyethylene's a fairly common

1    plastic.  So yes.  It was in those items and indications that

2    the buffering material can have polyethylene.  It could also be

3    another source.

4        Q.   It could have come from another source.  That's

5    correct.  But one of the item -- sources it could have come

6    from would be that?

7        A.   Correct.

8        Q.   Do you know how a shotgun shell is put together or

9    manufactured?

10       A.   Very roughly.

11       Q.   Roughly how is it done?

12       A.   Roughly at the end of -- one end of the shotgun shell

13   is the primer cup.  The -- that's hit, creates a spark that

14   lights the smokeless powder which then burns, cause that

15   propelling and then that pushes against a wadding material

16   that's in the shell and then the shot material, usually the

17   metal spheres, push them out of the barrel.

18       Q.   And the buffering is mixed in with the shot?

19       A.   When it's present it's mixed in with the shot.  The

20   metal spheres.

21       MR. FRAZIER:  Pass the witness, Your Honor.

22                         CROSS-EXAMINATION

23   BY MR. BOYD:

24       Q.   So basically you tested the contents of this and

25   determined this is really smokeless powder?

1      A.   Correct.

2      Q.   And that's for each of these six bottles?

3      A.   Correct.

4      Q.   You testified that it's a low explosive?

5      A.   Correct.

6      Q.   And that's because it burns?

7      A.   Correct.  One of the ways of classifying explosives

8  is how rapidly it reacts and they're classified into low

9  explosives and high explosives.  So high explosives go away

10  almost immediately.  So we think of the traditional military

11  explosives are blasting explosives.  Low explosives are one

12  again that burn at a rate we can notice.  So this class

13  includes the pyrotechnics fireworks as well as smokeless

14  powders.

15      Q.   And with respect to creating an explosive reaction,

16  you noted pressure is required with stuff like this?

17      A.   Right.  In open air burning that material it doesn't

18  explode.  It can build up pressure because of the release of

19  the gas.  That pressure build up can ultimately lead to an

20  explosion.

21      Q.   And in the open air it's not an explosion.  It's a

22  deflagration?

23      A.   Correct.  Deflagration is a very fast burn.

24      Q.   And all that means is we haven't reached the required

25  definition to have an explosion.  We have a burn but we don't

Cross-Examination of Robert Mothershead By Mr. Boyd ——167

1   have an explosion?

2       A.   Actually that's not quite correct.

3       Q.   Okay.

4       A.   An explosion is a rapid release of energy.  And that

5   can come in various forms and usually it's accompanied with

6   heat and light and sound.  So a low explosive can cause an

7   explosion if that pressure and that heat is retained and to the

8   point where it ruptures whatever container or vessel it is and

9   all of a sudden there's a rapid release of that energy.

10      Q.   Okay.  So you don't differentiate between an

11  explosion and a deflagration?

12      A.   Deflagration relates to the burning rate of the

13  material itself.  The explosion is more a description of the

14  event that occurs again with that rapid release of energy.  So

15  a deflagration can if contained in that material and the gases

16  and all retained can lead to an explosion, but it doesn't have

17  to.  It depends on how it's -- how the device, whether it be a

18  gun or whatever, is designed and built.

19      Q.   And so it's important for a device to be designed and

20  built the right way?

21      A.   Yes.  And again I should make a note here.  I am an

22  explosives chemist.  I do analytical chemistry.  I am not a

23  device examiner in the unit.  Those are other examiners that

24  are present that are the device experts.

25      Q.   Well, I understand, but you understand how this stuff

1  works?

2      A.   I have, yes, a basic understanding of --

3      Q.   And --

4      A.   -- how it works.

5      Q.   And you understand that as a scientist things are

6  supposed to be done very precisely, right?  When you're

7  testifying, you test things very precisely?

8      A.   We try to.  Yes.

9      MR. BOYD:  Your Honor, just one moment.

10 BY MR. BOYD:

11     Q.   With regards to the items that you tested, did you

12 just work with samples or did you work with samples and

13 locations from which they were tested?

14     A.   I'm not clear I understand the question.

15     Q.   Did you just receive something in the mail that was a

16 sample and just test it to establish what it was or were you

17 made aware of where it came from?

18     A.   I received a sample in the mail that I analyzed.

19 There was information contained as far as the container that

20 the loose powders were submitted from.  So that information was

21 provided.  There's general case information.  Beyond that I'm

22 not clear what specifics.

23     Q.   You never saw the crime scene?

24     A.   Correct.  I did not.

25     Q.   You never went back behind it and asked to look at

Cross-Examination of Robert Mothershead by Mr. Boyd

 1    photos from the crime scene?

 2         A.    No.  I did not.

 3         Q.    You never did anything investigatory towards the case

 4    other than classify these items?

 5         A.    I just conducted the chemical analysis.

 6         MR. BOYD:  Nothing further.

 7         MR. FRAZIER:  Nothing further, Your Honor.

 8         THE COURT:  You may step down, sir, and you may be

 9    excused.

10         MR. SCHNEIDER:  The government calls Abraham Wherry.

11         (The witness was sworn.)

12                        DIRECT EXAMINATION

13    BY MR. SCHNEIDER:

14         Q.    Good afternoon, Mr. Wherry.

15         A.    Good afternoon.

16         Q.    Would you please state your name for the record?

17         A.    Abraham Eugene Wherry.

18         Q.    And by whom are you employed?

19         A.    ███████.

20         Q.    How long have you been employed at ████████?

21         A.    A couple years.  About two.

22         Q.    And where is that ████████ store that you're

23    employed?

24         A.    Antioch, Tennessee.

25         Q.    Where do you reside?

1    A.    ███████.

2    Q.    Now, directing your attention to July of 2011.  Were

3  you offering any items for sale at that time?

4    A.    Yes.  Selling an XD 40-caliber handgun.

5    Q.    And how did you list that item?

6    A.    I listed it on Boo.com which is like Fort Campbell

7  type Craig's List for the military base there.

8    Q.    And who has access to that web site?

9    A.    Anyone has access to it but mostly military and

10  military families use it to sell and buy used goods and they

11  also have a military section for military gear or firearms.

12    Q.    And what exactly were you selling as part of the gun?

13  Was anything else included?

14    A.    Yes.

15    Q.    Or was it just the gun?

16    A.    It was a handgun.  I had two mags that came with the

17  gun.  I also had bought an extra mag, an extended clip and I

18  put that in and a holster and the original case that it came in

19  with a lock for the gun.

20    Q.    And was there any ammunition included with that sale?

21    A.    Yeah.  I had a one round -- well, one magazine full

22  of ammunition.

23    Q.    And one magazine would hold about how many rounds?

24    A.    I think it was in the extended mag and that would

25  have been about 12.  If it was in the regular mag it would have

Direct Examination of Abraham Wherry by Mr. Schneider —171—

1    been nine, but I think it was the extended mag which would have

2    been about ten to 12 if I had them in there.

3         Q.   And you were including some ammunition with the sale?

4         A.   Yeah.  I think I had one mag full and I took them out

5    before I had sold the gun and gave it to him.

6         Q.   Did there come a time that you ultimately found a

7    buyer for that gun?

8         A.   I did.

9         Q.   When was that?

10        A.   July the 7th is when I sold it of 2011 I believe.

11        Q.   And how were you contacted by the buyer?

12        A.   Through the phone.  I think he had text messaged me.

13   I don't remember exactly if he texted me or called me, but I'm

14   pretty sure he texted me.

15        Q.   Did there come a time when you met with the buyer to

16   sell that gun?

17        A.   I did.

18        Q.   And when was that?

19        A.   July the 7th I believe the date was.

20        Q.   That was 2011?

21        A.   Yeah.

22        Q.   And where -- where did you set up a meeting to sell

23   that gun?

24        A.   Downtown Nashville.

25        Q.   What time of day were you setting up that meeting?

1    A.    It was sometime in the afternoon.  It was before I

2  had to go to work.  So sometime mid afternoon.  I'm going to

3  say between 1:00 and 3:00 or 1:00 and 4:00.  Between 1:00 and

4  4:00ish.

5    Q.    And did you choose any specific location in downtown

6  Nashville?

7    A.    Yeah.  The UPS.  I -- basically any time -- that's

8  the first time I sold a handgun, but I had a -- required to get

9  a notary, a bill of sale.  So I told him to meet me downtown

10  because I was going to get a bill of sale at the UPS.  So we

11  met downtown and that's why I met there because UPS would

12  notary.

13    Q.    Okay.  So you knew that UPS you can get a notary?

14    A.    Yeah.

15    Q.    You can get something notarized there?

16    A.    Yeah.  I checked with them to make sure they do the

17  notaries and I wrote a bill of sale out.  So...

18    Q.    Now, how far is Nashville from Fort Campbell?

19    A.    About -- driving minutes wise?

20    Q.    Yes.

21    A.    About 40 minutes.

22    Q.    And did there come a time that you actually met up

23  with the buyer by that UPS store?

24    A.    Yeah.  We did.  That same day that afternoon.

25    Q.    Now, how did you recognize the buyer?  Did you know

Direct Examination of Abraham Wherry by Mr. Schneider —173—

1  the buyer or was it someone you had never met?

2      A.   No.  I'd never met him.  I didn't know him, but I

3  think we were texting and I was asking where he was at and he

4  had given me a call or I gave him a call.  I don't remember.

5  And I was on the street driving straight and I had seen him.  I

6  don't remember the exact words, but he either said I'm the one

7  with the hat and glasses or I had seen him on the phone when he

8  was walking.  I was like, I think I see you and then he came up

9  and got off the phone.  Then I let him in the car and then we

10  went around -- well, we went like a block up the street and

11  pulled into a parking -- a parking lot.

12      Q.   So when you first saw him you mentioned he was

13  wearing a hat and glasses.  Can you describe the hat and

14  glasses?

15      A.   Just like a front -- like a billed hat where it's

16  bent in the front and some like shades like darker shades like

17  what a -- what you would see a lot of the I guess you could say

18  younger military guys wearing.

19      Q.   And did he wear those shades -- were they sunglasses?

20      A.   Yeah.  They looked like -- yeah -- yeah.  Sunglasses.

21  Either sunglasses or maybe some like shooting glasses but yeah.

22  One or the other and he had a T-shirt and I believe some shorts

23  on.

24      Q.   Did he wear the sunglasses the whole time if you

25  remember?

Direct Examination of Abraham Wherry by Mr. Schneider

1   A.   No.   I think he took them off in the car.  I'm pretty

2   sure he did because we was talking for a little bit.

3   Q.   Okay.  And what did you do after meeting up in the

4   car?

5   A.   Well, we went to the parking lot and I just asked him

6   about the military, you know, if he liked it and stuff like

7   that and what he did in the military and -- because I was

8   interested in joining the military.  My family's military and,

9   you know, I showed him the gun.  I basically showed him all the

10  basic functions of the gun, how to break it down, just

11  cleaning, just basic functions of it and then we went inside,

12  got a notary.  At some point he'd also got an envelope to put

13  it in to put the box --

14  Q.   Okay.  Let me stop you there and just go back to the

15  car.  So you're in the car.  You meet up with the buyer.  And

16  what exactly are you talking about if you remember?

17  A.   Well, I was asking about the military if he liked it.

18  He said -- I think he said it was okay or something around

19  about like that.  I asked him -- I think he told me he had got

20  back from overseas doing maybe a tour or, you know, he just got

21  back or something and he might have mentioned -- I don't

22  remember exactly.  He might have mentioned that he was thinking

23  about getting out.  I think he had told me also that the gun --

24  he was just using it for home protection, you know, and I think

25  that's about it and just the basic functions of the gun like

1    the breakdown, takedown lever.

2        Q.   Okay.  Do you recall anything about the way he spoke?

3        A.   Yeah.  He had a slight accent like I didn't know

4    where it was from, but I was thinking he was -- I was trying to

5    pinpoint it when I was actually speaking to him but I was

6    thinking he was just from maybe like just, you know,

7    somewhere -- somewhere where they talk like the way he talks,

8    you know.

9        Q.   Now, while you were in the car, other than making

10   small talk did you discuss guns generally and that gun

11   specifically?

12       A.   Not really.  I mean, we discussed that gun

13   specifically because I was just basically giving him the

14   information that I know like the basic stuff because even

15   though he's in the military, I don't think regular soldiers

16   carry sidearms or handguns.  I think most of them carry just

17   their primary weapon which is the M4 or whatever and they don't

18   carry a handgun unless they're an officer.  So I didn't

19   really -- it didn't strike me as something that was unusual.

20   So I just talked about the gun.  I just told him how to break

21   it down, clean it.  I might have showed him side alignment.

22   You know, other than that, that's about it.  Maybe like the

23   ambidextrous mag release.  I mean, just the basic functions.

24   That's it really.  And then like I said about the information

25   on the military if he liked it and, you know, that's about it.

1    Q.   So did you ultimately make a deal to sell that gun

2    while you were together?

3    A.   I did.

4    Q.   And what happened when you made that deal?

5    A.   He gave me the money for -- I think it's 460 cash I

6    believe.  I can't remember exactly, but I think it was around

7    460 cash.  I gave him the gun, unloaded one of the magazines,

8    told him he could keep the ammo.  It was like only 12 rounds or

9    so.  I gave him -- I think I also gave him an extra holster

10   that I had for the gun that I was selling with it, but I think

11   I just threw it in there and gave it to him because I didn't

12   have a use for it.  And either we had went inside and got the

13   notary and came back out.  At some point though he had got an

14   envelope when he was inside and then --

15   Q.   Okay.  Let me stop you there and ask you about the

16   notary.  You said you went inside to get a notary.  What was it

17   that you were getting notarized?

18   A.   The bill of sale for the handgun.

19   Q.   And did you prepare a bill of sale?

20   A.   I did.  I wrote it out.

21   Q.   Okay.  I'm going to show you Exhibit No. 43 for

22   identification.

23   A.   All right.

24   Q.   Do you recognize that exhibit?

25   A.   I do.

1    Q.   What is it?

2    A.   It's a -- my bill of sale for the Springfield XD

3  40-caliber handgun.

4    Q.   And is it your handwriting on there?

5    A.   Yes.  It is.

6    Q.   Is it your signature?

7    A.   It is.

8    MR. SCHNEIDER:  Your Honor, we move to have Government's

9  Exhibit No. 43 in evidence.

10    MR. BOYD:  No objection.

11    THE COURT:  It's admitted.

12    (Exhibit(s) admitted:  G43)

13  BY MR. SCHNEIDER:

14    Q.   Looking at that bill of sale, was that signed by the

15  buyer?

16    A.   It was.

17    Q.   Do you remember the buyer's name?

18    A.   I don't remember the name he gave me when we met.

19  Looking at this, Asher Pluto.  But I don't remember him

20  actually, you know, telling me his name, but I'm sure he did.

21    Q.   Okay.  Do you remember what the person looked like

22  that was the buyer of the gun?

23    A.   I do.

24    Q.   Okay.  I'm now going to show you what's already in

25  evidence as Government's Exhibit No. 153A.  Do you recognize

1    that photo?

2         A.    I do.

3         Q.    And who is that?

4         A.    The gentleman that purchased the handgun from me.

5         Q.    And just to show you 153B.  Is that the same person?

6         A.    Looks like the same person to me.  Yep.

7         Q.    Now, you said you went into the UPS store and you had

8    your bill of sale notarized?

9         A.    Yes, sir.

10        Q.    What, if anything else, happened while you were

11   inside the UPS store?

12        A.    The only thing else that might have happened was he

13   got the envelope.  I just don't remember when he got it in the

14   process of doing the notary for the bill of sale.

15        Q.    Okay.  Can you explain what you mean by he got the

16   envelope?  What exactly happened with an envelope?

17        A.    I think he just remembered that he needed to get an

18   envelope and I was like, okay.  And then he bought -- he

19   purchased the envelope and then we went back to the car at some

20   point and when basically the transaction was complete and, you

21   know, he was -- he put the handgun -- we put the handgun in the

22   case and locked it and stuff.  I think he was riding a bus.

23   I'm not positive, but I think he was riding public

24   transportation because I seen him walking and he might have

25   mentioned it and he put it in the envelope and --

1      Q.   Let me stop you there.  How big was the envelope?

2   Was it a small letter size envelope?

3      A.   No.  It was bigger.  It was like -- I don't --

4   something like this (indicating.)

5      Q.   Okay.  We can't capture that for the record.  Could

6   you estimate about how big the envelope was in inches?

7      A.   I'm going to say at least about 14 inches by --

8   probably 14 by ten at least because it has -- the case fit

9   inside and it had to fit inside.  So the case was, you know,

10  about 12 inches or so.  Maybe ten, 12 inches.

11     Q.   So you saw the individual put the gun inside the

12  envelope?

13     A.   Yeah.  Well, he put it in there.  We put the gun and

14  the mags and everything in the case and it's a lockbox.  So we

15  locked the case and then he put that in the envelope and then,

16  you know, sealed it and then just wrote on it.  He said that he

17  had learned of something that if you write on there like

18  attorney privileges or something around that -- I don't know

19  the exact words -- but that the police wouldn't be able to

20  search it if you was to get pulled over or if you was to, you

21  know, out in the public or, you know, if the police was to

22  approach you or whatnot which I think he was riding the city

23  bus.  So I was like okay.  That makes sense.

24     Q.   And how long were you together?  How long was this

25  whole transaction?

1      A.   From the time I picked him up until the time he left,

2    I'm going to say about 15 minutes around about maybe give or

3    take.

4      Q.   While you were together and discussing this gun sale

5    did you have any discussions about licenses or permits or

6    anything like that?

7      A.   Yeah.  I think he had mentioned -- well, I don't know

8    how we got to talking about it, but he had -- I don't know if I

9    mentioned I had a handgun permit because I think I did because

10   I had a handgun on me at the time because I have a permit.  I

11   carry one normally, but he had said -- I think that's when he

12   had told me that he was just planning on using it not to carry.

13   He was just going to keep it in the house for like home

14   protection or something like that.  So...

15     Q.   Okay.  Now, just to clarify again what were the items

16   that you sold during that transaction?

17     A.   The Springfield XD 40-caliber handgun, two mags, one

18   regular, one extended mag that came with it.  I bought an extra

19   mag that I also put in.  So basically the handgun, three mags

20   and the case.  There would have been a generic OEM handgun

21   holster, an OEM magazine holster and the lock for the handgun

22   and the case and 12 rounds of -- or ten, 12 rounds, however

23   many it was.

24     Q.   And when you sold him all these items, were the

25   rounds of ammunition inside the gun?

1    A.   And the holster, too.  Sorry.

2    No.  The -- well, I don't remember if I -- the rounds were

3  in the magazine but they wasn't chambered and then when I sold

4  it to him I took them out of the magazine because I didn't want

5  him to get in trouble because if you have a permit -- that's

6  maybe what I asked him -- but if you didn't have a permit he

7  would have got in trouble if he would have had it loaded.  So I

8  took the rounds out and just gave him the rounds and...

9    Q.   Okay.  I'm now going to show you Government's Exhibit

10  No. 73 for identification.

11    A.   All right.

12    Q.   Do you recognize that?

13    A.   It looks like a Springfield XD 40-caliber.

14    Q.   Have you previously looked at this before?

15    A.   I have.

16    Q.   Do you have the bill of sale?

17    A.   Yeah.  I do.  I got an extra copy in my pocket.

18    Q.   Did you -- have you previously compared the bill of

19  sale, the serial number on the bill of sale?

20    A.   Yeah.  I looked at it.

21    Q.   The serial number on this exhibit?

22    A.   I did.

23    Q.   Okay.  I'm going to show you Government's Exhibit No.

24  70.  Do you recognize that?

25    A.   Yeah.  It looks like that's the 40-caliber XD

1   extended mag.

2      Q.   And is there anything else included --

3      A.   Oh, yeah.

4      Q.   -- in this exhibit?

5      A.   A couple of rounds.  Looks like -- from here looks

6   like six rounds of 40-caliber ammunition.  I looked at it

7   before.  So yeah.

8      Q.   And is that the same or similar to the rounds that

9   you included as part of this gun sale?

10     A.   It looks like the same.  No way to verify, but it

11  looks like the same type of ammunition I would have bought for

12  it and added.

13     Q.   I'm showing you Government's Exhibit No. 101 for

14  identification.  Do you recognize that?

15     A.   The mag?  Small mag?  Is that the -- what's the thing

16  on the -- what's the thing on the right?  I can't really see

17  from here.  I recognize the magazine.

18     MR. SCHNEIDER:  May I approach, Your Honor?

19     THE COURT:  Yes, sir.

20     MR. SCHNEIDER:  Thank you.

21  BY THE WITNESS:

22     A.   Yeah.  That's the magazine and those -- well, I

23  didn't know what that was.  That's the bullets.

24  BY MR. SCHNEIDER:

25     Q.   And now showing you Government's Exhibit No. 103 for

1    identification.  Do you recognize that?

2        A.   Yeah.  That's the -- another extended mag 40-caliber

3    for the XD.

4        Q.   And are these three magazines that you've looked at

5    which is Government's Exhibit No. 70, 101 and 103, are those

6    the same or similar to the magazines that you included as part

7    of this gun sale?

8        A.   Yeah.  They would have been the exact same type.

9        Q.   And you compared the serial number on the bill of

10   sale to the serial number in Exhibit No. 73?

11       A.   For the handgun I did.  It was the same.

12       MR. SCHNEIDER:  Pass the witness, Your Honor.

13       MR. BOYD:  No questions of this witness, Your Honor.

14       THE COURT:  You may step down, sir, and you may be

15   excused.

16       THE WITNESS:  All right.

17       MR. SCHNEIDER:  The government calls Deborah Greeley.

18       (The witness was sworn.)

19                        DIRECT EXAMINATION

20   BY MR. SCHNEIDER:

21       Q.   Good afternoon, Ms. Greeley.

22       A.   Good afternoon.

23       Q.   Would you please introduce yourself to the jury?

24       A.   My name is Deborah Greeley.  I'm an associate from

25   Walmart.  I live in the ███████ area.  ████████████ and

1  ████████████  to be specific in Texas.

2  Q.  Now, you said you're employed by Walmart?

3  A.  That's correct.

4  Q.  How long have you been employed by Walmart?

5  A.  Ten years.

6  Q.  And what is your position at Walmart?

7  A.  I'm an asset protection coordinator.

8  Q.  How long have you been doing that for Walmart?

9  A.  Seven and a half years.

10  Q.  And in that position what are your responsibilities?

11  A.  To protect all the assets of the company which

12  includes the building, the fixtures, merchandise, the money,

13  the people regarding just safety issues and the reputation of

14  Walmart.

15  Q.  And do you handle one store or various different

16  stores?

17  A.  I am assigned specifically to one store but I also

18  oversee specific issues in about ten stores.

19  Q.  Do you have a home store where you're based out of?

20  A.  Yes.  My home store right now is in ████████,

21  Texas.  Previous to that I was in Plano, Texas.

22  Q.  And in July of last year 2011 what was your home

23  store?

24  A.  It was in Plano, Texas, address 425 North Coit Road

25  in Plano.

1    Q.   Now, are you one of the people that has care, custody

2  and control of the video surveillance system at that Walmart?

3    A.   Yes.

4    Q.   Are you familiar with the system?

5    A.   Yes.

6    Q.   And do you know where it records to?

7    A.   Yes.

8    Q.   Where is that?

9    A.   It records to memory blades that are located at the

10 rear of the facility and also at our home office in

11 Bentonville.

12   Q.   And where is the hard drive for that located?

13   A.   It's in the store in the back offices.

14   Q.   And are you familiar with how to operate that?

15   A.   Yes.

16   Q.   And when you watch a video from that video

17 surveillance system, can you tell looking at the video whether

18 it came from Walmart?

19   A.   Yes.  There are indicators that are consistent with

20 all Walmarts.

21   Q.   Like what?

22   A.   Like the fixtures, the way the registers are.

23 There's logos all over throughout the store, designing.  All of

24 those types of indicators will tell you that it's from Walmart.

25   Q.   And are you familiar with the layout of your own home

1  store in Plano?

2      A.   Yes.

3      Q.   Does Walmart keep that video surveillance in the

4  regular course of its business?

5      A.   Yes.

6      Q.   Is it part of Walmart's business to accurately record

7  the public places and areas inside and outside the store

8  including the parking lot?

9      A.   Yes.

10     Q.   Is the surveillance video recorded at the time it's

11 represented on the video itself through a time stamp or at

12 least near that time?

13     A.   Yes.

14     Q.   Okay.  I'm going to show you Government's Exhibit No.

15 45.  This is a -- can you tell us what that is?

16     A.   That is a recorded CD.

17     Q.   And is that from the video surveillance?

18     A.   Yes.  It is.

19     Q.   Have you previously reviewed the entire contents of

20 this CD?

21     A.   Yes.

22     Q.   Let me just clarify.  Is this copy -- is this a copy

23 of a CD or is this the CD from Walmart that you provided?

24     A.   It is a copy.

25     Q.   Okay.

Direct Examination of Deborah Greeley by Mr. Schneider -187-

1          MR. SCHNEIDER:  Your Honor, we move Government's Exhibit

2     No. 45 into evidence.

3          MR. BOYD:  No objection.

4          THE COURT:  It's admitted.

5          (Exhibit(s) admitted:  G45)

6          MR. SCHNEIDER:  And we're now going to play some clips

7     from that security camera video at Walmart if we can start with

8     Clip No. 1.

9          (Video played.)

10         MR. SCHNEIDER:  And if we could just pause it for one

11    second.

12    BY MR. SCHNEIDER:

13         Q.   Ms. Greeley, what does the angle of that video show?

14         A.   That is the angle looking straight down upon Register

15    17.

16         MR. SCHNEIDER:  Okay.  And if we can continue.

17         (Video played.)

18         SCHNEIDER:  And if we can play the next clip.

19         (Video played.)

20    BY MR. SCHNEIDER:

21         Q.   Now, Ms. Greeley, what was that last clip a video

22    angle of?

23         A.   That was looking down on the vestibule going out from

24    the grocery side of the store.

25         MR. SCHNEIDER:  And if we can play the next clip.

Direct Examination of Deborah Greeley by Mr. Schneider –188–

1          (Video played.)

2    BY MR. SCHNEIDER:

3          Q.   And, Ms. Greeley, what was that an angle of?

4          A.   That was an overhead shot from the door camera

5    exiting the building.

6          MR. SCHNEIDER:  And the next clip, please.

7          (Video played.)

8    BY MR. SCHNEIDER:

9          Q.   And, Ms. Greeley, what was that a view of?

10         A.   That is a picture of the outside of the store looking

11   at the crosswalk from the door that was previously in the

12   overhead shot.

13         MR. SCHNEIDER:  And finally the last clip.

14         (Video played.)

15   BY MR. SCHNEIDER:

16         Q.   Now, Ms. Greeley, can you tell from the video what

17   time this is occurring?

18         A.   Yes.  12:28 p.m. -- or in the morning.  I'm sorry.

19   12:28 in the morning.

20         Q.   And on this last clip what is that an angle video --

21   the video.  What angle is that?

22         A.   It's a rooftop shot of the parking area, specifically

23   Row 5.

24         Q.   And for all the clips that you viewed today in court,

25   are they fair and accurate videos and representations of the

1    way the Walmart Plano store looks, the one that is your home

2    store?

3        A.   Yes.

4        Q.   Ms. Greeley, are you familiar with the way that

5    transactions -- sale transactions are recorded with Walmart?

6        A.   Yes.

7        Q.   So if I go in to buy something at Walmart, are my

8    transactions recorded?

9        A.   Yes.  All transactions are recorded electronically.

10       Q.   And are you one of the people that has care, custody

11   and control of the system that records the transactions in

12   Walmart?

13       A.   Yes.

14       Q.   You're familiar with the system?

15       A.   Yes.

16       Q.   And where does it record those transactions?

17       A.   They are recorded into the database for Walmart that

18   is store specific.  It's a computer system that is -- each

19   store has its own specific system inside the store.

20       Q.   And you are familiar with the Walmart Plano for

21   the -- your home store, your specific store in Plano?

22       A.   Yes.

23       Q.   And can you tell looking at a printout or a receipt

24   from the Walmart Plano store whether it came from that specific

25   store?

1      A.    Yes.

2      Q.    Does Walmart keep all this transaction data in its

3   regular course of business?

4      A.    Yes.

5      Q.    Is it part of Walmart's business to accurately record

6   the sales and transactions that happens in its stores?

7      A.    Yes.

8      Q.    And are these sales and transactions recorded at the

9   time or near the time of the sale?

10      A.    Yes.

11      Q.    Okay.  I'm going to show you Government's Exhibit No.

12   44 for identification.  Do you recognize that?

13      A.    Yes.

14      Q.    What is it?

15      A.    That is an electronic copy of a receipt.

16      Q.    And did you print that copy out?

17      A.    Yes.

18      Q.    And you were able to print it out from the same

19   system you've been describing to us?

20      A.    Yes.

21      Q.    And is it from the Walmart Plano store that's your

22   home store?

23      A.    Yes.  It is.

24      Q.    And how can you tell that from looking at the

25   receipt?

Direct Examination of Deborah Greeley by Mr. Schneider -191—

1        A.   At the very top where it says "ST" and it has a

2   number 3482.  That is the specific facility number for that

3   store.

4        Q.   And I'm going to show you Government's Exhibit No. 77

5   for identification.  And what is that?

6        A.   That is a receipt that is generated from a register

7   at Walmart.

8        Q.   And does that relate to the Walmart store in Plano?

9        A.   Yes.

10       Q.   And how can you tell looking at that receipt?

11       A.   Two indicators.  The address is the correct address.

12  Also the ST number 3482 is the same.

13       Q.   And that's a unique number for that store?

14       A.   Yes.

15       Q.   And then looking at Government's Exhibit No. 96 for

16  identification.  Do you recognize that?

17       A.   Yes.

18       Q.   And what is it?

19       A.   That is a register generated receipt for Walmart.

20       Q.   And can you tell the same way you did from the prior

21  receipt?

22       A.   Yes.

23       Q.   Does it have the same store number?

24       A.   Yes.  It does.

25       Q.   Okay.

1      MR. BOYD:  No objection, Your Honor.

2      THE COURT:  They're admitted.

3      MR. SCHNEIDER:  Your Honor, the government moves

4   exhibits -- Government's Exhibit Nos. 44, 77 and 96 into

5   evidence.

6      THE COURT:  They're admitted.

7      (Exhibit(s) admitted:  G44, G77, G96)

8   BY MR. SCHNEIDER:

9      Q.   And I think we have Government's Exhibit No. 44 on

10  video that we can put it up on the screen.

11      Now, Ms. Greeley, starting with Government's Exhibit No.

12  44, that's the receipt that you said you generated from your

13  computer?

14      A.   Yes.

15      Q.   And can you tell us when that sale occurred?

16      A.   You've cut that off from my -- 25 minutes, 32 seconds

17  after midnight.

18      Q.   Now, does this receipt that we're looking at on the

19  screen now correspond to the video -- surveillance video that

20  we previously played here in court?

21      A.   Yes.

22      Q.   Okay.  Now, turning to the items on the receipt.  I'm

23  going to show you some items for identification.  Showing you

24  Government's Exhibit No. 129.  Do you recognize that?

25      A.   Yes.

Direct Examination of Deborah Greeley by Mr. Schneider -193—

1    Q.   And do you see that on the receipt anywhere in front

2    of you?

3    A.   It is the first item listed.

4    Q.   And have you previously examined this exhibit

5    Government's Exhibit No. 129 before?

6    A.   Yes.

7    Q.   Have you had a chance to review the box?

8    A.   Yes.

9    Q.   Is there anything on the box that helps you match up

10   this item to the receipt?

11   A.   The universal product code.

12   Q.   And can you briefly describe for the jury what that

13   is?

14   A.   Universal product code is a 12 digit number that is

15   specific to all items that are sold in the United States.

16   Every item has its own unique universal product code consisting

17   of the 12 numbers.  On our system we use placeholders at the

18   first but the item there after the first zero because that's a

19   placeholder.

20   Q.   So on this receipt can you explain the first item

21   that says cookware is that the description of the item?

22   A.   Yes.

23   Q.   And then the next column would be what?

24   A.   The universal product code.

25   Q.   And then the last item in the last column?

Direct Examination of Deborah Greeley by Mr. Schneider -194-

1      A.    Is the price.  The current retail price of that item.

2      Q.    Okay.  And those were prices as of July 26th of 2011?

3      A.    Yes.

4      Q.    Okay.  I'll now show you Government's Exhibits 126,

5   127 and 130 for identification.  And do you recognize that?

6      A.    Yes.

7      Q.    And does this match any of the items on the receipt?

8      A.    It is consistent with the pressure cooker the second

9   item.

10     Q.    Now, you don't have a UPC for this, do you?

11     A.    That's correct.

12     Q.    How were you able to match this to Item No. 2 on the

13  receipt?

14     A.    Through the video you can see the item itself.  When

15  the box is turned sideways, you get a picture of the item which

16  is consistent with that particular pressure cooker.

17     Q.    Are you also familiar with -- generally familiar with

18  the stock items that Walmart stocks?

19     A.    Yes.

20     Q.    And have you been able to find that item in stock?

21     A.    Not at this time.  It has gone out of stock.  It has

22  sold through.

23     Q.    Okay.  Now, looking at -- and looking at Exhibit No.

24  130, is that related to the pressure cooker that you just

25  looked at?

Direct Examination of Deborah Greeley by Mr. Schneider -195-

1    A.   Yes.

2    Q.   And can you tell that from looking at the --

3    A.   From the picture.

4    Q.   -- booklet itself?

5    A.   Uh-huh.  Yes.

6    Q.   Now I'm going to show you Exhibit No. 97.  That has

7  multiple items in it, but looking at Exhibit No. 97 does that

8  match to any of the items on the list?

9    A.   Yes.  It is the third item the quick change knife.

10   Q.   And there's no packaging on this, is there?

11   A.   That's correct.

12   Q.   So you weren't able to match up a UPC code?

13   A.   Not with that particular item.

14   Q.   Were you able to match what the item looks like to

15  products that Walmart keeps in stock and match that UPC?

16   A.   Yes.  I was.

17   Q.   Was it the same?

18   A.   Yes.  It was.

19   Q.   Okay.  And now I'm going to show you Exhibits 107 and

20  81.  And do you recognize those items?

21   A.   Yes.

22   Q.   And what are they?

23   A.   Electrical tape and the packaging that it comes in.

24   Q.   And have you been able to check the UPC code on the

25  packaging for the electrical tape?

Direct Examination of Deborah Greeley by Mr. Schneider -196

1      A.   Yes.

2      Q.   Does it match the receipt?

3      A.   Yes.

4      Q.   The next item on the receipt.  What is that?

5      A.   It is batteries.

6      Q.   Showing you Government's Exhibit No. 105 for

7  identification.  Do you see a package of batteries in that?

8      A.   Yes.

9      Q.   Have you been able to check the UPC code on that?

10     A.   Yes.

11     Q.   Does that match the receipt?

12     A.   Yes.  It does.

13     Q.   And what was the next item on the receipt?

14     A.   A bed skirt queen size.

15     Q.   Showing you Government's Exhibit No. 140 for

16  identification.  Do you recognize that?

17     A.   Yes.

18     Q.   Have you checked the UPC code on this item?

19     A.   Yes.

20     Q.   What is it?

21     A.   It is consistent in the exact same as on the receipt.

22     Q.   As the bed skirt?

23     A.   Yes.

24     Q.   And the next item on the receipt?

25     A.   It says each on the receipt.

Direct Examination of Deborah Greeley by Mr. Schneider -197-

1      Q.   Okay.  I'm going to show you Government's Exhibit No.

2   87.  Do you recognize that exhibit?

3      A.   Yes.

4      Q.   And what is it?

5      A.   Drill bits.

6      Q.   Have you checked the UPC code on this item on the

7   packaging?

8      A.   Yes.  I have.

9      Q.   And does it match the receipt?

10      A.   Yes.  It is.

11      Q.   The next item on your receipt?

12      A.   CDED drill.

13      Q.   Okay.  I'm going to show you Government's Exhibits 85

14   and 86 for identification.  Do you recognize that?

15      A.   Yes.

16      Q.   And what is it?

17      A.   It is the drill and the box that it came in.

18      Q.   Have you checked --

19      A.   Packaging.

20      Q.   Have you checked the box in this case?

21      A.   Yes.

22      Q.   And looked at the UPC?

23      A.   Yes.

24      Q.   Does the UPC match?

25      A.   Yes.  It does.

1      Q.   Does the drill appear to come from the box?

2      A.   Yes.

3      Q.   And the next item on the receipt?

4      A.   Clock.

5      Q.   How many clocks are listed on the receipt?

6      A.   Four.

7      Q.   Showing you Government's Exhibits 89, 57, 58 and 88.

8  Have you examined all those before?

9      A.   Yes.

10     Q.   And what are they?

11     A.   They're an exact match for the items on the -- listed

12 on the receipt.

13     Q.   What are these items?

14     A.   Clocks.

15     Q.   And you've checked the UPC codes on each of these for

16 clocks?

17     A.   Yes.

18     Q.   And they match?

19     A.   Yes.

20     Q.   And what is the next item on the receipt?

21     A.   Batteries.

22     Q.   Showing you Government's Exhibit 59.  Do you

23 recognize that?

24     A.   Yes.

25     Q.   And are these batteries?

1    A.    Yes.

2    Q.    Have you checked the UPC code on this?

3    A.    Yes.  I did.

4    Q.    And did it match the receipt?

5    A.    Yes.  It did.

6    Q.    And what is the next item on the receipt?

7    A.    18 gauge red wire.

8    Q.    Showing you Government's Exhibit No. 111 which has

9  objects in it.  Do you see anything that matches the receipt?

10   A.    Yes.

11   Q.    Which is that?

12   A.    On the left side there's the red wire.

13   Q.    And have you previously looked at this exhibit?

14   A.    Yes.

15   Q.    Have you checked the UPC code on the packaging?

16   A.    Yes.

17   Q.    Does it match?

18   A.    Yes.

19   Q.    And the next item?

20   A.    16 gauge black wire.

21   Q.    Okay.  And this Government's Exhibit No. 60 for

22  identification.  Do you recognize that?

23   A.    Yes.

24   Q.    And what is that?

25   A.    That is the black wire.

1    Q.    And did you match the UPC code?

2    A.    Yes.

3    Q.    And it matches the receipt?

4    A.    Yes.  It does.

5    Q.    And what is the next item on your receipt?

6    A.    Ammunition.

7    Q.    Showing you Government's Exhibit 114.  Do you

8  recognize that?

9    A.    Yes.

10    Q.    What is that?

11    A.    Two boxes of ammunition.

12    Q.    And have you previously looked at the UPC codes on

13  Government's 114?

14    A.    Yes.

15    Q.    Have you compared it to the receipt?

16    A.    Yes.

17    Q.    And are both of those boxes a match for the receipt?

18    A.    Yes.

19    Q.    And what is the next item?

20    A.    18 gauge black wire.

21    Q.    Showing you Government's 111 which we've already

22  looked at.  This has two items in it.  You've already

23  identified the red wire.  Do you see another item there that

24  matches?

25    A.    Yes.  The black wire.

1      Q.    Have you looked at the UPC code on the packaging?

2      A.    Yes.

3      Q.    Does it match the receipt?

4      A.    It does.

5      Q.    What is the next item?

6      A.    16 gauge black wire.

7      Q.    I'm showing you Government's Exhibit 61.  Do you

8  recognize that?

9      A.    Yes.

10     Q.    Have you checked the UPC code on this item?

11     A.    Yes.  I have.

12     Q.    What is the item?

13     A.    Black wire.

14     Q.    And does the UPC wire match?

15     A.    Yes.

16     Q.    And what is the next item?

17     A.    Knife blades.

18     Q.    Showing you Government's Exhibit 97.  Except for the

19  packaging on this, do you recognize knife blades?

20     A.    Yes.

21     Q.    And this is not in the original packaging, is it?

22     A.    No.  It is not.

23     Q.    But is the item consistent with the knife blades that

24  Walmart carries?

25     A.    Yes.

1      Q.   And the next item?

2      A.   T-shirt.

3      Q.   Showing you Government's Exhibit 135 for

4   identification.  Do you recognize that?

5      A.   Yes.

6      Q.   What is it?

7      A.   It is a NCAA T-shirt for Texas Longhorns.

8      Q.   Okay.  And this does not have a UPC code on it, does

9   it?

10     A.   No.  It does not.

11     Q.   I'm showing you now Government's Exhibit No. 80.  Do

12  you recognize that?

13     A.   Yes.

14     Q.   What is that?

15     A.   That is a tag that is most commonly found on those

16  T-shirts.  They are licensed for team team wear.

17     Q.   Does the front of the tag say anything about the

18  product?

19     A.   NCAA.

20     Q.   And is there a UPC code on the tag?

21     A.   Yes.

22     Q.   And have you matched the UPC code on the tag to the

23  receipt?

24     A.   Yes.

25     Q.   And does it match?

1      A.   Yes.  It does.

2      Q.   Next item on the receipt?

3      A.   Shorts.

4      Q.   I'm showing you Exhibit 145.  Do you recognize any

5   shorts in that exhibit?

6      A.   Yes.  They are the same team wear.

7      Q.   Does it match the previous exhibit the T-shirt?

8      A.   Yes.

9      Q.   And showing you Exhibit No. 83.  Do you recognize

10  these tags?

11     A.   Yes.

12     Q.   The two tags here?

13     Have you previously looked at the UPC codes on these tags?

14     A.   Yes.

15     Q.   And did you match up one of the UPC codes to the

16  shorts?

17     A.   Yes.

18     Q.   And did it match?

19     A.   Yes.

20     Q.   And the final item on this receipt?

21     A.   Is a hat.

22     Q.   Showing you Government's Exhibit 146.  Do you

23  recognize that?

24     A.   Yes.

25     Q.   What is it?

 1     A.    It is a Texas Longhorn team hat.

 2     Q.    Does that have a UPC code on it?

 3     A.    Not on the hat itself.  No.

 4     Q.    But showing you again Government's Exhibit No. 83

 5  which had two tags, you said you've examined both of those UPC

 6  codes?

 7     A.    Yes.

 8     Q.    Was there a matching tag for the hat?

 9     A.    Yes.

10     Q.    And finally on this receipt how much was the total

11  purchase?

12     A.    $315.05.

13     Q.    And does it say how the person paid for that?

14     A.    That's cut off from my view.

15  He tendered cash in the amount of $320.

16     Q.    Okay.  And now we're going to take a look at 77,

17  Government's Exhibit No. 77 already in evidence.  And can you

18  tell us the date and time of this receipt?

19     A.    13 minutes, 55 seconds after midnight on July 26,

20  2011.

21     Q.    And how many items were purchased on this receipt?

22     A.    One item.

23     Q.    Was there any other items listed on the receipt?

24     A.    Yes.  Batteries.

25     Q.    And what happened with that transaction?

1      A.   The batteries were voided off.

2      Q.   Okay.  Now showing you Government's Exhibits 98 and

3 99 for identification.  Do you recognize these items?

4      A.   Yes.

5      Q.   And do they relate to this receipt?

6      A.   Yes.  The first item on the receipt is listed Kodak

7 Play Sport and the UPC number is an exact match.

8      Q.   What is the Kodak Play Sport?

9      A.   It's a camcorder.

10     Q.   And you've checked the UPC on the -- box on

11 Government's Exhibit No. 99?

12     A.   Yes.

13     Q.   And now looking at Government's Exhibit No. 77, the

14 receipt.  How much was that purchase?

15     A.   $128.82.

16     Q.   And does it say how that transaction was paid for?

17     A.   Cash was tendered in the amount of $140.

18     Q.   Okay.  And now finally looking at Government's

19 Exhibit No. 96.  And looking at that exhibit can you tell us

20 when, what day and what time the transaction occurred?

21     A.   That's not showing on the receipt, sir, on the

22 display.

23     That happened at 56 minutes, 47 seconds after 9:00 o'clock

24 p.m.  2100 hours.

25     Q.   On what day?

1    A.    July 25th, 2011.

2    Q.    And how many items were purchased on this receipt?

3    A.    Four.

4    Q.    Okay.  And what is the first item on the receipt?

5    A.    It is a Trac phone 105 bundle.

6    Q.    Showing you Government's Exhibits 76 and 133.  Do you

7  recognize these items?

8    A.    Yes.

9    Q.    And what is it?

10   A.    That is the packaging and the accessories for a Trac

11  phone.

12   Q.    Have you checked the Trac phone box?

13   A.    Yes.

14   Q.    Have you looked at the UPC code?

15   A.    Yes.

16   Q.    Does the UPC code match the --

17   A.    Yes.

18   Q.    -- receipt in this case?

19   A.    Yes.  It does.

20   Q.    Are there any other identifiers that help you match

21  this Trac phone to the receipt?

22   A.    Yes.  On the bottom panel of the box there is a

23  number.  It will match the top number that starts 8400.  It's

24  an identifier that allows them to activate that specific phone.

25   Q.    So that number on that receipt is unique to this one

1    specific phone?

2        A.    Yes.

3        Q.    What is the next item on the receipt?

4        A.    Sunglasses.

5        Q.    I'm showing you Government's Exhibit 146.  Do you

6    recognize that?

7        A.    Yes.

8        Q.    What is it?

9        A.    A pair of Foster Grant sunglasses.

10       Q.    And have you previously examined these sunglasses?

11       A.    Yes.

12       Q.    Now, this is not in the packaging, is it?

13       A.    No.  It is not.

14       Q.    Were you able to match up a UPC code?

15       A.    No.  I was not.

16       Q.    But do these match the brand of sunglasses?

17       A.    It is consistent with the brand that was purchased.

18   Yes.

19       Q.    And what is the next item on the receipt?

20       A.    60 unit card.

21       Q.    It's a card for what?  Can you tell?

22       A.    For a Trac phone air time.

23       Q.    Showing you Government's Exhibit 79 for

24   identification.  Do you recognize that?

25       A.    Yes.

1     Q.   And does this item have a UPC code on it?

2     A.   Yes.

3     Q.   Have you been able to match it to the receipt?

4     A.   Yes.

5     Q.   Do they match?

6     A.   Yes.  They do.

7     Q.   And finally showing you Government's Exhibit 92 for

8  identification.  Do you recognize that?

9     A.   Yes.

10     Q.   What is this?

11     A.   Acer notebook computer.

12     Q.   And have you matched the packaging -- the UPC code on

13  the packaging of this to the receipt?

14     A.   Yes.

15     Q.   Did it match?

16     A.   Yes.

17     Q.   On the receipt that you have are there any other

18  identifiers that match to the receipt?

19     A.   Yes.  The serial number that is specific to that

20  computer is also recorded on the receipt and on the box.

21     Q.   I'm sorry.  I think I said 72.  That was Government's

22  Exhibit 72 for identification, not 92.

23     And that's the computer you just told us about, the Acer

24  notebook?

25     A.   Uh-huh.

1       MR. SCHNEIDER:  Your Honor, we pass the witness.

2       MR. BOYD:  No questions, Your Honor.

3       THE COURT:  You may step down, ma'am.  You may be excused.

4       MR. SOFER:  Government calls Husam Al-Qaysi.

5       (The witness was sworn.)

6                       DIRECT EXAMINATION

7  BY MR. SOFER:

8       Q.   Good afternoon, Mr. Al-Qaysi.

9       A.   How are you doing?

10      Q.   Would you please tell the jury how old you are, sir?

11      A.   ██ years old.

12      Q.   And where were you born?

13      A.   In ███.

14      Q.   What city in ████?

15      A.   ██████.

16      Q.   When did you come to the United States, sir?

17      A.   In August 2009.

18      Q.   And can you tell the members of the jury what you do

19  for a living?

20      A.   I'm driving for -- I'm cab driver.

21      Q.   Okay.  And do you work for a particular company?

22      A.   Yeah.  It's █████████.

23      Q.   And were you driving a taxi on -- for the ██████████

24  company on July 25th, 2011?

25      A.   Correct.

Direct Examination of Husam Al-Qaysi by Mr. Sofer

1   Q.   Where is that company based out of and where is most

2   of your work?

3   A.   That's in Dallas.

4   Q.   On the evening of July 25th, 2011 were you dispatched

5   to the area of Spring Valley North of Dallas?

6   A.   Yes.

7   Q.   And was there a radio call or a call into your cab?

8   A.   No.  Radio call and they do have screen on the car

9   and they give the destination where is the customer at.  And

10  they give me his number too.

11  Q.   Okay.  And did that customer show up?

12  A.   No.  I call three times.  He don't answer and then I

13  call my company to cancel it.

14  Q.   Okay.  While you were in that same location looking

15  for that fare did somebody come to your cab?

16  A.   Yeah.  Because I want to get back because you must

17  pay parking if your car is safe and when I get back somebody

18  know the car.  He say I call for a cab.

19  Q.   Okay.  So the person knocked on the door?

20  A.   Yeah.

21  Q.   I'm going to show you what's been marked Government's

22  Exhibit No. 153 --

23  A.   Uh-huh.

24  Q.   -- already in evidence.

25  A.   Yes.  This is the guy.

1      Q.   This is the man that knocked on your cab?

2      A.   Uh-huh.

3      Q.   Show you 153B as well.

4      A.   Uh-huh.

5      Q.   Same guy?

6      A.   Yeah.

7      Q.   And when the defendant knocked on your cab door, did

8  you talk to him?

9      A.   Yeah.  I talked to him.  Where are you going?  He

10 said, can I get to the Walmart nearest one of here for this

11 area.  I told him, yes.  We have one in Plano on Coit north of

12 Coit in Plano.

13     Q.   Okay.  So he said he wanted to go to Walmart.  Did

14 you take him to Walmart?

15     A.   Yes, sir.  I take him there.

16     Q.   Do you recall what clothes the defendant was wearing?

17     A.   The same as the pictures over here.

18     Q.   Can you describe them for the members of the jury?

19     A.   Yeah.  It would be light like this color or light for

20 this color.

21     Q.   And was there anything else in particular you noticed

22 about the type of clothing that it was?

23     A.   No.  He get the bags with him.

24     Q.   No.  No.  I'm not talking about what he bought.  I'm

25 asking what he was wearing.

1      A.   He was wearing this same -- this same of the picture

2  over here.

3      Q.   I understand.

4      A.   Yeah.  Near something like that.

5      Q.   Okay.  Did you have a conversation with him at that

6  time before you got to Walmart about where else he wanted to go

7  or no?

8      A.   No.  He just asked me about if he had -- if I find

9  the car if I want to go to the north of Austin or that I tell

10  him okay.  I will take you there.  And he say how much I

11  charge?  I tell him it would be 400, 500 but he don't decide

12  first time.  I said okay.  And he went to the Walmart.

13      Q.   Okay.  And did you take him to Walmart?

14      A.   Yes, sir.

15      Q.   And did he go inside?

16      A.   Yeah.

17      Q.   Did you go with him the first time?

18      A.   No.

19      Q.   What happened next?

20      A.   When he get inside and get out and he told me I need

21  to use my laptop, my internet.  So he looking for that --

22      Q.   Let me slow you down a little bit.  I'm sorry.

23      A.   Okay.

24      Q.   But he went into Walmart?

25      A.   And he get out.

1    Q.   Did he have anything with him?

2    A.   He said -- yes.  He get some bags with him.

3    Q.   Okay.

4    A.   And he tell me I want to use my internet.  Let's go

5    ahead.  He see the McDonald and he said take me there.

6    Q.   Okay.  And did you take him to McDonald's?

7    A.   Yes.  I took him to the door.  I wait till he get

8    inside and he say to come back to me 11:00 o'clock.

9    Q.   Now, was this all being paid on the meter of the cab

10   at this point?

11   A.   Yes.  And he give me $20.

12   Q.   Did you leave him at McDonald's?

13   A.   Yeah.  Yeah.  It would be silly and he give me 20 and

14   he say come back at 11:00 o'clock.

15   Q.   Okay.  And did you do that?

16   A.   Yes, sir.

17   Q.   Did you ask him for his phone number or anything to

18   get in touch with him?

19   A.   Yeah.  I tell him, what's your number?  I say you

20   find me here.  I'm waiting for you in McDonald's.

21   Q.   He wouldn't give you his number?

22   A.   No.

23   Q.   Did there come a time when you went back to

24   McDonald's to pick him up?

25   A.   Yes.  At 11:00 o'clock.  11:00, something like that.

1       Q.   Okay.  Can you describe for the members of the jury

2  what happened next?

3       A.   After that if he can -- I waiting for him and he gets

4  some stuff on the floor.  On -- he sit on the floor in the

5  front of the door.

6       Q.   Are you talking about in front of McDonald's?

7       A.   At McDonald.  And he left some stuff on the street

8  and other stuff he picking up in the car and he don't get

9  inside.  He talk by the phone.  Waiting for ten minutes and

10 then he said let's go back to the Walmart.

11      Q.   He wanted to go back to Walmart?

12      A.   Yes.

13      Q.   And did you take him back to Walmart?

14      A.   Exactly.

15      Q.   Okay.  And what happened there?

16      A.   And then he -- he get in the Walmart.  I waiting for

17 ten minutes, 15 minutes.  I say, okay.  While I'm doing in my

18 cab let me to see the TV or something I buy it from the

19 Walmart, you know, and I'm just around of him.  I see him go to

20 the left or right in Walmart and then he told me I am done.  I

21 tell him, okay.  I went with him to the --

22      Q.   Let me again slow you down a little bit.  So he went

23 in.  You got tired of waiting for him.  Would that be fair to

24 say?

25      A.   Say again.

1      Q.   He went in.  You got tired of waiting for him

2  outside?

3      A.   Yes.  And he late.

4      Q.   Okay.

5      A.   I come back to make a round in Walmart.  I don't --

6      Q.   Shopping?

7      A.   No.  To see something just to spend the time.

8      Q.   Okay.

9      A.   So I saw him.  He get left right there and I don't

10  talk with him but then -- and then he get all his stuff with

11  the cart.  I say I'm ready.  Let's go.

12      Q.   Okay.  And where did you go?  What part of Walmart

13  did you go to?

14      A.   First he go into the -- from -- from electric stuff.

15      Q.   Electric stuff?

16      A.   Yeah.  From the -- from the TV and, you know, about

17  Walmart inside.  They pay cash.  And then we take this stuff

18  with the cashier.  I was with him and he pay all.

19      Q.   So you waited at the cashier with him?

20      A.   Yes.

21      MR. SOFER:  Okay.  And if we could play what's in evidence

22  as Government's Exhibit No. 45, Clip 1, please.

23      (Video played.)

24  BY MR. SOFER:

25      Q.   As this is playing, were you present during this

1  time?

2      A.   Uh-huh.  Yeah.  This for him.

3      Q.   This yellow box here?

4      A.   Yes.  Yes.

5      Q.   Was that his?

6      A.   Yeah.  The yellow bags and more stuff, something that

7  stuff.  I pick him up with him.

8      Q.   Okay.  Now, there's somebody walking around --

9      A.   Yeah.

10     Q.   -- at the top here.  Do you see up there where I

11 indicated?

12     A.   Yeah.

13     Q.   Do you know who that is?

14     A.   That's me.

15     Q.   Do you recognize your foot?

16     A.   Yep.

17     Q.   You looked at this video before, right?

18     A.   Yeah.  Yeah.

19     Q.   You know who's going to show up?

20     A.   Exactly.

21     Q.   Do you see these clocks being purchased?

22     A.   Yes.  Be three or four.  I don't make sure.

23 Yeah.  He putting this credit through.

24     Q.   Was he talking to you during this time as well while

25 he was in the store?

```
 1          A.   He talk with the ladies.

 2          Q.   Okay.

 3          A.   But I stand by just so he can get finished.

 4          MR. SOFER:  We can stop it.  Let's play Clip No. 2.

 5          (Video played.)

 6          MR. SOFER:  Thank you.

 7   BY MR. SOFER:

 8          Q.   Do you recognize who's walking out of the store now?

 9          A.   Yeah.

10          MR. SOFER:  Pause it.

11   BY THE WITNESS:

12          A.   My car because so far from the gate.

13   BY MR. SOFER:

14          Q.   This fellow here?

15          A.   Yeah.

16          Q.   Is that you?

17          A.   Yeah.  That's me.

18          Q.   Is this the defendant?

19          A.   Uh-huh.

20          Q.   Indicating the individual towards the center of the

21   screen?

22          A.   Yeah.

23          MR. SOFER:  Okay.  Play the next clip.

24          (Video played.)

25   BY THE WITNESS:
```

1      A.    That's my car.

2      MR. SOFER:  Can you pause it, please?

3  BY THE WITNESS:

4      A.    Yeah.  ██████.

5  BY MR. SOFER:

6      Q.    This is the vehicle you were driving that evening?

7      A.    Yes.

8      Q.    And this is the vehicle that ultimately you and --

9      A.    Uh-huh.

10     Q.    -- the defendant drove from and to Walmart in,

11  correct?

12     A.    Yep.

13     MR. SOFER:  Can you play the two in the middle, please?

14     (Video played.)

15  BY MR. SOFER:

16     Q.    Again, this individual here?

17     A.    Uh-huh.

18     Q.    In the screen now wearing this shirt?

19     A.    Yep.

20     Q.    And the shorts and the flip flops.  Is that you?

21     A.    Yeah.  That's me.

22     MR. SOFER:  Can you play the last clip, please?

23     (Video played.)

24  BY MR. SOFER:

25     Q.    And you were with the defendant there again, correct?

1        (Video played.)

2   BY THE WITNESS:

3        A.   Yeah.  We move there.

4   BY MR. SOFER:

5        Q.   Is that you and him leaving the store?

6        A.   Yeah.

7        Q.   Okay.  I want to just show you some items real quick.

8        A.   Uh-huh.

9        Q.   If I can have Government's Exhibit No. 129 --

10       A.   Yeah.

11       Q.   -- for identification.  Is that the box you were

12  talking about?  It looks like the box that you saw on that

13  particular day?

14       A.   Yeah.

15       Q.   And if I could have 58, 59, 88 and 89.  Are these

16  items?

17       A.   Yes.

18       Q.   All look like the clocks?

19       A.   Yes, sir.

20       Q.   That were rolling across the cash register?

21       A.   Yep.

22       Q.   Finally I'm going to show you what's been marked

23  Government Exhibit No. 146 for identification.

24       A.   Yes.  That's hat.

25       Q.   Is that?

1     A.   The hat is beside the cashier.  He take it off.  He

2  put that with the stuff.

3     Q.   And he bought a bunch of other stuff as well,

4  correct?

5     A.   Yes.

6     Q.   Do you recall how he paid for all of this?

7     A.   I think it be more for 200 for more for that but he

8  have a gift card and he does it so he said we keep that.  We

9  pay for cash.

10     Q.   Okay.

11     A.   And he pay for cash.

12     Q.   After you left Walmart did you get in that cab we saw

13  in the video in your cab?  Did you get in the cab with him

14  after Walmart?

15     A.   After Walmart we got start to go to the Killeen, but

16  he don't tell me Killeen first.  He said let's go to the

17  Austin.  The ride from on 35 east.

18     Q.   Okay.  And so first he said he wanted to go to Austin

19  or somewhere 35?

20     A.   Yeah.  But he get a map.

21     Q.   Okay.

22     A.   And he find it.  He said hold on.  Let me check up.

23  And he check out the map and he tell me go to the 35 south.

24     Q.   Okay.  And did he ultimately tell you to get off of

25  35 south and go somewhere else?

1    A.   Yes.

2    Q.   And was that Killeen?  Is that what you said before?

3    A.   Yeah.  Killeen to be the last final one when I drop

4  him off.

5    Q.   By the way, was your meter running this whole time?

6    A.   No.  Because you have a deal $400.

7    Q.   For how much?

8    A.   400.  I tell him 400, 400, $500.

9    Q.   Okay.

10   A.   And at midnight because they don't have enough gas

11  and he pay for the credit card for the gas.

12   Q.   Okay.  So it was the money plus the gas?

13   A.   Yes.

14   Q.   And on the drive down south did you talk to him?

15   A.   Yes.  He talk with me but I want to turn the radio.

16  He say, no.  No.  Turn it off.  I don't like the music or I

17  don't like to hear anything.  I say it's okay.  So I talk to

18  you.  And we don't talk anything and he get mad because he talk

19  by the phone.  And he don't talk after the middle of the road

20  and he go and start to talk with me.

21   Q.   Okay.  Did there come a time when he -- well, did you

22  ever tell you his name during your conversations with him?  His

23  name?  Did he ever tell you?

24   A.   Talk about -- talk about -- you mean Bin Laden he

25  talk with me?

1    Q.   No.  No.  Did he ever talk to you about his name?

2    A.   No.

3    Q.   Okay.

4    A.   I said where are you from?  He say my parents from

5  Jordan I think.

6    Q.   Okay.  And you just mentioned Bin Laden.  Did he

7  mention something about Bin Laden to you?

8    A.   No.  He said think you think they kill him or

9  something like that.  I say, man.  He's dying.  This doesn't

10 matter what this man good or not.  It's over right now.  And he

11 told me how can I read the Koran?  How can you -- can you teach

12 me because I'm Muslim, too.  I tell him okay.  If you get CD in

13 your radio you can repeat that more every day you'll be fine.

14 That's it.  And he don't talk again.

15   Q.   To memorize the Koran?

16   A.   Yes.  Correct.

17   Q.   Okay.  Now, did there come a time when you arrived in

18 Killeen?

19   A.   Huh?

20   Q.   In Killeen, Texas.

21   A.   Yes.

22   Q.   Did you arrive there?

23   A.   No.  First time I'm driving to I think I'm going to

24 Austin.

25   Q.   Okay.

1        A.   And he say exit.  I tell him what?  He say let's go

2   to this side over here.  We look around because come to Killeen

3   you know about all the hotel around he say, okay.  Make turn.

4   I make a turn.  He checked all the hotels.

5        Q.   Okay.  So you drove back and forth looking for a

6   hotel?

7        A.   Where the hotel I drop him off before that is traffic

8   light and make turn.  There's many of hotels there.  And he

9   don't decide that and he said get back and when we arrive in

10  this hotel he say, okay.  I'm going to stay here.

11       Q.   Okay.

12       A.   I take him there.

13       Q.   I'm going to show you what's been marked Government's

14  Exhibit No. 47 for identification.

15       A.   Uh-huh.

16       Q.   Have you watched this video?  I'm sorry.  Have you

17  watched this CD?

18       A.   Yep.

19       Q.   Okay.  And did you have an opportunity to see whether

20  or not you were on this CD?

21       A.   Yes.

22       Q.   Is this a CD of you going to that hotel -- of you

23  walking into the hotel?

24       A.   Yep.

25       Q.   And do you see the defendant as well on this CD

1    walking into the hotel?

2        A.    Exactly.

3        Q.    Okay.  And that happened at about what time in the

4    morning?  Do you remember?

5        A.    I think because three hours to be between 2:30, 3:00

6    o'clock in the morning.

7        Q.    Okay.  It was early morning hours?

8        A.    Yeah.

9        Q.    Could it have been 3:30 in the morning?

10       A.    Yeah.  3:30.  It would be 3:00, 3:30, something like

11   that.

12       Q.    Okay.  When you dropped him off, can you tell the

13   jury what happened?

14       A.    Okay.  We -- drop him off at the hotel you mean?

15       Q.    Yes, sir.

16       A.    Okay.  Hotel I drop him off.  He get outside.  After

17   three minute I get out, follow him and he talk with that --

18   from the guys from reception and they tell him if you want to

19   stay for -- till 5:00 o'clock it will be more cheaper than

20   charge you for whole day.  He say no.  I must get it right now.

21   I don't have -- and he give him the money.

22       Q.    How did he pay?  Do you know?

23       A.    Yeah.  Cash.  And he give me the gift card and $200

24   more.

25       Q.    Okay.  So he gave you your payment?

1    A.   Yeah.  And he left -- we left together.  We till

2  around in the back side from the door.

3    Q.   Let's just slow you down a little bit.  Left from the

4  lobby area?

5    A.   The lobby.

6    Q.   And where did you go?

7    A.   I make a turn around at the hotel in the back side.

8    Q.   Okay.

9    A.   And I left him and he get his stuff but some stuff he

10  put it in the cab and he said get this stuff in the back side

11  if you don't mind help me and he get the stuff on the cab and I

12  don't know what his...

13    Q.   Okay.  About how much stuff did -- how many bags did

14  he bring up?

15    A.   It would be seven, seven, eight bags, something like

16  that.  I put them all on the door because he must open the door

17  and get back and he say I take care for that.

18    Q.   Was the defendant wearing anything during the time

19  that you saw him?

20    A.   No.  Just his -- as far as the bags.

21    Q.   Did you ever see him with a backpack?

22    A.   Yeah.  Backpack's be his laptop I've seen and the

23  map.

24    Q.   Okay.

25    A.   He put them behind me but I do know it's dark and I

Direct Examination of Husam Al-Qaysi by Mr. Sofer

1   can't -- it's not my stuff.  Not my business --

2       Q.   Okay.

3       A.   -- to check out what's going on.

4       MR. SOFER:  Pass the witness, Your Honor.

5                       CROSS-EXAMINATION

6   BY MR. BOYD:

7       Q.   Mr. Al-Qaysi, my name is Zachary Boyd.  Am I saying

8   your name correct?

9       A.   Husam Al-Qaysi.  That's right.

10      Q.   Okay.  Al-Qaysi?

11      A.   Yes.

12      Q.   Okay, sir.  I'll try to keep it straight.  Okay?

13      A.   Okay.

14      Q.   At what time did you have to begin work the next day?

15      A.   I don't sleep.  I get back when I drop him.  I get

16  back because I have customer.  He want to go to work to his

17  apartment and 7:00 o'clock in the morning.  So I get back in

18  6:00 o'clock and wait 30 minute, sleep on in his room beside

19  his complex until he wake up.  He call me are you ready?  I say

20  yes.

21      Q.   And so that's when -- you made Mr. Abdo aware that

22  you had --

23      A.   I don't know his name.

24      Q.   You made --

25      A.   I don't know his name.  They tell me the customer.  I

1  told yes.

2      Q.   Well, you -- that would be confusing to the jury,

3  sir.  Do you understand that?

4      A.   Okay.

5      Q.   Okay.  So the first customer you're talking about

6  that I first asked you a question about --

7      A.   Uh-huh.

8      Q.   -- is someone other than Mr. Abdo, correct?

9      A.   What do you mean?  Say again.

10      Q.   The customer that you just spoke about.

11      A.   Yes.

12      Q.   About having a fare at 6:00 o'clock on the 27th of

13  July.

14      A.   Yeah.

15      Q.   That was a fare at what location?  Was that back in

16  the Dallas area?

17      A.   Yes.

18      Q.   Okay.

19      A.   He's in -- he's -- he's Indian guys and he was in

20  the --

21      Q.   Okay.  And originally with respect to the fare that

22  you took from the Dallas/Fort Worth area to the Killeen area?

23      A.   Uh-huh.

24      Q.   Originally he wanted to go to Edinburg but you

25  couldn't because you had that 6:00 o'clock in the morning fare

1    and so you told him you'd take him to Austin instead because

2    that would let you come back to Dallas, right?

3         A.   No.  He don't tell me go to -- where he's going.  He

4    said let's go to the 35 east south.  I don't know where he's

5    going but I have enough time 6:00 o'clock to get back because I

6    driving all the time to the Austin and Houston and so I know

7    how far is it.

8         Q.   But you knew you couldn't make it to Houston and get

9    back, right?

10        A.   But Houston -- Austin or Houston you say?

11        Q.   Just now I just said Houston.

12        A.   Houston?  Houston be five hours.

13        Q.   You couldn't make it back, right?

14        A.   Yeah.  I stay there or I coming back but to be late.

15        Q.   Okay.  And you couldn't make it to Edinburg, Texas

16   either and get back, could you?

17        A.   Where you come from?

18        Q.   From Dallas to Edinburg.

19        A.   Oh, Dallas?

20        Q.   You couldn't make it from Dallas to Edinburg and

21   back?

22        A.   I don't know what it will be.

23        Q.   Okay.  Thank you, sir.

24        A.   You're welcome.

25        MR. SOFER:  No questions, Your Honor.  May we excuse the

1    witness?

2         THE COURT:  Yes.  Mr. Al-Qaysi, you may be excused.

3         We'll take our afternoon recess at this point, ladies and

4    gentlemen.

5         LAW CLERK:  All rise.

6         (Jury exited the courtroom at 3:19.)

7         LAW CLERK:  Court will stand in recess for 20 minutes.

8         (A break was taken from 3:19 to 3:40.)

9         LAW CLERK:  All rise.

10        (The jury entered the courtroom at 3:40.)

11        THE COURT:  Be seated, everyone.

12        MR. SOFER:  Your Honor, the government calls Aaron

13   Bernardo.

14        (The witness was sworn.)

15                         DIRECT EXAMINATION

16   BY MR. SOFER:

17        Q.   Good afternoon, Mr. Bernardo.  Would you please tell

18   the members of the jury how old you are?

19        A.   I'm 19.

20        Q.   And where are you presently employed?

21        A.   America's Best Value Inn in Killeen.

22        Q.   And can you tell us where that is located in Killeen?

23   The address?

24        A.   1100 South Fort Hood Street.

25        Q.   And how long have you been working at that hotel,

1    sir?

2         A.    Almost a year and a half.

3         Q.    Tell the members of the jury what hours you work.

4         A.    9:00 p.m. to 5:00 a.m.

5         Q.    And were you working that late shift in late July of

6    2011?

7         A.    Yes, sir.

8         Q.    Among your duties do you have care, custody and

9    control of the surveillance system in the America's Best Value

10   Inn when you're working there at night?

11        A.    Yes, sir.

12        Q.    And are you familiar with that surveillance system?

13        A.    Yes.

14        Q.    Where does the recording actually record to if you

15   know?

16        A.    It records to a hard drive on a computer inside the

17   office.

18        Q.    Okay.  And that's the office outside of which you

19   work, correct?

20        A.    Yes, sir.

21        Q.    Can you tell looking at a video whether it came from

22   the hotel surveillance system?

23        A.    Yes, sir.

24        Q.    And does the hotel keep the video surveillance in the

25   regular course of its business?

1       A.    Yes.

2       Q.    Is it part of the hotel's business to accurately

3  record the public places and areas both inside and outside the

4  hotel?

5       A.    Yes, sir.

6       Q.    And does the surveillance video record at or near the

7  time represented on the video itself?

8       A.    Yes.

9       Q.    I want to show you what's been marked Government

10  Exhibit No. 47 -- it's a disk -- for identification and ask you

11  if you recognize it?

12       A.    Yes, sir.

13       Q.    How do you recognize it?

14       A.    It has my initials and the date.

15       Q.    Okay.  Does Government's Exhibit No. 47 contain the

16  video clips or some video clips from the Best Value Inn

17  security system that you just described?

18       A.    Yes, sir.

19       Q.    And did you recognize the camera angles and video

20  angles when you watched it from being inside the hotel?

21       A.    Yes, sir.

22       Q.    And do those images fairly and accurately represent

23  the hotel and the areas of the surveillance camera that the --

24  the area of the surveillance cameras that it's usually focused

25  on?

1      A.   Yes.

2      MR. SOFER:  At this time the government offers Government

3  Exhibit No. 47 for identification into evidence.

4      MR. BOYD:  No objection, Your Honor.

5      THE COURT:  It's admitted.

6      (Exhibit(s) admitted:  G47)

7  BY MR. SOFER:

8      Q.   Okay.  We're going to play a couple of clips from

9  this.  Well, let's -- yeah.  Let's hold off there for one

10  second.  I want to direct your attention to July 26, 2011 at

11  about 3:30 in the morning.  Did there come a time when you

12  checked a guest into the hotel at that date and time?

13      A.   Yes, sir.

14      Q.   And do you see that man here in the courtroom

15  today -- well, strike that.

16      Show you what's been marked Government Exhibit No. 153A.

17  Do you recognize that individual?

18      A.   In the picture, yes.

19      Q.   Okay.  Who is that -- is that the man who checked

20  into the hotel at the time and date that I just pointed to?

21      A.   Yes, sir.

22      Q.   Is the same true for 153B?

23      A.   Yes, sir.

24      Q.   Do you recall what it is that the defendant was

25  wearing when he came into the hotel?

1      A.   He was wearing scrubs.

2      Q.   When you say scrubs, what do you mean by that?

3      A.   Like nursing scrubs.

4      Q.   Okay.  Do you remember what color they were?

5      A.   Tannish.

6      Q.   Do you recall if he came into the hotel alone?

7      A.   At first he did and then someone walked in after him.

8      Q.   Were you able to see how he arrived at the hotel?

9      A.   All I saw was a car pull up.  As far as, you know, if

10  it was his or not, I wasn't too sure.

11     Q.   Okay.  You weren't paying attention to the outside?

12     A.   Yes, sir.

13     MR. SOFER:  Now, if we can, please play the clips from

14  Government's Exhibit No. 47.  Let's start with Clip 1.

15     (Video played.)

16  BY MR. SOFER:

17     Q.   Now, as it's playing does Clip 1 here represent --

18  what -- it represents what part of the hotel, sir?

19     A.   The lobby.

20     Q.   And where is the place where a guest would check into

21  the hotel, sir?

22     A.   The lobby, front desk.

23     Q.   Do you see an individual walking in at this time at

24  the video?

25     A.   Yes.

Direct Examination of Aaron Bernardo by Mr. Sofer ——234——

1      Q.   Was that the individual you described before the

2   defendant in this case?

3      A.   Yes, sir.

4      MR. SOFER:  Okay.  Clip 1 again.

5      Let's play Clip 2.

6      (Video played.)

7   BY MR. SOFER:

8      Q.   Now, can you tell us what area of the hotel Clip 2

9   represents?

10     A.   It represents the back hallway of the hotel and the

11  second floor.

12     MR. SOFER:  That went by real fast.  Maybe we can pause

13  it.

14     (Video played.)

15     MR. SOFER:  Can you play it with a person in it?

16     (Video played.)

17  BY MR. SOFER:

18     Q.   Okay.  And again is that the same individual you just

19  described?

20     A.   Yes, sir.

21     Q.   The defendant in this case?

22     MR. SOFER:  Could you play Clip 3?

23     (Video played.)

24  BY MR. SOFER:

25     Q.   Is that the same camera angle?

Direct Examination of Aaron Bernardo by Mr. Sofer          235

1       A.   Yes, sir.

2       MR. SOFER:  Okay.  Play the next clips, please.  Stop them

3  if you can.

4       (Video played.)

5  BY MR. SOFER:

6       Q.   Okay.  Is that the same angle of the hotel at a

7  different time?

8       A.   Yes, sir.

9       Q.   Okay.  Generally speaking is the date and time

10 represented in the left-hand -- upper left-hand corner

11 accurate?

12      A.   Yes, sir.

13      MR. SOFER:  Okay.  Play the next clip, please.

14      (Video played.)

15 BY MR. SOFER:

16      Q.   Okay.  Is that the same area we saw in the first clip

17 except during the daylight hours?

18      A.   Yes, sir.

19      Q.   I want to go back to July 26th, 2011 and ask you when

20 the defendant came into the hotel to check in could you tell us

21 what it is that you did?

22      A.   I checked him in for a six night stay and at the time

23 we didn't have any single bedrooms available so what I did was

24 I said, you know, I'll put you in a one bedroom for tonight

25 and -- or a two bedroom for tonight and then tomorrow you can

Direct Examination of Aaron Bernardo by Mr. Sofer ——236

1   move to a single bed.

2      Q.   And can you describe for the members of the jury what

3   documents it is that you fill out when someone checks into the

4   hotel?

5      A.   If they pay cash we fill out a receipt and give them

6   a copy or we just keep a copy.  There's a registration card

7   they must fill out and then we also take a copy of the ID.

8      Q.   Okay.  I want to show you three pages of documents

9   marked Government Exhibit No. 46 for identification.  Have you

10  looked at these documents previously, sir?

11     A.   Yes, sir.

12     Q.   Do you recognize -- from where I'm standing can you

13  see them?

14     A.   Yes, sir.

15     Q.   Okay.  Are these the documents that you used to check

16  in the defendant on the 26th when he checked in?

17     A.   Yes, sir.

18     Q.   And that was again at about 3:30 in the morning?

19     A.   Yes.

20     Q.   Do they fairly -- is it your writing on these

21  documents?

22     A.   If it has my initials on it, yes.

23     Q.   Okay.  You've seen these before, right?

24     A.   Yes.

25     Q.   Okay.  Do you recall having -- it having your writing

1    on them?

2         A.   Yes, sir.

3         MR. SOFER:  At this time the government offers Government

4    46 into evidence.

5         MR. BOYD:  No objection.

6         THE COURT:  46 is admitted.

7         (Exhibit(s) admitted:  G46)

8    BY MR. SOFER:

9         Q.   Try to show these to you so that you can see them.

10   Show the big page here, the big white page.  Can you see

11   Government Exhibit No. 46 in evidence there?  Can you tell the

12   members of the jury what that document is?

13        A.   That is the guest registration form.

14        Q.   Okay.  And again the writing here on the document, is

15   that your writing down here at the bottom?

16        A.   Yes, sir.

17        Q.   Okay.  Now, can you describe for the members of the

18   jury whether or not the defendant changed his reservation while

19   he was staying at the hotel?

20        A.   Could you repeat that?

21        Q.   Did there come a time when the defendant changed his

22   reservation during the time he was staying at the hotel?

23        A.   Yes, sir.

24        Q.   Can you describe that for the members of the jury?

25        A.   He had checked in early morning on the 26th.  I was

1    off work for the rest of the day, then came back that night and

2    he came in about 10:00, 10:15 p.m. on my next shift and wanted

3    to change to a single bedroom.

4        Q.   Okay.  Did he change the amount of days that he was

5    staying as well?

6        A.   Yes, sir.

7        Q.   Can you describe that for the members of the jury?

8        A.   He had asked if he doesn't want to stay the six

9    nights, you know, is there a possibility of a refund for

10   whatever he paid whatever the difference would be.

11       Q.   Okay.  And did you give him a refund?

12       A.   Yes, sir.

13       Q.   How much of a refund -- how many nights did you give

14   him a refund for?

15       A.   I refunded him for two nights.

16       Q.   So he both changed the room he was in as well as how

17   many nights he was staying?

18       A.   Yes, sir.

19       Q.   And can you tell the members of the jury what room he

20   originally checked into and what room he ultimately went to?

21       A.   He had checked into Room 248 which is two beds and a

22   smoking room and he was supposed to move to Room 230 which is

23   also a smoking room but only has one bed in it.

24       Q.   Okay.  And can you describe basically for the members

25   of the jury what the defendant's demeanor was while he was

1    checking into the hotel?

2        A.   He didn't seem right.  He just wouldn't stay still,

3    jittery and didn't really ask a lot of questions like usual

4    customers do about, you know, wi-fi, breakfast and anything

5    like that.  He just kind of kept to himself.

6        Q.   Okay.  Is it the hotel's policy to make a copy of the

7    identification that your guest uses to check in?

8        A.   Yes, sir.

9        Q.   I'm going to show you the third page of Government

10   Exhibit No. 46.  Do you recognize this?

11       A.   Yes, sir.

12       Q.   What is it?

13       A.   It is the ID that he gave me so I can process it in

14   the computer.

15       Q.   I don't know if you're able to see this, but can you

16   tell the members of the jury what name is on that

17   identification?

18       A.   Asher Pluto.

19       Q.   And is this -- was this document that is the original

20   Tennessee identification card or driver's license given to you

21   by the defendant when he checked into the hotel?

22       A.   Yes, sir.

23       Q.   Finally did you give him a receipt?

24       A.   No, sir.  I kept both copies.

25       Q.   Okay.  Well, what's this document here on top?

1     A.   That is the cash receipt that I wrote out for him.

2     Q.   Okay.  So that was the cash receipt.  And again under

3 the name Pluto?

4     A.   Yes, sir.

5     Q.   How did he pay for his stay at the hotel?

6     A.   In cash.

7     MR. SOFER:  Pass the witness, Your Honor.

8     MR. BOYD:  No further questions, Your Honor.

9     MR. SOFER:  May the witness be excused, Your Honor?

10    THE COURT:  Yes, sir.

11    You may step down, sir.  You may be excused.

12    MR. FRAZIER:  Cathy Cheadle will be the government's next

13 witness.

14    (The witness was sworn.)

15                    DIRECT EXAMINATION

16 BY MR. FRAZIER:

17    Q.   And would you please introduce yourself to the ladies

18 and gentlemen of the jury?

19    A.   My name is Cathy Cheadle.  I'm the store manager at

20 Guns Galore.

21    Q.   And how long have you worked at Guns Galore?

22    A.   About eight years.

23    Q.   Where is Guns Galore located?

24    A.   In Killeen, Texas.

25    Q.   Okay.  That's in Bell County?

Direct Examination of Cathy Cheadle by Mr. Frazier

1          A.    Yes.

2          Q.    And what type of store is Guns Galore?

3          A.    Firearm retail, ammunition, reloading accessories,

4    that kind of thing.

5          Q.    And how long has Guns Galore been open for business?

6          A.    Since May of 1999.

7          Q.    All right.  And do you -- who all works in the store

8    there?  I mean, it's you and your husband David Cheadle?

9          A.    Uh-huh.  And there's another full-time clerk Dave

10   Newby and then we have a part-time worker who works Monday and

11   Thursday.

12         Q.    And who is that?

13         A.    Greg Ebert.

14         Q.    Okay.  I want to direct your attention back to the

15   date of July the 26th of last year.  Do you recall that date?

16         A.    Yes.

17         Q.    Okay.  Did you have occasion on that date to come

18   into contact with someone who came into -- let me rephrase that

19   question.  Did you come into contact with someone that day who

20   came into your store looking for -- asking questions about

21   smokeless powder?

22         A.    He didn't ask questions about it.  He just started

23   grabbing.

24         Q.    Okay.  And that's -- the only reason I say that is I

25   want to direct your attention.  You know which episode or

1    incident I'm talking about?

2        A.   Yes.

3        Q.   About what time of day was this?

4        A.   About close to 1:00 o'clock.

5        Q.   Okay.

6        A.   Around there.

7        Q.   Okay.  I'm showing you what's been marked for

8    identification and previously introduced rather as Government's

9    Exhibit No. 153A.  Do you see that photograph?

10       A.   Yes.

11       Q.   Do you recognize that person?

12       A.   Yes.

13       Q.   Is that the person who came into the store that day

14   that we're talking about?

15       A.   Yes.

16       Q.   When -- first of all can you tell the ladies and

17   gentlemen of the jury how the person you just described in 153A

18   was dressed?

19       A.   He was wearing a Longhorn T-shirt and matching like

20   basketball shorts and a pair of dark sunglasses.

21       Q.   Did he have a cap or hat or anything like that on?

22       A.   No.

23       Q.   Okay.  And was there anything about the way -- what

24   he was wearing or his demeanor that struck you -- that you

25   noticed as he walked into the store?

1    A.   Not initially.

2    Q.   Okay.  What did catch your attention?

3    A.   He kept his sunglasses on the whole time he was in

4  the store.  Never took them off.  Occasionally he'd like do

5  this, you know.

6    Q.   When you say do this, you mean pull the glasses down?

7    A.   To see but wouldn't take them off.

8    Q.   Okay.  Where did the person go that you just

9  identified for us in 153A?  Where did he go when he came into

10  the store?

11    A.   He came down the middle aisle and kind of around the

12  corner and stopped at the smokeless powder display we have.

13    Q.   Okay.  What did he do there?

14    A.   He started picking, looking at them, putting them

15  back.  Eventually he selected four one pound containers and

16  brought them to the counter and then went back to the display

17  and at the same time was asking what smokeless powder was as he

18  was picking two more pounds of it.

19    Q.   What did you think of that when he made that -- asked

20  you that question?

21    A.   I thought it was odd because he's picking six pounds

22  of something he knows nothing of what it is.

23    Q.   And what is smokeless powder?

24    A.   It's used for reloading bullets.

25    Q.   Okay.  Does it -- is it flammable?

1        A.   Flammable.

2        Q.   Is it highly flammable?

3        A.   Yes.

4        Q.   So when he asked that question, did anyone answer

5   him?

6        A.   Well, we explained it was a substitute for black

7   powder which we do not sell.  It's a smokeless -- they just

8   call it smokeless powder because you need certain permits for

9   black powder and record keeping and we just don't stock that.

10        Q.   Okay.  So after he picked the four pounds and placed

11   them on the counter, what did he do then?

12        A.   He started to just randomly walk around the store not

13   really looking at anything.  Went to the back aisle.  Asked

14   about .40 ammunition like, you know, get me some .40 Smith &

15   Wesson ammunition and Greg the other store clerk told him it

16   was up here in the front.  He could come and make his own

17   selection, that we weren't just going to pick out the

18   ammunition for him.

19        Q.   Are there -- are there many different types of .40

20   caliber ammunition?

21        A.   Yes.

22        Q.   Was that question -- did you -- what did you think of

23   that particular question regarding -- or the statement he made

24   regarding the 40-caliber ammunition?

25        A.   Well, it's kind of like an order like get it for me

1    and we're just, no.  Just come pick your own out.

2         Q.   Okay.  Back to the -- to the smokeless powder.  You

3    say he picked four canisters of it and a canister weighs how

4    much each one?

5         A.   We have one pound canisters.

6         Q.   Did he acquire any more smokeless powder?

7         A.   He had the four initial and then grabbed two more.

8         Q.   Okay.

9         A.   So a total of six.

10        Q.   Now, was there anything unusual about the types of

11   smokeless powder that he picked?

12        A.   They were all different.

13        Q.   Did that strike you as odd?

14        A.   Usually when somebody buys that quantity they're

15   buying more like two of one kind or multitudes of the same kind

16   and then they're also buying other components, bullets,

17   primers, cases, stuff for reloading.  It's not just six random

18   selections of black powder.

19        Q.   Did he acquire any of those things like primers and

20   bullets?

21        A.   No.

22        Q.   When he sat the canisters of smokeless powder on the

23   counter, what did you do?

24        A.   I was making note of what types he was buying number

25   one just for what he was buying and then also we -- I do that

1    so that when the customer leaves I can go restock the same

2    amount of what he picks off the shelf.

3        Q.   Okay.  Now, at some point after he had the

4    conversation with Mr. Ebert regarding the 40-caliber

5    ammunition, what did the defendant do then?

6        A.   He also inquired about a magazine for a firearm to

7    Greg.

8        Q.   What type of magazine?

9        A.   It was for an XD pistol.

10       Q.   Was there anything in particular about the magazine

11   that he was asking about?

12       A.   No.  He just was asking for one.

13       Q.   Okay.  Ultimately did he pick one?

14       A.   Yeah.  He and Greg picked that out.

15       Q.   Okay.  Was it one that was part of his purchase?

16       A.   Yes.

17       Q.   What else happened?  What else did he do inside the

18   store after he picked the magazine?  Anything else?

19       A.   He asked about some shotgun ammunition.  We showed

20   him different types of that.  He selected some 20 gauge

21   Winchester ammunition.  Made his purchase.  He paid in cash,

22   left the receipt, left the cash.  There wasn't very much change

23   but he left that.  As he was leaving, I told him to have a nice

24   day.

25       Q.   Now, let me ask you.  I'll come back to that part in

Direct Examination of Cathy Cheadle by Mr. Frazier

1    just a moment.  I don't want to get too far ahead.

2         A.   Okay.

3         Q.   So he bought the -- he got -- acquired two -- how

4    many boxes of 12 gauge ammunition did he acquire?

5         A.   I believe it was three.

6         Q.   Okay.  And were there any other items that he

7    acquired for purchase that you recall?  Is that pretty much it?

8         A.   That's pretty much it.

9         Q.   Okay.  Now, the -- at this point at the point that

10   he's checked out or is checking out have you made some type of

11   notation?  You said you were making notes of the black powder.

12   By this time had you already made your notations of what type

13   of smokeless powder the person was purchasing?

14        A.   Yes.  And then we were also checking the security

15   monitors just because we randomly do that.  Noticed an

16   individual standing in the parking lot.  So that was kind of

17   like a flag.  We looked at it a little bit closer.  It was the

18   driver of a cab who was standing in the parking lot which

19   seemed odd but not -- you know, it just doesn't happen very

20   often.

21        Q.   Okay.  So at this point what -- what was going

22   through your mind?

23        A.   I just found the amount of smokeless powder kind of

24   alarming, his demeanor, the fact he wouldn't take his

25   sunglasses off.  It just was a little odd.

1    Q.   Okay.  Do customers routinely purchase six pounds at

2    a time?

3    A.   If -- if they do, it's usually like I said more

4    multitudes of the same kind and they're buying other components

5    as well.

6    Q.   For the reloading supplies?

7    A.   Right.  They're stocking up for -- you know, they're

8    going to do a reloading run.

9    Q.   Okay.  Now, you mentioned surveillance video.  Does

10   Guns Galore have a video surveillance system?

11   A.   Yes.

12   Q.   Okay.  And it was operating at the time?

13   A.   Yes.

14   Q.   And you are actually in the transaction yourself.  So

15   you've had a chance to view the video; is that correct?

16   A.   Yes.

17   Q.   Now I'm showing you what's been marked for

18   identification as Government's Exhibit No. 49.  You've had a

19   chance previously to look at the video surveillance or the

20   digital footage from your store, correct?

21   A.   Yes.

22   Q.   And is the exhibit contained -- the video

23   surveillance footage of the transaction that occurred at the

24   counter between the person you identified in Government's

25   Exhibit No. 153A and yourself and who else is in the video

Direct Examination of Cathy Cheadle by Mr. Frazier ——249

1    surveillance?

2        A.   Greg Ebert.

3        Q.   Okay.  And approximately how long is that particular

4    transaction this particular video run in terms of length of

5    time?

6        A.   I want to say seven minutes or so.

7        Q.   Okay.  And -- but in addition to this angle, the

8    store surveillance has a number of different angles that they

9    have of surveillance not just inside the store but also outside

10   the store as well, correct?

11       A.   Yes.

12       Q.   And is this a fair and accurate -- 49 a fair and

13   accurate clip, if you will, of the transaction that occurred

14   between you, Mr. Ebert and the person who is buying the

15   smokeless powder and other items you described?

16       A.   Is the disk a --

17       Q.   In other words is it the entire transaction?

18       A.   Yes.

19       Q.   Nothing's been left out of it is what I'm asking.

20       A.   Uh-huh.

21       MR. FRAZIER:  Your Honor, we will offer into evidence

22   Government's Exhibit No. 49 into evidence.

23       MR. WHITE:  No objection.

24       THE COURT:  It's admitted.

25       (Exhibit(s) admitted:  G49)

Direct Examination of Cathy Cheadle by Mr. Frazier ———250———

1        MR. FRAZIER:  If you could -- it's paused -- if you could

2    pause it for just a second, please.

3    BY MR. FRAZIER:

4        Q.   Now, we're at the beginning of Government's Exhibit

5    No. 49 that she's playing on the video.  If you could, please

6    identify for the jury the people in the video that we're

7    watching.

8        A.   I am sitting in a chair.  Greg is the gentleman in

9    the black shirt and the individual is in the corner what you

10   can see the longhorn.

11       Q.   Where I just put that green arrow on the far

12   left-hand side?

13       A.   Yes.

14       MR. FRAZIER:  Okay.  You can continue.

15       (Video played.)

16   BY MR. FRAZIER:

17       Q.   And there's no audio on this, correct?

18       A.   No.

19       Q.   What area --

20       MR. FRAZIER:  Can you pause, please?

21   BY MR. FRAZIER:

22       Q.   If you could please tell the jury what area is the

23   person in the back here that I'm circling what is he looking at

24   in the store?

25       A.   He's looking at the display of smokeless powder.

1           MR. FRAZIER:  Okay.  You can proceed.  Go ahead.

2           (Video played.)

3           MR. FRAZIER:  If you could pause, please.

4    BY MR. FRAZIER:

5           Q.   What's he just sat on the counter there?

6           A.   The initial four pounds.

7           Q.   Thank you.

8           MR. FRAZIER:  You can proceed.

9           (Video played.)

10   BY MR. FRAZIER:

11          Q.   What are you doing now?

12          A.   Making note of what types he's buying.

13          Q.   And why are you making that note?

14          A.   Primarily just -- I had this feeling.  I just wanted

15   to make note of what he was buying and plus to restock the

16   shelf later.

17          Q.   Now, can you tell the jury what you're looking at

18   right now?

19          A.   I'm looking at the security monitor.  There's a

20   camera on the back aisle so I was seeing what he was doing on

21   the back aisle.

22          Q.   Are you looking at the surveillance video again?

23          A.   Yes.

24          Q.   What are you showing him now?

25          A.   The shotgun ammunition.

1      Q.   When was it you noticed there was a cab outside

2  waiting for him?

3      A.   I think it was when he was making his selections I

4  just kind of glanced up to see what was going on outside.  We

5  just kind of randomly always check all the cameras what's

6  happening.

7      Q.   And what's taking place right now?

8      A.   He -- Greg is getting ready to ring him up.

9      Q.   And what did you just hand back to that person?

10     A.   I wanted to make sure he was of age to purchase the

11 powder.

12     Q.   What type of identification -- what type of card did

13 he give you?

14     A.   It was an out of state license.

15     Q.   Do you remember what the year of birth was?

16     A.   I believed it was '89 at the time.

17     Q.   Did you notice the name on the driver's license or ID

18 card that he gave you?

19     A.   No.

20     Q.   At this point what is the person you identified in

21 153 doing?

22     A.   He's gone.

23     Q.   What are y'all looking at on the monitor there?

24     A.   We're seeing if he is getting in the cab and leaving

25 in the cab.

1        Q.   And did he in fact do that?

2        A.   Yes.

3        MR. FRAZIER.  Okay.  That's good.  Thank you.

4    BY MR. FRAZIER:

5        Q.   Okay.  You told us you -- let me go back to what

6    you'd said something earlier that when he left the store you

7    said to that person have a nice day.  I want to pick up that

8    point.

9        A.   Have a nice afternoon.

10       Q.   Have a nice afternoon.

11       Did the person you identified in 153A that photograph did

12   he respond to you?

13       A.   Yes.

14       Q.   Tell the ladies and gentlemen of the jury what he

15   said.

16       A.   He said that he hoped that mine would go better than

17   his will.

18       Q.   That was it?

19       A.   Uh-huh.

20       Q.   So what did you do at that point when he left the

21   store -- this is about 1:00 o'clock in the afternoon.  What did

22   you do?

23       A.   Well, we had other customers coming in.  So, you

24   know, when Greg and I could talk we were kind of discussing if

25   we both felt the same that it was as odd to him as it was to me

1    just the whole transaction and we were trying to do it where

2    there weren't customers -- we were trying to find it when the

3    store was empty.  You know, it was kind of difficult because,

4    you know, there is people in there all the time and we came to

5    the conclusion that it was just something we couldn't ignore.

6    It was just something felt not right to us.

7         Q.   So what did you do?

8         A.   At closing, you know, we decided that we didn't want

9    to get anybody in trouble if it was nothing, but we decided

10   that if -- if we didn't do anything and it turned out to be

11   something, it would be worth getting an innocent person in

12   trouble for reporting something that wound up not being

13   anything.

14        Q.   Okay.

15        A.   So Greg being in law enforcement he has, you know,

16   still the guys he knows on the force.  So he made the phone

17   call to report an incident and if they decided to act on it,

18   you know, great.  If not, then we had done our part and we felt

19   okay with that.

20        Q.   And when you say the police department, are you

21   talking about the Killeen Police Department?

22        A.   Yes.  The Killeen Police Department.

23        Q.   Okay.  Now I want to show you some exhibits marked

24   for identification starting with No. 50.  Do you recognize

25   that?

Direct Examination of Cathy Cheadle by Mr. Frazier —255—

1        A.   Yes.  That's the store receipt from that transaction.

2        Q.   Okay.  Is it one you printed off your register?

3        A.   Yes.

4        Q.   And showing you Government's Exhibit No. 51.  Do you

5   recognize that?

6        A.   Yes.  That's my notation of what types of powder were

7   purchased.

8        Q.   Looked like on the video Government's Exhibit No. 49

9   you were writing on a sticky note?

10       A.   Yes.

11       Q.   Did you take that information and transfer it to this

12   on 51?

13       A.   Yes.  And then I just -- because our register doesn't

14   print out descriptions of what the items are next to them, I

15   wrote what they were like the shotgun ammunition and the

16   magazine.

17       MR. FRAZIER:  All right.  We'll offer Government's Exhibit

18   No. 50 and 51 into evidence.

19       MR. WHITE:  No objection.

20       THE COURT:  They're admitted.

21       (Exhibit(s) admitted:  G50, G51)

22   BY MR. FRAZIER:

23       Q.   Government's Exhibit No. 50 is basically what you

24   described as a copy of the receipt?

25       A.   Yes.

1    Q.   Let's go to 51.  We'll zoom in on this a bit.  Using

2  Government's Exhibit No. 51 can you run down the list of items

3  he purchased there in the store and how you've made your notes

4  on here to reflect that?

5    A.   The first -- the first item is three boxes of the

6  shotgun ammunition at 12.99 and then it gives the total.  Then

7  three of those one pound containers of powder were at 24.99.

8  Two of them were at 25.99 and then the last sixth one was

9  28.99.  Then the next item is the XD -- the firearm magazine he

10 had purchased.  The sub total, the tax and the total.

11   Q.   All right.  I'm going to show you what's -- for

12 identification purposes as Government's Exhibit No. 71.

13   MR. FRAZIER:  May I approach the witness, Your Honor?

14   THE COURT:  Yes, sir.

15 BY MR. FRAZIER:

16   Q.   Do you recognize these two boxes contained in

17 Government's Exhibit No. 71?

18   A.   It looks like a type of ammunition we would sell.

19   Q.   Okay.  Was it the type of ammunition he in fact

20 bought?

21   A.   Yes.

22   Q.   I show you Government's Exhibit 100 and 118.  Do you

23 recognize those particular shells?

24   A.   I believe they're what would be in that box.

25   Q.   The same type of shells?

Direct Examination of Cathy Cheadle by Mr. Frazier

1      A.    Yes.

2      Q.    And this box that's contained in Government's 100, is

3  it the same type of box?

4      A.    Yes.

5      Q.    Do you recognize the price tag on that box?

6      A.    It looks like our price tag.

7      Q.    Can you see this on your screen, ma'am?

8      A.    Yes.

9      Q.    Okay.  Government's 116.  Do you recognize what that

10 is?

11     A.    It's the packaging for the XD magazine.

12     Q.    And Government's Exhibit No. 102.  Can you see

13 that --

14     A.    Yes.

15     Q.    -- at all?

16     A.    Yes.

17     Q.    Do you recognize what that is?

18     A.    That's a 12 round magazine for an XD firearm.

19     Q.    Would 116 be the packaging for an item just like the

20 one contained in 102?

21     A.    Yes.

22     Q.    I'm showing you Government's Exhibit No. 90 marked

23 IMR4198; 91, HS-6; 92, H414; 93, Lil'Gun; 94, H4350; finally

24 Government's Exhibit No. 95 marked HS-7.  Do you recognize

25 these canisters?

1    A.   Yes.

2    Q.   And what are these canisters?

3    A.   Those are one pound containers of smokeless powder.

4    Q.   Are they the same cans of smokeless powder purchased

5    by the person you identified in 153 -- excuse me.  I'll clear

6    this up for you.  Are these the same containers of smokeless

7    powder purchased by the person you identified in 153 earlier?

8    A.   They appear to be.

9    Q.   Okay.  And are they the same notations on the one

10   that you -- that you have on your receipt?

11   A.   Yes.

12   Q.   Okay.  And are the price tags on these consistent

13   with the price tags that your company -- that Guns Galore uses

14   for their pricing?

15   A.   Yes.

16   Q.   Now, the next day -- and it was later -- about what

17   time of day was it that the call was actually made to the

18   Killeen Police Department if you know?

19   A.   When we closed because it was quiet and we could kind

20   of openly talk and discuss it.

21   Q.   And what time would that have been?

22   A.   6:00 o'clock.

23   Q.   Okay.  And was a phone call made?

24   A.   Yes.

25   Q.   You were present when it was made?

1    A.   Yes.

2    Q.   I won't ask you what was said or anything like that,

3  but as a result of that phone call did someone come to your

4  store either later that day or the next day?

5    A.   The next day.

6    Q.   Okay.  And who was it that came to the store?

7    A.   I believe it was -- I think it's Officer Boone.

8    Q.   Okay.  And did you provide him with something off

9  your surveillance equipment?

10   A.   I'm not sure if he requested copies of the

11 surveillance or not.

12   Q.   Did somebody in law enforcement either he or someone

13 else later request copies of surveillance?

14   A.   Yes.

15   Q.   And who was that that you recall requesting copies?

16   A.   I believe it was an FBI officer I believe.

17   Q.   Okay.  Well, I'm talking about for the Killeen

18 police.  Was there somebody from the Killeen police that you

19 provided copies to?

20   A.   I don't recall that because I had no property

21 evidence.  You know, usually they'll give me something when

22 they take a piece of property.

23   Q.   Okay.  I'm showing you what's been marked for

24 identification as Government's 48.  Do you recognize what these

25 are?  I'm showing you A, B, C, D and E.  Do you recognize

1   those?

2       A.   Those are still shots of our surveillance.

3       Q.   Okay.  And these were produced off your surveillance

4   equipment that you identified earlier?

5       A.   Yes.

6       MR. FRAZIER:  Okay.  We'll offer Government's Exhibit No.

7   48 into evidence.

8       MR. WHITE:  No objection.

9       THE COURT:  It's admitted.

10      (Exhibit(s) admitted:  G48)

11  BY MR. FRAZIER:

12      Q.   Now, this is a different camera angle in Photograph

13  No. A.  What is this -- tell the jury what we're looking at

14  here.

15      A.   That's the aisle directly from the entrance to the

16  store.  The middle aisle of our store.

17      Q.   This would be when the person was entering the store?

18      A.   Yes.

19      Q.   Photograph B?

20      A.   That's right in front of the cash register.

21      Q.   Photograph C.  Is that one of the stills of the video

22  that we saw played for the jury Government's Exhibit No. 49

23  just a few minutes ago?

24      A.   Yes.

25      Q.   And finally D is -- or next is D.  Another still from

Direct Examination of Cathy Cheadle by Mr. Frazier

 1    the same surveillance video?

 2         A.   Yes.

 3         Q.   E.   The same as from the surveillance video?

 4         A.   Yes.

 5         Q.   And I have an exhibit I'd like to show you for

 6    identification as 154.  Do you recognize what this is a picture

 7    of?

 8         A.   That's the outside corner of the store.

 9         Q.   Is this the way it appeared back in July of last

10    year?

11         A.   Yes.

12         MR. FRAZIER:  We'll offer 154 into evidence.

13         MR. WHITE:  No objection.

14         THE COURT:  It's admitted.

15         (Exhibit(s) admitted:  G154)

16         MR. FRAZIER:  Pass the witness, Your Honor.

17                        CROSS-EXAMINATION

18    BY MR. WHITE:

19         Q.   Ms. Cheadle, you didn't sell Mr. Abdo anything that

20    was illegal to sell him that day in the store, did you?

21         A.   No.

22         Q.   These items by themselves are not illegal for you to

23    sell?

24         A.   No.

25         Q.   And any combination, any of the things on the

Cross-Examination of Cathy Cheadle by Mr. White

1   receipts or the items themselves illegal in any way?

2       A.   No.

3       Q.   And if it wasn't illegal for you to sell those items,

4   it was not illegal for Mr. Abdo to purchase those items?

5       A.   Correct.

6       Q.   And it was perfectly legal for Mr. Abdo to purchase

7   those items each on their own or in any combination?

8       A.   Yes.

9       Q.   In fact none of the activity we saw either in still

10  photographs or in video that we watched this afternoon, nothing

11  shows illegal activity that you're aware of, does it?

12      A.   No.

13      Q.   You met with Special Agent Stephen and Officer

14  Castleberry.  Do you remember that?

15      A.   Not by name I don't.

16      Q.   You mentioned 20 gauge ammunition.  Could you might

17  have instead meant 12 gauge ammunition?

18      A.   Initially I believe it might have been what he bought

19  because he was looking at that but in going back and looking at

20  the surveillance it was the 20 gauge that he had selected.

21      Q.   And that would be a reason for a mistake in a report,

22  correct?

23      A.   Correct.  The boxes are all the same color.

24      Q.   But being a different gauge still didn't make

25  anything that you sold or anything that Mr. Abdo purchased

1    illegal that day, did it?

2         A.   No.

3         Q.   Thank you.

4         MR. FRAZIER:  No further questions, Your Honor.

5         THE COURT:  You may step down, ma'am.  You may be excused.

6         MR. SCHNEIDER:  The government calls David Hutton.

7         (The witness was sworn.)

8                         DIRECT EXAMINATION

9    BY MR. SCHNEIDER:

10        Q.   Good afternoon, Mr. Hutton.

11        A.   Hello.

12        Q.   Can you introduce yourself to the jury?

13        A.   I'm David Richard Hutton.

14        Q.   And by whom are you employed?

15        A.   ███████████.

16        Q.   Where is ████████████ located?

17        A.   It's on ██████████████████ in Killeen.

18        Q.   And how long have you worked at ██████████████?

19        A.   20 years.

20        Q.   What kind of store is ████████████?

21        A.   It's an Army surplus store.

22        Q.   And what kind of items do you sell there?

23        A.   Basically military surplus plus uniform supplies,

24   boots, stuff geared towards the military.

25        Q.   And how close is that to Fort Hood?

1      A.   Right outside the main gate.

2      Q.   What are your responsibilities at the store?

3      A.   I manage the store basically.

4      Q.   Were you working on direct -- on July 4th of 2011 --

5   sorry.  July 26th of 2011?

6      A.   Yes.

7      Q.   And do you remember a customer coming into the store

8   to purchase a uniform?

9      A.   Yeah.

10      Q.   And can you describe your first interaction with that

11   customer?

12      A.   My first one I'm not really sure what the first one

13   would have been, but...

14      Q.   Can you describe your interaction with the customer

15   while he was in the store?

16      A.   I basically sold him a uniform and some boots and

17   name tags and sewing.  Got him set up with a complete uniform.

18      Q.   Do you remember what the name tag was on the uniform?

19      A.   Smith.

20      Q.   Do you remember seeing the individual first come into

21   the store?

22      A.   No.

23      Q.   Do you remember what he was wearing while he was

24   shopping?

25      A.   Yeah.  He was wearing a tank top and shorts and a hat

1    all geared towards Texas Longhorns.

2         Q.   Was he wearing anything else on his face or --

3         A.   Sunglasses.

4         Q.   -- on his body?

5         Did you say sunglasses?

6         A.   Yes, sir.

7         Q.   Did he take off the sunglasses while he was in the

8    store?

9         A.   No.

10        Q.   Did you have any discussions with him about any of

11   the items that he wanted to purchase?

12        A.   I basically told him where the boots are at.  I

13   also -- you know, normally I try to spark conversation between

14   customers and I, you know, asked him where he was coming from

15   and basically that's...

16        Q.   I'm going to show you Exhibit 153A which is already

17   in evidence.  Do you recognize that photo?

18        A.   Yes.

19        Q.   Is that the person that came into the store that day

20   that we're talking about?

21        A.   Yes.

22        Q.   And just to show you another view Exhibit 153B.  Is

23   that the same person?

24        A.   Yes.

25        Q.   So you said you came -- he came in and you tried to

1    engage him in conversation.  Was there any conversation?

2       A.   Very limited.  He told me he was coming from Campbell

3    but much more than that I don't recall.  He seemed not very

4    talkative.

5       Q.   And do you remember him bringing any items for

6    purchase?

7       A.   Yes.  He bought basically a complete uniform, pants,

8    jacket, hat, T-shirt, boots.

9       Q.   Now, do you have a surveillance video inside Surplus

10   City?

11      A.   Yes, sir.

12      Q.   And are you one of the people that has care, custody

13   and control of the video surveillance system in that store?

14      A.   Yes, sir.

15      Q.   You're familiar with the system?

16      A.   Yes, sir.

17      Q.   Is it always running?

18      A.   Always.

19      Q.   Where does it record to?

20      A.   We've got a computer in the office that records all

21   of the cameras.

22      Q.   And if someone needs to look at the surveillance

23   video footage, are you the person that is in charge of that?

24      A.   Yes.

25      Q.   Can you tell looking at a certain video whether it

Direct Examination of David Hutton by Mr. Schneider ——267

1   comes from inside Surplus City?

2       A.   Yes.

3       Q.   And does Surplus City keep the video surveillance in

4   its regular course of business?

5       A.   Yes.

6       Q.   Is it part of Surplus City's business to accurately

7   record events on that video?

8       A.   Yes.

9       Q.   Is the surveillance video recorded at the time

10  that's -- is there -- actually let me back up.  Is there a time

11  stamp on the video?

12      A.   Yes.

13      Q.   And is the surveillance video recorded at the time of

14  the events as they're occurring or close to it?

15      A.   Close to it.  Yes.

16      Q.   Okay.  I'd like to show you Government's Exhibit 52

17  for identification.  Do you recognize that?  Do you know what

18  that is?

19      A.   A CD.

20      Q.   And did you provide a CD with video surveillance

21  footage from the surplus store, Surplus City store to the FBI?

22      A.   Yes.

23      Q.   And did you review that surveillance video footage --

24      A.   Yes.

25      Q.   -- prior to providing it to the FBI?

1      A.   Yes.

2      MR. WHITE:  No objection.

3      MR. SCHNEIDER:  Your Honor, the government would move

4  Government's Exhibit 52 into evidence.

5      THE COURT:  It will be admitted.

6      (Exhibit(s) admitted:  G52)

7      MR. SCHNEIDER:  Okay.  If we can -- if we can play 52.

8      (Video played.)

9  BY MR. SCHNEIDER:

10     Q.   Now, the footage that we're watching on the screen

11  right now, what is that an angle of?

12     A.   That's the front door.

13     MR. SCHNEIDER:  Can you pause it right there?

14  BY MR. SCHNEIDER:

15     Q.   Is that the individual that you've been testifying

16  about previously?

17     A.   Yes, sir.

18     Q.   And what is he wearing in that picture?

19     A.   The Longhorns T-shirt -- I mean tank top, hat and

20  shorts.

21     Q.   Okay.  Is there anything else that he has on his

22  person?

23     A.   Sunglasses and the backpack.

24     Q.   Do you recall him entering the store with the

25  backpack?

Direct Examination of David Hutton by Mr. Schneider ——269——

1    A.   Yes.

2    Q.   Do you remember while he was in the store if he ever

3  took off the backpack in your sight?

4    A.   Not that I recall.

5    MR. SCHNEIDER:  Okay.  If you can continue the video.

6    (Video played.)

7    MR. SCHNEIDER:  Okay.  And If we can play the next clip,

8  please.

9    (Video played.)

10  BY MR. SCHNEIDER:

11    Q.   Now, who else is in the video footage in this clip?

12    A.   The coworker Rita.

13    Q.   And is she the one located on the bottom of the

14  screen?

15    A.   Yes, sir.

16    Q.   And she's wearing sort of a purple shirt?

17    A.   Yes.

18    Q.   And there's another head that's in the screen.  Do

19  you know who that is?

20    A.   That's me.

21    Q.   Do you remember being at the counter during this

22  purchase?

23    A.   Yes.

24    Q.   And can you tell us what the items are that are being

25  put on the counter for purchase?

1        A.   He's got a pair of boots, a shirt, a hat and a pair

2   of pants.

3        Q.   Okay.  So other than those uniform pieces that were

4   just put on the counter in that video, did this person buy any

5   other items in your store?

6        A.   He purchased the name tag U.S. Army.  He had sewing

7   done on the hat and then he also bought a belt.

8        Q.   Now, did you have any discussion about any of the

9   patches for the uniform?

10       A.   Yes.  He asked me for the patch -- you know, a

11  patch -- the main patch for Fort Hood and I said, well,

12  basically it depends, you know, which unit you're going to and

13  coming from Campbell I figured he might have been Airborne so

14  he was either 504 through First Cav, but he didn't seem to know

15  which really patch he needed.

16       Q.   And is that something that's common that you see at

17  your store?

18       A.   Yeah.  Until they get to Fort Hood and get to the

19  21st replacement to know who they're going to, a lot of times

20  they're not sure of who they're going to be with.

21       Q.   And were there any other patches that he purchased

22  for his uniform?

23       A.   I believe the American flag patch, too.

24       Q.   And what about for the hat?

25       A.   He had rank sewn on the hat.

Direct Examination of David Hutton by Mr. Schneider —— 271 —

1        Q.   And what was the rank?

2        A.   Sergeant.

3        Q.   Was there a rank on the uniform?

4        A.   He probably would have bought a rank for the shirt,

5   too.

6        Q.   And was there any type of name tag?

7        A.   Yes.

8        Q.   And what was the name tag?

9        A.   Smith.

10       Q.   I'd like to show you Government's Exhibit 121 for

11   identification.  This contains a number of items in

12   Government's Exhibit 121.  First item.  Do you recognize this?

13       A.   It's an Army hat.  Yes.

14       Q.   And does it have a name on the back?

15       A.   Yes.  Smith.

16       Q.   Okay.  And this next item from Government's 121?

17       A.   It's an Army shirt.

18       Q.   Is there a name --

19       A.   Smith.

20       Q.   -- on that?

21            Is there a rank?

22       A.   Sergeant Smith.  Yes.

23       Q.   And what patches?

24       A.   First Cav.  And First Cav is a combat patch with the

25   American flag.

1      Q.   This next item from Government's Exhibit 121.  Do you

2   recognize that?

3      A.   Yes, sir.

4      Q.   What is that?

5      A.   It's a pair of Army ATU pants.

6      Q.   The next item?

7      A.   It's a belt.

8      Q.   What color?

9      A.   It's tan.

10      Q.   And this next item?

11      A.   That's just a black belt.

12      Q.   And then finally this last item from Government's

13   121?

14      A.   A pair of boots.

15      Q.   And are these all items that the defendant purchased

16   in Surplus City from you?

17      A.   All besides the black belt.

18      Q.   Now, do you remember -- do you remember how much this

19   cost?

20      A.   Approximately $200.

21      Q.   And do you remember how the defendant paid?

22      A.   Cash.

23      Q.   Once he paid for these items, what, if anything,

24   happened next?

25      A.   He -- I believe he called for a cab, got the

Direct Examination of David Hutton by Mr. Schneider —273—

1  phonebook and asked for a cab and then purchased a belt because

2  he -- he asked to try to -- to put the clothes on and then

3  before he did that he realized he needed a belt.  Purchased a

4  belt and then went to the bathroom to try them on.

5      Q.   And did he just try on the clothes for a fit, or --

6      A.   No.

7      Q.   What did he do when he tried them on?

8      A.   He put them on and wore them out of the store.

9      MR. SCHNEIDER:  And do we have the next clip of the video?

10     (Video played.)

11  BY MR. SCHNEIDER:

12     Q.   What does this show in the -- on the counter?

13     A.   It's the items he purchased.

14     (Video played.)

15  BY MR. SCHNEIDER:

16     Q.   Now, do you remember what time of day this occurred?

17     A.   I believe it was in the afternoon.

18     Q.   And is that you in the bottom of the screen?

19     A.   Yes.

20     Q.   In the blue shirt?

21     A.   Yes.

22     MR. SCHNEIDER:  Go to the next clip.

23     (Video played.)

24  BY MR. SCHNEIDER:

25     Q.   What camera angle is this?

1     A.   This is from -- close to the register.  So the front

2  door.

3     Q.   And what does that video show?  Is that the same

4  person?

5     A.   Yes.

6     Q.   And is he leaving there in the uniform that you just

7  sold him?

8     A.   Yes, sir.

9     Q.   Now, you mentioned that he had called a cab?

10     A.   Yes.

11     Q.   And did he do that in front of you?

12     A.   Yes.  He borrowed our phonebook.

13     Q.   And did you ever see if the cab showed up?

14     A.   Yes.  I actually went outside to tell the person

15  driving the cab that he was inside trying some clothes on and

16  that he would -- because he'd been quite awhile in the

17  bathroom.

18     Q.   And finally I'd like to show you Government's Exhibit

19  155 for identification.  Do you recognize that?

20     A.   Yes.  That's our store front.

21     MR. WHITE:  No objection.

22     MR. SCHNEIDER:  The government moves Government's Exhibit

23  No. 155 into evidence.

24     THE COURT:  It's admitted.

25     (Exhibit(s) admitted:  G155)

1    BY MR. SCHNEIDER:

2        Q.   And is that a picture of the outside of the store?

3        A.   Yes, sir.

4        Q.   Is that a fair and accurate representation of how it

5    looked --

6        A.   Yes, sir.

7        Q.   -- last summer?

8        A.   Yes, sir.

9        Q.   Regarding the video surveillance that we've just

10   looked, does that have a time stamp on it?

11       A.   It should have a time stamp on one of them.

12       Q.   Okay.  And which of the videos would help you in

13   determining what time these events took place?

14       A.   Well, the one where you can see me -- where I was

15   eating my lunch.  Usually I eat lunch around 1:00 o'clock so --

16   and that's a pretty -- I'm a diabetic.  So I kind of eat on

17   schedule.

18       Q.   If we play the video again would you be able to tell

19   what the time is?  Does that have a time stamp on it?

20       A.   I'm not sure which -- we don't have a time stamp on

21   it.

22       Q.   Okay.  But you recall eating lunch at the time at the

23   counter?

24       A.   Yes, sir.

25       MR. SCHNEIDER:  Nothing further.  Pass the witness.

                          CROSS-EXAMINATION

BY MR. WHITE:

     Q.   Sir, none of these items you sold Mr. Abdo, it wasn't

illegal for you to sell them?

     A.   No, sir.

     Q.   So therefore it wasn't illegal for Mr. Abdo to

purchase any of the things that he purchased from you in the

store that day?

     A.   No, sir.

     Q.   And any of the footage we've seen of the video,

nothing showed any illegal activity whatsoever, did it?

     A.   No, sir.

     Q.   Thank you.

     MR. SCHNEIDER:  Nothing further.  May the witness be

excused, Your Honor?

     THE COURT:  Yes, sir.

     You may step down.  You may be excused.

     MR. FRAZIER:  United States calls Rosemary Manning.

     THE COURT:  How long will she be?

     MR. FRAZIER:  About 15 minutes, maybe shorter.

     THE COURT:  All right.

     (The witness was sworn.)

                          DIRECT EXAMINATION

BY MR. FRAZIER:

     Q.   Would you please introduce yourself to the ladies and

Direct Examination of Rosemary Manning by Mr. Frazier —277—

1    gentlemen of the jury?

2        A.    My name?

3        Q.    Yes, ma'am.

4        A.    I'm Rosemary Manning.

5        Q.    Okay.  And pull the microphone just a little closer

6    to you.  Thanks.

7        What do you do for a living, Ms. Manning?

8        A.    I drive a taxi in Killeen.

9        Q.    Okay.  And what company do you work for?

10       A.    ██████████.

11       Q.    Back in July of last year were you working with Cove

12   Taxi?

13       A.    Yes.  I was.

14       Q.    And did you around 1:20 or so in the afternoon get a

15   dispatch to a business in Killeen?

16       A.    Yes.  I did.

17       Q.    And what business was that?

18       A.    Surplus City in Willow Springs.

19       Q.    I'm showing you Government's Exhibit 155.  Can you

20   see that photograph where you sit?

21       A.    Yes, sir.

22       Q.    On your screen right there?

23       A.    Uh-huh.

24       Q.    Okay.  Is that a picture of Surplus City?

25       A.    Yes.  It is.

1      Q.   And that's where you went on the 26th of last year?

2      A.   Yes.  It is.

3      Q.   Now, when you got there did -- was your fare waiting

4   for you?

5      A.   He was busy getting dressed.

6      Q.   Okay.  Did you have to wait awhile?

7      A.   Yes, sir.  I did.

8      Q.   And how did you know he was getting dressed?

9      A.   Because the man at the Surplus City came out and told

10   me that I need to wait a minute, that he was changing.

11     Q.   Did he eventually come out?

12     A.   He did.

13     Q.   And what was he wearing when he came out?

14     A.   Army clothes.

15     Q.   All right.  And I'm showing you Government's Exhibit

16   No. 153A.  Do you recognize that photograph?

17     A.   Yes.  I do.

18     Q.   And who is that person?

19     A.   Naser Abdo, the one -- the kid that was in my taxi.

20     Q.   All right.  Is that the fare that you picked up there

21   at Surplus City?

22     A.   Yes.  It is.

23     Q.   Okay.  From Surplus City tell the ladies and

24   gentlemen of the jury where you went.  Where Mr. Abdo wanted to

25   go.

Direct Examination of Rosemary Manning by Mr. Frazier —279—

1      A.   We -- first we went to a Whataburger parking lot

2  where he -- I got out of my cab and got in my trunk and got a

3  telephone book out.  If I can remember this correctly.  From

4  there we went to Kmart which is 1,000 feet in front.  He went

5  in for awhile.  He came back out.  He had just a Gatorade in

6  his hand.  Then from there we went to Lowe's and I believe from

7  Lowe's we went to Hawaiian Grill on Rancier and then I took him

8  back to his motel.

9      Q.   All right.  Let me back up just a second to the

10 Lowe's.  When you dropped him off at Lowe's, did he go inside

11 to shop?

12     A.   Yes, sir.  He did.  I waited for him.

13     Q.   Did he come out with some items?

14     A.   Yes, sir.  He did.

15     Q.   And in particular do you remember a couple of the

16 items that he came out with?

17     A.   I do.  He had some butterfly laminates like something

18 you would put outside on your patio.

19     Q.   And what else do you remember him having?

20     A.   I'm not really quite sure.

21     Q.   Did you see any boxes or anything?

22     A.   Oh, yes, sir.  As a matter of fact we did get two

23 boxes.  He had two boxes.

24     Q.   All right.  I'm showing you what's been marked for

25 identification as Government's Exhibit No. 134.  Can you see

1    this box from where you're at?

2        A.    Yes, sir.

3        Q.    Does this look similar to the box that he had?

4        A.    It does.

5        Q.    Okay.  When you say laminates, you mean like little

6    lights?

7        A.    Like little lights.  Uh-huh.

8        Q.    And Government's Exhibit No. 144.  Do you recognize

9    these boxes in this bag?

10        A.    Yes, sir.  I do.

11        Q.    And where do you recognize them from?

12        A.    From Lowe's.

13        Q.    They look like the boxes he had on that day?

14        A.    Yes, sir.

15        Q.    What did he do -- and did he have some other items as

16    well that he had acquired at Lowe's?

17        A.    He could have but I just remember seeing the

18    laminates.

19        Q.    Okay.  And the boxes?

20        A.    And the boxes.  Uh-huh.

21        Q.    Where did those items go when he left Lowe's?  What

22    did y'all -- what did he do with them?

23        A.    They were in my taxi.

24        Q.    And from there you went where?

25        A.    From Lowe's I believe we went to the C&H Hawaiian

1   Grill on Rancier.

2        Q.   Was that because he asked for --

3        A.   He asked for a place to eat.

4        Q.   Okay.  Did he acquire food there?

5        A.   Yes, sir.  He did.  A takeout order.

6        Q.   And then did he get back in the cab?

7        A.   Yes, sir.  He did.

8        Q.   And what did he -- where did you go then?

9        A.   I believe I dropped him off at his motel at the Best

10   Value Inn.

11        Q.   Okay.  America's Best Value Inn?

12        A.   America's Best Value Inn.  Yes, sir.

13        Q.   And where is that located at?

14        A.   It's on South Fort Hood Street.

15        Q.   Okay.  Was he carrying anything with him the entire

16   time you were with him from the time he got into the cab until

17   the time he left?

18        A.   Yes, sir.  He was.  He had a black backpack.

19        Q.   Did the black backpack did it appear to have stuff in

20   it?

21        A.   Oh, yes.

22        Q.   Okay.  Did he ever leave the backpack in your -- in

23   your cab on any of the stops that he made?

24        A.   He did not that I recall.  I never remembered him

25   leaving it.

1     Q.   Okay.  And after you dropped him off at the America's

2   Best Value Inn and Suites approximately how much -- how much

3   time had elapsed from the time you picked him up?

4     A.   It had to be a good hour.

5     Q.   Okay.  Can you describe the defendant's demeanor, how

6   he acted and what -- not how he acted but what his mind-set

7   was, his demeanor was while you were with him in the cab?

8     MR. BOYD:  Your Honor, I'm going to object as to calls for

9   speculation asking her to testify as to mind-set.

10    THE COURT:  I agree.  Sustained.

11  BY MR. FRAZIER:

12    Q.   What was -- describe what his demeanor was.  In other

13  words not what he was thinking.  I didn't mean that but act --

14  how he was acting.

15    A.   He -- he was quiet and distant.  I thought he was a

16  little arrogant.  He was on the phone at times.  His cell phone

17  at times.  He didn't seem like -- I mean, he wanted to be in

18  charge.

19    Q.   Okay.

20    A.   And I kind of had a feeling he may have -- he didn't

21  know much of the area but he at least knew where Lowe's was.

22    Q.   Okay.  All right.  Thank you very much, ma'am.

23    MR. FRAZIER:  We'll pass the witness.

24                         CROSS-EXAMINATION

25  BY MR. BOYD:

1     Q.   Good afternoon, ma'am.  I'm Zach Boyd.

2          So you picked him up, went to Kmart, went to Lowe's, went

3     to Hawaiian Grill and then back to the hotel?

4     A.   That's correct.

5     Q.   And as a taxi cab driver, you know, when people ask

6     you to go places, I mean, they are kind of in charge, right?

7     You're providing them a service, right?

8     A.   Right.

9     Q.   Okay.

10    A.   Uh-huh.

11    Q.   Now, you didn't see him steal anything from Kmart,

12    did you?

13    A.   I didn't go into Kmart with him.  So therefore I

14    didn't see him steal anything.

15    Q.   You didn't see him do anything illegal, did you?

16    A.   No.

17    Q.   Weren't aware of anything illegal he had on his

18    person at any time?

19    A.   No.

20    Q.   He was just a fare, right?

21    A.   Right.

22    MR. BOYD:  Nothing further.

23    MR. FRAZIER:  Nothing further, Your Honor.  May this

24    witness be excused?

25    THE COURT:  Yes, sir.

1        You may be excused, ma'am.

2        And, ladies and gentlemen, we will recess for this

3   afternoon.  We'll resume at 9:00 o'clock in the morning.

4   Please remember the instructions I've give you that you

5   shouldn't talk with anyone about the case or allow anyone to

6   talk with you.  Do not use any type of electronic equipment or

7   any other manner to try to learn something about the case.  You

8   know more about this case than any place you could try to learn

9   something about it because you're the ones who have been

10  sitting here listening.  We'll see you at 9:00 o'clock in the

11  morning.

12        LAW CLERK:  All rise.

13        (Jury exited the courtroom at 4:57.)

14        LAW CLERK:  Court will stand in recess until 9:00 o'clock

15  tomorrow morning.

16        (Hearing adjourned at 4:58.)

17

18

19

20

21

22

23

24

25

1                   IN THE UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF TEXAS

3                               WACO DIVISION

4    UNITED STATES OF AMERICA       *
                                    *
5                                   *
     VS.                            *  CRIMINAL ACTION NO. W-11-CR-182
6                                   *
     NASER JASON ABDO               *     May 23, 2012

7
         BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
8                        JURY TRIAL PROCEEDINGS
                               VOLUME 3
9
     APPEARANCES:
10
     For the Government:           Mark Frazier, Esq.
11                                 Gregg N. Sofer, Esq.
                                   Lawrence Schneider, Esq.
12                                 Assistant United States Attorneys
                                   PO Box 828
13                                 Waco, Texas 76701

14   For the Defendant:            Zachary L. Boyd, Esq.
                                   PO Box 870
15                                 Copperas Cove, Texas 76522
                                   – and –
16                                 Michael F. White, Esq.
                                   1103 N. Gray
17                                 Killeen, Texas 76541

18   Court Reporter:               Kristie M. Davis
                                   United States District Court
19                                 PO Box 20994
                                   Waco, Texas 76702-0994
20

21

22       Proceedings recorded by mechanical stenography, transcript

23   produced by computer-aided transcription.

24

25

1   (May 23, 2012, 9:07, defendant present.)

2       LAW CLERK:  All rise.

3       (The jury entered the courtroom at 9:07.)

4       THE COURT:  Be seated, everyone.

5       Good morning, ladies and gentlemen.  I think we're ready

6   to begin with the government's next witness.

7       MR. SCHNEIDER:  Good morning, Your Honor.  The government

8   calls Cameron Chesser.

9       (The witness was sworn.)

10                   DIRECT EXAMINATION

11  BY MR. SCHNEIDER:

12      Q.   Good morning, Mr. Chesser.

13      A.   Good morning.

14      Q.   Would you please introduce yourself to the jury?

15      A.   My name is Cameron Chesser.  I'm a loss prevention

16  safety manager with ███████ in Killeen, Texas, ██████████████.

17      Q.   And how long have you been employed by ███████?

18      A.   Come this November it will be five years.

19      Q.   And you said you were a loss prevention officer?

20      A.   Yes.

21      Q.   How long have you been a loss prevention officer with

22  ██████?

23      A.   The entire time.  I was hired I believe November

24  19th, 2007.

25      Q.   And in that position what are your responsibilities?

Direct Examination of Cameron Chesser by Mr. Schneider —287—

1    A.   Basically control shrink, reduce liability of the

2  store, ensure that we remain profitable.

3    Q.   Are you one of the people at ███ that has care,

4  custody and control of the video surveillance system?

5    A.   Yes.  I am.

6    Q.   And is that for the specific store you work at in

7  Killeen?

8    A.   Yes.

9    Q.   Are you familiar with the system?

10   A.   Yes.

11   Q.   Do you know where it records to?

12   A.   Yes.

13   Q.   Where is that?

14   A.   It records to a DVD server located in the office.

15   Q.   And do you have access to that hard drive?

16   A.   Yes.

17   Q.   Can you tell looking at a given video whether it came

18  from the Lowe's store in Killeen where you work?

19   A.   Absolutely.

20   Q.   Does Lowe's keep video surveillance in the regular

21  course of its business?

22   A.   Yes.

23   Q.   Is it part of Lowe's' business to accurately record

24  the public places and areas inside and outside of the store?

25   A.   Yes.

1      Q.   Is the surveillance video that's recorded, is that

2  made at the time it's represented on the video itself through a

3  time stamp or at least near that time?

4      A.   Yes.

5      Q.   I'm going to show you Government's Exhibit 53 for

6  identification.  And this is 53A.  Do you recognize that?  It

7  should be on your screen in front of you.

8      A.   Yes.

9      Q.   And now I'm going to show you 53B.  Do you recognize

10 that photo?

11     A.   Yes.

12     Q.   And 53C?

13     A.   Yes.

14     Q.   And what are these photos?

15     A.   Those are still shots from video surveillance of a

16 transaction that took place back on July 26th.

17     Q.   And do you recognize it as being from your store?

18     A.   Yes.

19     Q.   And how can you tell?

20     A.   From the individuals in there on the video.  I

21 recognize the cashier.  I recognize the angle in the camera.

22     Q.   And those are fair and accurate still photos from the

23 video surveillance from your store?

24     A.   Absolutely.

25     MR. SCHNEIDER:  Your Honor, the government moves Exhibit

1    53A, B and C into evidence.

2         MR. BOYD:  Your Honor, no objection.

3         THE COURT:  They're admitted.

4         (Exhibit(s) admitted:  G53A, G53B, G53C)

5    BY MR. SCHNEIDER:

6         Q.   Okay.  So now looking at Exhibit 53A, can you tell us

7    from the still photo when that was taken?

8         A.   There's a time stamp at the bottom left-hand corner

9    of the image at 14:07:20.

10        Q.   That would be 2:07 in the afternoon?

11        A.   That's correct.

12        Q.   And does it have a date stamp on it?

13        A.   Yes.  In the top center 7-26 of 2011.

14        Q.   And can you tell from that photo if there's a

15   specific register that's being shown in that --

16        A.   Yes.

17        Q.   -- photo?

18        A.   Above the time stamp it's listed 14-38.  That's Lane

19   14, Terminal 38.  That's our customer service desk.

20        Q.   Do you recognize anything else in the photo?  Do you

21   recognize any of the people in the photo?

22        A.   Yes.  The cashier.  She's a current employee with us.

23        Q.   Okay.  And now I'm going to show you 53B.  Is that

24   the same register?

25        A.   Yes.

Direct Examination of Cameron Chesser by Mr. Schneider -290-

1    Q.    Is that the same cashier at the register?

2    A.    Yes.

3    Q.    And the time stamp on that?

4    A.    14:07:35.

5    Q.    And is that the same date?

6    A.    Yes.

7    Q.    And 53C.  Can you tell if that's the same register?

8    A.    Yes.

9    Q.    And the same cashier?

10   A.    Yes.

11   Q.    And is it the same date?

12   A.    Yes.

13   Q.    And what is the time stamp on that?

14   A.    It's out of image right now.

15   Q.    Can you see it now?

16   A.    Yes.

17   Q.    What's the time stamp?

18   A.    14:08:03.

19   Q.    Okay.  Now, in terms of the receipts and transactions

20   that are conducted in Lowe's, are you familiar with the system

21   that records transactions?

22   A.    Yes.

23   Q.    And how does it work?  How are transactions typically

24   recorded at a Lowe's store?

25   A.    They're recorded to a dedicated server in the back on

Direct Examination of Cameron Chesser by Mr. Schneider -291-

1    a system that we call Genesis.

2         Q.   And are you one of the people that has care, custody

3    and control of that Genesis system?

4         A.   Yes.

5         Q.   And you're familiar with that system?

6         A.   Yes.

7         Q.   And where does it record the transactions to?

8         A.   It records to a server that's downloaded at the end

9    of business each day.

10        Q.   And do you have access to that server?

11        A.   I have access to it.  Yes.

12        Q.   Are you generally familiar with the items that are

13   sold in Lowe's?

14        A.   Yes.

15        Q.   And if you wanted to look up an item to see what it

16   is, are you able to do that?

17        A.   Absolutely.

18        Q.   And how generally would you do that?

19        A.   There are several different ways that you can do that

20   but typically utilizing the Genesis screen you can look up item

21   numbers, bin locations based on breakdowns of where -- where

22   the item is, what type of item it is, that kind of thing.

23        Q.   Now --

24        A.   Additionally I will say that they can also be looked

25   up online as well.

1    Q.    And can you actually see the product --

2    A.    Absolutely.

3    Q.    -- when you look it up online?

4    A.    Yes.

5    Q.    Now, can you tell looking at either a receipt or

6    printout of a transaction whether that transaction was

7    conducted and made in Lowe's?

8    A.    Yes.

9    Q.    And does Lowe's keep these transaction data such as

10   receipts and other transaction reports in its regular course of

11   business?

12   A.    Yes.

13   Q.    Is it part of Lowe's' business to accurately record

14   those transactions?

15   A.    Absolutely.

16   Q.    Are the receipts and other transaction data recorded

17   at the time of the sale or at least near the time of the sale?

18   A.    Yes.

19   Q.    Okay.  I'm now going to show you Government's Exhibit

20   No. 54 for identification.  Do you recognize this exhibit?

21   A.    It's out of focus but yes.  It appears to be the

22   Genesis transaction printout of the sale in question.

23   Q.    Okay.  Can you see it better now?

24   A.    Yes.

25   Q.    And how do you recognize it?

Direct Examination of Cameron Chesser by Mr. Schneider -293-

1       A.   Based off of the store number, date, time and the

2  items that are listed.

3       Q.   And is that the store number for the Killeen store

4  where you work?

5       A.   Absolutely.  0209 in the lower left-hand corner.

6       Q.   And did you print this out yourself from the system

7  that you just described?

8       A.   Yes.  I did.

9       MR. SCHNEIDER:  Your Honor, the government moves Exhibit

10 54 into evidence.

11      MR. BOYD:  No objection.

12      THE COURT:  It's admitted.

13      (Exhibit(s) admitted:  G54)

14 BY MR. SCHNEIDER:

15      Q.   Now, can you see that exhibit, Mr. Chesser?

16      A.   Yes.

17      Q.   Looking at that exhibit can you tell us again the

18 date and time of the transaction on that receipt?

19      A.   Yes.  The time stamps looking in the lower center

20 July 26th, 2011.  Time is 14:07:56.

21      Q.   And does that date and time match the still photos

22 that you previously identified as Government's Exhibit 53A, B

23 and C?

24      A.   Yes.  It does.

25      Q.   And that's from the surveillance camera system at the

Direct Examination of Cameron Chesser by Mr. Schneider -294-

 1    Lowe's where you work?

 2         A.   The photos?

 3         Q.   The photos were taken from that video system; is that

 4    correct?

 5         A.   Yes.

 6         Q.   Now, are you able to look at the receipt which is

 7    Government's 54 and tell what items were purchased?

 8         A.   Yes.

 9         Q.   Okay.  Can you tell the first item that was

10    purchased?

11         A.   They were -- it was a package of string lights.

12         Q.   Okay.  I'm going to show you Government's Exhibit 134

13    for identification.  Do you recognize that?

14         A.   Yes.

15         Q.   And have you seen this before?

16         A.   Yes.  I have.

17         Q.   Have you been able to check the product code on this

18    package?

19         A.   Not on that specific package.

20         Q.   Okay.  And would you like to see it?

21         A.   That'd be fine.

22         MR. SCHNEIDER:  Your Honor, may I approach?

23         THE COURT:  Yes, sir.

24    BY THE WITNESS:

25         A.   Yes, sir.

1   BY MR. SCHNEIDER:

2       Q.   Now, looking at Government's Exhibit No. 134, do you

3   recognize that exhibit?

4       A.   Yes.

5       Q.   Does it match any of the items on the receipt in

6   Government's Exhibit 54?

7       A.   It matches the item listed on the top the string

8   light stars.

9       Q.   Okay.  And what is the next item on the receipt?

10      A.   A two inch economy brush Item No. 253307.

11      Q.   And showing you Government's Exhibit 106.  Do you

12  recognize that item?

13      A.   Yes.

14      Q.   And what is it?

15      A.   It appears to be the same item as listed in the

16  second line, the two inch economy brush.

17      Q.   Now, this doesn't have a packaging on it, does it?

18      A.   No.  It does not.

19      Q.   So you can't match up any product --

20      A.   Correct.

21      Q.   But does the description match?

22      A.   Yes.

23      Q.   What is the next item on the receipt?

24      A.   Medium moving box.

25      Q.   Does it say the quantity?

1      A.    Yes.   Two of them were purchased.

2      Q.    I'm showing you Government's Exhibit 144 for

3   identification.   Do you recognize this?

4      A.    Yes.

5      Q.    What is this?

6      A.    They're two medium moving boxes.

7      Q.    Does it have any markings on it?

8      A.    Markings?

9      Q.    Any identification on the box?   Does it say anything?

10     A.    Yes, that it's a medium box from Lowe's.

11     Q.    Does it say Lowe's on it?

12     A.    Yes.

13     Q.    And how many are there in this exhibit?

14     A.    Two.

15     Q.    Does this match the description on the receipt?

16     A.    Yes.

17     Q.    And what is the next item?

18     A.    35 yard Gorilla duct tape.

19     Q.    Showing you Government's Exhibit 104 for

20   identification.   Do you recognize that?

21     A.    Yes.

22     Q.    And what is this?

23     A.    It appears to be a roll of Gorilla duct tape.

24     MR. SCHNEIDER:   And, Your Honor, may I approach?

25     THE COURT:   Yes, sir.

Direct Examination of Cameron Chesser by Mr. Schneider –297–

1    BY MR. SCHNEIDER:

2         Q.    Can you tell looking at the tape if it's Gorilla

3    tape?

4         A.    Yes.

5         Q.    And how --

6         A.    Clearly.  It's branded on the interior of the roll.

7         Q.    And to you does this appear to match the item on the

8    receipt?

9         A.    Yes.

10        Q.    I'm now showing you Government's Exhibit 138 for

11   identification.  Do you recognize that?

12        A.    Yes.

13        Q.    What is that?

14        A.    It is the next item actually listed on the receipt.

15   The quart gel contact cement.

16        Q.    And does this match the product number on the

17   receipt?

18        A.    Yes.

19        Q.    And is there another item on the receipt?

20        A.    Gatorade cool blue 32 ounce.

21        Q.    Okay.  Now, what is the total for the purchases in

22   that receipt?

23        A.    Including tax and everything $39.38.

24        Q.    And can you tell from that receipt how it was

25   purchased, whether it was cash, credit card?

1       A.   Yes.  He paid $100 in cash.

2       Q.   And then received change?

3       A.   Yes.

4       MR. SCHNEIDER:  Nothing further, Your Honor.  Pass the

5  witness.

6                          CROSS-EXAMINATION

7  BY MR. BOYD:

8       Q.   Can you see that Exhibit No. 54?

9       A.   Yes.  I can.

10      Q.   Now, is anything on Exhibit No. 54 illegal?

11      A.   No, sir.

12      Q.   Is there anything sold in Lowe's that's illegal?

13      A.   No, sir.

14      Q.   So no one broke a law by selling it to him at all?

15      A.   No, sir.

16      MR. BOYD:  Nothing further.

17      MR. SCHNEIDER:  Nothing further from the government, Your

18  Honor.  May this witness be excused?

19      THE COURT:  Yes, sir.

20      MR. FRAZIER:  Greg Ebert will be the government's next

21  witness, Your Honor.

22      (The witness was sworn.)

23                          DIRECT EXAMINATION

24  BY MR. FRAZIER:

25      Q.   And would you please introduce yourself to the ladies

Direct Examination of Greg Ebert by Mr. Frazier          299

1   and gentlemen of the jury?

2          A.   Good morning, ladies and gentlemen.  My name is Greg

3   Ebert.

4          Q.   And, Mr. Ebert, are you employed currently?

5          A.   Part time.  Yes, sir.

6          Q.   And where do you work?

7          A.   I work at Guns Galore in Killeen, Texas.

8          Q.   Prior to working at Guns Galore what did you do for a

9   living?

10         A.   I was a peace officer for the City of Killeen.

11         Q.   And how many years were you a peace officer for the

12  City of Killeen?

13         A.   20 years.

14         Q.   And did you retire from the department?

15         A.   I did, sir.

16         Q.   Okay.  And when you retired, what department were you

17  serving in with the Killeen Police Department?

18         A.   I was the sergeant in charge of crimes against

19  property.

20         Q.   And how long have you worked at Guns Galore?

21         A.   Approximately two years.

22         Q.   Okay.  And Guns Galore -- and what do you do for Guns

23  Galore?

24         A.   I'm just a clerk.

25         Q.   Okay.  I want to ask you if back on July the 26th,

1   2011 you were working on that date at Guns Galore?

2       A.   Yes, sir.

3       Q.   Okay.  In the early afternoon did you come into

4   contact with a man later identified to you as Naser Jason Abdo?

5       A.   Yes, sir.

6       Q.   I want to show you what's been previously introduced

7   into evidence as Government's Exhibit No. 153A.  Do you see

8   that photograph?

9       A.   Yes, sir.  I can.

10      Q.   Do you recognize it?

11      A.   Yes, sir.

12      Q.   And who is that a photograph of?

13      A.   The young gentleman that was in the store on the

14  aforementioned date.

15      Q.   Okay.  Later did you learn it was Naser Jason Abdo?

16      A.   That's correct.

17      Q.   Now, the -- about what time of day did the gentleman

18  enter the store?

19      A.   Roughly 1:00 p.m.

20      Q.   Okay.  And at the conclusion of his stay in the store

21  when he left the store that date you were working with -- well,

22  during the transaction with the gentleman -- with Mr. Abdo you

23  were working with someone else, correct?

24      A.   Yes, sir.  I was.

25      Q.   Who was that?

1      A.   The young lady's name is Cathy Cheadle.  She's a

2    store manager.

3      Q.   And when the time came that Mr. Abdo left the store,

4    did you and Ms. Cheadle talk about what had transpired during

5    the transaction, during the events that occurred inside the

6    store between you and Ms. Cheadle and Mr. Abdo?

7      A.   We spoke intermittently.  We were kind of reluctant

8    to say anything in front of the other patrons that were in the

9    store but during those periods when there was no one shopping

10   we discussed what had taken place and our concerns regarding

11   the young man.

12     Q.   All right.  And at the end of the day was a decision

13   reached for you to contact friends of yours who work in the

14   Killeen Police Department?

15     MR. BOYD:  I'm going to object as to leading.

16     THE COURT:  Sustained.

17   BY MR. FRAZIER:

18     Q.   What did you do at the end of the day?

19     A.   After discussing -- well, actually we had a

20   discussion at some length during the period between 1:00 and

21   5:30 or so and I came to the conclusion that it was probably a

22   wise thing to call one of the lieutenants that I had previously

23   worked with and share those concerns with him, taking the

24   mind-set that at that point it would be up to the police

25   department to decide whether it was prudent for them to take a

Direct Examination of Greg Ebert by Mr. Frazier                    302

1    look at what had taken place or not.

2         Q.   All right.  And who did you contact?

3         A.   I spoke with Lieutenant Patrick Boone.

4         Q.   Now, after you spoke with Patrick Boone, did you talk

5    to someone else?  At some point did you ever talk to Lieutenant

6    Bradley?

7         A.   I spoke with Eric probably a day or two later.

8         Q.   Okay.  And basically did you report what had

9    transpired in your store to Pat Boone regarding the transaction

10   with Mr. Abdo?

11        A.   Yes, sir.

12        Q.   Okay.  I want to show you what's been previously

13   introduced as Government's Exhibit No. 48.  There's five still

14   photos.  This is B, C, D and E.  Do you recognize those photos?

15        A.   Yes, sir.

16        Q.   Did you provide a copy of these to someone the

17   following day?

18        A.   I did not.  Mrs. Cheadle downloaded the information

19   from the in-store video.

20        Q.   And was provided to members of the Killeen Police

21   Department?

22        A.   That I can't answer, sir.  I do not know.

23        Q.   Okay.  Now, when the transaction took place -- I'm

24   going to show you what's been previously introduced as

25   Government's Exhibit No. 50.  Can you see that from where you

1  sit?

2       A.   Yes, sir.

3       Q.   This is a copy of the receipt of that transaction?

4       A.   I believe it to be.  Yes, sir.

5       Q.   Okay.  And the total on here --

6       THE COURT:  Sir, it's right there on your right if you can

7  see it easier.

8       THE WITNESS:  Okay.  Thank you, sir.

9  BY MR. FRAZIER:

10      Q.   Sorry about that.  I should have directed you to

11  that.

12      What was the total of the sale, the transaction that took

13  place between Guns Galore and Mr. Abdo?

14      A.   $256 and some change.

15      Q.   And how was that paid for?

16      A.   Cash.

17      Q.   And when Mr. Abdo left the store, do you recall how

18  he left?

19      A.   He seemed to be in a hurry.  He didn't wait for the

20  change.  It was just a matter of a few coins.  Neither did he

21  ask for a receipt.  He just took his purchase and left.

22      Q.   And how did he leave?  What method of transportation?

23      A.   Same mode he arrived.  In a taxi cab.

24      Q.   Do you know which cab company?  What color the cab

25  was?

Direct Examination of Greg Ebert by Mr. Frazier

1    A.   It's blue and it has silver lettering on the side of

2  the cab.  I apologize.  I don't recall the name --

3    Q.   Okay.

4    A.   -- of the cab company right off the top of my head.

5    Q.   And Guns Galore maintains a video surveillance system

6  of transactions and activities that take place in and around

7  the store; is that correct?

8    A.   Yes, sir.

9    Q.   And are you depicted in that video transaction -- you

10  and Ms. Cheadle along with Mr. Abdo during that transaction?

11    A.   I believe so.  Yes, sir.

12    MR. FRAZIER:  Okay.  We'll pass the witness, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. BOYD:

15    Q.   Good morning, sir.  I'm Zachary Boyd.

16    A.   Good morning.

17    Q.   With regards to the items purchased on the 26th day

18  of July, was that a lawful sale that occurred?

19    A.   I believe so.  Yes, sir.

20    Q.   And nothing you sold was illegal?

21    A.   No, sir.  It was not.

22    Q.   And you developed a concern over the period of around

23  five hours?

24    A.   Roughly.  Yes, sir.

25    Q.   And then you called your friend.  I think you called

1     him Eric Bradley?

2          A.   Lieutenant Boone, sir.

3          Q.   You called -- oh, is it -- who is Eric?  You referred

4     to someone as Eric.  Who is that?

5          A.   I believe the prosecutor brought that gentleman's

6     name up.  Eric Bradley is also assigned to the unit over which

7     Lieutenant Boone supervises.

8          Q.   Okay.  You said you spoke with Eric at some point?

9          A.   Couple days after --

10         Q.   Okay.

11         A.   -- this event.

12         Q.   It would be fair to say you're friends, right?

13         A.   Yes, sir.

14         Q.   Okay.  Thank you very much.

15         A.   You're welcome.

16                         REDIRECT EXAMINATION

17    BY MR. FRAZIER:

18         Q.   Sir, did your concerns begin during the transaction?

19         A.   Shortly after.  Yes, sir.

20         Q.   Thank you.

21         MR. FRAZIER:  Pass the witness.

22         MR. BOYD:  No further questions.

23         THE COURT:  You may step down, sir, and you may be

24    excused.

25         MR. FRAZIER:  Our next witness will be Eric Bradley, Your

 1    Honor.

 2         (The witness was sworn.)

 3                          DIRECT EXAMINATION

 4    BY MR. FRAZIER:

 5         Q.   Would you please introduce yourself to the ladies and

 6    gentlemen of the jury?

 7         A.   Richard Eric Bradley, sergeant City of Killeen Police

 8    Department.

 9         Q.   And how long have you been employed with the Killeen

10    Police Department?

11         A.   Since 1997.

12         Q.   And where are you -- did you have any prior law

13    enforcement experience before coming to Killeen?

14         A.   City of Harker Heights for three years.

15         Q.   And prior to that what did you do?

16         A.   United States Air Force.

17         Q.   And what did you do for the Air Force?

18         A.   Law enforcement.

19         Q.   How many years did you do there?

20         A.   Four years active duty.

21         Q.   And what division are you currently assigned to in

22    the Killeen Police Department?

23         A.   The organized crime unit.

24         Q.   And how long have you worked there?

25         A.   Just over a year.

1    Q.   All right.  Back in July of last year were you

2  working at the organized crime unit?

3    A.   Yes, sir.  I was.

4    Q.   What type of work do you do in the organized crime

5  unit from day to day?

6    A.   Sergeant of the unit I oversee detectives that

7  investigate crimes that involve narcotics and gang activity,

8  organized crime, vice crimes, things like that.

9    Q.   I want to direct your attention to the date of July

10 26th of last year.  Were you working on that date?

11   A.   Yes, sir.  I was.

12   Q.   What time did you come on duty?

13   A.   2:00 o'clock.  2:00 p.m.

14   Q.   All right.  Around 5:00 o'clock -- not 5:00 --

15 between 5:00 and 6:00, somewhere late in the afternoon did you

16 receive or -- did you receive information from Pat Boone

17 regarding a phone call he had received?

18   A.   Yes, sir.  Lieutenant Boone is my immediate

19 supervisor.  Came into my office advised that he had somebody

20 on the telephone that I needed to speak to.

21   Q.   Okay.  And who was that person?

22   A.   Greg Ebert.

23   Q.   Okay.  And who is Greg Ebert?  Do you know who that

24 is?

25   A.   Greg Ebert is a retired sergeant from our department.

1      Q.   All right.  And what was -- did you talk with

2  Mr. Ebert?

3      A.   Yes, sir.  I did.

4      Q.   And what did you learn from him?

5      A.   Mr. Ebert explained that earlier in the day -- he's a

6  clerk at the Guns Galore shop on South Hood Road South 195 and

7  that he had a subject that had come into the store that

8  concerned him a little bit on a particular item that he

9  purchased and just his attitude while he was inside the store.

10  Gave a description of the individual, advised that he had

11  bought six pounds worth of smokeless gun powder.  Some of his

12  mannerisms, keeping his sunglasses on.  Sergeant Ebert relayed

13  this information, his full description, how he had left the

14  store and his concerns as to why or what drew his suspicion to

15  this person.

16      Q.   Okay.  And generally what was the concern?  From law

17  enforcement's standpoint when you received that information,

18  what did you do with it and what were you concerned about?

19      A.   Initially just the items that were purchased, a

20  statement made or a question asked about what does smokeless

21  powder do when you're buying six pounds of it.  Other items

22  inside the store purchasing ammunition, a magazine for a

23  subcompact semiautomatic pistol and just the demeanor of

24  keeping the sunglasses on the entire time in the store.

25      Q.   Okay.

1      A.   That kind of drew his attention, and once he relayed

2  that information to me I was -- piqued my interest, also.

3      Q.   Okay.  Now, in particular to your law enforcement

4  experience have you worked overseas?

5      A.   Yes, sir.  I have.

6      Q.   And what capacity have you worked -- where have you

7  worked and what capacity?

8      A.   I worked in Afghanistan as a police advisor police

9  mentor for 19 months.

10      Q.   Okay.  And as part of your duties in Afghanistan did

11  you deal with individuals responsible for either making or

12  manufacturing bombs?

13      A.   Yes, sir.

14      Q.   What are those commonly known as in the military

15  terminology?

16      A.   IEDs or improvised explosive devices.

17      Q.   Okay.  And did you deal with that very much in the

18  time you were in Afghanistan?

19      A.   Every time we went out on a convoy it was something

20  we had to be aware of.

21      Q.   Okay.  Now, let's direct your attention and back to

22  this transaction.  After you received the -- talked to

23  Mr. Ebert, did you learn from him how the individual left the

24  store?  What manner of transportation?

25      A.   He initially advised that he had left in a blue

1  vehicle, a blue taxi cab with white or light colored writing on

2  it which narrowed it down to Luxury Cab Company in Killeen.

3  They're the only cab company that runs with a royal blue paint

4  scheme with light colored writing on it.

5      Q.   So what did you do?

6      A.   I called Luxury Cab Company and initially spoke to a

7  subject that identified themself as JT and asked him if he

8  could do some research for me and find out any information on a

9  run that was made to the Guns Galore shop that day on South

10 Fort Hood.

11     Q.   Okay.  Were you able to find out anything at that

12 time?

13     A.   Not initially.  They had to actually call me back and

14 initially told me that they had no runs.  Nothing's showing

15 that they had made a run to Guns Galore.  Based on the

16 information provided by Sergeant Ebert, I knew that there was

17 something more to this and I asked that subject to contact all

18 of his drivers from the day and find out if anybody had made a

19 run and it wasn't until sometime later that I was advised that

20 they had made what he called an off the books run to Guns

21 Galore.

22     Q.   Okay.  Off the books meaning there wasn't going to be

23 a record of it?

24     A.   Correct.

25     Q.   Now, what time of day was this that you started

1  contacting the cab companies in Killeen?

2     A.   After my -- it was in the evening.  It was after my

3  contact with Sergeant Ebert on the phone.

4     Q.   All right.  And what time was it you got the

5  information concerning the run to Guns Galore?

6     A.   After 8:00 o'clock.

7     Q.   All right.  When you got that information, what did

8  you do?

9     A.   I was given information that the subject was

10  initially picked up at the America's Best Value Inn on South

11  Fort Hood Road, taken to the Guns Galore shop on South Fort

12  Hood Road and then eventually dropped off at an Army Surplus

13  store Surplus City off of Willow Springs.  With that

14  information I attempted to contact the Surplus City, but at

15  that time they were already closed for the evening.

16     Q.   All right.  And likewise was Guns Galore already

17  closed?

18     A.   Yes, sir.

19     Q.   Okay.  So what did you do then?

20     A.   I took one of my detectives and we went to the

21  America's Best Value to try to do an initial canvass based on

22  the description that I had gotten from Sergeant Ebert.  We made

23  contact with the desk clerk and a couple of employees.  The

24  only person that they pointed out that was just vaguely in the

25  same ballpark turned out to be a subject that was a contractor

1    working at the DPS facility off of South Highway 195 south of

2    Florence.  So he was easily eliminated.  Once we were unable to

3    locate anybody matching that description, we left the hotel.

4         Q.   About what time was that?

5         A.   I'm not sure.  It was very late in the evening.

6         Q.   Okay.  What time did your shift end?

7         A.   12:00 midnight.

8         Q.   So what was the next event that happened?  Did you go

9    home at 12:00 midnight?

10        A.   Yes, sir.  Everybody is normally done unless we have

11   an operation going on at midnight and everybody leaves.

12        Q.   All right.  Do you just basically pass the

13   information on or do you wait -- I mean, what did -- what did

14   you do with the information that you had up to that point?

15        A.   I wasn't able to pass any of the information on until

16   the next morning.  Lieutenant Boone placed a call to me to see

17   if I had followed up on Sergeant Ebert's information which I

18   did.  I explained to him what I had located or found out and he

19   said that since he was out and about that he would continue to

20   follow up on that information for me.

21        Q.   Okay.  And did you receive a phone call from him

22   later regarding the follow-up?

23        A.   Yes, sir.  Lieutenant Boone explained that he had

24   made contact with Surplus City and made contact with a clerk

25   and gave the general description that was provided by Sergeant

Direct Examination of Richard Bradley by Mr. Frazier —313—

1    Ebert and was told that a person matching that description had

2    come into the Surplus City and purchased a few items including

3    an Army combat uniform, both the trousers, the pants, the belt,

4    a hat and asked for a name tag of Smith and then asked for

5    patches for the uniform that would be consistent with Fort

6    Hood.

7         Q.   When you heard that information, what did you do?

8         A.   I was in bed.  It was fairly early in the morning and

9    I immediately sat up.  I knew something was wrong.

10        Q.   When you say something was wrong, what do you mean?

11        A.   Somebody was planning something, possibly an attack

12   against soldiers, against Killeen, something.  Somebody

13   purchasing a uniform, a large amount of smokeless powder, there

14   was something.  Somebody was putting something together.

15        Q.   Okay.  Were you scheduled to work that day?

16        A.   Yes, sir.

17        Q.   So did you -- what did you do when you heard that

18   information?

19        A.   I told Lieutenant Boone that I was going to get up,

20   get dressed and that I would meet him at the Surplus City and

21   that in the meantime I would attempt to contact the Criminal

22   Investigation Division on Fort Hood to notify them that there

23   was possibly something that was intended to impact soldiers or

24   the military.

25        Q.   Okay.  And had you had experiences in Afghanistan

1    with similar situations with individuals attempting to disguise

2    their intentions by obtaining uniforms?

3        A.   Yes, sir.  Working with the Afghan National Police it

4    was common for insurgents or Taliban and antigovernment forces

5    to use -- utilize the Afghan National Police uniform as

6    camouflage to get into an area --

7        Q.   All right.

8        A.   -- to come in and attack.

9        Q.   Now, what did you do then?  What steps did you take?

10       A.   I was able to get in contact with a CID analyst by

11   the name of Chris Ledford.  Made contact with her and requested

12   that she meet me at the Surplus City on Willow Springs.  I

13   drove from the house and met Lieutenant Boone at the Surplus

14   City.  He advised me that he was made aware of some video

15   footage from the Guns Galore that he was going to go get a copy

16   of and attempt to get some still pictures off of the footage

17   from Guns Galore.  He also made mention that the Surplus City

18   manager was also trying to pull up some video from the previous

19   day and at that time he left to go get the video footage and I

20   attempted to start following up on a phone number that I had

21   provided by the cab company that had been used to call the cab

22   initially to the America's Best Value.

23       Q.   And as a result of your follow-up and a phone number,

24   what were you able to find?

25       A.   Found out that it was a throw away phone, basically a

Direct Examination of Richard Bradley by Mr. Frazier —315—

1    prepaid phone through T Mobile.  I initially tried to get

2    information on the subscriber.  Never was able to get that

3    information but I did do an exigent form to the T Mobile

4    company through our Bell County Communication Center in an

5    attempt to get the information.

6         Q.   Okay.  But that ended up being a dead end?

7         A.   Correct.

8         Q.   Okay.  So what did you do next?

9         A.   I had to go and fax the form at the office, wound up

10   meeting again with Lieutenant Boone who had obtained some still

11   photos from the video footage at Guns Galore.  We took those

12   still photos to the America's Best Value and again attempted to

13   do a canvass of the hotel to see if we could locate a subject.

14        Q.   I'm going to show you what's been previously

15   introduced as Government's Exhibit No. 48 and there's five

16   photos.  I'm going to thumb through them very quickly.

17        Do you recognize these photos Government's Exhibit 48 A

18   through E?

19        A.   Yes, sir.  Those are the photos I used for the

20   canvass.

21        Q.   In fact this is your actual set of the --

22        THE COURT:  You can see them on your screen.

23   BY MR. FRAZIER:

24        Q.   I'm sorry.

25        A.   I'm sorry.  Yes, sir.

1      Q.   Are these in fact the actual photos you obtained that

2    you used during your investigation?

3      A.   Yes, sir.  They are.

4      Q.   Okay.  When you obtained 48, what did you do with it?

5      A.   I'm sorry, sir?

6      Q.   When you obtained these pictures Government's 48,

7    what did you do with them?

8      A.   I made contact with the desk clerk at the hotel that

9    was on duty at that time.  Made contact with some of the

10   housekeepers, and although they all recognized the subject, we

11   still could not get an exact room or a name at that time.

12     Q.   Okay.

13     A.   The clerk actually went through some of the check-in

14   sheets that have copies of driver's licenses and things like

15   that and picked out a couple that were close and we continued

16   to canvass.

17     Q.   All right.

18     A.   We also attempted to go back to the manager's office

19   to review some of their video footage, security footage from

20   the day before in an attempt to locate the subject.

21     Q.   Okay.  During the time that you were there doing the

22   canvass at the hotel, did something happen?

23     A.   Yes, sir.  Lieutenant Boone notified me -- we were

24   actually back in the manager's office watching the video.

25   Lieutenant Boone -- I'm sorry.  Let me back up.  We had

Direct Examination of Richard Bradley by Mr. Frazier

1    notified a couple of other detectives from the north precinct,

2    Detective Anita Rinehart and Detective Willie Wingfield.  They

3    were in a distinctive police uniform.  They came there also and

4    they were in the office with myself watching the video.

5    Lieutenant Boone came into the office and said that he needed

6    me to come outside or actually to the front lobby area and sit

7    with him.  Once we got out there he explained that he had

8    observed another Luxury cab out in front of the hotel and just

9    thought we needed to sit there and see if anybody got out to

10   come to that cab.

11        Q.   Okay.  And at some point did that happen?

12        A.   Yes, sir.  It did.

13        Q.   Okay.  What did you observe?

14        A.   We were sitting in the lobby area a bunch of tables

15   and chairs set up maybe like a dining area and Lieutenant Boone

16   kind of nudged me and I looked up and I saw a white male

17   walking toward the exit of the hotel exact description had been

18   given to us by Sergeant Ebert, same exact description as in the

19   photos that we were using for the canvass.  In the initial

20   photos there was orange University of Texas clothing that was

21   worn.  On this particular day it was white University of Texas

22   clothing that was being worn this time also with a ball cap,

23   same sunglasses and the subject was walking towards the front

24   doors to exit the hotel.

25        Q.   Okay.  And was the individual carrying anything?

1    A.   He had a backpack on.  A large backpack that was

2  basically full.

3    Q.   Okay.  And how could you tell it was full?  Just

4  from --

5    A.   Just -- there was no -- basically no collapsed areas

6  in the backpack.  It was all fully extended.

7    Q.   Okay.  Now, did the individual make eye contact with

8  you?

9    A.   For a quick second, yes, sir, and then looked back

10  toward the door.

11    Q.   And how were you and Lieutenant Boone dressed?

12    A.   In our unit we tend to dress what's called plain

13  clothes.  We don't wear a distinctive uniform most of the time.

14  On that particular day Lieutenant Boone had a T-shirt and some

15  cargo shorts on.  I was dressed in a pair of blue jeans and a

16  service shirt from a plumbing company.

17    Q.   Okay.  And what did you do when you saw the

18  individual?

19    A.   Lieutenant Boone stood up and started following

20  behind the subject out the front door as I followed Lieutenant

21  Boone out the front doors.  Based on the information that we

22  had been provided, the subject had purchased smokeless powder,

23  ammunition, a magazine for a semiautomatic pistol, Lieutenant

24  Boone drew his weapon and advised the person to stop.  At that

25  time the person, the male did stop and turned around, kind of

1    gave us a blank stare, had his hands up for a moment, moved his

2    hands in a downward position.  The look that he gave us is a

3    term that I use kind of a fight or flight look in which the

4    subject is determining whether or not he's going to engage us

5    or turn around and run.  I had not initially drawn my weapon.

6    Based on this -- this action by the subject in case he did run,

7    I needed to give chase.  When the subject's hands started

8    coming down, I did produce my weapon and ordered him or advised

9    him not to touch anything and we had the subject lay down face

10   down prone down on the ground.

11        Q.   He was detained at that point?

12        A.   Yes, sir.

13        Q.   All right.  And what did -- what actions did you take

14   as soon as the person laid on the ground?

15        A.   Lieutenant Boone was able to get on the phone and get

16   ahold of the detectives inside the office.  Neither one of us

17   at that moment had access to our handcuffs and so we had the

18   detectives come outside.  Detective Wingfield, Detective

19   Rinehart did come outside and the subject was handcuffed by

20   Detective Wingfield.  I advised Detective Wingfield to

21   remove -- to slowly remove the backpack from the subject and

22   place it off to the side initially and then he was handcuffed

23   by Detective Wingfield.

24        Q.   Okay.  And ultimately where was the backpack placed?

25        A.   A short time later I advised Detective Wingfield to

1    move the backpack again based on the information that we had of

2    the items that were purchased by the subject to move the

3    backpack between a couple of the pillars out in front of the

4    hotel.  That way if there was a device or anything in there

5    that would have exploded we'd have been afforded some type of

6    protection from the pillars out there in front of the hotel.

7         Q.   Was that what your concern was?

8         A.   Yes, sir.

9         Q.   That there was what in the backpack?

10        A.   Explosives.

11        Q.   All right.  Now, I want to show you what's previously

12   been introduced into evidence as Government's Exhibit No. 47.

13   I want you to watch this and I'll ask you some questions about

14   it.

15        (Video played.)

16   BY MR. FRAZIER:

17        Q.   In that clip that we just watched can you -- it's a

18   video surveillance from America's Best Value Inn and Suites.

19   Can you tell the jury what we just watched?

20        A.   The course of events I explained where Lieutenant

21   Boone and I were sitting in the lobby area, observed the

22   matching -- the person matching the description coming out

23   through the front lobby to the front doors and us exiting the

24   hotel behind him.

25        Q.   All right.  I show you what's been marked for

1    identification as Government's Exhibits 145 and 146.

2        A.   Yes, sir.

3        Q.   Can you tell us what 145 and 146 are?

4        A.   Appears to be the same clothing the subject had on at

5    the time he was detained.

6        Q.   And were these in fact taken by the Killeen Police

7    Department after -- at a later time?

8        A.   Yes, sir.

9        MR. FRAZIER:  All right.  We'll offer Government's

10   Exhibits 145 and 146 into evidence.

11       MR. BOYD:  No objection.

12       THE COURT:  They're admitted.

13       (Exhibit(s) admitted:  G145, G146)

14   BY MR. FRAZIER:

15       Q.   Now, did you attempt to engage the -- and for the

16   record I want to show you Government's Exhibit No. 153 and ask

17   you if you recognize the person depicted in this photograph?

18       A.   Yes, sir.  Naser Abdo.

19       Q.   Okay.  Was that the defendant -- you later identified

20   as the defendant in this case?

21       A.   Yes, sir.

22       Q.   Okay.  Was that the person you detained outside the

23   America's Best Value Inn and Suites that we just watched on the

24   video?

25       A.   Yes, sir.

1    Q.   Okay.  What -- did you engage Mr. Abdo in any

2    conversation?

3    A.   Initially the conversation was between Lieutenant

4    Boone and the subject and basically trying to ascertain what

5    his name was.

6    Q.   Okay.

7    A.   Lieutenant Boone asked, you know, what his name was

8    and the subject replied that, you know who I am.

9    Q.   Okay.  And then after handcuffs were placed on the

10   defendant, what happened to him?

11   A.   Initially Detective Wingfield was able to locate ID

12   on the subject.  Shortly after that I advised Detective

13   Wingfield to go get the patrol car that they had arrived in.

14   Patrol car was parked off to the side, turned off, parked.  He

15   had to actually start the vehicle up and bring it over to where

16   we were at to place the subject inside the back of the vehicle.

17   Q.   All right.

18   A.   Back seat.

19   Q.   I want to show you what's been marked for

20   identification as Government's Exhibit No. 74.  Can you see

21   that on your screen?

22   A.   Yes, sir.

23   Q.   And do you recognize it?

24   A.   That's the ID that was -- I'm sorry.  That was the ID

25   that was found on the subject ID belonging to an Asher Pluto

1    that was removed by Detective Wingfield who in turn gave the ID

2    to me.

3         MR. FRAZIER:  We'll offer Government's 74 into evidence,

4    Your Honor.

5         MR. BOYD:  No objection.

6         THE COURT:  It's admitted.

7         (Exhibit(s) admitted:  G74)

8    BY MR. FRAZIER:

9         Q.   Now, after the defendant was placed in the police

10   car, what did you do?

11        A.   I advised Detective Wingfield to Mirandize the

12   subject prior to any conversations with him.  While Detective

13   Wingfield was doing that I had walked I believe inside to speak

14   with Lieutenant Boone or the desk clerk.  I'm not sure at that

15   moment who we spoke to.  I was advised a short time later by

16   Detective Wingfield that the subject needed to talk to me or I

17   needed to talk to that subject.

18        Q.   Okay.  When you say Mirandize, are you talking about

19   giving his legal warnings?

20        A.   Yes, sir.  Read his rights.

21        Q.   Okay.  And did you go to the car at some -- at that

22   point did you go to the vehicle to speak with the defendant or

23   what happened next?

24        A.   When Detective Wingfield advised me that I needed to

25   talk to the subject, I confirmed that he had Mirandized the

Direct Examination of Richard Bradley by Mr. Frazier —324—

1    subject.  He advised that he had.  So I went to the vehicle and

2    began speaking with the subject.

3        Q.   Okay.  And that particular interview with the

4    subject, was that -- was that recorded?

5        A.   Yes, sir.

6        Q.   Okay.  And that particular conversation that was

7    recorded was recorded in the vehicle itself, correct?

8        A.   Yes, sir.  There's a camera system inside the vehicle

9    that records voice and video and it was initiated and it

10   recorded the entire conversation.

11       Q.   Okay.  And you've had an opportunity previously to

12   view the -- or not to view but to listen to I guess and to view

13   the conversation that took place between yourself and the

14   defendant in the -- that was in the back of the patrol car?

15       A.   That's correct, sir.  In this particular video it's

16   an older system.  It has only a forward pointing camera.  It

17   does not have a camera to the rear, but you can hear the video.

18       Q.   Okay.  So basically the video on it is just facing I

19   guess Fort Hood Street?

20       A.   Yes, sir.

21       Q.   And but the conversation is you talking with the

22   defendant in the back of the patrol car?

23       A.   Yes, sir.  It is.

24       MR. FRAZIER:  Okay.  Your Honor, at this time we'll offer

25   into evidence Government's Exhibit No. 55 that portion of the

Direct Examination of Richard Bradley by Mr. Frazier —325—

1   dash cam video referenced by the witness.

2       MR. BOYD:  Your Honor, with respect to this exhibit I

3   believe that this is a portion of an entire sequence that this

4   witness has testified to.  I'd request under the rule of

5   optional completeness that the entire videotaped portion be

6   presented in conjunction with this.

7       MR. FRAZIER:  Your Honor, we would object because he's not

8   demonstrated what's left out of this video that makes it

9   incomplete.  We're only playing a portion just the statements

10  of the defendant, not the entire one hour or two hour video.

11      THE COURT:  You will have the opportunity to do -- attempt

12  to do that later.

13      MR. FRAZIER:  Okay.  If you could -- if I could -- may I

14  approach the witness very briefly, Your Honor?

15      THE COURT:  Yes, sir.

16  BY MR. FRAZIER:

17      Q.   I show you what's been marked for identification

18  purposes as Government's Exhibit No. 55A.  You've had a chance

19  to see this previously, haven't you?

20      A.   Yes, sir.  I have.

21      Q.   And what is Government's Exhibit No. 55A?

22      A.   It's the dialogue between myself and the suspect.

23      Q.   The transcript?

24      A.   The transcript.

25      Q.   And is it an accurate -- fair and accurate summary of

1    the conversation that portion Government's Exhibit No. 55 that

2    we are about to play?

3         A.   Yes, sir.

4         MR. FRAZIER:  Your Honor, at this time I would like to

5    pass out copies of transcripts without offering them into

6    evidence of the transcription to the jury.

7         MR. BOYD:  Your Honor, I'm going to -- to the extent they

8    have been verified that's one thing, but there's just some

9    inaudible portions of the audio that I don't know have been

10   transcribed properly.  So I'm worried about inaccurate

11   transcription notes.

12        MR. FRAZIER:  They're -- let me ask the witness.

13   BY MR. FRAZIER:

14        Q.   There are portions of this transcript that weren't

15   transcribed because they're inaudible, correct?

16        A.   Correct, sir.

17        Q.   And they're indicated as such by the letters "UI" or

18   "unintelligible" on the transcript?

19        A.   Yes, sir.

20        Q.   Okay.

21        MR. BOYD:  Your Honor, that's fine.

22        MR. FRAZIER:  All right.

23        THE COURT:  The jury may be allowed to use them as an aid.

24        MR. FRAZIER:  And if I didn't offer Government's Exhibit

25   No. 55, I thought I did, but just to make sure, I'm offering it

1    now.  Is it admitted?

2         THE COURT:  It's admitted.

3         (Exhibit(s) admitted:  G55)

4         MR. FRAZIER:  All right.  Thank you, Judge.  I just wanted

5    to make sure that was cleared up.

6         If you could please play Government's Exhibit No. 55.

7         (Video played.)

8    BY MR. FRAZIER:

9         Q.   And in addition, this particular video 55 also has

10   the transcription scrolling across the bottom of it as well,

11   correct?

12        A.   Yes, sir.

13        (Video played.)

14        MR. FRAZIER:  Okay.  Go forward.  Proceed.

15        (Video played.)

16   BY MR. FRAZIER:

17        Q.   Now, after that conversation -- at the end of the

18   conversation there's someone else speaking with the defendant,

19   correct?

20        A.   Yes, sir.  Detective Willie Wingfield.

21        Q.   All right.  And after that conversation took place,

22   what was the next investigative step you took?

23        A.   Run the information through our Bell County

24   Communication Center for a warrants check.

25        Q.   Okay.  And then -- but as far as investigation of

1    what happened, what did you do?

2        A.    Went back, made contact with Lieutenant Boone,

3    started notifying agencies of the incident that we had as far

4    as items possibly being in the room that could be concerned for

5    public safety and evacuating the areas around that room in the

6    hotel.

7        Q.    Okay.  And did you learn from the front desk what

8    rooms the defendant had been in?

9        A.    Yes, sir.  We did.

10       Q.    And do you recall what rooms those were?

11       A.    I'm going to refer to my notes, sir.

12       Q.    Sure.

13       MR. FRAZIER:  We're through with the transcripts by the

14   way, Your Honor.  So those can be collected.

15   BY THE WITNESS:

16       A.    The room numbers escape me right now, sir.  It was

17   200 and something.

18   BY MR. FRAZIER:

19       Q.    But there were a couple of different rooms that --

20       A.    Yes, sir.

21       Q.    -- were -- that you were able to identify?

22       A.    Yes, sir.

23       Q.    And for one of those rooms whichever one the

24   defendant was staying in last, did your agency attempt to

25   obtain or start the process of getting a search warrant for

1   that room?

2       A.   Yes, sir.  I made contact with Detective John Bowman,

3   explained to him what we had, the information that we had up to

4   that point and asked him to start working on the probable cause

5   affidavit for application for a search warrant.

6       Q.   Okay.  And in particular were there -- in addition to

7   other -- what agency contact -- what other law enforcement

8   agency contact did you make?

9       A.   I initially contacted or had dispatch contact the

10  Fort Hood Explosive Ordnance Detachment, EOD, bomb disposal

11  unit to initially assess and help us with the backpack.  We

12  also contacted -- had them contact the FBI, ATF and federal

13  agencies to assist us.

14      Q.   Okay.  And Fort Hood EOD, do they essentially -- or

15  do they assist local law enforcement on situations like this

16  where explosives may be present?

17      A.   Yes, sir.

18      Q.   Okay.  I'm going to show you for identification two

19  exhibits.  Show you Government's Exhibit No. 75A and 75B.  Do

20  you recognize those photos?

21      A.   That's the sign in front of the America's Best Value

22  Inn.

23      Q.   Are they accurate photos as -- the scene as it

24  appeared back in July of last year?

25      A.   Yes, sir.

1      MR. FRAZIER:  We'll offer Government's 75A and B into

2  evidence.

3      MR. BOYD:  No objection, Your Honor.

4      THE COURT:  They're admitted.

5      (Exhibit(s) admitted:  G75A, G75B)

6  BY MR. FRAZIER:

7      Q.   I'm showing you Government's Exhibit 75A.  What is

8  that a picture of?

9      A.   The sign -- again the America's Best Value Inn sign

10  in front of the business.

11      Q.   And is this the street -- Fort Hood Street that --

12  where the video shows -- where the police video camera is

13  pointed?

14      A.   Yes, sir.

15      Q.   Okay.  And B of 75.  What is that a photo of?

16      A.   The front parking lot, sir, of the same business.

17      Q.   All right.  Now, you mentioned earlier in your

18  testimony that the defendant was carrying a large backpack; is

19  that correct?

20      A.   Yes, sir.

21      Q.   I'm showing you what's been marked for identification

22  as Government's Exhibit No. 56.  Do you recognize this?

23      A.   The black backpack, sir.

24      Q.   Is this the backpack he was carrying?

25      A.   Yes, sir.

Direct Examination of Richard Bradley by Mr. Frazier

1     Q.   Except it's empty at this time?

2     A.   Yes, sir.

3     MR. FRAZIER:  Pass the witness, Your Honor.

4     MR. BOYD:  Your Honor, if I could have a comfort break.

5     THE COURT:  Sir?

6     MR. BOYD:  If I could have a comfort break.

7     THE COURT:  Can you wait another ten minutes or so when we

8     take our normal break?

9     MR. BOYD:  Yes, Your Honor.  I just didn't want to

10    interrupt any cross-examination.

11    THE COURT:  Go ahead and begin.

12    MR. BOYD:  Yes, Your Honor.

13                      CROSS-EXAMINATION

14    BY MR. BOYD:

15    Q.   Officer Bradley, you'd previously testified that you

16    spoke to Mr. Greg Ebert on the 26th or is it the 27th?

17    A.   On the 26th, sir.

18    Q.   Okay.  And you're certain that you spoke to him that

19    day?

20    A.   Yes, sir.

21    Q.   It wasn't a day or two later?

22    A.   No, sir.

23    Q.   And you also previously just testified that you -- in

24    the course of your investigation you ran into a period of time

25    where on the 26th you kind of stopped investigating for a

 1    little bit?

 2         A.   Yes, sir.

 3         Q.   And what time was that?

 4         A.   Around midnight, sir.

 5         Q.   Around midnight?

 6         Now, at some point on the 26th you went to the America's

 7    Best Value Inn, correct?

 8         A.   Yes, sir.  I did.

 9         Q.   And you attempted to locate who you were looking for,

10    correct?

11         A.   Yes, sir.

12         Q.   And you were not successful?

13         A.   No, sir.  We were not.

14         Q.   Now, at this point you were concerned there may be

15    something going on?

16         A.   Yes, sir.

17         Q.   And at this point you could have arranged for

18    surveillance to happen?

19         A.   Could have.

20         Q.   And at that point no surveillance happened, did it?

21         A.   No, sir.

22         Q.   And you didn't go back to the America's Best Value

23    Inn until sometime the next day?

24         A.   Correct.

25         Q.   Around what time?

1    A.   I'm not sure of the exact time that we made it back

2    to the hotel, sir.

3    Q.   Well, just a few minutes before you arrested -- the

4    arrest, right?

5    A.   Yes, sir.

6    Q.   Now, there's more videos of the arrest, right?

7    A.   Yes, sir.  There are.

8    Q.   And in particular what hadn't been shown to the jury

9    yet is the actual footage outside, correct?

10   A.   Yes, sir.

11   Q.   And that footage would be able to demonstrate to the

12   jury this conversation you had with Mr. -- with Detective

13   Wingfield with regards to moving the backpack for everyone's

14   safety and all of that, right?

15   A.   It would show the video.  Yes, sir.

16   Q.   But it would demonstrate this conversation that you

17   had, right?

18   A.   At some point.  Yes, sir.

19   Q.   It would be fair to say that you didn't initially

20   know who you had initiated contact with at the America's Best

21   Value Inn, correct?

22   A.   Correct, sir.

23   Q.   And it would also be fair to say that there was no

24   suspicious behavior in my client walking out the front door

25   that day?

Cross-Examination of Richard Bradley by Mr. Boyd      334

1        A.   Not walking out the front door.  No, sir.

2        Q.   Or even walking down the hall towards the front door

3   that day?

4        A.   In and of itself, no.  No, sir.

5        Q.   And when you drew your weapon and Lieutenant Boone

6   drew his weapon as we saw in that video, y'all were affecting

7   an arrest, weren't you?

8        A.   We were detaining the subject.

9        Q.   And at some point you testified that somebody read

10   the Miranda rights?

11        A.   Yes, sir.

12        Q.   In fact, you indicated that you instructed Detective

13   Wingfield to read the Miranda rights?

14        A.   Yes, sir.  I did.

15        Q.   Did anyone else instruct him to read the Miranda

16   rights?

17        A.   Not to my knowledge, sir.

18        Q.   You didn't observe him read the Miranda rights, did

19   you?

20        A.   No, sir.  I had stepped away from the vehicle.

21        Q.   Okay.  Let's go back briefly to some of your previous

22   experiences.  You were -- you testified previously to the

23   IEDs --

24        A.   Yes, sir.

25        Q.   -- in Afghanistan.

1      A.   Yes, sir.

2      Q.   It would be fair to say that IEDs in Afghanistan

3  aren't made out of smokeless powder, are they?

4      A.   I'm not sure of all the components that they use,

5  sir.

6      Q.   So are you aware that -- of the nature of smokeless

7  powder?

8      A.   What it's used for in reloading ammunition.

9      Q.   Okay.  At some point you were able to identify Mr.

10 Abdo walking down the hall?

11     A.   Walking out to the lobby.  Yes, sir.

12     Q.   And y'all saw him coming down -- y'all were watching

13 the surveillance and you saw him walking down the hall?

14     A.   No, sir.

15     Q.   You didn't?

16     A.   No, sir.

17     Q.   Okay.  A cab pulled up?

18     A.   Yes, sir.

19     Q.   Someone also noticed a cab pulling up?

20     A.   Lieutenant Boone.

21     Q.   And thought maybe it's connected?

22     A.   Yes, sir.

23     Q.   And so y'all decided to go check out the lobby?

24     A.   Yes, sir.  We went to sit in the lobby to see if

25 anybody would approach the taxi.

 1      Q.   Okay.  And so y'all had -- y'all had the ability to

 2 observe and monitor?

 3      A.   In the area that we were sitting in.  Yes, sir.

 4      Q.   And y'all could have continued to observe and monitor

 5 as well, right?

 6      A.   Yes, sir.

 7      Q.   Are there police procedures in place for when y'all

 8 need to do surveillance on people?

 9      A.   Yes, sir.

10      Q.   And is it common practice to initiate surveillance

11 when it's appropriate?

12      A.   Yes, sir.

13      Q.   So surveillance could have been initiated in this

14 case?

15      A.   Yes.

16      Q.   And a conscious decision was made not to?

17      A.   That's correct.

18      Q.   When do you typically read someone their Miranda

19 rights?

20      A.   Prior to engaging in conversation that would lead to

21 guilt seeking questions.

22      Q.   And you personally never Mirandized Mr. Abdo,

23 correct?

24      MR. FRAZIER:  Judge, I'm going to object.  This is

25 irrelevant and repetitive.

1        THE COURT:  Sustained.

2   BY MR. BOYD:

3        Q.   What did you do after you arrested Mr. Abdo?

4        A.   Later on after the warrants were confirmed and he was

5   formally placed under arrest, Officer Jennings transported him

6   to the Killeen Police Department jail.

7        Q.   And was that the extent of your involvement at this

8   point?  Did you do any further investigation into this matter?

9        A.   I contacted the other detectives from the special

10  investigative division both from my office, from the burglary

11  unit and from the special missions unit to come assist us at

12  the location to secure the location, to evacuate the location,

13  to contact the appropriate agencies to assist us with that

14  investigation.

15       Q.   And between the time that the arrest happened and the

16  first time the explosive ordnance company shows up, how long

17  had passed?

18       A.   I'm not sure how long it took Fort Hood EOD to get

19  out there, sir.  It was a little bit.

20       Q.   Several hours?

21       A.   Possibly, sir.

22       Q.   About four or five hours?

23       A.   I'm not sure.

24       Q.   Ultimately did you recover an explosive device on

25  Mr. Abdo?

1     A.   I did not, sir.

2     Q.   Was there one recovered on him?

3     A.   No, sir.

4     Q.   Was there one in the backpack?

5     A.   Not a device.  No, sir.

6     Q.   There was nothing in his backpack that could have

7  even been detonated at that point?

8     A.   Not in the backpack.  No, sir.

9     Q.   Or on his person either?

10     A.   No, sir.

11     Q.   Or in the hotel room either?

12     A.   I'm not sure what all was located in the hotel room.

13  I did not inventory the items in there.

14     Q.   You haven't done any follow-up investigation?

15     A.   I read some reports, sir.

16     Q.   And from the reports you've read, you know that there

17  was nothing located in the hotel room that could have been

18  detonated?

19     A.   Not at that immediate time.  No, sir.

20     Q.   But right now you know that?

21     A.   Yes, sir.

22     MR. BOYD:  Your Honor, I have no further questions of this

23  witness at this time but I would like to reserve him for recall

24  later.

25     THE COURT:  All right.  Anything further, Mr. Frazier?

1          MR. FRAZIER:  Just one follow-up, Your Honor.

2                          REDIRECT EXAMINATION

3     BY MR. FRAZIER:

4          Q.   Did the defendant have a gun and ammunition in his

5     backpack?

6          A.   Yes, sir.  He did.

7          MR. FRAZIER:  Pass the witness.

8                          RECROSS-EXAMINATION

9     BY MR. BOYD:

10         Q.   The ID card that was put into evidence, 74, that was

11    located in his backpack, right?

12         A.   I'm not sure exactly where Detective Wingfield

13    removed it from the subject at that time.  I'm not sure if it

14    was in his back pocket or the backpack, sir.

15         Q.   Well, you had this -- so the backpack -- let me just

16    try and understand this.

17         A.   Actually I can clarify that.  Nobody opened anything

18    in the backpack until the EOD team moved it and examined it;

19    therefore, the ID card would have had to have been on his

20    person in his pocket.

21         Q.   Or the backpack would have had to have been opened

22    prior to?

23         A.   That's correct.

24         MR. BOYD:  Nothing further.

25         MR. FRAZIER:  Nothing further, Your Honor.

1          THE COURT:  You may step down, sir.  We'll take our

2   morning recess at this point.

3          LAW CLERK:  All rise.

4          (Jury exited the courtroom at 10:23.)

5          LAW CLERK:  Court will stand in recess for 20 minutes.

6          (A break was taken from 10:25 to 10:44.)

7          LAW CLERK:  All rise.

8          (The jury entered the courtroom at 10:44.)

9          THE COURT:  Be seated, everyone.

10         MR. SOFER:  Government calls Sergeant Brad Grimes, Your

11   Honor.

12         (The witness was sworn.)

13                        DIRECT EXAMINATION

14   BY MR. SOFER:

15         Q.   Good morning, Sergeant Grimes.

16         A.   Good morning.

17         Q.   Please tell the members of the jury by whom you're

18   employed.

19         A.   The United States Army.

20         Q.   And what is your position with the Army, sir?

21         A.   Currently I am an explosive ordnance disposal

22   technician.

23         Q.   Okay.  We keep hearing throughout this trial EOD.  Is

24   that an acronym for the -- what you just described?

25         A.   Yes.  It is.

Direct Examination of Brad Grimes by Mr. Sofer          341

1    Q.   And can you tell the members of the jury your rank as

2    if they couldn't see it on your uniform?

3    A.   Sergeant first class.

4    Q.   How long have you been with the United States Army,

5    sir?

6    A.   18 years now.

7    Q.   And how long has your specialty been EOD?

8    A.   11 of those years.

9    Q.   Can you describe for the ladies and gentlemen of the

10   jury the training that you have gone through to become an EOD

11   specialist or is it -- is your title EOD specialist or

12   technician?

13   A.   Technician.

14       It begins with attending a course down in Eglin Air Force

15   Base.  It's Naval School Explosive Ordnance Disposal.

16   Q.   Okay.  How long does that course take?

17   A.   A year.

18   Q.   And do you attend that school for an entire year?

19   A.   Yes.  You do.

20   Q.   And did you graduate?

21   A.   Yes.  I did.

22   Q.   Have you taken additional classes since then?

23   A.   Yes.  I've taken multiple courses for different

24   aspects of that title.

25   Q.   Okay.  Can you -- what year did you go through the

Direct Examination of Brad Grimes by Mr. Sofer

1    training down at Eglin Air Force Base?

2        A.   That was 2000.

3        Q.   Okay.  And can you describe for the members of the

4    jury some of the other classes or areas that you've studied?

5        A.   Yes.  I'm going to refer to some of my notes, but

6    advanced improvised explosive devices.  I was an instructor.  I

7    also attended the course and I became an instructor of the

8    course.

9        Q.   Okay.  And is another name for improvised explosive

10   device, that also goes by an acronym like everything else in

11   the government.  It's called IED; is that correct?

12       A.   That's correct.

13       Q.   Okay.  What else, sir?

14       A.   The NATO advanced IED course in Kyneton, England.

15   The humanitarian demining course, the -- the global

16   antiterrorism awareness course, the -- and that's referred to

17   as GATER.  That's a course that goes over the current threats

18   in theaters of operation.

19       Q.   And what other courses have you taken?

20       A.   The SPARTA IED WMD threat assessment and task

21   management, defense nuclear weapons school, radiological

22   emergency team operations, the county improvised disposal

23   device course.

24       Q.   Okay.  Is it fair to say you've taken a lot of other

25   courses?  About how many are we talking about here?

Direct Examination of Brad Grimes by Mr. Sofer

1      A.   About 15.

2      Q.   Okay.  Have you received on-the-job training as well?

3      A.   Yes.  I have.  We do -- consistently we're training

4  to keep current on techniques, trends and things that are

5  developing.  We do refreshers which is biannual at the company

6  and battalion level of training and we're daily researching new

7  and what we would call important trends.

8      Q.   Okay.  Has some of the training that is on-the-job

9  training taken place overseas?

10     A.   Yes.  It has.  I've served five years as an explosive

11 ordnance technician in Europe and also been deployed to

12 Afghanistan, Kosovo and Iraq.

13     Q.   And during your deployments overseas did you

14 encounter and observe IEDs in your work?

15     A.   Yes.  I did.

16     Q.   Basically can you tell the members of the jury what

17 it is your job is when encountering such a device?

18     A.   My job is to neutralize and defeat any device

19 encountered.

20     Q.   And just a very broad estimate, during the course of

21 your time as an EOD technician, can you tell the members of the

22 jury approximately how many IEDs you have observed or made safe

23 in your career?

24     A.   I would say approximately 500.

25     Q.   Are you also -- are you a supervisor of other IED

Direct Examination of Brad Grimes by Mr. Sofer

1    technicians?

2        A.   Yes.  I am.  I've served as a platoon sergeant.  My

3    role once obtained has been an explosive ordnance disposal team

4    leader and I've also served as first sergeant for an explosive

5    ordnance disposal company.  I'm currently serving as the

6    operations noncommissioned officer in charge of five companies

7    as they respond and I basically ensure that everything is done

8    correctly and we receive all operations and divvy those down to

9    the companies.

10       Q.   So approximately how many men and women do you

11   presently supervise?  Approximately?

12       A.   Approximately 250.

13       Q.   I want to direct your attention to July 27th, 2011.

14   Were you working on that day?

15       A.   Yes.  I was.

16       Q.   Could you tell the members of the jury in what

17   capacity?

18       A.   I was at the time the first sergeant for the 797th

19   Ordnance Company EOD and I was also the team leader on call at

20   the time.

21       Q.   Okay.  As the team leader on call did you receive a

22   call of an incident?

23       A.   Yes.  I did.

24       Q.   Without going into too much detail, can you tell us

25   basically what kind of information you received?

1     A.   I received information that -- that the Killeen

2  Police Department was at a local hotel and they had apprehended

3  a person and they were -- they had a backpack that was at --

4  what we call a suspect item at that time.

5     Q.   Okay.  And suspect item would mean what?

6     A.   That they believed that there were an explosive

7  threat within that backpack.

8     Q.   Okay.  Do you remember what hotel this was?

9     A.   Yes.  It was the American Best Value Suite.

10    Q.   Okay.  Did you go to that hotel?

11    A.   Yes.  I did.

12    Q.   And that was in Killeen?

13    A.   Yes, sir.

14    Q.   Here in the Western District of Texas?

15    A.   Yes, sir.

16    Q.   I'm going to show you what's been previously entered

17 into evidence as Government's Exhibit A -- sorry.  75A.  Is

18 that Government's 75A the hotel you responded to?

19    A.   Yes, sir.  It is.

20    Q.   I'm going to show you what's been previously admitted

21 into evidence as 75B.  Is that another photograph of the hotel

22 that you responded to?

23    A.   Yes, sir.  It is.

24    Q.   How did you get to the hotel?

25    A.   I traveled by a government vehicle.  Our explosive

1    ordnance disposal response vehicle.

2         Q.   And about how long between the time you received the

3    call was it before you got there, if you recall?

4         A.   Let me refer to my notes.  What I'm looking at is my

5    incident sheet, and the time it was reported to me was 1330 and

6    we departed at 1345.

7         Q.   Okay.  About how far away were you approximately give

8    or take?

9         A.   I would say we were approximately two miles.

10        Q.   Okay.  Did you go alone or did someone go with you?

11        A.   No.  My team member went with me.

12        Q.   And who was that?

13        A.   Sergeant Juan Hong.

14        Q.   Okay.  And did you take anything with you?

15        A.   Yes.  I took my -- the explosive ordnance response

16   vehicle is loaded out for emergency response with all of the

17   basic EOD tools.

18        Q.   Okay.  When you say tools, what kind of things are we

19   talking about?

20        A.   We're talking about the advance robotic system.

21   There are -- there's rope, pulleys, x-ray devices, everything

22   that an EOD team would need to explore and mitigate any type of

23   explosive threat.

24        Q.   Okay.  Does that include explosives as well?  Your

25   own explosives?

1        A.   Yes.   They're held in a bunker and we have to travel

2   from our responding unit to that bunker, procure whatever

3   explosives deemed necessary for the call and then head out to

4   the call.

5        Q.   And did you do that in this case?

6        A.   Yes.  I did.

7        Q.   I want to show you what's been marked Government

8   Exhibit No. 75C for identification only.  Can you tell the --

9   can you tell us what 75C is?

10       A.   That is the robotics platform that we used on the

11  27th.

12       Q.   Okay.  You say robotics platform.  It's a robot?

13       A.   Yes.

14       Q.   And how about 75D?  Is that also a picture of the

15  same robot?

16       A.   Yes.  It is.

17       Q.   Are they both fair and accurate representations of

18  the device that you took with you on that particular day?

19       A.   Yes.

20       MR. SOFER:  At this time the government moves 75C and D

21  into evidence.  They've previously been shown to Counsel.

22       MR. BOYD:  I have no objection to those, Your Honor.

23       THE COURT:  They're admitted.

24       (Exhibit(s) admitted:  G75C, G75D)

25  BY MR. SOFER:

1    Q.   Let's publish those.  Again can you give the jury a

2  basic idea of why it is that you have a robot and what the

3  robot does?

4    A.   The robot is used as a recon device and also used as

5  what we call -- the robot is used as a safe separation device

6  to where things can be opened, moved and mitigated and

7  inspected so that a person doesn't have to be right on the

8  device in case the device functions and explodes.  Then you're

9  looking at a down robot versus a down person.

10   Q.   And in addition to the robot do you have other

11  protective gear that you bring out to a scene, a call like

12  this?

13   A.   Yes.  We bring the bomb suit with us and our normal

14  black vest, helmet which is made of kevlar and carry plates in

15  it also.

16   Q.   Okay.  And were those things also taken with you on

17  July 27th when you responded to the America's Best Value Inn

18  and Suites?

19   A.   Yes.

20   Q.   Did there come a time when you arrived at the hotel?

21   A.   Yes.

22   Q.   And can you tell the members of the jury what you did

23  when you arrived?

24   A.   When I arrived I approached the Killeen Police

25  Department that was on site, established who the on scene

1    commander was and had him tell me what has happened since the

2    phone call, has anything else taken place.  Once that was

3    established I looked over the scene and he identified a

4    backpack that was under the overhang of the hotel in the front

5    right by the front door.  So that was the backpack that was in

6    question.  I ascertained the size of the backpack and from

7    where police officers were located.  Some were not in a far

8    enough safe distance so I advised him that we needed to push

9    the cordon out to the road and spread people to a safe

10   distance.

11       Q.   Okay.  When you say the cordon, do you mean -- what

12   do you mean by this?

13       A.   A cordon is an area that is pretty much no people are

14   allowed to be in for their safety.  So everyone is removed from

15   that area.

16       Q.   Okay.  And to your knowledge was the hotel itself

17   evacuated at the time that you arrived?

18       A.   Yes.  It was.  I was told the hotel was completely

19   evacuated.

20       Q.   Okay.  What did you do next?

21       A.   Once the cordon was established, I took a look around

22   to get a better feel of the area and I directed my team member

23   Sergeant Hong to remove the robot from the truck and remove the

24   bag to -- with the robot from the hotel in case that it was in

25   fact a device and explode then that'll minimize the damage to

1    the hotel.  So he moved it to the far corner of the parking

2    area of the hotel and there was an approximately six feet wall

3    in that far corner made of cement and a metal trash Dumpster.

4    So between the wall and the trash Dumpster is where I directed

5    him to place that bag with the robot.

6        Q.   Okay.  In Government's Exhibit 75B which direction of

7    the hotel did you move it?  Towards the flag that's up there on

8    the -- for me it's the left side of the photo or towards the

9    right side where there's a red awning.  Which side of the hotel

10   did you move the backpack to?

11       A.   To the left side with the red awning.

12       Q.   Okay.  So for you it's the left side.

13       And why did you choose to move it near the Dumpster and

14   the wall?

15       A.   Because that was the furthest point away from the

16   hotel and that wall was high enough and thick enough that if

17   that device -- if that bag was filled with any type of

18   explosive and would explode, then that wall would contain most

19   of that explosion along with the metal Dumpster.

20       Q.   What did you do next?

21       A.   At that point I -- I had my team member Sergeant Hong

22   dress me out in the bomb suit.  I gathered some tools which one

23   of those tools was an x-ray and I walked the x-ray down to

24   the -- where the bag was sitting and came back up range to

25   where my team member and my truck was and took a few x-rays of

1    the bag.

2        Q.    And what, if anything, did the x-ray reveal?

3        A.    It revealed some mechanical devices that we -- the

4    gears was consistent with clocks.  Also it revealed some wires.

5    It revealed what we saw at the time was -- it appeared to be

6    some type of electronic package that was consistent with a

7    computer but we did not see where everything was connected.  We

8    was looking for explosives and an initiator.  We couldn't see

9    that in the x-rays also.  So we moved into our next phase.

10       Q.    Okay.  And what was that?

11       A.    We -- which was suit me up in the bomb suit so that I

12   can remotely open the bag.

13       Q.    Okay.  And when you say remotely open the bag, can

14   you explain to the members of the jury what you did next?

15       A.    Yes.  Once in the bomb suit I walked down to the bag

16   with ropes, with two ropes actually and D rings and some zip

17   ties and some vise grips I -- and pinions.  I put zip ties on

18   all of the zippers on the bag.  I pinioned the bag to the

19   cement or the asphalt so that it wouldn't move.  Then I

20   connected those ropes to each of the zippers and went back to

21   the safe area and pulled which opened each section.  The bag

22   had multiple pockets so my plan was to open up each pocket one

23   at a time.

24       Q.    Okay.  When you did that, what did you observe?

25       A.    I observed items falling out of the bag.  Some of the

Direct Examination of Brad Grimes by Mr. Sofer

1    items that came out of the bag in different pulls was a

2    notebook, a laptop, still in a box some clocks, some wires,

3    some nine volt batteries and a handgun.

4         Q.   Okay.  And I want to show you what's been marked

5    Government Exhibit No. 75E for identification and ask if you

6    recognize that?

7         A.   Yes.  I do.

8         Q.   Tell us what that is.  It's a photograph, right?

9         A.   Yes.  That's a photograph of the area and the

10   backpack and all of the items that were pulled out of the

11   backpack.

12        Q.   And is it a fair and accurate representation of what

13   those items looked like on that particular day after they were

14   removed from the backpack?

15        A.   Yes.

16        MR. SOFER:  At this time the government offers Government

17   Exhibit No. 75E for identification into evidence.

18        MR. BOYD:  No objection, Your Honor.

19        THE COURT:  It's admitted.

20        (Exhibit(s) admitted:  G75E)

21   BY MR. SOFER:

22        Q.   When you approached these items -- well, what did you

23   do -- after it was open, what did you do next?

24        A.   As you can see, everything is opened.  It wasn't in

25   that configuration when it came out of the backpack.  So it's

Direct Examination of Brad Grimes by Mr. Sofer

1    part of my procedures to make sure all items are safe and does

2    not contain threat.  So all of the clocks I crushed the

3    cardboard to ensure that they contained nothing that would have

4    been dangerous.  And any container that was closed I opened.

5    The handgun when it fell out of the backpack, I gained control

6    of it.  It had a magazine in the magazine well so I dropped the

7    magazine well.  I slid the slide to the rear and locked it to

8    the rear and when I did that a round came out of the chamber.

9        Q.   And were there additional rounds that you could see

10   in the magazine itself?

11       A.   Yes.  There were.

12       Q.   At this juncture were you wearing a bomb suit still?

13       A.   Yes.

14       Q.   And can you tell the jury what your primary focus was

15   at this point?

16       A.   To clear all items -- the backpack and all items

17   found in the backpack of any explosive hazards.

18       Q.   Okay.  Did you review any of the items in the

19   notebook that's pictured there in Government Exhibit 75E in

20   evidence?

21       A.   Yes.  I did.  While down there verifying -- once I

22   had verified that there were no fully functioning device in the

23   backpack, I opened the notebook and briefly read through some

24   of the pages that were contained in it.

25       Q.   Okay.  And what, if anything, happened after you read

Direct Examination of Brad Grimes by Mr. Sofer

1    those pages?

2         A.   I determined from reading the pages a viable threat.

3    I saw some articles on how to shoot a handgun, How To Build A

4    Bomb In The Kitchen Of Your Mom.   I flipped through that and

5    some of the items that were listed in that and also in the

6    notebook listed out were some of the same items that I found in

7    the backpack that's laid out on that picture.

8         Q.   Okay.

9         A.   So I took the notebook back to the safe area and had

10   a discussion with my team member of what was down range what I

11   discovered and what was in the notebook.   We looked through the

12   notebooks and at that point I ascertained that based on the

13   notebook and what it contained and the items that were found in

14   the backpack that this was a viable threat.   So I took that to

15   all of the policing agencies that were on scene at that time

16   and explained everything that we had found and that we needed

17   to investigate further and see whether or not in any areas that

18   the owner of the backpack had been if there's an actual device

19   in that area.

20        Q.   Okay.   I want to go through the items that you found

21   in the backpack and the backpack itself.   I'm showing you

22   Government's Exhibit No. 56 for identification.   Do you

23   recognize it?

24        By the way, you've looked at all of these items back in

25   the United States Attorneys office at some point, correct?

Direct Examination of Brad Grimes by Mr. Sofer

1    A.   Yes.  I did.

2    Q.   Again showing you 56 for identification.  Do you

3    recognize this?

4    A.   Yes.  That's the backpack.

5    Q.   And is it in substantially the same condition it was

6    that day except for being empty?

7    A.   Correct.

8    Q.   By the way, is this twist tie yours or do you know

9    whether this was on -- does this look like one of your twist

10   ties?

11   A.   Yes.  That's one of my twist ties that I put on to

12   open it.

13   Q.   Show you what's been marked Government's Exhibit Nos.

14   57 and 58 for identification.  Do you recognize these?

15   A.   Yes.

16   Q.   What are these?

17   A.   Those are the clocks that I found in the backpack and

18   crushed the cardboard on.

19   Q.   Show you what's been marked Government's Exhibit No.

20   59 for identification.  Can you see from there what that is?

21   A.   Yes.  I can.

22   Q.   Tell the members of the jury.

23   A.   Those are the nine volt batteries that was inside of

24   the backpack.

25   Q.   I'm going to show you what's been marked Government

1  Exhibit No. 60 and 61.  Do you recognize these?

2       A.   Yes.

3       Q.   Tell the members of the jury what they are.

4       A.   That is the wire that came out the backpack, also.

5       Q.   And all the items I'm showing you are in

6  substantially the same condition as they were when they were

7  recovered; is that correct?

8       A.   That's correct.

9       Q.   When you saw them?

10      For these --

11      MR. SOFER:  If may I approach briefly, Your Honor.

12      THE COURT:  Yes, sir.

13  BY SOFER:

14      Q.   I'm going to show you 62, 63, 64, 65, 66, 67 and 68.

15  Can you tell the members of the jury if you recognize those

16  items?

17      A.   Yes.  I can.

18      Q.   Tell the members of the jury how they were configured

19  on July 24th when you saw them.

20      A.   Yes.  When the notebook was lying on the ground after

21  the pull, these items were stuffed inside of the notebook and

22  the notebook was laying flat on the ground.

23      Q.   Okay.  So looking at Government Exhibit 75E, is that

24  essentially how they were configured when you saw them on July

25  27th of 2011?

Direct Examination of Brad Grimes by Mr. Sofer

1    A.   Yes.  It is.

2    MR. SOFER:  Approaching the witness.

3  BY MR. SOFER:

4    Q.   Showing you what's been marked Government Exhibit No.

5  69.  Do you recognize this one?

6    A.   Yes.  I do.

7    Q.   What is that?

8    A.   That is the Atlas that was also in the backpack.

9    Q.   Can you see from there Government Exhibit No. 70 for

10  identification?

11   A.   Yes.

12   Q.   Do you recognize this?

13   A.   Yes.  That is one of the magazines that was -- that

14  was a magazine in the firearm.  So I believe that's the

15  magazine that came out of the firearm.

16   Q.   Okay.

17   A.   That had rounds in it.

18   Q.   And the rounds that are contained inside Government

19  Exhibit No. 70, they weren't in this cellophane or plastic

20  container that --

21   A.   No.  They were not.  They were in the magazine.

22   Q.   Okay.  Was one of them in the chamber?

23   A.   Yes.  It was.

24   Q.   As far as you recall?

25   A.   Yes.

1      Q.   Let me show you what's been marked Government Exhibit

2  No. 70 for identification.  Do you recognize this?

3      A.   Yes.  I do.

4      Q.   Can you tell the members of the jury what this is?

5      A.   Those are the 20 gauge shotgun shells that were in

6  the box in the bag in the backpack.

7      Q.   Okay.  Some of these have been cut open.  Were they

8  cut open by you?

9      A.   No.  They were not.

10     Q.   Okay.  When you looked at them did they have Q

11  numbers or FBI lab numbers on them?

12     A.   No.  They did not.

13     Q.   But they do now, correct?

14     A.   Yes.

15     Q.   Otherwise it's the same as it was when you saw it?

16     A.   All the shells were inside of the box and I cut the

17  box open and the shells were still intact in the box.

18     Q.   Okay.  My colleagues remind me I called this 70.

19  It's actually 71.

20     Show you what's been marked Government Exhibit No. 72 for

21  identification.  Do you recognize this?

22     A.   Yes.  I do.

23     Q.   Tell us what it is.

24     A.   That is the box that contained the laptop that was in

25  the backpack.

Direct Examination of Brad Grimes by Mr. Sofer

1    Q.   Okay.  Have you had an opportunity to look at this as

2  well?

3    A.   Yes.  I did.

4    Q.   And there is a computer in here, correct?

5    A.   Yes.  And I opened that.  It was already opened

6  originally, but I cut open an area that I felt safe to

7  determine that it was what it appeared to be.

8    Q.   Okay.  I'm going to show you Government Exhibit No.

9  73 for identification.  Do you recognize this?

10   A.   Yes.

11   Q.   Can you tell the members of the jury what that is?

12   A.   That is the handgun that was inside of the backpack.

13   Q.   And that's the handgun that you made safe?

14   A.   Yes, sir.

15   Q.   Show you what's been marked Government Exhibit No. 76

16  for identification.  Do you recognize this?

17   A.   Yes.  I do.

18   Q.   Tell the members of the jury what this item is.

19   A.   That is a cell phone box that was -- after we had

20  entered the room it was found in Room 248.

21   Q.   We got a little ahead of ourselves.  So we'll stop at

22  73.

23        THE COURT:  Counsel, let me interrupt you.

24        MR. SOFER:  Yes, sir.

25        THE COURT:  For the benefit of the jury, when you -- when

1    he said -- the handgun was made safe, what does that mean?

2         MR. SOFER:  My apologies, Judge.

3    BY MR. SOFER:

4         Q.   Can you describe for the members of the jury what

5    make safe means with respect to the gun?

6         A.   Okay.  In the EOD world whenever the scene is

7    explosively free we still are not allowed to bring anyone down

8    to that scene until all items are in a safe condition and then

9    in this case the handgun which had the magazine and the round

10   chambered I had to remove the magazine and remove the round out

11   of and make sure that that handgun would be safe for handling

12   without firing.

13        Q.   Okay.  Essentially you unloaded it; is that right?

14        A.   Yes.

15        Q.   Okay.  And again all the items I just showed you were

16   in essentially the same condition as they were at the time that

17   you saw them; is that correct?

18        A.   Yes.

19        MR. SOFER:  At this time the government offers 56 through

20   73 into evidence, Your Honor.

21        MR. BOYD:  Your Honor, I have no objections.

22        THE COURT:  They're admitted.

23        (Exhibit(s) admitted:  G56 thru G73)

24   BY MR. SOFER:

25        Q.   Again, the shotgun shells contained in 71 which is

1   now in evidence, when you found them they weren't cut like

2   this, correct?

3       A.   No.  They were not.  They were all intact and in the

4   box.

5       Q.   Have you learned that the FBI's crime lab in

6   Quantico, Virginia did this?

7       A.   Yes.  I was told that.

8       Q.   Okay.  At this juncture what did you do next,

9   Sergeant?

10      A.   At this juncture after we discussed that in order for

11  me to determine that the scene was safe to turn over that I

12  needed to ensure that the room that the person that owned the

13  backpack was in that that didn't have a device in it either.

14  So at that time the policing agencies that were on scene had a

15  discussion and I was told that I needed to wait before I can go

16  into that room until they obtained a search warrant.

17      Q.   Okay.  And you had said earlier that there were

18  things in the -- inside the notebook -- papers inside the

19  notebook which caused you particular concern; is that right?

20      A.   Yes.

21      Q.   I want to show you what's been marked Government

22  Exhibit No. 75F for identification.  Do you recognize that

23  document?

24      A.   Yes.  That's one of the pages of the notebook that

25  came out of the backpack.

1    Q.   Okay.  And does it appear here as it did that day?

2    A.   Yes.  It does.

3    MR. SOFER:  Government moves 75F into evidence.

4    MR. BOYD:  No objection, Your Honor.

5    THE COURT:  It's admitted.

6    (Exhibit(s) admitted:  G75F)

7  BY MR. SOFER:

8    Q.   What about this list caused you concern, sir?

9    A.   Well, the items on the list which caused me concern

10 because those items were items that were also a part of the

11 article How To Build A Bomb In The Kitchen Of Your Mom and that

12 describes taking those items and making them into a functioning

13 explosive device.

14   Q.   That's that other article that you read.  That was

15 also in the notebook?

16   A.   Yes.

17   Q.   Okay.  And this in combination caused you concern?

18   A.   Yes.  It did.  Because some of the items that's on

19 that list were also in the backpack.

20   Q.   Okay.  And I'm going to show you what's been marked

21 Government Exhibit No. 75G for identification.  Did this

22 document cause you concern as well?

23   A.   Yes.  It did.

24   Q.   And among other things it's got Osama Bin Laden's

25 name on it, correct?

1      A.   Yes.  It does.

2      Q.   And again does this document appear the way it did on

3  that particular day?

4      A.   Yes.  It does.

5      Q.   Fair and accurate representation of what you saw?

6      A.   Yes, sir.

7      MR. SOFER:  At this time the government moves 75G into

8  evidence.

9      MR. BOYD:  No objection.

10      THE COURT:  It's admitted.

11      (Exhibit(s) admitted:  G75G)

12  BY MR. SOFER:

13      Q.   You said you looked at the article How To Build A

14  Bomb In The Kitchen Of Your Mom.  Did you explain what you had

15  learned to other officers at the scene?

16      A.   Yes.  I went through each page of the notebook and of

17  the articles on the scene showing them all the things that were

18  found and that that were these things in combination with the

19  items that were found in the backpack would all together

20  equated to a viable threat.

21      Q.   Okay.  And what did you do next?

22      A.   We waited.

23      Q.   And did there come a time when you were given

24  authority to conduct further searches?

25      A.   Yes, sir.

1       Q.   Where were those searches conducted?

2       A.   Inside of the hotel in Room 230 and Room 248.

3       Q.   Okay.  And do you recall which of those rooms you

4  searched first?

5       A.   Yes, sir.  We searched Room 230 first.

6       Q.   Again this was done at the America's Best Value Inn,

7  correct?

8       A.   Yes, sir.

9       Q.   And when you conducted these searches did you don any

10  protective gear?

11      A.   Yes, sir.  I once again donned the bomb suit.

12      MR. SOFER:  Okay.  Can we play 47, Cut 7 which is already

13  in evidence?  And if you can, pause it.

14  BY MR. SOFER:

15      Q.   I don't know how well you can see there.  Looks like

16  something out of a science picture movie, but could you please

17  tell the jury if you can are you in that picture to your

18  knowledge?

19      A.   Yes.  I am.

20      Q.   And can you describe to the jury what's happening

21  there?

22      A.   Well, in the bomb suits it is myself and a civilian

23  bomb technician and we are coming up the stairs of the hotel

24  along with two other members.  One was my team member and the

25  other was a civilian technician's team member and we was

Direct Examination of Brad Grimes by Mr. Sofer        365

1   bringing all items to a down -- what we call a down range safe

2   area.  An area far enough away from the rooms but close enough

3   that we can get needed tools that -- while we was down range.

4        Q.   Okay.  Did you ultimately conduct a search of Room

5   230?

6        A.   Yes.  I did.

7        Q.   And can you describe for the members of the jury

8   again what your primary goal was in conducting that search?

9        A.   My primary goal when entering the room was identify

10   an explosive threat and to mitigate that threat.

11        Q.   I want to show you what's been marked Government

12   Exhibit No. 147-1 for identification.  Tell us what that is.

13        A.   That is a picture of the door to Room 230.

14        Q.   And again is it how it appeared on that particular

15   day?

16        A.   Yes, sir.

17        Q.   And I'll show you Government Exhibit No. 2 for

18   identification -- 147-2 for identification.  Do you recognize

19   that?

20        A.   Yes.  That is the inside of Room 230.

21        Q.   Okay.  Is that a -- does that picture represent the

22   items that were present in the room or some of them?

23        A.   Yes.  That does depict some of the items that were in

24   the room.

25        Q.   Okay.  And does it fairly and accurately depict the

1    items themselves?

2          A.   Yes.  It does.

3          MR. SOFER:  At this time, Your Honor, government moves

4    147-1 and 2 into evidence.

5          MR. BOYD:  No objection, Your Honor.

6          THE COURT:  They're admitted.

7          (Exhibit(s) admitted:  G147-1, G147-2)

8    BY MR. SOFER:

9          Q.   I won't show you the outside, but this is -- can you

10   see that clearly?

11         A.   Yes.  I can see it.

12         Q.   Okay.  I want to go through with you the items that

13   were present in the room, but before I do that can you please

14   explain to the members of the jury what you did when you

15   entered the room?

16         A.   Okay.  When I got to the room, the room door was

17   already cracked open.  So I took a -- well, I assured that

18   there were no boobie traps going into the room using a laser

19   pointer and a flashlight and a mirror and took a look around

20   the entrance first and then once I had entered the room I

21   searched the rest room because that was the immediate room to

22   my right.  Once I searched that room I came from there and

23   focused on the main area.

24         Q.   Okay.  And essentially what were you doing as you

25   went through the room?

1    A.   Searching the room for boobie traps and explosive

2  devices.

3    Q.   Okay.  Were you collecting evidence for any kind of

4  case at that juncture?

5    A.   No.  Not at all.

6    Q.   Okay.  I'm going to go through with you now the items

7  that were inside of Room 230.  There's a lot of them.  So it

8  may take a little bit of time.  Start with 85 and 86.

9  Government Exhibit No. 85 and 86 for identification.  Do you

10 recognize these objects?

11   A.   Yes.  I do.

12   Q.   Okay.  Were they inside Room 230?

13   A.   Yes.  They were.

14   Q.   Okay.  And again do they appear substantially the

15 same as they did on that day?

16   A.   Yes, sir.

17   Q.   Do you recall whether this, that is 85, was inside of

18 86 the box?

19   A.   Yes.  I do and it was.

20   Q.   And was this part of -- you said you were opening --

21 did you open packages while you were in there?

22   A.   Yes.  I did.  Same as the backpack.  Any item that

23 was contained I opened that package to ensure that it was as it

24 appeared and it did not contain an explosive device.

25   Q.   Okay.  Now, Government Exhibit No. 87 for

1   identification.  Do you recognize that?

2        A.   Yes.  I do.

3        Q.   Tell the jury what that is.

4        A.   That is a drill bit case that was found in Room 230.

5        Q.   Again Government Exhibits 88 and 89.  Can you tell us

6   what that is?

7        A.   Yes.  Those are two clocks that were also found in

8   Room 230.

9        Q.   Okay.  Did you find numerous containers of black

10  powder?

11       A.   Yes.  I did.

12       Q.   And I'll show you Government Exhibit No. 90.  Is that

13  one of them?

14       A.   Yes.  It is.

15       Q.   Do you recall whether they were opened or closed?

16       A.   They were closed.

17       Q.   I'm sorry.  Smokeless powder I should have said.

18       A.   Yeah.

19       Q.   Government Exhibit No. 91?

20       A.   Yes.

21       Q.   Same kind of smokeless powder?

22       A.   Yes, sir.

23       Q.   Same -- it was smokeless powder a bottle of it?

24       A.   Yes, sir.

25       Q.   92.  Is that one of the bottles?

1      A.   Yes.  It is.

2      Q.   93?

3      A.   Yes, sir.

4      Q.   94.  Is that one of the bottles as well?

5      A.   Yes, sir.

6      Q.   So was 93?

7      A.   Yes, sir.

8      Q.   And 95.  Is that one of the bottles as well?

9      A.   Yes, sir.

10     Q.   Of the smokeless powder?

11     A.   Yes, sir.

12     Q.   97.  Do you recognize the items inside of

13  Government's Exhibit No. 97 --

14     A.   Yes, sir.

15     Q.   -- for identification?

16  What is this?

17     A.   A box cutter, a Leatherman or Gerber.  I'm not sure

18  which brand that is.  And some -- can I see a close look?

19     MR. SOFER:  May I approach, Your Honor?

20     THE COURT:  Certainly.

21  BY MR. SOFER:

22     Q.   There's a blue container with a blue stopper in it;

23  is that right?

24     A.   Yes.

25     Q.   What's inside of that?

1      A.   Some razor blades.

2      Q.   Okay.  Again substantially in the same condition you

3  saw them on July 27th, 2011?

4      A.   Yes, sir.

5      Q.   We went out of order because we had to find it.  96.

6  Do you recall what this was?

7      A.   Yes.  That was a receipt that was found in Room 230.

8      Q.   98 and 99.  Do you recognize these objects?

9      A.   Yes.  I do.  That was on one of the tables in Room

10  230 and I opened it to make sure it contained no explosive

11  device.

12     Q.   That's -- to your recollection was 98 inside of 99?

13     A.   Yes.  It was.

14     Q.   100.  Do you recognize what I'm holding as Government

15  Exhibit No. 100 for identification?

16     A.   Yes.  I do.

17     Q.   And tell the members of the jury what that is.

18     A.   That is a box of shells just like the shells that

19  were found in the backpack that was -- that box was found in

20  230.  I opened that.  It was closed.  I opened it, cut it open

21  and the shells were in that box intact.

22     MR. SOFER:  May I approach, Your Honor?

23     THE COURT:  Yes, sir.

24  BY MR. SOFER:

25     Q.   Were these shells inside here cut open at the time?

Direct Examination of Brad Grimes by Mr. Sofer

1      A.   Okay.  Those shells were cut open at the time.  Those

2  were on the floor near a cup.  A clear plastic cup.

3      Q.   Okay.  I don't know if we can see, but we'll show you

4  some pictures again.  But 100, these shells were already open.

5  Is that what you're saying?

6      A.   Yes.

7      Q.   So they appear now as they did when you saw them on

8  July 27th, 2011?

9      A.   Yes.

10     Q.   I don't know if you can see from here, but can you

11  see --

12     A.   I can see it.

13     Q.   -- what's in Government's Exhibit No. 119 for

14  identification?

15     A.   Yes, sir.

16     Q.   Can you tell us what that is?

17     A.   One of the items is the plastic cup that I was just

18  speaking of and that bag has the ball bearings and the other

19  powder or that -- all that was inside of that cup sitting on

20  the floor in the Room 230.

21     Q.   It wasn't crushed like this, right?

22     A.   No.  It was not crushed.

23     Q.   101.  Can you tell us what this is?

24     A.   Yes.  That is a magazine that was found in Room 230

25  on the floor.

Direct Examination of Brad Grimes by Mr. Sofer

1    Q.   Okay.  Now, again there's what appear to be something

2    else in here, rounds of ammunition inside this plastic.  Were

3    they inside this plastic when you found them?

4    A.   No.  They were not.  They were actually inside of the

5    magazine.

6    Q.   How about 102?  Do you recognize this?

7    A.   Yes.  I do.

8    Q.   Again were the rounds inside of 102 inside the

9    plastic or were they inside the --

10   A.   They were inside of the magazine.

11   Q.   How about 103?  Can you tell us what that is?

12   A.   Yes.  That's a magazine, also.

13   Q.   Do you recall if there were any rounds in this one at

14   all?

15   A.   I honestly do not recall if there was rounds in that

16   magazine.

17   Q.   Let me show you 104 for identification.  Do you

18   recognize this?

19   A.   Yes.

20   Q.   What is it?

21   A.   Gorilla tape.

22   Q.   Okay.  Is this also substantially in the same

23   condition it was when you saw it?

24   A.   Yes, sir.

25   Q.   How about 105?  Do you recognize this, sir?

1      A.   Yes.  I do.  Those are the batteries that were found

2  on the floor in Room 230.

3      Q.   How about 106?  Do you recognize this, sir?

4      A.   Yes.  I do.  That's a paint brush that was found in

5  Room 230.

6      Q.   How about 107?  Do you recognize this?

7      A.   Yes, sir.  That's electrical tape that was found in

8  Room 230 on the floor.

9      Q.   108?

10      A.   Bundle of zip ties that was found in Room 230 on the

11  floor.

12      Q.   109?

13      A.   Some jeweler's screwdrivers that were also found in

14  Room 230 on the floor.

15      Q.   Okay.  Is there also a wrench of some kind here?

16      A.   Yes.  An allen wrench.

17      Q.   110.  Do you recognize this?

18      A.   Yes.  That was a pressure -- the top to a pressure

19  cooker that was found in Room 230.

20      Q.   Okay.  111.  Do you recognize this?  Can you see

21  what's in there?

22      A.   Yes.  And those are two spools of wire that was found

23  in Room 230 that was on the floor.

24      Q.   112 and 113.  Do you recognize these items?

25      A.   Yes.  I do.  And they both were in Room 230 on the

1    floor.

2         Q.   What is it as far as you can tell?

3         A.   Granulated sugar and powdered sugar.

4         Q.   114.  Do you recognize this?

5         A.   Yes.  Those were the boxes that was found in Room 230

6    of ammunition that I cut open.

7         Q.   Do you recall what kind of ammunition it is?

8         A.   I think it's XD .40 pistol ammunition.

9         Q.   40-caliber ammunition?

10        A.   Yes.

11        Q.   And were these boxes opened at the time that you saw

12   them inside Room 230?

13        A.   They were closed and I cut them open.

14        Q.   Okay.  Why did you cut them open?

15        A.   To verify that they were not a device and that they

16   were in fact ammunition.

17        Q.   What about 115?

18        A.   Yes.

19        Q.   Tell us what this is.

20        A.   Ammunition that was found on the floor in Room 230.

21        Q.   What about 116?

22        A.   Yes.  And that was found also on the floor in Room

23   230.

24        Q.   Can you describe it basically?

25        A.   Plastic container.  I'm not sure.  I can't see from

1    here.

2         MR. SOFER:  May I approach, Your Honor?

3         THE COURT:  Yes, sir.

4    BY THE WITNESS:

5         A.   Yeah.  Plastic container for a magazine.

6    BY MR. SOFER:

7         Q.   117.  Can you see those?

8         A.   No.  I cannot.

9         MR. SOFER:  May I approach again, Your Honor?

10   BY THE WITNESS:

11        A.   Okay.  A box of razors that was also found in Room

12   230.

13   BY MR. SOFER:

14        Q.   Okay.  118?

15        A.   Some shotgun shells.

16        Q.   Now, in Government's Exhibit No. 118 for

17   identification similar to what we talked about before, are

18   there -- are there shotgun shells here that have been cut open?

19        A.   Yes.  Those are cut open.

20        Q.   And have you learned that they were cut open by the

21   FBI laboratory?

22        A.   Yes.  I was told that.

23        Q.   And when you saw them did they all look like the two

24   shells that are not cut open?

25        A.   That's true.  Yes.  They did.

1    Q.   Otherwise they are in substantially the same

2    condition?

3    A.   Yes.

4    Q.   Okay.  I'm going to show you Government Exhibit No.

5    120 for identification.  Do you recognize that from there?

6    A.   Yes.  I do.  And that appears to be the ball bearings

7    and smokeless powder or black powder that was found in the

8    bottom of one of the crock pots or pressure cookers in Room

9    230.

10   Q.   Okay.  So when you entered the room this was inside

11   of something else?

12   A.   Yes.  It was.

13   Q.   And it looked -- otherwise it looks substantially the

14   same?

15   A.   Yes.

16   Q.   That's Government's Exhibit No. 120.

17   Now I'm going to show you what's been marked Government's

18   Exhibit No. 121 or the contents of it.  Can you tell us -- I'll

19   try to do this quickly.  Do you recognize this, sir?

20   A.   Yes.

21   Q.   Can you tell us what it is?

22   A.   That is a U.S. Army ACU pattern cap.

23   Q.   Does it have a rank and a name tag on it?

24   A.   Yes.  It has an E-5 sergeant rank and the name Smith

25   on the back.

1    Q.   Okay.  How about this, sir?  It's Government's

2    Exhibit No. 121 for identification.

3    A.   Yes.  That's an ACU top.

4    Q.   Does it have a name tag on it?

5    A.   Yes.  It does.  The name is Smith.  The rank is

6    sergeant and U.S. Army and that's a U.S. cavalry division

7    patch.

8    Q.   How about this?  What am I holding up?

9    A.   The U.S. Army bottoms for the ACU uniform.

10   Q.   I have two things here.  Can you describe them

11   quickly?

12   A.   Yes.  The one in your left hand is a belt normally

13   worn with the ACU uniform and that's just a black cloth belt.

14   Q.   And finally 121, the box?

15   A.   The boots normally worn with the ACU uniform.

16   Q.   Okay.  Were all these items inside of Room 230?

17   A.   Yes.  They were.

18   Q.   And do they appear substantially in the same

19   condition as when you saw them?

20   A.   Yes, sir.

21   Q.   Okay.  I'm going to show you 122.  What am I holding

22   now?

23   A.   That appears to be the nurse uniform or medical

24   uniform that I found on the bed in Room 230.

25   Q.   Okay.  And does it have a little pin on it?

1      A.   Yes.  It does.

2      Q.   Do you recall what it said?

3      A.   No.  I don't recall what it said.

4      MR. SOFER:  May I approach briefly, Your Honor?

5 BY MR. SOFER:

6      Q.   Does that help refresh your recollection?

7      A.   Yes.  Medical assistant.

8      Q.   Okay.  Was this on that -- on this nursing uniform

9 when you saw it inside of Room 230?

10     A.   Yes.  It was.

11     Q.   Likewise what am I holding here?

12     A.   The bottoms to the nursing uniform.

13     Q.   Okay.

14     A.   A brown T-shirt.

15     And an ID holder.

16     Q.   Okay.  Sometimes called a lanyard?

17     A.   Yes.

18     Q.   That was 122.

19     Let me show you what's been marked Government Exhibit No.

20 123 for identification.  Do you recognize these items?

21     A.   Yes.  I do.  Those are the identification cards that

22 were found in Room 230 on the dresser to my immediate left.

23     Q.   I'm going to show you Government Exhibit No. 124 for

24 identification.  Do you recognize this?

25     A.   Yes.  That is one of the pressure cookers that was

1   found in Room 230.

2        Q.   You stated before that one of the pressure cookers

3   had something inside it, correct?  It had those pellets and the

4   powder?

5        A.   Yes, sir.

6        Q.   Is this the one that had them inside it?

7        A.   I believe it is, sir.

8        Q.   What about Government Exhibit No. 125?

9        A.   The lid to that pressure cooker.

10       Q.   Okay.  Government Exhibit No. 126.  Do you recognize

11  this?

12       A.   Yes.  And that's another pressure cooker that was

13  found in Room 230.

14       Q.   All these items inside of Room 230?

15       A.   Yes.

16       Q.   What about 127?

17       A.   Yes.

18       Q.   Government Exhibit No. 128.  Do you recognize this?

19       A.   Yes.  And that was another pressure cooker top that

20  was found in Room 230.

21       Q.   Government Exhibit No. 129?

22       A.   Yes.  That's a pressure cooker box that was found in

23  Room 230.

24       Q.   Government Exhibit No. 130?

25       A.   The pressure cooker instruction manual that was found

1    in Room 230.

2          Q.   Government Exhibit No. 131.  Do you recognize this?

3          A.   Yes.  I do.

4          Q.   Can you tell us what that is?

5          A.   It is a stun gun that was found on the table in Room

6    230.

7          Q.   Okay.  These batteries, if you recall, were they

8    inside or outside when you saw it?

9          A.   Inside.

10          Q.   It's been made safe as you said for court, correct?

11          A.   Yes, sir.

12          Q.   131 -- 132.  Do you recognize these?

13          A.   Yes.

14          Q.   Can you tell us what this is?

15          A.   Binos that were found on the table in Room 230.

16          Q.   Binos means binoculars?

17          A.   Yes, sir.

18          Q.   133.  Do you recognize this?

19          A.   Yes.  I do.

20          Q.   Tell us what that is.

21          A.   That is the -- a container that was found in one of

22    the boxes that I opened in Room 230.

23          Q.   Do you know what's in here basically?

24          A.   I'm not sure if that was the camera box or not.

25          Q.   What's inside of this Exhibit 133?  Can you see from

Direct Examination of Brad Grimes by Mr. Sofer          381

1     there?

2          A.    No.

3          MR. SOFER:  May I approach briefly, Your Honor?

4     BY THE WITNESS:

5          A.    Okay.  It appears to be a cell phone charger, holder

6     and -- yeah.  The wall charger and a car charger.

7     BY MR. SOFER:

8          Q.    Government Exhibit No. 134.  Do you recognize this?

9          A.    Yes.  I do.  And that's a Christmas light set that

10    was found on the floor of Room 230.

11         Q.    Government Exhibit No. 135.  Do you recognize this

12    object?

13         A.    Yes.  I do.  And that's a shirt that was found in

14    Room 230 on the floor.

15         Q.    Government Exhibit No. 136.  Can you recall seeing

16    this in Room 230?

17         A.    Yes.  I do.  And that was a phonebook that was in

18    Room 230 that was opened and that page was torn out of the

19    phonebook.

20         Q.    Okay.  Government Exhibit No. 137.  Do you recognize

21    this?

22         A.    Yes.  That was on the floor of Room 230, also.

23         Q.    Can you see this from here Government Exhibit No.

24    138?  Can you see what that is?

25         A.    Yes.  I can.

1          Q.   Tell us what that is.

2          A.   That is a container of liquid cement that was found

3     in Room 230 on the floor.

4          Q.   Government Exhibit No. 139.  Do you recognize this?

5          A.   Yes.

6          Q.   Tell us what that is.

7          A.   Those are cigarette lighters that were also found in

8     Room 230.

9          Q.   Government Exhibit No. 140.  Do you recognize this?

10         A.   No.  I do not.

11         MR. SOFER:  May I approach, Your Honor?

12    BY THE WITNESS:

13         A.   Okay.  Yes.  I do.

14    BY MR. SOFER:

15         Q.   Tell us what that is.

16         A.   That was found on the table I believe in Room 230.

17         Q.   Government's Exhibit No. 141.  Do you recognize this?

18         A.   Yes.  I do.

19         Q.   Tell us what that is.

20         A.   That's a head lamp that was found on the floor of

21    Room 230.

22         Q.   Government Exhibit No. 143.  Do you recognize this?

23         A.   Yes.  I do.

24         Q.   Can you tell us what it is?

25         A.   That's one of the bank cards that was found in Room

Direct Examination of Brad Grimes by Mr. Sofer

1   230.

2       Q.   Okay.  Government Exhibit No. 142.  Do you recognize

3   this?

4       A.   Yes.  I do.

5       Q.   Tell us what that is.

6       A.   Those contained magnetic keys to Room 230 and 248

7   that were found in Room 230.

8       Q.   Show you what's been marked Government Exhibit No.

9   144 for identification.  Do you recognize these?

10      A.   Yes.  I do.

11      Q.   Tell us what they are.

12      A.   Cardboard boxes and a plastic bag that were found in

13  Room 230 on the floor.

14      Q.   Now, in addition to these items, there were other

15  items as well found in the room, correct?

16      A.   Yes.  There were.

17      Q.   At this time -- and all of those items were found

18  that we just went through are in substantially the same

19  condition today other than how you testified as they were when

20  you conducted your EOD search of the room back on July 27th,

21  2011; is that correct?

22      A.   That's correct, sir.

23      MR. SOFER:  At this time, Your Honor, the government

24  offers Government Exhibit 85 through 144 into evidence.

25      MR. BOYD:  Your Honor, with respect to any objections, I

1    don't have any objections to them coming into evidence.  I just

2    want it to be clear that there were a couple of items that were

3    cut open by the FBI crime laboratory and those wouldn't

4    necessarily substantially be in the same condition, but I have

5    no objection to them coming into evidence.

6         THE COURT:  I think that's been made clear.  They'll be

7    admitted.

8         (Exhibit(s) admitted:  G85 thru G144)

9         MR. SOFER:  And my colleagues, Your Honor, tell me 96 had

10   already been admitted into evidence.

11   BY MR. SOFER:

12        Q.   Now, did you get an opportunity to look at -- in

13   addition to the photos we've shown you so far -- I've shown you

14   so far -- another 43 pictures that were taken inside of the

15   room of 230?

16        A.   The pictures you're holding?

17        Q.   Yes, sir.

18        A.   Yes.  I did look at those pictures.

19        Q.   And do they fairly and accurately represent what the

20   objects looked like in the room?

21        A.   Yes.  They do.

22        MR. SOFER:  At this time the government offers Government

23   Exhibit No. 147-3 all the way through 45 into evidence.

24   They've been previously within shown to Counsel.

25        MR. BOYD:  No objection, Your Honor.

1          THE COURT:  They're admitted.

2          (Exhibit(s) admitted:  G147-3 to G147-45)

3     BY MR. SOFER:

4          Q.   I'm just going to go through these photos as quickly

5     as we can here.  I'm going to show you Government Exhibit No.

6     147-3.  Can you just as we do this explain to the jury what

7     we're seeing and basically describe what you saw when you

8     entered the room.

9          A.   Okay.  That's --

10         Q.   And you may be able to touch on the screen --

11         A.   Okay.

12         Q.   -- as to certain items.

13         A.   Well, I'll start with the pressure cooker.  That was

14    found --

15         Q.   Talking about --

16         A.   -- approximately the same area where it is right now

17    right here.  Yes.

18         Q.   Okay.

19         A.   And that was the pressure cooker that had the ball

20    bearings and the black or smokeless powder in the bottom of it.

21         Q.   Okay.  How about 147-4?

22         A.   Yes.  In the previous picture the -- these were laid

23    down.  This is how -- well, I found it within the bag.  That

24    bag wasn't torn.  I tore that bag and lifted and shook each one

25    and made sure it was what it was or appeared to be.  It hadn't

1   been modified.

2        Q.   Okay.  I think this is a close-up of No. 147-5.

3        A.   Yes.

4        Q.   What about 147-6?  Can you see that?

5        A.   Yes.  And that is one of the pressure cookers that

6   was also found in Room 230 -- that -- in that general area.

7   The smaller of the two.

8        Q.   Okay.  When you found it, was it together or was it

9   separated like that?

10       A.   It was together and I opened it up and took out the

11  different parts of it to ensure that it was not a functioning

12  device.

13       Q.   Okay.  How about 147-7?

14       A.   Yes.  That is one of the tables or the table that was

15  in Room 230 and the container for the phone wasn't like that

16  when I originally discovered it.  I opened the box that it came

17  in and opened up all the contents to ensure that it wasn't a

18  functioning device.

19       Q.   Okay.  And do you see other items that you've just

20  described here --

21       A.   Yes.

22       Q.   -- now in evidence?

23       A.   The cement, the sheets and the head lamp and the

24  cords that were in the phone box, also.

25       Q.   And how about over here?  Can you see what's over

1   there in that picture?

2        A.   I can't make that out from here.

3        MR. SOFER:  May I briefly approach, Your Honor?

4        THE COURT:  Yes, sir.

5   BY MR. SOFER:

6        Q.   I don't know if this picture up close is easier to

7   see.  Can you tell what --

8        A.   Yes.  I see it now and that's the stun gun that was

9   found on the table in Room 230.

10       Q.   I'm going to show you 147-8 in evidence.

11       A.   Yes.  That is a picture of the bed from Room 230 and

12   that is after I moved the clothing to make sure they didn't

13   contain anything or a working device and laid them out on the

14   bed.

15       Q.   How about 147-9?

16       A.   Yes.  That is a picture of the drill and the drill

17   bits that were found in Room 230.

18       Q.   10?

19       A.   A picture of the clocks that were found in Room 230.

20       Q.   Now, this cardboard area around them, did you crush

21   that, or --

22       A.   Yes.  I crushed that.

23       Q.   12?  147-12?

24       A.   That is a receipt that was found in Room 230 along

25   with some peanut snacks that were -- along with some candy that

1    was found in a bag in Room 230 that I emptied the contents of

2    that bag and discovered those items.

3        Q.   13?

4        A.   Yes.  That is the box cutter and the Gerber or

5    Leatherman that was found in Room 230 that were in the same

6    condition that I found them.

7        Q.   Okay.  Skip a couple of these.  How about 16?

8        A.   Yes.  Those are the shells that were already on the

9    floor cut open as shown that -- I didn't move those shells at

10   all.  I didn't have a reason to move them.  They appeared open

11   and they were -- they didn't have the powder or the pellets in

12   it anymore.

13       Q.   Okay.  17.  Can you see that?

14       A.   Barely.  And it appears to be the magazines that were

15   found in Room 230 that was on the floor.

16       Q.   18?

17       A.   Yes.  Those items were found as shown in Room 230

18   except for the two boxes up here in this corner where they were

19   closed.  The tops were closed and I cut those open.

20       Q.   Okay.  I'm going to skip around a little here so we

21   can get moving.  20.  Can you tell us what that is?

22       A.   Yes.  Another picture of some of the boxes that I cut

23   open and some of the shells that were already out on the floor.

24       Q.   24?

25       A.   That is a picture of the cup.  That cup I did not

1   move and I didn't take that picture either but that cup was

2   actually on the floor in that condition with the BBs and the

3   other item underneath the white.

4        Q.   Okay.  How about 25?

5        A.   That is the inside -- a picture of the inside of one

6   of the pressure cookers as I found it and with the BBs and the

7   black powder and plastic innards of the -- what I believed to

8   come from the 20 gauge shells.

9        Q.   38?

10       A.   Yes.  Again it's showing the shells that were already

11  cut open, the phonebook that was on the floor and opened and

12  magazines.

13       Q.   Okay.  39?

14       A.   Yes.  This is a picture of that lid and this one kind

15  of puzzled me a little bit because right here is a plastic

16  razor blade and on that plastic razor blade that's sitting on

17  top of that lid there was some melted substance around it and

18  part of the razor blade was melted.  But there was no black

19  scoring of it.  So I was kind of concerned on what that -- that

20  substance was around it.  So I took a sample of it and did a

21  field explosive test on it which consisted of subjecting it to

22  heat shock and friction to see if it would react to any of

23  those and it did not react.

24       Q.   Okay.  And I just put up 41.  Is that a closer

25  picture of what you did?

1          A.   Yes.  It is.

2          Q.   Okay.  What did you conclude after the testing you

3    did in looking at this?

4          A.   I concluded that it was probable that it was a test

5    burn of some of the powder, the black powder or smokeless

6    powder that was found in the 20 gauge shells due to the -- from

7    the picture it showed how the melting was consistent with a

8    really hot and really fast burn.  So that's what I ascertained

9    that it was.

10         Q.   That someone had -- what did -- I'm going to show you

11   137.

12         MR. SOFER:  If I may approach, Your Honor.

13   BY MR. SOFER:

14         Q.   Is that the item you're discussing?

15         A.   Yes.  It is.

16         Q.   Okay.  And what again did you conclude happened here?

17         A.   A test burn of the black powder or smokeless powder

18   found in the 20 gauge shells was done to determine the burn

19   consistency of it.

20         Q.   Okay.  Some of the pictures that you looked at had

21   tags with numbers.  I assume those were not there when you

22   entered the room; is that correct?

23         A.   That's correct.  Those were not there.

24         Q.   Okay.  After you went through Room 230, what did you

25   do?

1        A.    Once all the -- once the room to the best of my

2   abilities was cleared of any explosive device, then I directed

3   my team member that he could come in and start recording all of

4   the items that were in the room as myself and the civilian bomb

5   technician moved to the next room to interrogate it.

6        Q.    Okay.  And some of the pictures we saw were taken by

7   your team member?

8        A.    Yes.

9        Q.    Did you ultimately conduct a search of another room?

10       A.    Yes.  I did.

11       Q.    What room was that?

12       A.    That was Room 248.

13       Q.    And again your primary purpose in going through that

14   room?

15       A.    Was to ensure that there were -- there were not any

16   explosive devices functioning -- in a functioning capacity in

17   that room and if found, neutralize the said device.

18       Q.    I'm going to show you --

19       THE COURT:  Hold on.  Were there items found in that room?

20   BY MR. SOFER:

21       Q.    Were there other items found in the room?

22       A.    Explosive device.

23       Q.    Were there any items?

24       THE COURT:  No.  Are there items that you're going to

25   offer into evidence, Counsel?

Direct Examination of Brad Grimes by Mr. Sofer

1        MR. SOFER:  Yes, Your Honor.

2        THE COURT:  Then we're going to recess for lunch at this

3    point.

4        MR. SOFER:  Yes, sir.

5        THE COURT:  We'll recess until 1:30, ladies and gentlemen.

6        LAW CLERK:  All rise.

7        (Jury exited the courtroom at 12:00.)

8        LAW CLERK:  Court will stand in recess until 1:30.

9        (A break was taken from 12:00 to 1:32.)

10       LAW CLERK:  All rise.

11       (The jury entered the courtroom at 1:32.)

12       THE COURT:  Be seated, everyone.

13       MR. SOFER:  May I proceed, Your Honor?

14       THE COURT:  Yes, sir.

15    BY MR. SOFER:

16       Q.   Sergeant Grimes, before we broke you were about to

17    explain that you conducted another search in connection with

18    your response to the incident on July 27th, 2011.  Did there

19    come a time when you searched Room 248?

20       A.   Yes.  There was.

21       Q.   And have you previously -- I think I asked you this

22    before lunch, but you employed the same techniques that you've

23    described so far?

24       A.   Yes.

25       Q.   And was your priority the same when you entered 248?

1      A.   Yes.  My priority was.

2      Q.   And what was that again?

3      A.   To diffuse -- to find and diffuse or neutralize any

4  devices found.

5      Q.   Okay.  Now, prior to coming here to testify today did

6  you see a series of photographs which were marked Government

7  Exhibit No. 84A through J of some of the items that were

8  recovered from inside of that room?

9      A.   Yes.  I did.

10     Q.   Were they fair and accurate representations of at

11 least the items as you saw them on July 27th, 2011 inside of

12 Room 248 in the America's Best Value hotel?

13     A.   Yes.  They are.

14     MR. SOFER:  At this time the government offers 84A through

15 J into evidence previously viewed by Counsel.

16     MR. BOYD:  No objection, Your Honor.

17     THE COURT:  It'll be admitted.

18     (Exhibit(s) admitted:  G84A thru G84J)

19 BY MR. SOFER:

20     Q.   Show you 84A in evidence.  It's a bad picture of the

21 outside of Room 248, correct?

22     A.   Yes.  That's the door to Room 248.

23     Q.   Show you B.  Can you tell the members of the jury

24 what's depicted in Government's Exhibit No. 16B?

25     A.   Yes.  I can.  There's a trash can here that's in that

Direct Examination of Brad Grimes by Mr. Sofer — 394 —

1  room and --

2      Q.   Indicating the upper left-hand corner of the

3  photograph.

4      A.   All of the items that you see in that picture were

5  removed from the trash can.

6      Q.   Okay.  And again why was that done?

7      A.   To ensure that the trash can did not contain a

8  working explosive device.

9      Q.   I'm going to show you B -- I'm sorry -- C.  84C.  Can

10  you tell the jury what that is?

11      A.   Yes.  That's an item that was found in the Room 248 a

12  package of electrical tape with the electrical tape not being

13  in the package.

14      Q.   Okay.  And 84D.  Tell us what that is depicting.

15      A.   That is another picture of items found in Room 248

16  removed from the trash bin.

17      Q.   Okay.  And E?

18      A.   That is a view of one of the walls in Room 248 that

19  contained the dresser with the television on it and some of the

20  items that were found in the trash can were placed on top of

21  that dresser.

22      Q.   Okay.  So you or somebody else placed those items up

23  there just so they could be photographed?

24      A.   Yes.

25      Q.   And in that part what F is?

Direct Examination of Brad Grimes by Mr. Sofer

1    A.   That's correct.  That's what F is, also.

2    Q.   Show you 84G.  Do you recognize that?

3    A.   Yes.  That's a -- that is a wadded up piece of paper

4  that's -- with some writing on it.  Appears to be a list that

5  was found in the trash can Room 248.

6    Q.   So the list was in the trash can.  Do you recognize

7  some of the items on Government's Exhibit No. 84G in evidence?

8    A.   Yes.  I do.  I looked at it, directed my team member

9  when he came into the room to take a photo of it also because

10  the items that were listed were consistent with some of the

11  things found in Room 230.

12    Q.   Okay.  How about 84H?

13    A.   Yes.  That's a receipt that was found in the trash

14  can of Room 248, also.

15    Q.   And were there some items found not in the trash can?

16    A.   Yes.  There were some tags that appeared to be off of

17  clothing that were found in the rest room as shown.

18    Q.   Okay.  Finally J.  Are those the tags that were

19  found --

20    A.   Yes.

21    Q.   -- in Room 248 in the bathroom?

22    A.   Yes, sir.

23    Q.   Okay.  We'll go through as quickly as we can the last

24  set of items that you recovered.  Show you what's been marked

25  Government's Exhibit No. 76 for identification.  I started with

1    this before but do you recognize this?

2         A.   Yes.  That's the telephone or cell phone box that was

3    found in Room 248.

4         Q.   Okay.  How about 77?

5         A.   Receipt that was found in Room 248.

6         Q.   78?

7         A.   Yes.  The wadded up piece of paper with the items

8    listed on it that was found in Room 248.

9         Q.   Okay.  And that's the one you just described that had

10   some of the items that were in Room 230 listed upon it?

11        A.   Yes.

12        Q.   79?

13        A.   Those are phone cards and items found in Room 248.

14        Q.   How about -- I don't know if you can see this but 80?

15        A.   Yes.  And those are the tags that were found in the

16   rest room in Room 248.

17        Q.   It's one tag.  Do you know whether this is one in the

18   rest room or whether or not it was in the room?  Can you tell

19   from looking at it?

20        A.   No.  I cannot.

21        Q.   But this was in Room 248?

22        A.   Yes.

23        Q.   How about 81?

24        A.   The container of electric tape without the electric

25   tape that was found in Room 248.

1    Q.   82?

2    A.   The hat that was found in Room 248.

3    Q.   Finally two tags.  Can you see those two tags?

4    A.   Yes.  I can.

5    Q.   Do you know what those are?

6    A.   Yes.  Those were the tags that were found in Room

7  248.

8    Q.   Okay.  Were these the ones in the bathroom?  Do you

9  know?

10    A.   I believe they were.

11    Q.   Are all those items in substantially the same

12  condition as they were when you saw them inside Room 248 on

13  July 27th, 2011?

14    A.   Yes, sir.

15    MR. SOFER:  At this time the government offers

16  Government's 83, 82, 81, 80, 79, 78, 77 and 76 into evidence.

17    77's already in.

18    MR. BOYD:  No objection, Your Honor.

19    THE COURT:  They're admitted.

20    (Exhibit(s) admitted:  G76, G78 thru G83)

21  BY MR. SOFER:

22    Q.   Were all the items that you've described, that is,

23  the items found in Room 230, the items found in 248 and items

24  found in the backpack eventually taken into custody by the FBI?

25    A.   I believe they were.

1      Q.    And during the course of your review of what was in

2    Room 230, was there any sign that an individual had begun the

3    process of building a bomb or IED?

4      A.    Yes.  There were signs.  We believed that during the

5    crock pot or the pressure cooker that contained the ball

6    bearings and the smokeless or black powder in the bottom of it

7    were signs that the process had begun to construct an explosive

8    device.

9      Q.    And I'm showing you Government's Exhibit No. 147-25

10   which is in evidence.  Is that what you're referring to?

11     A.    Yes.  It is.

12     Q.    I want to show you 147-24.  Did that indicate

13   anything to you?

14     A.    Yes.  The same indication that those items were

15   removed from the 20 gauge shell and the process of making an

16   explosive device to use the ball bearings as shrapnel.

17     Q.    I want to show you 147-16.  Did that indicate

18   anything to you?

19     A.    Yes.  Those were the shells that were already opened

20   and empty.  The powder and shells that indicated that they

21   were -- that's where those previous items had been taken from.

22     Q.    Finally Government Exhibit No. 147-41.  Did that

23   indicate anything to you?  I think you've testified about this

24   already, but I just wanted to make sure.

25     A.    Yes.  That -- that was what indicated to me that a

1   test burn on the consistency of a burn from the powder from the

2   shells were -- was conducted.

3       Q.   Okay.  Now, do you have an opinion based on all your

4   training and experience as to whether there were components in

5   that room that would complete a working IED if --

6       MR. BOYD:  Your Honor, at this time I'm going to object.

7   This witness has not been offered as an expert.

8       MR. SOFER:  Your Honor, we've qualified him and would

9   offer him now if that has not been --

10      THE COURT:  He'll be allowed to give his opinion.

11  BY MR. SOFER:

12      Q.   Please answer the question.

13      A.   Yes.  There were numerous items in the room that if

14  placed in concert they would in fact complete a working

15  explosive device.

16      Q.   And approximately how long would it take you, do you

17  believe, to do that?  I know you can't testify what someone

18  else could do, but how long would it take you to do it?

19      A.   It would take me 30 minutes or less to complete a

20  working device.

21      Q.   Do you -- were you able to review the article How To

22  Build A Bomb In The Kitchen Of Your Mom?

23      A.   Yes.

24      Q.   And do you have an opinion based on your training and

25  experience as to whether the instructions that you read in that

1    article are enough if followed to construct a working bomb or

2    IED?

3        A.   Yes.  In my opinion if followed correctly the

4    instructions was clear and easy enough that you can in fact

5    construct an IED based off those instructions.

6        MR. SOFER:  One moment.

7    BY MR. SOFER:

8        Q.   Were some of the components that were called for in

9    the article and also would assist one in making a device found

10   also in the backpack?

11       A.   Yes.  They were.

12       MR. SOFER:  Pass the witness, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. BOYD:

15       Q.   Sergeant First Class Grimes, are you a chemist?

16       A.   No.  I'm not a chemist.

17       Q.   And if you were to classify black powder, how would

18   you classify black powder?

19       A.   It is classified or it is known to be classified in

20   the low explosive realm.

21       Q.   Okay.  How about smokeless powder?

22       A.   Same.  It is classified in the low explosive realm.

23       Q.   So based on your experience they're the same?

24       A.   Based on my experience, there's -- no.  They're not

25   the same, but they're both low explosives.  Smokeless powder

Cross-Examination of Brad Grimes by Mr. Boyd                                   401

1    was designed or was created because black powder is so dirty.

2    It creates such a dirty burn.  So smokeless powder was created

3    to mitigate that residue.

4         Q.   Now, with respect to your previous testimony, you

5    testified that before you went into Room 230 that the door was

6    already opened?

7         A.   Yes.  It was cracked.

8         Q.   Who went in before you?

9         A.   I'm not sure who went in before me.  We were not

10   given keys to the rooms.  So like I say I'm not sure if anyone

11   went in or not before me.  I just know when I got up the stairs

12   the hotel rooms and the rooms in the hotel were evacuated and

13   the doors were cracked open.

14        Q.   Now, with respect to -- let's look at the backpack.

15   You didn't find any device in the backpack, right?

16        A.   An explosive device is what you're asking me?

17        Q.   That's correct.

18        A.   A complete working explosive device was not obtained

19   from the backpack.

20        Q.   You didn't even locate any amount of an explosive

21   device in the backpack?

22        A.   No.  I did not.

23        Q.   And, I mean, you found a computer, right?

24        A.   Yes.

25        Q.   This is part of Government Exhibit 75E.  Let me see

1    if I can't make that -- there it goes.  This is the contents of

2    the backpack, right?

3         A.   Correct.

4         Q.   And there's two clocks, right?

5         A.   Yes, sir.

6         Q.   And those clocks don't have batteries in them, do

7    they?

8         A.   I don't recall that there were batteries in the back

9    of those clocks or not.

10        Q.   But that would have been something you would have

11   checked for?

12        A.   Yes.

13        Q.   And you would have -- you would have x-rayed for it

14   at first because you were looking for some sort of a device?

15        A.   That's correct.

16        Q.   And so the truth is there's no -- there's no

17   batteries in those clocks.  You'd remember that?

18        A.   Well, you're talking about almost over a year ago and

19   like I said I did not find a fully functioning device in the

20   backpack and that's not something I would like commit to

21   memory.

22        Q.   But you didn't even find any device in the backpack?

23        A.   No.  I found those items that were --

24        Q.   You found items in a backpack, right?

25        A.   Yes.  Yes.

1      Q.   You didn't find any device in a backpack?

2      A.   Correct.

3      Q.   And it would be a misrepresentation to try to refer

4  to these items as a device?

5      A.   Correct.  But what we refer to them as bomb making

6  material.

7      Q.   Now, with respect to your understanding of where this

8  backpack was found, where was it found?

9      A.   I was told it was removed from the owner and when I

10  arrived on scene it was underneath the overhang, if that's the

11  correct word for it, that's attached to the front of the hotel

12  and there was a pillar, one of the pillars that holds that

13  overhang up.  It was right at the base of one of those pillars.

14      Q.   That's not a very good place to leave a suspected

15  device, is it?

16      A.   Well, where it ends up is where it ends up.  I mean,

17  I was told that they took it off of the owner and it -- that's

18  where it ended up.

19      Q.   Right.  But you would agree with me that police

20  placing a suspected bag at that location if they thought there

21  was a device in it that's just not a good location to put a bag

22  with a suspected device, is it?

23      A.   Well, I'm trying to answer your question.  And what I

24  teach law enforcement is once you determine that you have a

25  suspect item, then wherever you place it it's -- immediately

1    set it down and remove yourself and all the other people away

2    from it.

3        Q.   And that wasn't done in this case?

4        A.   I'm not sure.

5        Q.   Well, there --

6        A.   I wasn't there.

7        Q.   There were people around the bag up until you got

8    there?

9        A.   When I arrived they had a cordon, but the cordon was

10   not as far out as I would have liked it and that's why we

11   adjusted the cordon at that time but there wasn't no one within

12   ten feet of the bag.

13       Q.   You previously stated that you could have constructed

14   a device from the items in the hotel room.  You couldn't have

15   done that with these items, could you?

16       A.   Which -- the -- from the bag?

17       Q.   From the bag.

18       A.   Yes.  Well, yes.  You're correct that there's not

19   enough items in that -- that was in that backpack to construct

20   a completely working device.

21       Q.   Well, to construct any form of a working device.  I

22   mean, it just doesn't happen with those items, right?

23       A.   Yes.  It does.

24       Q.   It does?

25       A.   Yes.  You have a major component which is your -- the

1    clocks which is a safe separation and is the switch with --

2    which is very important in constructing a device.  You have

3    nine volt batteries which is a great power source and which is

4    used worldwide for constructing a device.  You had wires.

5        Q.   That's not my question, sir.  My question is, from

6    just these items right here, they're not -- they can't be a

7    device.  They just physically cannot be a device.  That's true?

8        A.   Yes.  That is true that those items alone is not a

9    device.

10       Q.   And that's my question.  There is no way that the

11   items found in the bag could be assembled into any sort of a

12   device?

13       A.   That's where you're confusing me and --

14       Q.   These items standing alone, that bag was no threat,

15   right?

16       A.   Right.  At the end, that bag did not contain all of

17   the items needed to construct a working device.

18       Q.   Okay.  Let me back up and try to bring you back on.

19   Okay?  You had an initial concern about the bag, right?

20       A.   Yes.

21       Q.   You investigated the bag, right?

22       A.   Correct.

23       Q.   And you end up with the determination that this bag

24   simply is not a device or able to become a device with just

25   standing alone just looking at this bag.  That's correct,

1    right?

2         A.   That's correct.

3         Q.   And this was the bag that you were told was taken off

4    of Mr. Abdo's person?

5         A.   That's correct.

6         Q.   Now, with respect to the items found in the hotel

7    room, you found nothing fully functioning, correct?

8         A.   You mean a completely working device fully assembled?

9    No.

10        Q.   You found no initiator?

11        A.   According to the manual that was in the backpack on

12   how to construct an IED in the kitchen of your mom, it used or

13   it referenced Christmas lights as the initiation and I've been

14   trained on how to do that myself and so I believed those

15   Christmas lights with that knowledge of what was in the bag was

16   obtained for that purpose to be an initiator.

17        Q.   But it wasn't an initiator at the time you found it,

18   right?

19        A.   Right.

20        Q.   You found an unopened box and you're the one that

21   opened it, right?

22        A.   Correct.

23        Q.   As a matter of fact, you're the one that opened most

24   every box in that room, right?

25        A.   I wouldn't say most.  Only the ones that were not

Cross-Examination of Brad Grimes by Mr. Boyd

1    completely opened.

2        Q.   Well, you opened the drill box, right?

3        A.   Yes.

4        Q.   So no one had used that drill yet.  You opened it.

5    How about the ammunition boxes?  You opened those, right?

6        A.   Yes, but those were opened previous to me.  I just

7    didn't open it the way it would normally be opened.

8        Q.   But you also came to a room that the door was

9    previously open?

10       A.   Yes.  I did.

11       Q.   And you don't know who got into that room before you?

12       A.   That's correct.

13       Q.   Did you take it upon yourself at any point to test

14   those light bulbs yourself?

15       A.   No.  I did not.

16       Q.   Okay.  Have you ever built a device according

17   specifically to this recipe that you testified to?

18       A.   Yes.  I have, and not only have I built them, I've

19   taught other bomb techs how to build them and we've trained

20   against them or with them on numerous occasions.

21       Q.   So you've used that article?

22       A.   No, sir.

23       Q.   Well, sir, I asked you very specifically if you had

24   ever used that recipe book to build a device and you very

25   specifically said yes.

1      A.   Well --

2      Q.   So is it proper to say that you in fact have never

3  built a device according specifically to the recipe that was

4  contained in that article?

5      A.   The devices that I've built were constructed exactly

6  to form the same recipe that was found in that book.  Now, I

7  didn't hear you say that book the first time.  So --

8      Q.   You've never used the recipe in that book?

9      A.   That recipe in that book, no.  I've never used that

10 book, but the --

11     Q.   That's what I'm asking, sir.

12     THE COURT:  Let him finish his answer, Counsel.

13 BY THE WITNESS:

14     A.   But the things that I've taught and the things that

15 I've done myself in training to build that device were the

16 exact same.

17 BY MR. BOYD:

18     Q.   With respect to your previous testimony as to what

19 was located in the pressure cooker, which pressure cooker was

20 it located in?

21     A.   The larger of the two.

22     Q.   And you called it black powder when you testified

23 previously and in fact there was no black powder in that

24 pressure cooker, was there?

25     A.   I testified black powder, smokeless powder because I

1    did not do a chemical analysis of the powder.  So I can't

2    ascertain by sight which of the two it was.

3        Q.   Well, you're aware that there's a difference between

4    black powder and smokeless powder?

5        A.   Yes.  I am.

6        Q.   And that's a question of being precise, correct?

7        A.   But in my -- in my testimony or in my experience

8    there isn't a visible difference in the two that I could

9    determine.

10       Q.   Now, with respect to the sugar, sugar's an oxidizer,

11   right?

12       A.   Well, mostly used as a fuel.

13       Q.   Well, it's an oxidizer.  I mean, let's be precise in

14   these terms.  It's an oxidizer, right?

15       A.   Yes.

16       Q.   And the difference in black powder and the difference

17   in smokeless powder is smokeless powder pretty much has the

18   oxidizer built in, right?

19       A.   That's correct.

20       MR. SOFER:  Your Honor, I'm going to object to this line

21   of questioning.  Mr. Boyd started by saying that this witness

22   wasn't a chemist and so as the witness he's not qualified to

23   answer some of these questions.

24       THE COURT:  Overruled.

25   BY MR. BOYD:

1    Q.   And so the problem is if you add sugar which is an

2  oxidizer to smokeless powder, you create an inert -- something

3  that's inert, right?

4    A.   Well, you're talking the -- you can do that.

5    Q.   And --

6    A.   But you're -- the amount of ingredients would

7  determine whether it goes inert or whether it will actually

8  fuel the burn.

9    Q.   And it's important to know the amount?

10    A.   Yes.  It is.

11    Q.   Right?  It's very important?

12    A.   Yes.

13    Q.   And your expertise teaches you that?

14    A.   Yes.

15    Q.   And that's not expertise that they teach in infantry

16  school, is it?

17    A.   Not to my knowledge.

18    Q.   In fact, you had to go through very specialized

19  training to get that expertise, didn't you?

20    A.   Yes.

21    Q.   You didn't find any functioning device in Room 248

22  either, did you?

23    A.   No.  I did not.

24    Q.   You didn't find anything that could become a

25  functioning device in 248 either, did you?

1        A.    No.  I did not.

2        Q.    And it is your testimony that you being an expert

3   trained in assembling these items if you were to follow that

4   recipe precisely, you could create a device in 30 minutes?

5        A.    Yes, sir.

6        Q.    But you don't take into consideration the sugar, do

7   you?

8        A.    What do you mean?

9        Q.    If you poured all that sugar on top of everything in

10  accordance with the instructions, you've just neutralized the

11  device you built, right?

12       A.    I'm not sure if that instruction called for all the

13  sugar that we found.

14       Q.    Okay.  In fact it would really take several hours if

15  not a day or better to build such a device?

16       A.    Sir, I ran a site at the advanced explosive device

17  school and I built at a minimum 20 devices within a day.  I

18  have team members who can build that low degree of difficulty

19  device under 30 minutes.

20       Q.    I understand you have team members, sir.  But y'all

21  have expertise, right?

22       A.    That's correct.

23       Q.    One last question.  Isn't it true that deflagration

24  is simply a burning of powder?

25       A.    If used in the sense that you're speaking of.

1      Q.   So when powder burns it deflagrates?

2      A.   It --

3      Q.   Deflagrates, deflagration?

4      A.   Well, it consumes -- when it burns, depending on the

5   type of powder that you're speaking of, it will burn.  I mean,

6   there's so many different types of powder or low explosive

7   powders.  So, I mean, they all function differently when

8   ignited.  So, I mean, they burn at different temperatures.

9   They burn at different rates.

10     Q.   But in general when they burn it's called

11  deflagration?

12     A.   Well, I can't testify to that term and --

13     Q.   Do you not know what it is?

14     A.   No.

15     MR. BOYD:  Nothing further.

16     MR. SOFER:  No questions from the government.  May the

17  witness be excused, Your Honor?

18     THE COURT:  Yes, sir.  You may step down, Sergeant, and

19  you may be excused.

20     MR. SOFER:  Government calls Jason Cromartie.

21     (The witness was sworn.)

22                        DIRECT EXAMINATION

23  BY MR. SOFER:

24     Q.   Good afternoon.

25     A.   Good afternoon, sir.

1    Q.    Would you please tell the members of the jury how

2  you're employed?

3    A.    Special agent with the FBI.

4    Q.    And how long have you been with the FBI?

5    A.    Approximately seven years.

6    Q.    Are you presently assigned to a task force in Austin,

7  Texas?

8    A.    Yes, sir.

9    Q.    Can you tell us on July 27th, 2011 were you asked to

10  respond to an incident in Killeen, Texas?

11    A.    Yes, sir.

12    Q.    And that's here in the Western District of Texas in

13  the United States in the Waco Division; is that correct?

14    A.    Yes, sir.

15    Q.    Did there come a time when you observed numerous

16  items being taken into the FBI's custody?

17    A.    Yes, sir.

18    Q.    And did you later learn that those items were

19  recovered in Room 248, 230 and a backpack outside the hotel?

20    A.    Yes, sir.

21    Q.    Have you participated in parts of the investigation

22  of this case?

23    A.    Yes, sir.

24    Q.    And in doing so do you know if some of those items

25  were sent to the FBI lab in Quantico, Virginia for further

1    analysis?

2          A.    Yes, sir.  That's correct.

3          Q.    In connection with your investigation of this case,

4    have you had occasion to see Government's Exhibit No. 14 for

5    identification?

6          A.    Yes, sir.

7          Q.    Can you tell us what that is?

8          A.    Those are face masks, sir.

9          Q.    Do you recall when you first saw these?

10         A.    Yes, sir.  During a review of the evidence that we

11   had in custody at the Austin office we were going through a set

12   of evidence and located those items in the middle mixed with

13   some other evidence.

14         Q.    Do you recall what other evidence it was mixed with?

15         A.    Yes.  It was with a body bag.

16         Q.    And prior to discovering it inside that other

17   evidence, as far as you know, was the FBI or anyone else aware

18   of its existence?

19         A.    No, sir.

20         Q.    And is Government's Exhibit 14 for identification in

21   the same or similar condition as it was when you first located

22   it?

23         A.    Yes, sir.

24         Q.    Do you know approximately when that was?

25         A.    It was in October, sir.

1      Q.   Okay.

2      A.   October 2011.

3      Q.   And was that at the Austin office of the FBI?

4      A.   Yes, sir.

5      MR. SOFER:  At this time the government moves Government

6  14 for identification into evidence, Your Honor.

7      MR. BOYD:  No objection, Your Honor.

8      THE COURT:  Admitted.

9      (Exhibit(s) admitted:  G14)

10     MR. SOFER:  Just one moment, Judge.

11 BY MR. SOFER:

12     Q.   I'm going to show you what's marked 75G in evidence.

13 Have you had occasion during the course of your involvement in

14 this investigation to see this document?

15     A.   Yes, sir.

16     Q.   And do you know where it came from?

17     A.   Yes, sir.  From the backpack that was at the scene

18 from the subject.

19     Q.   Are you familiar with the names that are listed

20 there?

21     A.   Yes, sir.

22     Q.   And as part of your training in the FBI is it

23 important for you to be familiar with current events as it

24 relates to your work in national security?

25     A.   Yes, sir.  It is.

Direct Examination of Jason Cromartie by Mr. Sofer ———416———

1    Q.   Can you please tell the jury to the extent that you

2    know who these individuals are basically?

3    A.   The first name Abeer Qassin Hamza Al-Jonabi refers to

4    an Iraqi female that was assaulted and killed in Iraq.

5    The second name refers to Major Nidal Hasan, an individual

6    who's alleged to have committed an assault at Fort Hood killing

7    13 individuals.

8    Abdul Hakim refers to Abdul Hakim Mujahid Muhammad an

9    individual who perpetrated an attack against a Little Rock

10   Arkansas Army recruiting center killing one individual and

11   shooting another.

12   Faisal Shahzad refers to a naturalized U.S. citizen that

13   participated and put together a failed bombing attack in Time

14   Square in New York.

15   Osama Bin Laden is the widely recognized leader of

16   Al-Qaeda.

17   Al Ashi in what appears to be family in Dallas and there's

18   "Holy Land" behind that appears to refer to Gusan Al Ashi and

19   the Al Ashi family members who were involved with the Holy Land

20   foundation.  They were convicted for material support to Hamas.

21   And the final name at the bottom Hasan Akbar refers to

22   Army Sergeant Hasan Akbar who attacked soldiers while deployed

23   overseas killing a couple in a grenade attack.

24   Q.   Now, have you as part of your work become familiar

25   with the article how to -- well, have you become familiar with

Direct Examination of Jason Cromartie by Mr. Sofer ——— 417

1   Inspire magazine?

2       A.   Yes, sir.

3       Q.   And can you tell us very basically what you know of

4   that magazine the publication?

5       A.   It's an online magazine published by a group called

6   Al-Qaeda in the Arabian Peninsula.  It's meant for an English

7   speaking audience as a way to further carry out Al-Qaeda's

8   message, how to support them, how to carry out actions on their

9   behalf, how to communicate with them, etcetera.

10      Q.   And as part of your familiarity with the article have

11  you also learned about -- I'm sorry -- with the magazine have

12  you also learned about an article entitled How To Build A Bomb

13  In The Kitchen Of Your Mom?

14      A.   Yes.  That is an article that appeared in one of the

15  issues of Inspire magazine published by Al-Qaeda in the Arabian

16  Peninsula.

17      Q.   And have you reviewed that article?

18      A.   Yes.  I have, sir.

19      Q.   When you did so in connection with your duties in

20  this case, did you also review some of the evidence that was

21  recovered at the scene of the America's Best Value hotel in

22  Killeen, Texas on July 27th, 2011?

23      A.   Yes, sir.  I did.

24      Q.   And have you determined whether there are items --

25  item or items that correspond between the article itself and

1    what was recovered at the scene?

2         A.   Yes, sir.  There were.

3         MR. SOFER:  If we could pull up Government Exhibit No. 67

4    in evidence.

5         Can you just zoom in on the title -- the title at the very

6    top of that page?

7    BY MR. SOFER:

8         Q.   It says Open Source Jihad.  Can you tell the members

9    of the jury if you know from your experience what the word

10   "Jihad" means?

11        A.   Yes, sir.  My training and experience is --

12        Q.   Hold on one second.

13        THE COURT:  I think the previous witness may have left

14   something there on the witness stand.

15        MR. SOFER:  Thank you, Judge.

16   BY MR. SOFER:

17        Q.   The word "Jihad," the last word of that article can

18   you explain basically and in summary what that word means as

19   far as your training and experience?

20        A.   Yes.  In common usage it is often used to refer to

21   holy war.

22        Q.   And have you learned in your training and experience

23   what the word "Mujahidin" means or "Mujahid"?

24        A.   Yes.  In common usage it is often referred to someone

25   who is a holy warrior or someone who's a fighter in a

1    particular cause.

2         Q.   And finally have you learned in your experience what

3    the word "Inshallah" means?

4         A.   Inshallah refers to an expression meaning God

5    willing.

6         MR. SOFER:  If we could go to the first page of the

7    article How To Build A Bomb In The Kitchen Of Your Mom at the

8    top.  And if you could please magnify the first paragraph.

9    BY MR. SOFER:

10        Q.   And again this is Government's Exhibit No. 67 already

11   in evidence.  Can you read for the jury what that first

12   paragraph states?

13        A.   Yes, sir.

14        Can I make an effective bomb that causes damage to the

15   enemy from ingredients available in any kitchen in the world?

16   The answer is yes.  But before how, we ask why.  It is because

17   Allah says:  So fight in the cause of Allah.  You are not held

18   responsible except for yourself.  And inspire the believers to

19   join you that perhaps Allah will restrain the military might of

20   those who disbelieve.  And Allah is greater in might and

21   stronger in exemplary punishment.

22        MR. SOFER:  Now I want to go down one, two, three to the

23   fifth paragraph.  Starts with the words, "There are many

24   Muslims."  Could you please magnify that?

25   BY MR. SOFER:

1    Q.   Can you see that, Agent Cromartie?

2    A.   Yes, sir.

3    Q.   And can you read that portion to the jury, please?

4    A.   Yes, sir.

5    There are many Muslims who have the zeal to defend the

6    ummah but their vision is unclear.  They believe that in order

7    to defend the ummah they need to travel and join the mujahidin

8    elsewhere and they must train in their camps.  But we tell the

9    Muslims in America and Europe there is a better choice and an

10   easier one to give support to your ummah.  That is individual

11   work inside the west such as the operations of Nidal Hasan and

12   Faisal Shahzad.  With a few failed operations, as they claim,

13   the director of National Intelligence was forced to resign.

14   With a few more failed operations we may have the resignation

15   of the president of the United States.

16   Q.   Okay.  And some words that are in there, if you're

17   familiar with them, do you know what the ummah is?

18   A.   Yes.  It is a term referring to the community, the

19   Muslim community specifically.

20   Q.   And how about mujahidin?

21   A.   Plural of mujahid.  So holy warriors or fighters.

22   Q.   And the names Nidal Hasan and Faisal Shahzad.  Were

23   those found in the document that you just looked at as well?

24   A.   Yes, sir.

25   MR. SOFER:  Okay.  If we could just magnify the very

1  bottom of that page, please.

2      I'm sorry.  One paragraph up all the way to the bottom.

3  Starts with "My Muslim brother."

4  BY MR. SOFER:

5      Q.   Would you please read that to the members of the

6  jury?

7      A.   Yes, sir.

8      My Muslim brother, who wants to support the religion of

9  Allah, do not make too many calculations and forecasting of the

10 results and consequences.  It is true that Umar al-Faruq and

11 his brothers Nidal Hasan and Shahzad were imprisoned but they

12 have become heroes and icons that are examples to be followed.

13 We ask Allah to grant them steadfastness.  If they were sincere

14 and steadfast, their imprisonment would be an increased status

15 for them.  The hadith says if Allah loves a people, he would

16 put them through trials.  The result of these trials would be

17 the highest levels of Paradise, the pleasure of Allah, heaven

18 in the hearts of this world and eternal pleasure in the

19 afterlife.  My Muslim brother:  We are conveying to you our

20 military training right into your kitchen to relieve you of the

21 difficulty of traveling to us.  If you are sincere in your

22 intentions to serve the religion of Allah, then all what you

23 have to do is enter your kitchen and make an explosive device

24 that would damage the enemy if you put your trust in Allah and

25 then use this explosive device properly.  Here are the main

1    qualities of this bomb:  Its ingredients are readily available.

2    Buying these ingredients does not raise suspicion.  It is

3    easily disposed of if the enemy searches your home.  Sniffing

4    dogs are not trained to recognize them as bomb making

5    ingredients.  In one or two days the bomb could be ready to

6    kill at least ten people.  In a month you may have a bigger and

7    more lethal bomb that could kill tens of people.

8        Q.   Now, again going through the rest of the article --

9    I'll do so fairly quickly -- were there a number of places

10   where you found connections between what it is that was

11   recovered in this case in terms of evidence and what the

12   article itself lays out?

13       A.   Yes, sir.

14       MR. SOFER:  And we're not going into every single one of

15   them, but if we could put up on Page 34 of the article Items 1

16   and 2.  Well, let's do just 1, please.  That's fine.

17   BY MR. SOFER:

18       Q.   Can you read 1?

19       A.   Inflammable substance.

20       MR. SOFER:  Okay.  And put up a picture of Government's

21   Exhibit No. 90 through 95.

22   BY MR. SOFER:

23       Q.   Is this one of the connections that you found?

24       A.   Yes, sir.  It was.

25       Q.   Did you find other connections?

1    A.   Yes.  We did, sir.

2    Q.   What's another connection you found if it's already

3  highlighted?

4    A.   Should be the decorations lamp.

5    Q.   Okay.  And was there a decoration lamp as far as you

6  know?

7    A.   Yes.

8    Q.   Is this the one that says what is normally used for

9  Christmas trees?

10    A.   Yes, sir.

11    MR. SOFER:  Can we put up a picture of Government Exhibit

12  134, please?

13    Would you put up on Page 35 the bottom of the page,

14  please?  If you can highlight it.

15  BY MR. SOFER:

16    Q.   Something on there which was found as well?

17    A.   Yes.  We found -- we located a drill, sir.

18    Q.   Okay.  And is that --

19    MR. SOFER:  Can we put up picture 85, please?  Can we turn

20  to Page 37?  And the bottom of that page as well.

21  MY MR. SOFER:

22    Q.   Do you see anything in there that was located as

23  well?

24    A.   Yes, sir.  We recovered a battery.  Nine volt.

25    MR. SOFER:  And can you go up to the diagram on that page,

1    please, and highlight those either one?  One or two.

2    BY MR. SOFER:

3        Q.   Anything else that was recovered that's in that

4    diagram?

5        A.   Yes, sir.  Electrical wiring.

6        MR. SOFER:  Okay.  Can we put up pictures 59 and 111,

7    please?  I say pictures.  These are items in evidence 59 --

8    Government's 59 and Government's 111.  Let's turn to Page 38 of

9    the article, please, and could you just highlight the top?

10   BY MR. SOFER:

11       Q.   Were there items on this page that were found?

12       A.   Yes.

13       Q.   Or consistent with what's written on this page?

14       A.   Yes, sir.  The clocks.

15       MR. SOFER:  Okay.  Can we show Government's 57?

16       Let's go to Page 40.  And the top third of the page.  Can

17   you just get the top three paragraphs?

18   BY MR. SOFER:

19       Q.   Can you read that?  If you can read it?

20       A.   Yes, sir.

21       Q.   Can you read the first full paragraph that's

22   highlighted there for the jury?  Starts with the word

23   "however."

24       A.   However, in order to fill for example a pressurized

25   cooker with the substance from matches, it may take a lot of

1   matches to do so and therefore you may want to use gun powder

2   or the powder from fireworks.

3        Q.   And do you see something else on that page which was

4   recovered in this case --

5        A.   Yes, sir.

6        Q.   -- concerning your investigation?

7        A.   Yes, sir.  We recovered pressure cookers.

8        Q.   Okay.  We'll come to that in a second.

9        Anything else listed on that page?

10       A.   The gun powder and below that it mentions you also

11   need to -- or I'm sorry.  You also -- you need to also include

12   shrapnel.  The best shrapnel are spherical shaped ones.  As you

13   can see in the figure below, you'll need to glue them to the

14   surface of the canister.  If steel pellets are not available,

15   you may use nails instead.

16       We recovered opened up shell casings and also a cup that

17   contained metal spherical objects appeared to be gunshot.

18       MR. SOFER:  Okay.  And can we put Government's Exhibit No.

19   120 up?

20   BY MR. SOFER:

21       Q.   It mentions glue in there as well.  Did you recover

22   any glue in the case as far as you know?

23       A.   Yes.  We did.

24       MR. SOFER:  Can you put up Government's Exhibit No. 138,

25   please?

Direct Examination of Jason Cromartie by Mr. Sofer ——426

1  BY MR. SOFER:

2      Q.   Okay.  Is that what you were referring to?

3      A.   Yes, sir.

4      Q.   Let's go to the middle of the page.  It says, with

5  that said, can you read that for the members of the jury as

6  well?

7      A.   With that said, here are some important steps to take

8  for an effective explosive device.  Place the device in a

9  crowded area.  Camouflage the device with something that would

10 not hinder the shrapnel such as cardboard.

11     Q.   Was there anything recovered in this case consistent

12 with that?

13     A.   Yes, sir.  We recovered cardboard boxes.

14     MR. SOFER:  Can you put up Government Exhibit No. 144,

15 please?  A little farther down on that page, same page.

16 BY MR. SOFER:

17     Q.   Do you see anything there?  Well, can you read that

18 just that one paragraph around the picture?

19     A.   Yes, sir.

20     The pressurized cooker is the most effective method.  Glue

21 the shrapnel to the inside of the pressurized cooker and then

22 fill the cooker with the inflammable material.  Insert the

23 prepared lamp into the inflammable material gently in order not

24 to break the filament of the lamp.  Then have the wires

25 sticking out of the hole in the lid of the cooker.  Wrap some

1    tape around the hole to seal the electric source in the same

2    way as we did with the iron pipe.

3         Q.   Okay.  And you said a pressure cooker was recovered?

4         A.   Yes, sir.

5         Q.   Pressure cookers?

6         A.   Yes.

7         MR. SOFER:  Can you put up Government's Exhibit No. 125,

8    please?

9         Now, if we can pull up Government Exhibit No. 62, please.

10   And can you magnify just that area?

11   BY MR. SOFER:

12        Q.   Were you aware during the course of your

13   investigation of this piece of paper?

14        A.   Yes, sir.

15        Q.   And can you tell us if you know whether or not this

16   particular piece of evidence corresponds to the article How To

17   Build A Bomb In The Kitchen Of Your Mom?

18        A.   Yes.  The article lays out in detail the materials

19   needed to construct the improvised explosive device including

20   mentioning the items that are listed here on the list.  The

21   red, black, green wire, nine volt battery, Christmas lights,

22   pressure cooker, power drill, gun powder, Gorilla tape, epoxy

23   glue, shotgun shells, cardboard box, glue, honey comb lenses

24   for binos.  We recovered items that corresponded to this list.

25        MR. SOFER:  Okay.  You can take that down.

1   BY THE WITNESS:

2       A.   And these are the items that were mentioned as needed

3   for the construction of the device in the article.

4   BY MR. SOFER:

5       Q.   Have you previously been assigned responsibilities at

6   the FBI for what's called weapons of mass destruction?

7       A.   Yes, sir.

8       Q.   Can you tell the jury basically what that means?

9       A.   Refers to any device whether it be chemical,

10  biological, explosive that causes mass indiscriminate injuries.

11      Q.   Are you familiar with the FBI's response to such

12  incidents as a whole?

13      A.   Yes, sir.

14      Q.   Can you describe for the members of the jury what the

15  FBI's response would have been had there been a successful

16  detonation of an IED in a restaurant in Killeen in which

17  soldiers were killed in the explosion and/or shot and killed by

18  a gunman waiting outside after an explosion?

19      MR. BOYD:  Your Honor, I'm going to object as to this

20  calls for speculation as to something that just never happened.

21  There's no probative value.

22      MR. SOFER:  And, Your Honor, the government has to prove

23  an effect on interstate commerce here.  The specifics of that

24  proof state whether or not had it been successful it would have

25  had an effect on interstate commerce and that's our purpose

1   here, Your Honor.  It's an element of the crime charged.

2       THE COURT:  Overrule the objection.

3   BY MR. SOFER:

4       Q.   You can answer the question.

5       A.   It would have necessitated a response from several

6   units at FBI headquarters as well as several other units

7   located around the country.  FBI laboratory division personnel

8   out of Virginia, headquarters personnel out of DC, rapid

9   response personnel from other places, probably regional ERT

10   response units from different parts of this state and other

11   states.

12       Q.   You said ERT.  What is that?

13       A.   I'm sorry.  Evidence response team.

14       Q.   Okay.  So people would be -- lots of people would be

15   traveling to Killeen, Texas to assist in such an event?

16       A.   Yes.

17       Q.   And you're familiar with that from your experience in

18   the weapons of mass destruction program in the FBI?

19       A.   Yes.

20       Q.   In addition to that would there be multiple

21   communications from the State of Texas to Washington, DC,

22   Virginia and elsewhere in the United States by phone and the

23   internet?

24       A.   Yes, sir.  There would have been.

25       MR. SOFER:  Pass the witness, Your Honor.

1      THE COURT:  Members of the jury, let me instruct you right

2  quick.  The series of questions and answers you just heard you

3  should consider only as far as it affects the element of the

4  action involving interstate commerce and not for any other

5  reason.  That's the only reason that was allowed.

6      Counsel?

7                        CROSS-EXAMINATION

8  BY MR. BOYD:

9      Q.  I draw your attention to what has previously been

10  marked as Government's Exhibit No. 67.  Would you please read

11  the bullet comment that states "in one or" and read that for

12  me?

13      A.  In one or two days the bomb could be ready to kill at

14  least ten people.  In a month you may make a bigger and more

15  lethal bomb that could kill tens of people.

16      Q.  Now, let's talk about this for a second.  The way

17  that the article is written is more driven towards a pipe bomb,

18  right?

19      A.  I would answer that question by saying that the

20  article starts off describing a pipe bomb and then goes on to

21  explain how to make a more lethal device.

22      Q.  And my next question was going to be then it

23  progresses and it suggests a pressure cooker, correct?

24      A.  Yes.  It goes from a simple IED construction device

25  to multiple devices to a pressure cooker.

1    Q.   And so the simple one in looking at this article

2    would take one to two days to build?

3    A.   That's based upon the author's estimation.

4    Q.   And a more complicated one could take up to a month.

5    A.   Again that depends on the author's estimation of

6    whoever's constructing the device.

7    Q.   Now, with respect to the other language contained

8    within the same article, no pipes were recovered, right?

9    A.   No.

10   Q.   This device also calls for the use of a nail

11   according to this article, correct?

12   A.   It calls for the use of shrapnel.

13   Q.   Well --

14   A.   And nails was one type of shrapnel that was offered.

15   MR. BOYD:  Bring up Page 37.

16   BY MR. BOYD:

17   Q.   Now, this indicates that you would connect one wire

18   to a nail?

19   A.   Yes.  At this point.  Yes.

20   Q.   Right?

21   A.   Yes, sir.

22   Q.   So that's a -- that's something that you just didn't

23   recover was a nail?

24   A.   Yes, sir.  As I recall.  Correct.

25   Q.   Well, I mean, it's just not there.  It's not that

Cross-Examination of Jason Cromartie by Mr. Boyd ———— 432

1    you -- there was no nail recovered by the FBI; that's right?

2         A.   Not a single nail.  Yes, sir.

3         Q.   There was no nails at all recovered by the FBI?

4         A.   Yes, sir.

5         Q.   That's correct?

6         A.   Yes.  That is correct.

7         MR. BOYD:  Okay.  Bring up Page 40, please.

8    BY MR. BOYD:

9         Q.   This is in regards to the pressure cooker.

10   Specifically it states to fill the cooker with the inflammable

11   material, right?

12        A.   Yes, sir.

13        Q.   Now, there's simply not enough material to fill that

14   pressure cooker, is there?

15        A.   Probably not, sir.  If you're talking about filling

16   it to the brim, I would assume --

17        Q.   I'm talking about filling it in accordance with this

18   recipe there is not enough material to put in this pressure

19   cooker to fill it up.

20        A.   With six -- with those six -- if you're talking about

21   the six containers of gun powder, you're correct, sir.

22        Q.   That's correct.  And these just -- they don't do it?

23        A.   Correct, sir.

24        Q.   Even with the packaging there's a lot of space left

25   over, isn't there?

1        A.   Yes, sir.

2        MR. BOYD:  I have no further questions.

3        MR. SOFER:  No further questions from the government, Your

4   Honor.  May the witness be excused?

5        THE COURT:  He may.

6        MR. SCHNEIDER:  The government calls Erich Smith.

7        (The witness was sworn.)

8                        DIRECT EXAMINATION

9   BY MR. SCHNEIDER:

10       Q.   Good afternoon, Mr. Smith.

11       A.   Good afternoon.

12       Q.   Would you please introduce yourself to the jury?

13       A.   My name is Erich Smith.

14       Q.   And what is it you do for a living?

15       A.   I'm a physical scientist with the FBI laboratory.

16       Q.   And how long have you been employed by the FBI?

17       A.   I've worked for the FBI since May 1998.

18       Q.   And while you've been employed by the FBI, in what

19   positions have you worked?

20       A.   Initially when I started working with the FBI I was a

21   physical science technician and then I moved into the role of a

22   physical scientist specializing in firearms and tool mark

23   identification.

24       Q.   How long were you a technician?

25       A.   I was a technician for four years.

1        Q.   And in that capacity as a technician what did you do

2    at the FBI lab?

3        A.   Primarily I worked and assisted a qualified firearms

4    examiner documenting information about evidence.

5        Q.   And you said that you then became an examiner?

6        A.   That's correct.

7        Q.   And what kind of training did you receive to become a

8    qualified examiner?

9        A.   To become a qualified firearms and tool marks

10   examiner you have to think of it as an apprenticeship.

11   Initially when you start off you're assigned a training manual

12   that outlines all the key elements to become the firearms and

13   tool marks examiner.  But now you're going to work in concert

14   with a trained examiner for about two years and you're going to

15   look at thousands of known matches and known non matches.  And

16   when I speak of those I'm talking about bullets and cartridge

17   cases that have been fired.

18        It also has an element of gunshot residue.  We look at the

19   residues that are produced from the discharge of a firearm.  We

20   also look at tool marks.  We also are afforded the opportunity

21   to go to manufacturing facilities for firearms as well as tool

22   marks and this all culminates in the end in three oral boards

23   where my peers come together and they basically ask you

24   questions to test your knowledge.  If you successfully complete

25   that, then you have to do three moot courts.  You're given

1   three practicals.  It's set up in a trial setting just like

2   this and you have to present your case.  If you successfully

3   complete those six texts, you're qualified as a firearms and

4   tool marks examiner.

5       Q.   Now, you've mentioned a few times the word "tool

6   marks."  Can you explain to us what tool marks means?

7       A.   Sure.  You have to think of a tool as just the harder

8   object.  So a firearm is certainly a tool.  It's an object

9   that's designed to push a bullet or a cartridge case.  So a

10  tool, be it a pair of pliers or a hammer, is the harder object

11  that would impart a tool mark.  So we would compare tool marks

12  that were produced by a tool.  It's the same thing we do with

13  firearms as well.

14      Q.   Now, when were you qualified as an examiner for the

15  FBI?

16      A.   I passed my qualifications in February of 2002.

17      Q.   So for the last ten years have you been working in

18  the same position as a qualified examiner at the FBI lab?

19      A.   Yes.  I have.

20      Q.   And where is the FBI lab located?

21      A.   It's located in Quantico, Virginia.

22      Q.   And can you tell us what, if anything, you did before

23  joining the FBI?

24      A.   Yes.  Prior to that I was actually working in the

25  Virginia Division of Forensic Science in their firearms and

1   tool marks unit.

2       Q.   And what is your educational background?

3       A.   I have a bachelor of science degree in biology from

4   Virginia Commonwealth University.  I also have a masters in

5   forensic science from Virginia Commonwealth University.

6       Q.   Now, while you've been employed at the FBI either as

7   a physical scientist technician or a physical scientist and

8   qualified examiner, approximately how many firearms have you

9   tested?  How many tests have you conducted?

10      A.   I can't give you an exact number, but to put it in

11  perspective, since being qualified as examiner I've done over

12  900 cases.  So a case could consist of one or many guns.  So

13  it's easy to say I've worked over 1,000 guns since being

14  qualified as a firearms examiner.

15      Q.   Have you previously testified in court in those other

16  cases as to the operability of firearms or the operability of

17  ammunition?

18      A.   Yes.  I have.

19      Q.   Approximately how many times?

20      A.   I've testified approximately 28 times.

21      Q.   And have you been qualified as an expert in those

22  other cases?

23      A.   I've been qualified as an expert both in state and

24  federal court.

25      Q.   And based on your training and expertise are you able

1    to determine the operability of firearms and ammunition?

2         A.   Yes.  I am.

3         MR. SCHNEIDER:  Your Honor, the government offers Erich

4    Smith as an expert in the field of the operability and testing

5    of firearms.

6         MR. BOYD:  No objection, Your Honor.

7         THE COURT:  He'll be allowed to state his opinion.

8    BY MR. SCHNEIDER:

9         Q.   Now, related to this case and the defendant Naser

10   Abdo did you ever receive any items to be tested at the lab?

11        A.   Yes.  I did.

12        Q.   Do you remember what items you received at the lab to

13   be tested?

14        A.   I received some ammunition as well as a firearm and a

15   stun gun to look at.

16        Q.   And starting with the stun gun, does that fall under

17   firearms?

18        A.   That's atypical for my type of examination.  I

19   basically looked at the stun gun and made notations about what

20   the item was.

21        Q.   And did you determine if it was operable or not?

22        A.   Actually the stun gun had a switch and basically all

23   I did is I turned the switch on and it showed an illuminated

24   light indicating that it was powered up.

25        Q.   I'm going to show you Exhibit 131 that's already in

Direct Examination of Erich Smith by Mr. Schneider

1    evidence and ask you --

2         MR. SCHNEIDER:  Your Honor, may I approach?

3         THE COURT:  Yes, sir.

4    BY MR. SCHNEIDER:

5         Q.   Ask you to take a look at that.  And is that the stun

6    gun that you received in the lab and examined?

7         A.   Yes.  It is.

8         Q.   And how can you tell it's the same one that you

9    examined?

10        A.   Actually you can actually see on the outside of this

11   container it has my laboratory number which appears right here.

12   These are actually my initials and then on the stun gun

13   container or holder you can see the laboratory number again

14   that's been marked on there as well as the question item

15   number.

16        Q.   And other than -- is that stun gun, that exhibit, is

17   that in the same condition as when you received it?

18        A.   No.  It's not.  Actually the batteries have been

19   removed.  When I received it the batteries were inside the stun

20   gun.

21        Q.   Okay.  I'm now going to ask you to take a look at

22   Government 73 which is already in evidence.  And what is that?

23        A.   Again you can see on the outside of this box this is

24   the laboratory number and then this is the Q identifier for

25   this pistol that I received which is Q9.  This may be difficult

Direct Examination of Erich Smith by Mr. Schneider

1    to see, but I actually scribed underneath the trigger guard it

2    appears in the silver marked area the laboratory number and the

3    Q9 identifier and my initials.

4        Q.   And you recognize your initials on that gun?

5        A.   Yes, sir.  I do.

6        Q.   And does that serial number match the serial number

7    for the gun that you received?

8        A.   Can I take it out of the box?

9        Q.   Yes.  We can't remove it from the box.

10       A.   All right.

11       Q.   But if you can read the -- the serial number should

12   be on the front part of the item without removing it from the

13   box.

14       A.   It is the same serial number.

15       Q.   And can you tell us what that serial number is?

16       A.   It's US255990.

17       Q.   Okay.  Now, you said you also received some

18   magazines?

19       A.   Yes.  I did.

20       Q.   That came with that firearm?

21       A.   I did receive some magazines.

22       Q.   And how many magazines did you receive at the lab?

23       A.   I received four magazines.

24       Q.   I'm going to show you Government's Exhibit No. 101

25   and ask you to take a look at that.  Do you recognize that?

1     A.   Yes.  I do.

2     Q.   And is that one of the magazines that you examined?

3     A.   It is.  It actually has my initials on it as well.

4     Q.   And is there anything else in that exhibit?

5     A.   Yes.  As I explained earlier, this one has the

6   laboratory number on the bag as well and this one is Q27, and

7   Q27 represents the magazine, but also within the magazine when

8   I received it were cartridges and they'd been labeled Q27.1 to

9   Q27.4.  So when I received this magazine there were four

10  cartridges in the magazine.

11    Q.   And did you then remove those rounds of ammunition or

12  the cartridges?

13    A.   Yes.  I had to take the cartridges out to do the

14  examination on the cartridges themselves.

15    Q.   And can you tell if those are the same cartridges or

16  rounds of ammunition that you received?

17    A.   Can I take them out?

18    Q.   Yeah.  You can open that.  Or if you can tell from

19  the outside of the bag, that might be easier if there's a way.

20    A.   Actually on the side of the cartridge cases you can

21  see my initials just like on the bag.  So on these cartridges I

22  placed my initials on the outside of them.

23    Q.   And did you do that for every cartridge that you

24  received?

25    A.   For every cartridge I did put my initials on the

1   outside.

2       Q.   Now, what kind of cartridges are those?

3       A.   These were .40 -- well, the caliber we're talking

4   about is --

5       Q.   Yeah.  The caliber.

6       A.   -- .40 S&W.  The S&W stands for Smith and Wesson.

7       Q.   And what type of magazine is it?

8       A.   This magazine -- can I refer to my notes?

9       Q.   Yes.  You may.

10      A.   All right.  The Q27 magazine is actually a

11  Springfield Armory brand magazine.  That's the brand name.

12      Q.   I've now shown you what's been marked as Government's

13  102 which is already in evidence.  And is that one of the

14  magazines that you received?

15      A.   Yes.  It is.  You can actually see my initials on

16  this magazine right here.

17      Q.   And is anything else included in that exhibit with

18  the magazine?

19      A.   Yes.  It's actually sandwiched between these two

20  pieces of styrofoam are the cartridges that were removed from

21  this magazine when I received it.

22      Q.   So did the styrofoam come to the lab when you

23  examined that?

24      A.   No.  It was returned this way.

25      Q.   And can you tell if your initials are on those

Direct Examination of Erich Smith by Mr. Schneider — 442

1    cartridges?

2        A.    Yes.   They are.

3        Q.    How many cartridges?

4        A.    There are ten cartridges in this container.

5        Q.    And what's the caliber?

6        A.    This is -- again is a .40 Smith & Wesson caliber.

7        Q.    And looking at the magazine what type of magazine is

8    it?

9        A.    Again this is another Springfield Armory magazine.

10       Q.    Is that for a 40-caliber handgun?

11       A.    Yes.   It is.

12       Q.    Now, you have Government's Exhibit No. 103 already in

13   evidence.   Is that something that you analyzed at the lab?

14       A.    Yes.   It is.

15       Q.    What is that?

16       A.    This again is another magazine and it's sealed.   It

17   has my laboratory number on it and it was the Q28 identifier

18   and it is scribed with the laboratory number and my initials.

19       Q.    What kind of magazine is it?

20       A.    This is again is another Springfield magazine.

21       Q.    Is that for a 40-caliber handgun?

22       A.    That's correct.

23       Q.    Is there any ammunition or cartridges in that

24   exhibit?

25       A.    This one did not have any cartridges in it when I

Direct Examination of Erich Smith by Mr. Schneider ——443—

1    received it.

2         Q.   Now, you're looking at Government's Exhibit 70 which

3    is already in evidence.  Do you recognize that?

4         A.   Yes.  I do.

5         Q.   And did you analyze that magazine in the lab?

6         A.   Yes.  I did.  It has my laboratory number scribed on

7    it and the identifier Q8.1.

8         Q.   And is there anything else included in that exhibit?

9         A.   Yes.  Again you can see there's styrofoam.  You can

10   actually see the heads of the bullets for the cartridges and

11   these cartridges were actually removed from this magazine.

12        Q.   How many cartridges?

13        A.   There are seven cartridges in here.

14        Q.   And have those been initialed by you so that you can

15   tell that you've previously examined them?

16        A.   Yes.  They have.

17        Q.   And what is the caliber on the cartridges in that

18   exhibit?

19        A.   These are .40 Smith & Wesson.

20        Q.   And what type of magazine is that?

21        A.   This magazine is again another Springfield magazine.

22   It's designed to hold a .40 Smith & Wesson cartridge.

23        Q.   Now, with regard to the four magazines that you just

24   previously looked at, and that's Government's Exhibit 70,

25   Government's Exhibits 101, 102 and 103, a total of four

1    magazines, how did you examine them and test them when they

2    were received in the lab?

3        A.   I think you first have to start with the pistol.  The

4    pistol that I showed you first.  I have to take notes on it.

5    Basically I'm going to describe what I see on the pistol,

6    serial number, the caliber, the manufacturer.  And then with

7    the magazines I'm going to take them to my water tank room.

8    And if you were in my laboratory you have to imagine a large

9    tank that's probably about ten feet long, maybe three feet wide

10   and four feet tall.  Has a large hole in one end.  Basically

11   what I did is I took that pistol after I determined that it was

12   safe to handle, went into this room, took each one of the

13   magazines with one cartridge in each magazine and I actually

14   shot into this tank of water with each magazine.

15       Q.   And were all of the magazines functional?

16       A.   Yes.  They were.

17       Q.   Did they all fit into the gun which is Exhibit 73?

18       A.   Yes.  They did.

19       Q.   And did the gun operate?

20       A.   Yes.  The gun functioned properly.

21       Q.   Now, you said you loaded one round of one cartridge

22   into each magazine.  Was that a cartridge that you received

23   from the FBI in evidence related to its case or was that from

24   somewhere else?

25       A.   No.  We have our own working stock of ammunition.  So

1    I used something from our own stock at the lab.

2         Q.   Now, did you also receive ammunition or cartridges

3    relating to this case to be examined at the lab?

4         A.   Yes.  I did.

5         Q.   Okay.  I'm going to show you first Government's

6    Exhibit 114 already in evidence.  And what is that?

7         A.   These are two boxes of ammunition that I received in

8    the laboratory in regards to this case.

9         Q.   And what did you do when you received it?  How did

10   you analyze it?

11        A.   Well, first of all the cartridges which are now at

12   the bottom of the bag were actually in the boxes.  After we

13   took notation about the actual boxes, the cartridges were

14   removed and then I basically categorized the class

15   characteristics of the cartridges, what caliber, what the

16   cartridge cases are made out of, the type of bullet and what

17   the bullet is made out of.

18        Q.   And were they all functional bullets in your

19   estimation?

20        A.   They all have all the physical characteristics of

21   functional ammunition.

22        Q.   And what is the caliber?

23        A.   These are .40 Smith & Wesson.

24        Q.   Now showing you Government Exhibit 115 already in

25   evidence.  Do you recognize that?

1        A.    Yes.  I do.

2        Q.    What is that?

3        A.    This is a bag of loose ammunition that I received in

4   regards to this case.

5        Q.    And do you know how many cartridges or rounds are in

6   that exhibit?

7        A.    There are 22 rounds I believe.

8        Q.    And do you recognize it as being the same ammunition

9   that you received in the lab?

10       A.    Yes.  Each one of these has my initials marked on

11   them to include the Q identifier.

12       Q.    And looking back at Government's Exhibit 114 which

13   you've previously examined a minute ago -- that was the two

14   boxes of ammunition -- what did you do to recognize these items

15   as items that you previously looked at?

16       A.    Well, on each one of those cartridges are my initials

17   just like they are on these cartridges as well.

18       Q.    And that's for every round of ammunition in both --

19       A.    Yes.

20       Q.    -- of those boxes?

21       A.    Every round.

22       Q.    I'm showing you Government's Exhibit 148 in evidence.

23   Do you recognize that?

24       A.    Yes.  I do.

25       Q.    And what is that?

1      A.    These are actually the test fires that I made using

2  the pistol.  They're four bullets and now four cartridge cases.

3      Q.    Excuse me.  That's for identification.  That's not --

4  148 is not in evidence.

5      And are those the cartridges that you took to test fire

6  these from FBI stock?

7      A.    That's correct.

8      Q.    So these were not bullets that came with the evidence

9  you received related to this case?

10      A.    That's correct.

11      Q.    Now, do you know how many total rounds of ammunition

12  you received to analyze related to this case?

13      A.    There were 143 rounds of ammunition.

14      Q.    And were they all the same manufacturer?

15      A.    No.  They were not.

16      Q.    Were they all the same caliber?

17      A.    They were all the same caliber.

18      Q.    So would all 143 rounds that you received in the lab

19  operate in the gun, the 40-caliber gun which is Government's

20  Exhibit No. 73?

21      A.    That's correct.  They are the proper caliber to

22  function in the pistol.

23      Q.    And finally in your expert opinion is Government's

24  Exhibit 73, the 40-caliber gun, is that capable of expelling a

25  projectile by the action of an explosive?

Direct Examination of Erich Smith by Mr. Schneider

1        A.   Yes.  It is.

2        Q.   And you found it to be operable?

3        A.   Yes.

4        Q.   And just one final question.  Could you just identify

5    the exact make and model of this firearm?

6        A.   Sure.  It's a Springfield Armory Model XD 40.

7        Q.   And that's 40-caliber?

8        A.   It is a 40-caliber.  Yes.  .40 Smith & Wesson.

9        Q.   And what type of pistol is it as far as is it

10   automatic, semiautomatic?

11       A.   Okay.  It's a semiautomatic pistol.  So basically the

12   way a semiautomatic pistol works with one single pull of the

13   trigger it will fire one time, but as long as there's another

14   cartridge in the magazine it will load that cartridge but it

15   will not fire it until you pull the trigger again or you've run

16   out of ammunition.

17       MR. SCHNEIDER:  Pass the witness, Your Honor.

18       MR. BOYD:  No questions.

19       THE COURT:  You may step down, sir.  You may be excused.

20       MR. FRAZIER:  Government's next witness will be Ronald

21   Stamper.

22       (The witness was sworn.)

23                        DIRECT EXAMINATION

24   BY MR. FRAZIER:

25       Q.   And would you please introduce yourself to the ladies

1  and gentlemen of the jury?

2      A.   Ronald Stamper.

3      Q.   How are you employed?

4      A.   I'm a federal servant with Fort Hood, Texas.  I'm the

5  chief of force protection there.

6      Q.   And what is force protection at Fort Hood?

7      A.   It's the umbrella agency that has the antiterrorism

8  officers, emergency management officers and the intelligence.

9      Q.   Okay.  And what's your responsibilities at Fort Hood?

10     A.   Mainly establishing the security of the post and

11 coordinating all the different security elements on the post

12 and with the locals.

13     Q.   All right.  And when you say the locals, you're

14 talking about the areas outside of post like Killeen, Copperas

15 Cove, Harker Heights?

16     A.   Yes, sir.  Cities, counties and state.

17     Q.   All right.  And would -- as far as force protection

18 is concerned at Fort Hood, are there different levels of force

19 protection in terms of readiness at Fort Hood at any given

20 time?

21     A.   Yes, sir.  Within our regulation we have force

22 protection conditions, alpha being the lowest -- or normal

23 being the lowest.  Excuse me.  And then Alpha, Bravo, Charlie

24 and Delta increase significantly as our threat increases.

25     Q.   All right.  And if an event occurred outside of post

1    in a restaurant where a destructive device went off during a

2    lunch hour where soldiers might be present or are present,

3    would that cause a reaction on the part of Fort Hood regarding

4    the force protection threat level?

5        MR. BOYD:  Your Honor, I'm going to object as to this

6    answer.  It calls for speculation for an event that just simply

7    didn't happen.  It is inappropriate for him to comment on

8    something that just simply didn't happen.

9        MR. FRAZIER:  And again, Your Honor, it's an element of

10   Count One of the offense.  Congress said it's an element.

11       THE COURT:  Objection overruled.

12   BY MR. FRAZIER:

13       Q.   What would happen to the -- if an event like that

14   happened, what would be the reaction of Fort Hood regarding the

15   force protection level?

16       MR. BOYD:  Your Honor, could I please have the jury

17   instructed as to the purpose of the answer?

18       THE COURT:  To prove one of the elements of the

19   government's charges.

20   BY MR. FRAZIER:

21       Q.   You can answer the question.

22       A.   With an incident that would have occurred that close

23   to Fort Hood, my recommendation to the senior commander would

24   have been to go to force protection condition Delta.

25       Q.   And what happens when that recommendation of Delta is

Direct Examination of Ronald Stamper by Mr. Frazier ——451 ——

1  put into place?

2      A.   Automatically we close the installation access

3  control points and we start inspecting every vehicle that comes

4  onto the installation, and that includes any briefcases,

5  packages, anything inside that vehicle also.  We reduce the

6  number of access control points so we can only bring in

7  essential personnel and emergency personnel.  Everybody else is

8  turned away at the gate at Delta mainly because it takes so

9  much manpower just to search the folks we need to get in and

10  run the installation.

11      Q.   All right.

12      A.   All nonessentials are sent home and normally we'll

13  back up traffic on the highway system for miles in both

14  directions probably within 15, 20 minutes.  That's why we have

15  to coordinate with the Texas DPS and the local law enforcement

16  folks to let them know what's going on --

17      Q.   All right.

18      A.   -- mainly for the safety reasons.

19      Q.   All right.  Now, let me start with the communication

20  aspect of this.  If Delta's imposed and the post is closed,

21  what type of communication responsibilities are kicked in?  Who

22  is communicated with regarding post closure?

23      A.   Initially with our local liaison team which consists

24  of my office, department of emergency services, our police

25  folks, fire department, we would start notifying all the local

Direct Examination of Ronald Stamper by Mr. Frazier ——452——

1    law enforcement agencies, the local school, we would coordinate

2    with the County sheriff's offices, Coryell and Bell.  We would

3    let the Texas DPS know through our point of contact there and

4    then if that incident of that nature would have occurred I

5    would also picked up the phone and called the FBI in Austin and

6    informed them what was going on and what we were doing to

7    counteract that.  With the closing of the gates we also turn

8    away all cargo vehicles that would normally come in and deliver

9    for at least 24 hours and then up to three days while we're on

10   Delta and the only cargos that we would allow in after the

11   first day would be things that were detrimental if they didn't

12   come in for the deployment of troops.

13       Q.   All right.  Let me go back to the communication for

14   just a second.  Once you make the initial communication -- and

15   what are the -- outside the local law enforcement agencies you

16   mentioned there's some folks on post that would need to be

17   notified so they could respond to do other notifications.  Who

18   are the post law enforcement entities?

19       A.   Post law enforcement the DES.  They would notify all

20   the local law enforcement agencies within our area.  Our fire

21   department chief would start notifying the fire department

22   folks because we have MOAs and MOUs with the local fire

23   fighters.  So we would --

24       Q.   You mean memo of understanding?

25       A.   Memo -- yes, sir.  I'm sorry.

Direct Examination of Ronald Stamper by Mr. Frazier ——453——

1      Q.   And DES stands for director of emergency services?

2      A.   Yes, sir.

3      Q.   Okay.

4      A.   Our DES has our police force and our fire department

5    inside of it.

6      Q.   Okay.

7      A.   So DES has both of those and you have a chief for the

8    police and a chief for the fire department with one colonel

9    that runs it.  But they have to notify all the locals.  The

10   fire department because we may or may not be able to meet the

11   commitments in our MOUs or MOAs because of the higher threat

12   condition.

13     Q.   Right.

14     A.   The local law enforcement because the traffic being

15   backed up and everybody being pushed out into their

16   communities.  And then Texas DPS also because 190 runs through

17   Fort Hood so it backs up in both directions for miles within a

18   few minutes.

19     Q.   All right.  And what about CID?  Criminal

20   Investigation Division?

21     A.   The CID would notify their counterparts at other

22   installations if we think that the threat is targeted towards

23   more than one installation.  They would also even if the

24   threat's local to us put out a report that would go out to the

25   other CIDs so they would be aware of what was happening so they

Direct Examination of Ronald Stamper by Mr. Frazier — 454 —

1    could look for the same type of actions at their military

2    installations.  So that gets blasted across pretty much all CID

3    offices when they put out their reports.

4         Q.   Does that mean every CID office in the United States

5    would get the reports?

6         A.   They're going to get the message.  Yes.

7         Q.   It's a communication from Fort Hood, Texas to other

8    military installations outside of the State of Texas?

9         A.   Yes, sir.  It would go up to their headquarters and

10   then come back down to the installations.

11        Q.   And there's a number of installations outside of Fort

12   Hood that would get that communication?

13        A.   Oh, yes, sir.

14        Q.   Okay.  Now, you mentioned something about cargo and I

15   want to come back to that.  What would happen to cargo

16   regarding cargo shipments during Delta at the main gate?

17        A.   Well, the first 24 hours we turn all cargo away.

18   It's very confusing at the gates when you have multiple

19   vehicles being searched, multiple cars coming in.  So all the

20   cargo trucks are turned away for the first day where we try to

21   figure out what's going on and what the threat is.

22        Q.   Okay.  Does that include cargo not just from within

23   the State of Texas but also cargo delivering from outside --

24        A.   Anything that comes to the door for the first day's

25   turned away, sir.

Direct Examination of Ronald Stamper by Mr. Frazier ——455—

1      Q.   And that would include cargo shipments from outside

2   the State of Texas?

3      A.   Yes, sir.

4      Q.   Okay.

5      A.   After the first 24 hours we would coordinate with our

6   director of logistics to see if there's anything that he needs

7   delivered on its way in that would affect deployment of troops.

8   So if there's a shipping company in a semitruck coming in, we'd

9   allow that truck in but they're escorted from the gate to the

10  point where they're doing their drop-off and back out.  Any

11  vehicles from FedEx, UPS, DHL, they're all going to be turned

12  away for as long as we're at Delta because they make multiple

13  stops and we cannot control that vehicle and you don't really

14  know what it's bringing onto the installation.

15     Q.   So in other words those private carriers are --

16  during Delta are turned away the entire time just because they

17  make frequent trips to Fort Hood?

18     A.   Yes, sir.

19     Q.   And do they routinely carry shipments from outside

20  the State of Texas for delivery onto Fort Hood?

21     A.   Yes, sir.  Because of the way we even order our

22  supplies, each office has its own pot of money that they work

23  through E-Mall which is the GSA web site that we use to buy

24  things.

25     Q.   And GSA, how do they acquire these things for sale or

1  for purchase by Fort Hood?

2      A.   They -- through the E-Mall system they spread it out

3  amongst different commercial businesses so you don't focus on

4  just one business to give all your business to in the Army.  So

5  by going through E-Mall I may order paper and it may come in

6  from California.  I may order pens and it could come in from

7  Oregon.  You just don't know.  It's however they package it by

8  spreading your business around.

9      Q.   And again all of these -- these businesses are not

10  just in the State of Texas.  They're throughout the United

11  States --

12      A.   Yes, sir.

13      Q.   -- in other states and they're -- whose products are

14  being shipped to Fort Hood through GSA?

15      A.   Yes, sir.

16      Q.   And as a result of Delta, that is stopped during

17  the --

18      A.   Yes, sir.  That's stopped completely until we go at

19  least to FB Con Charlie.

20      Q.   Okay.  Now, what is the effect of traffic on the

21  interstate highway or U.S. Highway 190 -- when Delta is in

22  place what happens to cargo -- interstate shipments of cargo on

23  18-wheelers when the post is closed?

24      A.   Well, in the past, sir, when we've had major

25  incidents where we're at Delta for more than one or two days

Direct Examination of Ronald Stamper by Mr. Frazier ——457——

1   we've actually coordinated with the Texas DPS and they've put

2   out their automated signs trying to divert some of the cargo

3   trucks around the 190 section that goes through Fort Hood

4   because they know it's going to be bumper to bumper.  An

5   example of -- if you go back to the 911 time frame to get just

6   from Killeen to the front gate of Fort Hood about a six-mile

7   trip could take five or six hours because it's that bumper to

8   bumper traffic and that goes all the way back two towns all the

9   way back into Harker Heights and it'll go all the way into

10  Cove, Copperas Cove on the other side.

11      Q.   Okay.

12      A.   So they didn't want the trucks sitting there

13  especially if they have haz mat.  So we try to divert them

14  through another loop or another small highway.

15      Q.   And these are 18-wheelers --

16      THE COURT:  Mr. Frazier, don't you think you've pretty

17  much made your interstate commerce evidence requirement?

18      MR. FRAZIER:  Yes, sir.  I'll pass the witness.

19      THE COURT:  Thank you.

20      Any questions?

21      MR. BOYD:  Your Honor, I don't have any questions of this

22  witness.  I would just ask for an in limine instruction in

23  regards to the jury.

24      THE COURT:  You may step down, sir.

25      THE WITNESS:  Thank you, sir.

1    MR. FRAZIER:  Next witness, Your Honor, would be Tony

2 McRae.

3    THE COURT:  How long will this witness take, Mr. Frazier?

4    MR. FRAZIER:  It's just a predicate for a recording.  It's

5 from the jail.  I think he may be upstairs.  They're bringing

6 him down.

7    THE COURT:  Well, your intention is to call the witness

8 and play a recording?

9    MR. FRAZIER:  Yes, sir, but it's a fairly short recording

10 about four minutes.  About four minutes in length.  Yes, sir.

11    MARSHAL:  That witness stepped out.

12    MR. FRAZIER:  He's in the rest room.

13    THE COURT:  Let's take our afternoon recess at this point.

14    LAW CLERK:  All rise.

15    (Jury exited the courtroom at 3:21.)

16    LAW CLERK:  Court will stand in recess for 20 minutes.

17    (A break was taken from 3:25 to 3:43.)

18    LAW CLERK:  All rise.

19    (The jury entered the courtroom at 3:43.)

20    THE COURT:  Be seated, everyone.

21    MR. FRAZIER:  Tony McRae will be our next witness, Your

22 Honor.

23    (The witness was sworn.)

24                          DIRECT EXAMINATION

25 BY MR. FRAZIER:

1    Q.   And would you please introduce yourself to the ladies

2  and gentlemen of the jury?

3    A.   Lieutenant Anthony McRae.  I work for McLennan County

4  Sheriff's Office.

5    Q.   And do you work at the McLennan County Jail?

6    A.   Yes, sir.

7    Q.   What are your duties there at the jail?

8    A.   Lieutenant over security, administrative duties over

9  McLennan County jail.

10   Q.   All right.  And are you one of the custodians of the

11 jail telephone system -- monitoring system the jail has for

12 telephone calls?

13   A.   Yes, sir.  I am.

14   Q.   And are you -- that is, you have care, custody and

15 control of the recording equipment and the calls that are

16 recorded on it?

17   A.   Yes, sir.

18   Q.   What type of system does McLennan County use to

19 record telephone calls?

20   A.   McLennan County Sheriff's Office jail uses Global Tel

21 Link.  It's a monitoring system that records all completed

22 calls made from inside our facility to outside by inmates.

23   Q.   All right.  And where does it record to?

24   A.   Records to the main frame there at the jail.

25   Q.   Is it backed up at another location?

1    A.    Yes, sir.  I believe it is by GTL.

2    Q.    Okay.  Do you have access to the hard drive of that

3  recording equipment?

4    A.    No, sir.

5    Q.    I mean not at the GTL but at the McLennan County

6  Jail?

7    A.    Oh, yes, sir.  Yes, sir.

8    Q.    Okay.  And are you able to -- that is, if you wanted

9  to access it to make a copy of a particular telephone call,

10  could you do that?

11    A.    Yes, sir.

12    Q.    And are the recordings that are done on the Global

13  Tel system, are they done in the regular course of business at

14  the McLennan County Jail?

15    A.    Yes, sir.

16    Q.    And is the recording equipment, does it accurately

17  record the statements or calls being made between persons at

18  the jail and outside the jail?

19    A.    Yes, sir.

20    Q.    And is the -- is it part of the business of McLennan

21  County Jail to keep these recordings in the regular course of

22  business?

23    A.    Yes, sir.  It is.

24    Q.    And are they made at or near the time -- in fact are

25  they recorded instantaneously as the conversation takes place?

1      A.   Yes, sir.

2      Q.   And is it a complete -- have you had a chance to look

3  at Government's Exhibit No. 149 which I'm putting up on this

4  screen here prior to coming into court today?

5      A.   Yes, sir.  Those are my initials and today's date.

6      Q.   Okay.  And you've had a chance to record it?

7      A.   Yes, sir.

8      Q.   And likewise is there -- does the recording itself

9  it's an audio recording with a transcript on it, correct?

10     A.   Yes, sir.

11     Q.   Have you had a chance to review the transcript as the

12 recording plays?

13     A.   I have.

14     Q.   Is it a fair and accurate representation of the

15 recording that takes place?

16     A.   It is.

17     Q.   And likewise do you recognize the voices on the

18 recording?

19     A.   I do.

20     Q.   And who is the male voice on the recording marked

21 149?

22     A.   That's inmate Abdo.

23     Q.   Naser Jason Abdo?

24     A.   Yes, sir.

25     Q.   And was there another voice on the recording as well?

1   A female voice?

2         A.    Yes, sir.

3         Q.    And who is that?

4         A.    That's Carly Gordon the reporter from Nashville.

5         Q.    All right.  And was -- this recording 149 was made

6   when?

7         A.    November 22nd I believe.

8         Q.    Or November 20th of 2011 or 22nd or the 20th of 2011?

9         A.    Yes, sir.  11-20 of '11.  Yes, sir.

10        MR. FRAZIER:  Okay.  We'll offer 149 into evidence at this

11   time.

12        MR. BOYD:  Your Honor, no objection.

13        THE COURT:  It's admitted.

14        (Exhibit(s) admitted:  G149)

15        MR. FRAZIER:  If you could play 149 at this time.

16        THE COURT:  Did you say something about transcripts?

17        MR. FRAZIER:  I'm sorry?

18        THE COURT:  Do you have transcripts of this?

19        MR. FRAZIER:  The transcript is actually on the -- so

20   instead of handing them out it'd be easier just to read the

21   monitors.

22        (Audio played.)

23   BY MR. FRAZIER:

24        Q.    And, Lieutenant McRae, there was one word redacted in

25   there.  Other than that small redaction, was everything an

Direct Examination of Anthony McRae by Mr. Frazier ——463——

1   accurate recording of the actual telephone call that took place

2   on November the 20th, 2011?

3        A.   Yes, sir.  It is.

4        MR. FRAZIER:  That's all we have.  Pass the witness.

5        Oh, I'm sorry.  I'm sorry, Your Honor.  There is another

6   clip to this.  Before I pass the witness if we could play the

7   next clip.

8        (Audio played.)

9        MR. FRAZIER:  Now we pass the witness, Your Honor.

10       MR. BOYD:  No questions.

11       THE COURT:  You may step down, sir.

12       MR. SCHNEIDER:  The government calls Karen Anderson.

13       (The witness was sworn.)

14                      DIRECT EXAMINATION

15   BY MR. SCHNEIDER:

16       Q.   Good afternoon, Lieutenant Anderson.

17       A.   How are you?

18       Q.   Would you please introduce yourself to the members of

19   the jury?

20       A.   My name is Karen Anderson.

21       Q.   And by whom are you employed?

22       A.   The McLennan County Sheriff's Office.

23       Q.   How long have you worked there?

24       A.   For 18 years.

25       Q.   And what is your current rank there?

Direct Examination of Karen Anderson by Mr. Schneider —464—

1        A.    Lieutenant.

2        Q.    What are your responsibilities as a lieutenant at the

3    sheriff's office?

4        A.    I oversee the daily jail operations which consist of

5    feed and care of inmates.

6        Q.    So are you technically assigned to the McLennan

7    County Jail?

8        A.    Yes.  I am.

9        Q.    Are you one of the people at the jail that has care,

10   custody and control of the system that records in person jail

11   visits?

12       A.    Yes, sir.

13       Q.    Are you familiar with that system?

14       A.    Yes, sir.

15       Q.    What is the name in that system?

16       A.    View Gate.

17       Q.    Do you know where it records to?

18       A.    Yes, sir.  It records on DVRs which actually stores

19   on hard drives down at the visitation center.

20       Q.    And is that hard drive located at the jail?

21       A.    Yes, sir.  No.  It's actually located at the

22   visitation center.

23       Q.    Do you have access to the hard drive and to the

24   system?

25       A.    Yes, sir.

1    Q.   Can you tell from looking at a given video from that

2   system if it came from within the McLennan County Jail?

3    A.   Yes, sir.

4    Q.   Does the jail keep video surveillance of visits in

5   the regular course of its business?

6    A.   Yes, sir.

7    Q.   Is it part of the McLennan County Jail's normal

8   business routine to accurately record jail visits?

9    A.   Yes, sir.

10   Q.   Is the video recorded at the time of the visit or at

11  least very close to that time?

12   A.   Yes, sir.

13   Q.   Does the system have both audio and video components

14  to the recording?

15   A.   Yes, sir.  It does.

16   Q.   And were you asked to provide a surveillance -- a

17  video clip of an in jail visit?

18   A.   Yes, sir.

19   Q.   And have you seen Government's Exhibit No. 150

20  before?  Have you previously reviewed a CD containing the video

21  and audio of a jail visit concerning the defendant?

22   A.   Yes, sir.  I have.

23   Q.   And did you review the entire visit?

24   A.   Yes, sir.  I did.

25   Q.   Did you also review it in regards to a transcript?

1    A.   Yes, sir.  I did.

2    Q.   And did you compare the transcripts and the video?

3    A.   Yes, sir.

4    Q.   And was it accurate?

5    A.   Yes, sir.

6    Q.   Was the video a fair and accurate portrayal of the

7  visit?

8    A.   Yes, sir.

9    MR. BOYD:  No objection.

10   THE COURT:  It's admitted.

11   MR. SCHNEIDER:  Your Honor, the government moves Exhibit

12  150 into evidence.

13   THE COURT:  It's admitted.

14   (Exhibit(s) admitted:  G150)

15  BY MR. SCHNEIDER:

16   Q.   Now, in pulling this video, were you able to verify

17  which inmate was involved in this video, who's shown in the

18  video?

19   A.   Yes, sir.  I was.

20   Q.   Which inmate was that?

21   A.   Naser Abdo.

22   Q.   And have you previously seen him in the jail?

23   A.   Yes, sir.  I have.

24   Q.   Did you know what he looked like prior to pulling the

25  video?

1    A.   Yes, sir.  And we always take a picture down there

2  when we pull video.

3    Q.   Okay.  And are you able to tell from the computer

4  system who the other participant in the conversation is?

5    A.   Yes, sir.

6    Q.   And who was it in this video?

7    A.   It was his mother.

8    Q.   Now, when you have an in jail visit, an in person

9  jail visit, is there any policy for notification to the people

10  that are in the audio and video that their conversations will

11  be recorded?

12    A.   Yes, sir.  At visitation we actually have signs

13  posted in the visitation area and in the lobby.

14    MR. SCHNEIDER:  Okay.  If we can play Clip No. 1.

15    (Video played.)

16  BY MR. SCHNEIDER:

17    Q.   And before we go to the next clip, one question,

18  Lieutenant Anderson.  Can you tell from that video what the

19  date of that visit was?  We can put it up on the next video.

20  Is there a time stamp on the video or a date stamp?

21    A.   Yes, sir.

22    MR. SCHNEIDER:  So if we play the next clip.

23    (Video played.)

24  BY MR. SCHNEIDER:

25    Q.   So, Lieutenant Anderson, were you able to tell what

1   the date stamp or time stamp of the visit was?

2       A.   Yes, sir.  It was July 30th, 2011.

3       Q.   Okay.  Thank you.

4       MR. SCHNEIDER:  If we can play the next clip.

5       (Video played.)

6       MR. SCHNEIDER:  And if we could play the next clip.

7       (Video played.)

8       MR. SCHNEIDER:  And the next clip, please.

9       (Video played.)

10      MR. SCHNEIDER:  And can we play the next clip?

11      (Video played.)

12      MR. SCHNEIDER:  And can you play the next clip, please?

13      (Video played.)

14      MR. SCHNEIDER:  One more clip.

15      (Video played.)

16      MR. SCHNEIDER:  Pass the witness, Your Honor.

17      MR. BOYD:  No questions, Your Honor.

18      THE COURT:  You may step down, ma'am.

19      MR. SCHNEIDER:  The government calls Richard Stryker.

20      (The witness was sworn.)

21                      DIRECT EXAMINATION

22   BY MR. SCHNEIDER:

23      Q.   Good afternoon, Agent Stryker.

24      MR. BOYD:  Your Honor, may we approach briefly?

25      THE COURT:  Surely.

1        (On-the-record bench conference, to wit:

2        MR. BOYD:  Your Honor, at the appropriate time I'm going

3    to anticipate we need to object to the evidence outside the

4    presence of the jury in regards to what I believe is going to

5    be a video that the government's going to try and offer through

6    this witness in regards to the detonation of a device, and I

7    don't know if the Court wants me to do that now or if the Court

8    wants me to wait.

9        THE COURT:  Is that what you're going to do?

10        MR. SCHNEIDER:  Judge, we're going to be putting in a

11    video that we discussed during the motion in limine because

12    it's part of our case and we have to prove one of the elements

13    of what would have happened if the bomb had in fact been

14    detonated.  We have our FBI re-enactment of the bomb.

15        MR. BOYD:  And I would like the ability to take him on

16    voir dire outside the presence of the jury before the Court

17    makes that determination.

18        THE COURT:  For what purpose?

19        MR. BOYD:  To establish the fact that what they created is

20    not in fact close to what the device that would have been built

21    was.  It's a complete misrepresentation.  Its probative value

22    substantially outweighs the dangers.

23        THE COURT:  Okay.  All right.

24        (End of bench conference.)

25        THE COURT:  Ladies and gentlemen, I'm going to ask you to

Voir Dire Examination of Richard Stryker by Mr. Boyd —470—

1    step out to the jury room for just a moment, please.  I need to

2    take up a legal matter.

3        LAW CLERK:  All rise.

4        (Jury exited the courtroom at 4:20.)

5        THE COURT:  Be seated, everyone.

6        You want to voir dire the witness, Counsel?

7        MR. BOYD:  Yes, Your Honor.

8                        VOIR DIRE EXAMINATION

9    BY MR. BOYD:

10       Q.   Mr. Stryker, what is your full name?

11       A.   Richard Nicholas Stryker.

12       Q.   And are you someone that the government purports to

13   be an expert in regards to creating and -- creating, testing

14   and testifying regarding explosive devices?

15       A.   The term expert's usually left up to a court to

16   decide, but I am a trained and qualified forensic examiner.

17       Q.   And is it -- in this case were you asked to do some

18   things for the U.S. government?

19       A.   Yes.

20       Q.   And was one of those things that you were asked to do

21   to build a device and test it?

22       A.   Yes.

23       Q.   And when you built and tested that device, the device

24   that you built and tested you built and tested using your

25   expert knowledge, right?

1      A.   I used primarily the information that was contained

2    in the Inspire magazine article which was part of the evidence

3    that was submitted.  I didn't just decide what to do on my own

4    or with my knowledge and experience.

5      Q.   But you didn't use only the information contained in

6    the Inspire magazine knowledge?

7      A.   Primarily that information.

8      Q.   But, sir, you didn't use only the information

9    contained in the Inspire magazine article, did you?

10      A.   Not to the strict sense of only.  No.

11      Q.   You added to it?

12      A.   Can you tell me what you mean by added to it?

13      Q.   You used your own expertise in fashioning the device

14    that you tested and that you built and that you created?

15      A.   I'm not really sure what you mean.  I mean, I used

16    primarily that information which is readily -- I mean, it

17    teaches somebody who doesn't know much about it and that's what

18    I used as my guide.  As far as adding to it, I don't really

19    know what substantive issue you may be referring to that would

20    only allow somebody with a great deal of experience or

21    expertise to lend to that.

22      Q.   Sir, I'm just trying to understand if you built the

23    device exactly as it was portrayed in the article or if you

24    built the device differently than was portrayed in the article.

25      A.   There may have been some slight differences, but the

Voir Dire Examination of Richard Stryker by Mr. Boyd —472—

1    article itself gave some leeway and the article itself did not

2    specify necessarily every minute step.  I think it leaves

3    something to common sense.

4         Q.   The article was pretty specific.

5         THE COURT:  Is that a question?

6    BY MR. BOYD:

7         Q.   Wasn't it?

8         A.   There was some specificity with the article.  That's

9    correct.

10        Q.   And for instance you changed the ignition device?

11        A.   We did for safety reasons.

12        Q.   Well, you changed the ignition device, didn't you?

13        THE COURT:  He just answered that.

14   BY THE WITNESS:

15        A.   We changed it.  Yes.

16   BY MR. BOYD:

17        Q.   Now, when you changed the ignition device, you didn't

18   change it to something that was like a filament.  You changed

19   it to an electric match, right?

20        A.   It's the functional equivalent.  It is like a

21   filament.

22        Q.   Well, an electric match has the power to set off a

23   blasting cap, right?

24        A.   That doesn't make sense to me.  Can you be a little

25   bit more specific?

1      Q.   Electric match generates far more power than the

2   filament of a light bulb?

3      A.   I would disagree with that.

4      Q.   Okay.

5      A.   It creates heat and that's also what a filament does.

6   The filament is typically a metal like tungsten which burns

7   extremely intensity on the order of several thousand degrees

8   for an instantaneous moment.  So the filament is actually a

9   stronger source of heat.  There's just -- there's just nuances

10  or differences in a filament and electric match but essentially

11  they're the same thing.  For instance in a blasting cap one

12  could have a bridge wire to ignite the more sensitive mixtures

13  like a lead azide or lead styphnate or an electric match.  It

14  does the same purpose.  In fact in detonators or blasting caps

15  you have one or the other.  They're both doing the same thing.

16     Q.   Did you test the filament of the lights to determine

17  what they were made of?

18     A.   No.

19     Q.   So you don't know what they were made of and you

20  don't know what temperature they reached.  You essentially just

21  know that these Christmas lights were Christmas lights?

22     A.   And I know that lights like those the filament gets

23  extremely hot in the order of several thousand degrees.

24     Q.   With respect to -- you built a device that just

25  simply didn't exist in this case, correct?

1      A.   We built a device with the components that existed in

2   this case.

3      Q.   But you're aware that no device existed, right?

4      MR. SCHNEIDER:  Objection, Your Honor.  This has nothing

5   to do with the voir dire of the witness for his expert on this

6   matter.

7      THE COURT:  Sustained.

8   BY MR. BOYD:

9      Q.   When you built this device and tested it, you

10  intended it to be used and viewed by a jury?

11     A.   I knew that it was going to be, yes, or likely to be

12  depending on whether the Court allowed it.

13     Q.   And rather than using information that was just

14  available to Mr. Abdo, you did interject some expert experience

15  into the creation of that device?

16     MR. SCHNEIDER:  Objection, Your Honor.  Asked and

17  answered.

18     THE COURT:  Sustained.

19  BY MR. BOYD:

20     Q.   For instance, you didn't add sugar to the mix, did

21  you?

22     A.   It wasn't called for.

23     Q.   And furthermore --

24     MR. BOYD:  Would you bring up Page 34 of No. 67?

25  BY MR. BOYD:

Voir Dire Examination of Richard Stryker by Mr. Boyd —475—

1      Q.    In this instance there is a call for sugar as

2    indicated on Page 34 of this document, right?

3      A.    Yes, sir, as it pertains to the pyrotechnic mixture

4    on match heads.

5      Q.    Okay.  Now, with respect to the rest of the article,

6    nowhere in the rest of the article does it indicate you

7    shouldn't apply sugar?

8      A.    I'm not aware of the reference to sugar being used

9    pro or con for the rest of the article.

10     Q.    Okay.  Are you aware that there was sugar found at

11   the scene?

12     A.    Yes.

13     Q.    Okay.  Furthermore, whether or not sugar was added is

14   a factor that would affect whether or not the device

15   functioned?

16     A.    Not necessarily.

17     Q.    But you didn't test it so you wouldn't know?

18     A.    I would think that most people would realize that gun

19   powder or smokeless powder does not need to have sugar added.

20   It's not added to cartridge casings.  It's not any formula for

21   reloaders.  It's not needed.  I mean, it's just so basic I

22   don't really know where to go with this.

23     Q.    Additionally you're aware that the article calls for

24   the creator of whatever device gets created to fill up the

25   pressure cooker with the inflammable material, right?

1     A.   To fill it up?  I'm not necessarily familiar with

2  that.

3     MR. BOYD:  Please bring up Page 40 of Exhibit 67.

4  BY MR. BOYD:

5     Q.   Here it states the pressurized cooker is the most

6  effective method.  Glue the shrapnel to the inside of the

7  pressurized cooker.  Then fill in the cooker with the

8  inflammable material.

9     That says to fill in the cooker, right?

10     A.   It says to fill in the cooker.  This article is rife

11  with many improper sentence structure grammatical errors.  In

12  this one it says fill in.  To me that means to put it in.  It's

13  not necessary to fill it to the top.  So that instruction to me

14  essentially says put in whatever powder you have.  The article

15  also refers to the fact that using match heads is not generally

16  a good idea if you're going to use a pressure cooker because it

17  would take a heck of a lot of matches to, you know, get a

18  substantial quantity of them for that volume.  It doesn't

19  specify what level to fill it to.  It doesn't specify how much

20  powder to have.  It depends.  All you need to do is fill the

21  vessel, whatever it is, pipe, pressure cooker, with sufficient

22  powder that when it turns from a solid to a gas it overcomes

23  the holding pressure of that container and I think the article

24  does specify that you need to have a container that's strong

25  enough to hold that pressure briefly enough to cause an

1  explosion.

2      Q.  It's fair to say that you didn't fill up the pressure

3  cooker with material?

4      MR. SCHNEIDER:  Objection, Your Honor.  That's been asked

5  and answered.

6      THE COURT:  Sustained.

7  BY MR. BOYD:

8      Q.  The placement of the ignition source.  Where does it

9  indicate in this article the placement of the ignition source?

10     A.  It doesn't.  There's a picture there with it looks

11 like a Christmas tree bulb in -- I don't really know what model

12 pressure cooker this is, but it looks like the lid or the top.

13     Q.  Now, the item that you built didn't have a placement

14 of the ignition source at the top, did it?

15     A.  We did not put our ignitor at the top.  That's

16 correct.

17     Q.  In fact, you put the ignition source at the bottom?

18     A.  We did.

19     Q.  And you did that based on your knowledge and

20 expertise?

21     A.  Again, one does not have to have really any sort of

22 knowledge or expertise to discern that the ignition source has

23 to be in contact with the powder that's in there.  So if you're

24 going to put it at the top, you would either have to have

25 sufficient quantity so that it touched it or you simply turn it

Voir Dire Examination of Richard Stryker by Mr. Boyd —478—

1   on its side or flip it over.  I mean, it's -- again it's --

2   it's extreme common sense.  No matter where you put it, you're

3   going to want your powder in contact with it.

4       Q.  But you're relying on some degree of expertise in

5   building a device?

6       A.  I wouldn't call it expertise again.  I would call it

7   common sense again.  The whole purpose of this article is to

8   allow somebody with minimal or no experience in building

9   explosive devices to use readily available materials and easily

10  assemble these things.

11      Q.  And if you had put it through the top as they had

12  said, there's a very real possibility that the device that you

13  built wouldn't have functioned?

14      A.  There is that possibility.  However, it does not make

15  it any less of a potential hazard.

16      Q.  And by your own testimony, this is a pretty

17  sophomoric design for an explosive device?

18      MR. SCHNEIDER:  Objection, Your Honor.  This has nothing

19  to do with the voir dire of the witness for this testimony.

20      THE COURT:  Sustained.

21  BY MR. BOYD:

22      Q.  If you hadn't added your expertise in creating this

23  device, there is a very real possibility that the demonstration

24  that you purport to show to this jury would have failed?

25      MR. SCHNEIDER:  Objection, Your Honor.  He's already asked

1   this question.

2        THE COURT:  Sustained.

3   BY MR. BOYD:

4        Q.   You only built one device, not two, correct?

5        A.   For the full demonstration, yes.

6        Q.   And had you built two devices based on the same

7   amount of material available, the result would have been

8   different as well?

9        A.   There's the possibility that there could have been a

10  different effect.

11       Q.   Pretty substantial possibility?

12       A.   That there would have been a difference?  There would

13  have been a difference.  I don't know how substantial of a

14  difference there would have been, but when you change some

15  variable in the equation you're going to have some different

16  effect.

17       Q.   And even with all of these changes -- well, let me go

18  back.  You didn't use a clock, nail, wire electrical system,

19  did you?

20       A.   We did not use a nail.

21       Q.   And that is clearly called for in this article,

22  correct?

23       A.   It talks about using it.  Doesn't say that it's

24  necessary.

25       Q.   And you're a scientist, correct?

1      A.   I'm a forensic scientist.  Yes.

2      Q.   And so part of the science is being very precise?

3      MR. SCHNEIDER:  Objection, Your Honor.  This witness has

4  testified about the preciseness of the article and that it

5  leaves different options.

6      THE COURT:  I think that's correct and I think you've

7  about gone as far as you can go, Counsel.

8      MR. BOYD:  Then just one last question, Your Honor.

9  BY MR. BOYD:

10     Q.   What we see in the video that you're trying to show

11 to the jury is a deflagration, correct?

12     A.   There's two effects.  There's the -- there's a

13 mechanical -- there's an explosion caused by a deflagration.

14     Q.   Well, we see the effects of the deflagration when we

15 see the powder burn and that's actually the deflagration,

16 right?

17     A.   The powder burning is the deflagration.  That's

18 correct.

19     MR. BOYD:  Nothing further.

20     Your Honor, I would offer now in regards -- well, I'll

21 wait for cross-examination.  If they choose to cross-examine,

22 then I'll make my offer.

23     THE COURT:  They're not going to cross-examine.

24     MR. BOYD:  Yes, sir.

25     THE COURT:  You're going to make your objection I guess.

1        MR. BOYD:  Yes, Your Honor.  Let me make my objection for

2   the record.  Your Honor, I believe that any video shown, any

3   testimony offered in relation to any device built or tested

4   expressly for the purposes of this trial and demonstrating to a

5   jury that the probative value is substantially outweighed by

6   the dangers of unfair prejudice, confusing the issues to the

7   jury, misleading the jury.  It's highly speculative in nature.

8   They built a device that didn't -- simply didn't exist and

9   would be a waste of time.  And I would ask that anything

10  relating to the video or testimony in regards to the results of

11  any device built or tested or analyzed in preparation for this

12  trial be excluded from the jury.

13       THE COURT:  That would be completely overruled.

14       Bring the jury back in.

15       THE BAILIFF:  All rise.

16       (The jury entered the courtroom at 4:43.)

17       THE COURT:  Be seated, everyone.

18                      DIRECT EXAMINATION CONTINUED

19  BY MR. SCHNEIDER:

20       Q.   So once again good afternoon, Agent Stryker.

21       A.   Good afternoon.

22       Q.   Will you please introduce yourself to the jury?

23       A.   My name is Richard Stryker.  I work in the FBI

24  laboratory as a hazardous device forensic examiner.  I'm also a

25  supervisory special agent.  I've been there for approximately

Direct Examination of Richard Stryker by Mr. Schneider -482-

1  nine years.

2      Q.   How long have you been with the FBI?

3      A.   Approximately 14 and a half years.

4      Q.   And prior to joining the FBI what, if any, background

5  work did you do?

6      A.   Prior to joining the FBI I was in the Navy.  I served

7  as a -- both a surface warfare officer on a guided missile

8  destroyer as well as an explosive ordnance disposal officer in

9  the Navy both as an active duty officer and a reserve officer.

10     Q.   And how long did you do that?

11     A.   Combined active and reserve approximately eight

12 years.

13     Q.   And you said you joined the FBI in what year?

14     A.   1997.

15     Q.   And when you joined, you joined as a -- what was your

16 position?

17     A.   I joined as a special agent.  So I received basic

18 special agent training at Quantico and then was assigned to the

19 Philadelphia field office.

20     Q.   And how long were you there?

21     A.   Approximately five and a half, six years.

22     Q.   And were you assigned somewhere else after

23 Philadelphia?

24     A.   Yes.  After Philadelphia I applied for a position a

25 promotion to the FBI laboratory and received that position.

Direct Examination of Richard Stryker by Mr. Schneider –483

1    Q.   And where is the FBI laboratory?

2    A.   It's in Quantico, Virginia.

3    Q.   And in applying for and receiving that position did

4    you undergo any specialized training?

5    A.   Yes.  I did.  To become a qualified forensic examiner

6    it takes approximately two years of intensive working with

7    several examiners with their evidence, with their experience

8    and knowledge, taking several oral boards, getting many items

9    signed off and a qualification booklet and also attending a

10   great deal of training.

11   Q.   Now, prior to FBI you mentioned your naval experience

12   in EOD.  Can you explain what EOD is?

13   A.   Yes.  EOD stands for explosive ordnance disposal.

14   All branches have EOD technicians and officers and our primary

15   job is to locate, render safe and/or destroy or dispose of all

16   ordnance from something that's very small on up to nuclear

17   weapons.

18   Q.   And what kind of training did you receive when you

19   were in the Navy for that position?

20   A.   I received the basic training for an EOD technician.

21   At that time it was primarily held in Indian Head, Maryland.

22   And so the Navy receives additional training to most EOD

23   technicians because we deal with underwater ordinance.  So

24   there's a great deal of emphasis on that.  So it was

25   approximately 14 months in total duration.

Direct Examination of Richard Stryker by Mr. Schneider –484–

1       Q.    As a member of the Navy were you an employee of the

2   Department of Defense?

3       A.    Yes.

4       Q.    And do you know if all members of the uniformed

5   services of the United States, whether it be the Army, Navy,

6   Air Force, Marines are employees of the Department of Defense?

7       A.    Yes.  They are.

8       Q.    Now, you said that you underwent a training period of

9   about two years to become your current position.  And what is

10  the title of your current position?

11      A.    Forensic examiner.

12      Q.    And approximately how many times during the course of

13  your employment as a forensic examiner have you tested

14  explosive devices or components of explosive devices?

15      A.    Hundreds of times.

16      Q.    And have you previously testified in court on those

17  matters?

18      A.    Yes.  I have.

19      Q.    What courts?

20      A.    Federal courts, New York, Tampa.

21      Q.    And in each of those -- how many times?

22      A.    I believe five or six.

23      Q.    And in each of those occasions were you qualified as

24  an expert witness?

25      A.    In most of them.  One of the venues did not require

Direct Examination of Richard Stryker by Mr. Schneider –485–

1    that, but yes.  In the other instances I was.

2        Q.   Based on your training and experience are you able to

3    determine the operability of a destructive device?

4        A.   Yes.  To the extent that the condition of the parts

5    allow that to be discerned.

6        Q.   And also based on your training and experience are

7    you able to determine if components are present from which a

8    destructive device may readily be assembled?

9        A.   Yes.

10       MR. SCHNEIDER:  Your Honor, at this time the government

11   offers Richard Stryker as an expert in the field of the

12   operability of destructive devices and the testing of

13   destructive devices.

14       THE COURT:  He'll be allowed to state his opinion.

15   BY MR. SCHNEIDER:

16       Q.   Now, in this case were you involved in your role at

17   the lab in testing any items?

18       A.   Yes.  I was.

19       Q.   Were there items that came to the lab in Quantico,

20   Virginia related to this case?

21       A.   Yes.

22       Q.   And how do they come into the case?  Can you

23   generally describe for the jury the process?

24       A.   They come in typically via FedEx or equivalent

25   carrier trackable comes down to our evidence control center.

Direct Examination of Richard Stryker by Mr. Schneider –486–

1    In our case they don't open up the packages because of safety

2    concerns because we're part of the explosives unit.  So they'll

3    simply start the chain of custody, assign a laboratory number.

4    It comes up to our unit where we open the evidence, check it

5    for safety, inventory it, photograph it again to the extent

6    that's possible.  Some things we can't open because we don't,

7    you know, want certain chemical residues to be evaporating

8    there on the spot.  And then we'll look at the communication

9    that accompanied the submittal of the evidence and see what the

10   contributor wants done with it.  We'll formulate an exam plan

11   which is essentially the flow of evidence, which units are

12   going to get it next, latent fingerprints, DNA, whatever.  Then

13   we'll communicate with the contributor of the evidence if we

14   see that something may conflict with one exam.  Sometimes

15   forensic exams destroy other potential exams so we want to make

16   sure that we get it right.  And then once that's established we

17   start the flow of evidence.  We transfer it to other units that

18   need to do other exams on it and then we're, you know, the last

19   ones to get it and perform the hazardous device exams.

20        Q.   So when the lab -- when the items come into the lab

21   and they're inventoried, are you part of the decision-making

22   process to see where the items go next?

23        A.   Yes.  Typically.

24        Q.   And can you describe that process and what it's

25   called?

1      A.   To develop the exam plan?

2      Q.   Yes.

3      A.   It's -- the process is again just developing the exam

4  plan.  It's an actual, you know, physical piece of paper that

5  we list in which order the items will go to, whether it's again

6  trace evidence, latent fingerprints.

7      Q.   And what was your role on the examination plan with

8  regards to the evidence in this case?

9      A.   I was the hazardous devices examiner.  So I'm going

10 to look at the components for -- depending on what condition

11 they're in.  In this case we have components that were

12 primarily unopened or unused.  So we take a look at it from

13 functionality.  Could these things be used to make a

14 destructive device or a homemade bomb, improvised explosive

15 device.  Are the necessary components for that present?  That

16 would be the first thing that we would do.

17     Q.   Now, do you recall examining the items that you

18 received from the lab?

19     A.   Yes.

20     Q.   Was that your first step in your process?

21     A.   Yes.  Essentially just kind of taking inventory for

22 what it is.  A lot of times we'll get evidence that isn't

23 really germane to what we need to do with it so we'll just kind

24 of set that aside.  We're not going to really have any need to

25 do some exams if it's, you know, DNA swabs or clothing that has

Direct Examination of Richard Stryker by Mr. Schneider –488–

1    nothing to do with a device and then, you know, I'm going to

2    look at the components that I think may have some potential for

3    use as a destructive device.

4        Q.   So when you looked at all the evidence in total did

5    you determine that there was certain relevant items that were

6    in evidence that were relevant to bomb making components?

7        A.   Yes.  I did.

8        Q.   Okay.  Now I'm going to show you on the screen, if we

9    can put up the following exhibits one by one, show you first

10   with Exhibit No. 57.  Government's 57.  And is that one of the

11   clocks that you received in the lab?

12       A.   Yes.  It is.

13       Q.   And 58.  Is that also a clock?

14       A.   Yes.

15       Q.   And received by the lab.

16       A.   Yes.

17       Q.   And we'll go in order.  59.  Are those two nine volt

18   batteries received by the lab?

19       A.   Yes.

20       Q.   And 60.  Is that black wire that you received in the

21   lab?

22       A.   Yes.

23       Q.   Item 61.  What is that?

24       A.   That's more black insulated wire 16 gauge.

25       Q.   Okay.  Now let's go to 85.  Did you receive that in

Direct Examination of Richard Stryker by Mr. Schneider -489—

1   the lab?

2        A.   Yes.

3        Q.   And what is that?

4        A.   It's a Black & Decker electric drill.

5        Q.   And 86.  Is that the box for that same drill?

6        A.   Yes.

7        Q.   Did you receive that in the lab?

8        A.   Yes.

9        Q.   And 87.  And are those drill bits that you received

10  in the lab?

11       A.   Yes.

12       Q.   88.  Did you receive that wall clock as well?

13       A.   Yes.  There were a total of four.

14       Q.   And 89.  Is that the fourth wall clock you received?

15       A.   Yes.

16       Q.   And all of the wall -- all of the wall clocks you

17  examined?  You looked at them?

18       A.   Yes.  We did.

19       Q.   Were they all the same type and brand?

20       A.   Yes.  They were.

21       Q.   And exhibits -- Government Exhibits 90 through 95.

22  Did you receive those exhibits, all bottles of smokeless

23  powder?

24       A.   We received samples from those bottles.

25       Q.   97.  Did you receive the knife and Leatherman

Direct Examination of Richard Stryker by Mr. Schneider -490

1   utility?

2       A.   Yes.  We did.

3       Q.   And 100.  Did you receive this item, the cut shotgun

4   shells?

5       A.   Yes.

6       Q.   And Exhibit -- Government's Exhibit 104.  That's

7   gorilla tape?

8       A.   Yes.  We received that as well.

9       Q.   And Item -- Government's Exhibit 105?  Did you

10  receive those batteries?

11      A.   Yes.  We did.

12      Q.   Government's Exhibit 106.  Did you receive that paint

13  brush?

14      A.   Yes.

15      Q.   Government's Exhibit No. 107.  Did you receive that

16  electrical tape?

17      A.   Yes.

18      Q.   Exhibit 109.  Did you receive those screwdrivers and

19  allen wrench?

20      A.   Yes.  We did.

21      Q.   And Exhibit 110.  Did you receive that piece to the

22  pressure cooker?

23      A.   Yes.

24      Q.   Item Government's Exhibit 111.  Did you receive these

25  two items, black and red wire?

1    A.   Yes.

2    Q.   Government's Exhibits 112 and 113.  Did you receive

3  this box of sugar and 113 a bag of sugar?

4    A.   Yes.  We did.

5    Q.   Government's Exhibit 117.  Did you receive those

6  razor blades?

7    A.   Yes.

8    Q.   Government's Exhibit 120.  Now, this shows the

9  contents of the pressure cooker that was recovered at the

10  scene.  Did you receive the contents of the pressure cooker?

11    A.   Yes.

12    Q.   And how did you receive it?  It wasn't --

13    A.   Yes.  I believe it was in a bag.

14    Q.   It wasn't contained in the pressure cooker, was it?

15    A.   That's correct.

16    Q.   And going back to Exhibit 119.  Are you able to see

17  that?  Did you receive this exhibit which was shotgun pellets

18  and powder in a plastic cup?

19    A.   I don't recall the plastic cup, but I know we

20  received the shotgun pellets and powder.

21    Q.   And Government's Exhibit 124.  This is the bottom of

22  the pressure cooker.  Did you receive the pressure cooker?

23    A.   Yes.

24    Q.   And is this the large or the small pressure cooker?

25    A.   This is the large one.

1    Q.   125.  That's the lid.  Did you receive that?

2    A.   Yes.

3    Q.   Government's Exhibit 126.  Is that the bottom of the

4  smaller pressure cooker?

5    A.   Yes.

6    Q.   And --

7    A.   The bottom circle and the lid's to the left.

8    Q.   And Exhibit 127.  Is that the lid you received?

9    A.   That's the lid.  Yes.

10   Q.   Government's Exhibit 128.  Did you receive that

11  regulator?

12   A.   Yes.

13   Q.   Government's Exhibit 129.  Did you receive the box

14  that went along with the larger pressure cooker?

15   A.   Yes.

16   Q.   Government's Exhibit 130.  That's the instruction

17  manual.  Did you receive that as well for the smaller pressure

18  cooker?

19   A.   Yes.

20   Q.   Government's Exhibit 134.  Did you receive those

21  string of lights?

22   A.   Yes.  We did.

23   Q.   Government's Exhibit 137.  Did you receive this item

24  which was a melted razor on a metal lid?

25   A.   Yes.

Direct Examination of Richard Stryker by Mr. Schneider –493

1      Q.   Government's Exhibit 138.  Did you receive the

2  contact cement at the lab?

3      THE COURT:  How many of these exhibits are you going to go

4  through, Counsel?

5      MR. SCHNEIDER:  I'm almost done, Your Honor.

6  BY MR. SCHNEIDER:

7      Q.   And finally Exhibit 144.  Did you receive the

8  cardboard boxes at the lab?

9      MR. SCHNEIDER:  Is that 144?  Yes.

10 BY MR. SCHNEIDER:

11     Q.   I don't know if you can make out.

12     A.   The Lowe's boxes?

13     Q.   Yes.

14     A.   I'd have to check my notes, but I'm not certain with

15 those.

16     Q.   Okay.  So first looking at these items that we've --

17     THE COURT:  Don't -- nope.  Nope.  Nope.  We're going to

18 stop now.  You're obviously not going to get anywhere with this

19 witness of any substance.  So we'll wait until tomorrow

20 morning.

21     We'll recess until tomorrow morning at 9:00, ladies and

22 gentlemen.  Please remember the instructions I've given you not

23 to talk with anyone about the case.  Try to prevent yourself

24 from watching anything on the media regarding the case because

25 you're the ones who have been here.  You know what's happened.

1    Anything that's reported is going to be secondhand as far as

2    you're concerned.  Have a -- get a good night's rest.  We're

3    going to try to finish up tomorrow.  See you in the morning at

4    9:00.

5         LAW CLERK:  All rise.

6         (Jury exited the courtroom at 4:59.)

7         LAW CLERK:  Court will stand in recess until 9:00 tomorrow

8    morning.

9         (Hearing adjourned at 5:00.)

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE WESTERN DISTRICT OF TEXAS

3                              WACO DIVISION

4    UNITED STATES OF AMERICA        *
                                     *
5                                    *
     VS.                             *  CRIMINAL ACTION NO. W-11-CR-182
6                                    *
     NASER JASON ABDO                *     May 24, 2012

7
        BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
8                       JURY TRIAL PROCEEDINGS
                              VOLUME 4
9
     APPEARANCES:
10
     For the Government:           Mark Frazier, Esq.
11                                 Gregg N. Sofer, Esq.
                                   Lawrence Schneider, Esq.
12                                 Assistant United States Attorneys
                                   PO Box 828
13                                 Waco, Texas 76701

14   For the Defendant:           Zachary L. Boyd, Esq.
                                   PO Box 870
15                                 Copperas Cove, Texas 76522
                                   - and -
16                                 Michael F. White, Esq.
                                   1103 N. Gray
17                                 Killeen, Texas 76541

18   Court Reporter:              Kristie M. Davis
                                   United States District Court
19                                 PO Box 20994
                                   Waco, Texas 76702-0994
20

21

22       Proceedings recorded by mechanical stenography, transcript

23   produced by computer-aided transcription.

24

25

Direct Examination of Richard Stryker by Mr. Schneider -496—

1   (May 24, 2012, 9:08, defendant present.)

2        LAW CLERK:  All rise.

3        (The jury entered the courtroom at 9:08.)

4        THE COURT:  Be seated, everyone.

5        Good morning, ladies and gentlemen of the jury.  I think

6   we're ready to proceed with the examination of Mr. Stryker.

7        MR. SCHNEIDER:  Thank you, Your Honor.

8   BY MR. SCHNEIDER:

9        Q.   Good morning, Agent Stryker.

10       A.   Good morning.

11       Q.   Yesterday during your testimony we reviewed a large

12  number of items of evidence you received at the lab.  Did you

13  examine all of those items?

14       A.   Yes.

15       Q.   And from looking at those items could you tell based

16  on your training and experience whether or not those items

17  could be used to make a working bomb?

18       A.   Yes.  I did.

19       Q.   And based on your training and experience and your

20  opinion, if someone intended to use those items to build a bomb

21  or a destructive device, could they be readily assembled into a

22  destructive device?

23       A.   Yes.  They could.

24       Q.   After looking at those items did you test the

25  functionality of any of those items?

1    A.   Yes.

2    Q.   Which ones and how?

3    A.   We tested the clocks simply by inserting a double A

4    battery in them to ensure that they worked and they did.  We

5    also took the strand of decorator bulbs, plugged them in.  They

6    all illuminated.  We also cut one from the strand, touched both

7    ends to a nine volt battery both the positive and negative

8    leads.  It illuminated.  And we examined the pressure cookers

9    just to make sure that there were, you know, no modifications

10   and that the lids sealed on them.  They did.  We also examined

11   the batteries to make sure that they had proper voltage.  The

12   nine volt batteries typically have a little over nine and half

13   volts, and I believe all of the batteries did or close to or at

14   least over nine volts as well as the triple A batteries had at

15   least one and a half volts each.

16   Q.   Now, did you receive a copy of Government's Exhibit

17   67 which was the Inspire magazine article?

18   A.   Yes.  I did.

19   Q.   And that was the article How To Build A Bomb In The

20   Kitchen Of Your Mom?

21   A.   Correct.

22   Q.   Were you generally familiar with this article before

23   you received it as evidence in this case?

24   A.   Yes.  I was.

25   Q.   And in this case when you were testing the items you

1    received in evidence, did you read the article -- did you read

2    the article?

3         A.   Yes.  I did.

4         Q.   And after reading the article did you determine if

5    the instructions for building a bomb as set forth in that

6    article were sound and could produce a viable bomb or a

7    destructive device?

8         A.   Yes.  I did.  I determined that the article provided

9    sufficient instruction to somebody with little or no experience

10   in building an explosive device with the basic knowledge of how

11   to do so.

12        Q.   So in following up on what you just answered, does

13   the article in your opinion call for any expertise in

14   explosives?

15        A.   No.  Not at all.

16        Q.   Did you compare the instructions in the article to

17   the items that you received in evidence in this case that had

18   been recovered at the scene?

19        A.   Yes.

20        Q.   And were you able to determine if all the necessary

21   components were present to readily assemble a bomb or

22   destructive device by following those instructions?

23        A.   Yes.  I did and the components were present.

24        Q.   After examining the article and the components, did

25   you conduct any other tests?

1    A.   Yes.  We did.

2    Q.   And what was the first test that you conducted?

3    A.   First test -- first we didn't use the actual

4  components that were received as evidence.  We went out and

5  purchased essentially the same items or like items to the

6  extent that we couldn't find the exact item.  Most of the items

7  were obtained at Walmart and we purchased the same clocks,

8  battery, Gorilla tape, couldn't find the exact strand of

9  Christmas tree bulbs or decorator bulbs that were in that pack

10 of ten with the gold star so we bought a standard pack of

11 Christmas tree bulbs, the same type, the small incandescent

12 bulb type of light bulb.  And the first thing we wanted to do

13 was determine whether the six different smokeless powders which

14 we purchased the identical smokeless powders from those

15 containers whether a Christmas tree bulb had sufficient energy

16 to ignite all those powders.  So we broke the Christmas tree

17 bulbs open like the article specified.  We heated them up,

18 dipped them in some water, tapped it on the side and it broke

19 fairy cleanly.  We put a couple of grams in a little dish under

20 a fume hood in contact with the filament and just touched them

21 to a nine volt battery and in all cases each type of smokeless

22 powder initiated upon receiving the current which illuminated

23 the filament.  The filament burns really intensely for a brief

24 moment of time.  It's enough energy to ignite those powders.

25    Next we took a blend of all six out, kind of a homogenous

1   blend, and took a sample from that and again similar fashion,

2   touched it to a nine volt battery and it successfully ignited

3   the powder.

4       Q.   With regards to the Christmas lights that were

5   received in evidence by you at the lab, did that -- did those

6   have some decorative covering on the lights itself?

7       A.   The ones that we received as evidence were

8   essentially the same type of Christmas bulb.  They were gold in

9   color and they were affixed to a -- like a gold star to provide

10  some illumination to make the star more visible or sparkle with

11  the light that was provided.  So there was ten bulbs in that

12  strand attached one each to a star.

13      Q.   Did the gold star have anything to do with making a

14  bomb?

15      A.   Nothing at all.

16      Q.   So the light that was in the Christmas lights that

17  were recovered at the scene of the crime, were they similar to

18  the lights that you used when you conducted the test?

19      A.   Yes.

20      Q.   Did you conduct any other tests?

21      A.   We did.  The next test that we did was to assemble a

22  device consistent with the directions that were provided in the

23  Inspire magazine article.  What we wanted to show with the next

24  test that we did was that -- let me back up one step.  We do

25  numerous reconstructions throughout the examinations that we

Direct Examination of Richard Stryker by Mr. Schneider —501—

1   do.  We don't always do it exactly like a bomber would do it

2   because the bomber is not necessarily concerned with safety.

3   We are.  So we will take incremental steps to show that what

4   we're doing does not substantially change what the bomber

5   intended to do.

6        So in this case we wanted to show that the energy from a

7   Christmas tree bulb igniting smokeless powder was no different

8   from using an electric match.  An electric match is something

9   that is professionally made.  It's safe and it's reliable.  A

10  Christmas tree bulb that's been broken with the filament

11  exposed is not necessarily the safest thing to do.  It's

12  expedient.  It'll work, but there's also a chance of a misfire

13  where sometimes if the filament breaks, and it talks about it

14  in the article, that you want to, you know, ensure that it's

15  reliable.  So if we have a misfire, we have to go through a

16  whole procedure to successfully make it safe again.  So that's

17  essentially what we wanted to do is show that the energy

18  provided from an electric match is no different than the energy

19  provided from the illumination of that filament.

20       So we sat up a device.  We did it two times; one with a

21  match, one with the filament.  We put a couple ounces of the

22  homogenous blend of smokeless powder in one of the pressure

23  cookers.  We drilled a hole in the bottom, inserted on one

24  occasion the Christmas tree bulb, poured that powder on top and

25  we built a simple series circuit as was specified in the

1   Inspire magazine article where we have a clock serving as a

2   switch in the fusing system.  Essentially when the minute hand

3   on the clock -- we chose to use the minute hand in this case --

4   would time down and meet the other exposed wire, it would make

5   contact and complete the circuit.  The other two ends were

6   hooked up to the positive and negative and to the battery.

7   It's the most basic circuit, very simple circuit that one could

8   design or utilize.  So we did that and we put it in the

9   original container that the pressure cooker came in, the box.

10  Now, what we decided to do since we didn't know definitively

11  how the defendant or how one would place this in a restaurant

12  or some other location, we figured the safest thing to do would

13  be to transport it in a safe condition.  So all we did was we

14  cut a little slit in the box and we used some of the clear

15  packaging material from the drill bits that we had also

16  purchased, the same drill bit package, and we inserted that

17  through the box and through the back of the clock where the

18  triple A battery was.  It essentially just blocked one of the

19  contacts so that the clock wasn't ticking.  So we put all that

20  in the box and had the little tab sticking out so you can

21  transport it relatively safely.  So then when you pull that tab

22  out, the battery to the clock starts making the clock work and

23  it ticks down.  And we had the distance separated only by a

24  fraction of an inch to show that it would still work, but we

25  just wanted to make sure that the video wasn't rolling for 30

Direct Examination of Richard Stryker by Mr. Schneider -503-

1   minutes or an hour, however.  You have whatever time you set

2   the clock to be.  So we did that and showed the two tests to

3   compare the amount of flame coming out.  And again this was not

4   covered.  The pressure cooker was simply placed in the box with

5   no lid on to show the amount of flame or energy that's provided

6   by that system.

7        Q.   And did you videotape each of those tests?

8        A.   Yes.

9        Q.   And have you previously seen Government's Exhibit

10  151?

11       A.   Yes.

12       Q.   And are those your initials on Government's Exhibit

13  151 for identification?

14       A.   Yes.

15       Q.   Does this CD contain video recordings of both of

16  those tests, the electric match and for the bulb test?

17       A.   Yes.  It does.

18       Q.   Does it contain other items, this CD?

19       A.   I'm not sure if it has the other tests that we did on

20  that one.  I think it was on a separate CD.

21       Q.   Okay.  What was the next test that you performed in

22  this case?

23       A.   The next test after we did the open top pressure

24  cooker was to build a device again with the components that

25  were essentially submitted with the evidence.  There was two

1    pressure cookers.  One was an eight quart.  One was a 16 quart.

2    We decided to use the 16 quart not for any great specific

3    reason.  I think the only reason was that there's a perforated

4    plate that goes in that pressure cooker and there was some

5    burnt material on top of that when we received it.  So did that

6    indicate that that one was going to be used?  We don't know.

7    We just essentially randomly decided to the use the larger one.

8    It really wouldn't make much difference if we used the smaller

9    one.  You'd still get a similar effect.

10       We took the pressure cooker.  We drilled a hole in it,

11   built the same fusing system but we did not use the fusing

12   system in a real device again because we're not going to set it

13   up that way.  That's not the safest thing to do.  So what we

14   did is we used an electric match that was initiated with a long

15   wire that went back to a safe area with a commercially

16   available blasting machine.  Essentially we're just sending

17   current down that line to the match.  We left the fusing system

18   in there because that would have been part of the device and it

19   could have contributed potentially to some additional fragments

20   that may have resulted from the explosion.

21       Q.   And can I just stop you there and ask you a question?

22       Is the fusing system you used, is that the same example

23   you told us about earlier where you tested the bulb and then

24   you tested the electric match and they provided the same exact

25   initiation to the powder?

1       A.   Yes.   It was the same system using that Main Stay

2   brand clock, nine volt battery, some wires and just insert it

3   in the box in the same location.

4       So each powder was poured in individually.  We used I

5   forget how many pellets from the same type of shotgun shell.

6   It was a couple thousand I believe.  Poured that on the powder,

7   put the perforated plate on top of that, put the lid on, sealed

8   it and put some Gorilla tape on top of that.  In the −− the

9   Inspire magazine did not necessarily specify the use of the

10  Gorilla tape in that matter, but it was part of the specimens

11  that were used.  It did specify I believe using glue to help

12  seal up things, but rather than wait for the glue to dry,

13  we just used the Gorilla tape.  We went back to a safe

14  location −− and back up one other step.  We sat up a room in an

15  old abandoned prison in Lorton, Virginia.  Got the permission

16  from all the county folks to do this and it's used extensively

17  by military and law enforcement for training purposes.  They're

18  eventually going to demolish it.  So it was in a room that we

19  set up to as best we could a restaurant scenario.  We had

20  several folding tables, 3D type wooden dummies which are used

21  by the military for testing purposes.  They're articulating

22  wooden dummies with springs and hinges.  We set place settings

23  out.  We put some pieces of drywall and plywood material on an

24  opposite wall potentially as witness material for whatever may

25  result in the explosion.  So that's where we sat it and we

Direct Examination of Richard Stryker by Mr. Schneider −506−

1    decided to put the box with the device on top of one of the

2    tables essentially centrally located.

3           We then went to a safe area, initiated the device.  It

4    resulted in an explosion where the lid violently jettisoned

5    from the pressure cooker, essentially buckled, shot into the

6    ceiling and appeared to take a chunk of wood out of one of the

7    beams.  And after reviewing the video that we took you can see

8    the pressure cook spinning in air.  There's some flame.  And

9    then as the remainder of the powder is spinning through the

10   air, the residual frame catches that remainder of powder as

11   it's spinning through the air and creates a large fireball

12   that, you know, could have resulted in injuries to anybody who

13   was in that area.  It did not fragment the pressure cooker, the

14   main vessel.  Again it just caused the lid to buckle, shoot off

15   violently and through that spinning motion created a large

16   fireball.

17          Q.   When you built the replica device did you use sugar?

18          A.   No.

19          Q.   And was there a reason why you didn't use sugar?

20          A.   It wasn't specifically called for in the magazine.

21   It was talking about using the sugar with the match head

22   material and I believe by one quarter percent by weight or

23   volume.  Not really necessary to use sugar in that case because

24   the match head material is an explosive, a low explosive in and

25   of itself.  Oftentimes sugar is used as a fuel in combination

Direct Examination of Richard Stryker by Mr. Schneider -507-

1    with another oxidizer to create a homemade explosive.  In that

2    case it rarely wouldn't have added anything.  And it didn't

3    call for it to be used necessarily or specifically with the

4    reference to gun powder or smokeless powder.

5        Q.   Was the article when you read it was it specific on

6    how to build the bomb or did it give different options on how

7    to build a bomb?

8        A.   There was some specificity with how to construct.  It

9    recommended doing some, you know, testing of the circuit to

10   make sure it would work.  But there was some -- some room for,

11   you know, making it essentially the same way, but it didn't

12   specify that it had to be to the T an exact way or it wouldn't

13   function.  Again you're just building --

14       Q.   And looking -- looking -- we're going to put up

15   Government's Exhibit 67 on the screen.  If you could take a

16   look at that.  Do the photos in the Inspire magazine article,

17   do those photos show a pressure cooker?

18       A.   Not in that series of photos.

19       Q.   What does that show as using for the bomb?

20       A.   It's showing using a pipe elbow with two internal end

21   plugs, the match head material and a Christmas tree bulb.

22       Q.   So that's a way of making the bomb within this same

23   article?

24       A.   Correct.

25       Q.   Now, if one were to make the pipe bomb that's

Direct Examination of Richard Stryker by Mr. Schneider –508–

1   pictured in that picture and someone else were to make the

2   pressure cooker bomb the way you replicated it in your tests,

3   is the pressure cooker more complex than the pipe bomb?

4       A.   No.  It's essentially the same thing.  You're just

5   using a different container for the explosive material.

6       Q.   How long generally would someone -- if you could

7   estimate -- would someone without explosives expertise, how

8   long would it take them to put together either of those?

9       A.   If they had all the materials present, it shouldn't

10  take any more than a half an hour.

11      Q.   Would it take a month to put together the pressure

12  cooker bomb the way it's laid out in the article?

13      A.   No.  It wouldn't take a month at all.

14      Q.   So you told us that when you built this replica bomb

15  it actually detonated and it worked; is that correct?

16      A.   It exploded and it functioned as designed.

17      Q.   And what is your opinion based on your training and

18  experience as to whether the items found in the defendant's

19  possession together with the Inspire magazine could be used to

20  readily assemble a destructive device or explosive bomb?

21      A.   Absolutely.  I mean, you have the instructions.  You

22  have the materials.  It's fairly straightforward.

23      Q.   Okay.  I'm now going to show you Government's Exhibit

24  151 and 152 for identification.  Do you recognize those?

25      A.   Yes.

Direct Examination of Richard Stryker by Mr. Schneider –509–

1    Q.   And have you initialed both of those?

2    A.   Yes.  I have.

3    Q.   Do these two CDs contain videos that you videotaped

4  as part of your testing?

5    A.   Yes.

6    MR. BOYD:  Your Honor, I have the same objections that

7  I've previously posed to the Court on both of these videos.

8    THE COURT:  That will be overruled.  They'll be admitted.

9    (Exhibit(s) admitted:  G151, G152)

10   MR. SCHNEIDER:  The government moves Government's Exhibit

11  151 and 152 into evidence.

12   THE COURT:  It's admitted.

13   MR. SCHNEIDER:  And could we start by queueing up

14  Government's Exhibit 151?

15  BY MR. SCHNEIDER:

16   Q.   And, Agent Stryker, can you tell us what we're going

17  to see in this clip?

18   A.   Again this is the setup that I previously described

19  with the clock, the minute hand as close to the number four

20  where another exposed piece of wire is taped to that position

21  just separated again by roughly a quarter inch.  It's going to

22  be less than a minute of time elapse.  We're going to

23  essentially put the pressure cooker in the box or the fusing

24  system first, then put the pressure cooker in there, pour the

25  powder on top of the Christmas tree bulb which is taped to the

Direct Examination of Richard Stryker by Mr. Schneider -510

1    bottom of the pressure cooker and then I'll pull the tab out of

2    the back and we will observe flame generated by the ignition of

3    a smokeless powder, and that's essentially what it depicts.

4         (Video played.)

5    BY THE WITNESS:

6         A.   That's the clear tab just keeping one of the contacts

7    of the battery in the back separated and I'm just pushing it

8    through a slit in the box that I had previously made.

9    BY MR. SCHNEIDER:

10        Q.   Can you tell us how much powder you're putting in for

11   the test in this test that we're seeing?

12        A.   Just a couple of ounces.  I believe it was

13   approximately three ounces of powder.

14        Q.   And how does that compare to what you used when you

15   replicate the device later on?

16        A.   When we replicated the device we used all the powder.

17   So we used six pounds versus three ounces.

18        Q.   And in this example, this video and the subsequent

19   videos where you actually replicate the device, in each case

20   are you converting the pressure cooker into a destructive

21   device?

22        A.   Yes.

23        I'm going to pull the tab.  The battery's now connected to

24   the clock and the minute arm of the clock will start timing

25   down.

Direct Examination of Richard Stryker by Mr. Schneider –511–

1    Q.   And this video is to demonstrate how the bulb would

2  react to the powder?

3    A.   Right.  How the bulb would effectively cause the

4  powder to ignite.

5    Q.   And what is the next video clip that we're going to

6  see?

7    A.   Next video is the same setup, but instead of using a

8  Christmas tree bulb we used an electric match which is what we

9  used in the final demonstration to show that there's no

10  difference in the amount of energy imparted to that system.

11    Q.   And that was done strictly for safety reasons?

12    A.   Yes.

13    (Video played.)

14  BY MR. SCHNEIDER:

15    Q.   And in your expert opinion when you tested both of

16  those methods were you able to discern any difference between

17  the way the powder reacted?

18    A.   There is no discernible difference.

19    Q.   Now, is this the actual explosion?

20    A.   Yes.  This is the setup where we had the wooden

21  dummies.  You can see the box in the center with the pressure

22  cooker in there.  The lid is secured.  The vent's been plugged

23  up but we're initiating it remotely.

24    Q.   And is the next clip going to be the same explosion

25  but from a different angle?

1        A.   Yes.

2        (Video played.)

BY MR. SCHNEIDER:

4        Q.   And now we're going to look at the last video.  Were

5   there multiple cameras and camera angles for these videos?

6        A.   Yes.

7        Q.   And was there also different speeds on the cameras?

8        A.   Yes.  And this last one shows a high speed

9   perspective to really slow it down to show what's going on.

10        (Video played.)

11        MR. SCHNEIDER:  Pass the witness, Your Honor.

12                       CROSS-EXAMINATION

BY MR. BOYD:

14        Q.   With regards to the article out of Inspire magazine,

15   it is fair to say that you did not construct the device that

16   you constructed exactly to the recipe contained in that

17   article?

18        A.   It was essentially the same but it wasn't exact.

19        Q.   So it's a fair representation that you did not

20   construct an exact device based on the recipe from the article?

21        A.   The article specified the use of a nail for one of

22   the contact points.  We didn't use a nail.  Number one, it's

23   not needed.  Number two, there were no nails used or submitted

24   as evidence although --

25        MR. BOYD:  I'm going to object as nonresponsive.

1      THE COURT:  Overruled.

2   BY THE WITNESS:

3      A.   The -- you could have used one of the drill bits if

4   your desire was to use a nail, but the purpose of using a nail

5   was just to provide a contact point where the wire would be

6   attached to.  We simply used a bare end of a wire taped over

7   the clock.  It serves the same purpose.

8   BY MR. BOYD:

9      Q.   How long have you been doing this?

10      A.   Doing what?

11      Q.   What you do.

12      A.   I've been an examiner for about nine years.

13      Q.   It would be fair to say that you have a great deal of

14   knowledge in this area, right?

15      A.   Yes.

16      Q.   You've probably forgotten more knowledge than most

17   people ever acquire; isn't that true?

18      A.   I don't know really know how to answer that.  I

19   mean...

20      Q.   With respect to your characterization of this device,

21   you view this as a relatively simple device.  That's fair to

22   say, correct?

23      A.   Yes.

24      Q.   And you just testified under oath that you felt it

25   would take about 30 minutes to assemble this device, correct?

Cross-Examination of Richard Stryker by Mr. Boyd          514

1       A.   That's correct.

2       Q.   But it took you much longer as you were preparing

3  everything, didn't it?

4       A.   No.  I wouldn't say that it took longer.

5       Q.   Well, I mean, just the test that we just watched,

6  just the lead in took about five minutes.  Would you agree with

7  that?

8       A.   The lead in for which video?

9       Q.   The first two.  Those are about five minutes in

10  length total.

11       A.   For each video?

12       Q.   No.  No.  No.

13       A.   That could be.

14       Q.   Not for each video.  Total?

15       A.   I didn't measure the time.

16       Q.   So you didn't measure the time?

17       A.   Not for the videos.  No.

18       Q.   And you didn't measure the time how long it took you

19  to the build the device either, did you?

20       A.   I did not.

21       Q.   And so you're guessing when you're telling everyone

22  that it would take about 30 minutes?

23       A.   I'm not guessing.  I'm using my experience on

24  approximately what I think it would take to build it.  Could

25  you build it less than a half hour?  You could.  Could it take

Cross-Examination of Richard Stryker by Mr. Boyd

1    a little bit longer than a half hour?  That's possible, too.

2         Q.   And the other thing about building a device is that

3    you have to have all the components, don't you?

4         A.   Yes.

5         Q.   And as you just stated, you didn't have all the

6    components listed in the article, did you?

7         A.   We had all the components to build a device.  We

8    didn't have a nail.

9         Q.   Okay, sir.  And that nail is an item that is listed

10   in the article, isn't it?

11        A.   It is.  But there's also differences in what he had.

12        Q.   So there's more differences in what we had and what

13   y'all built?

14        A.   We used what was provided.  We used the items that

15   were submitted as evidence.  We used the same items purchased

16   separately to construct our device.

17        Q.   But you didn't, did you?  You didn't use every item

18   that was present, did you?

19        A.   We didn't use every item and it wasn't called for in

20   the article.

21        Q.   And the purpose that you had in creating this

22   pyrotechnic display for the jury was precisely that.  You were

23   going to create a video to show to a jury; isn't that correct?

24        MR. SCHNEIDER:  Objection as to his intent to show it to a

25   jury.

1        THE COURT:  Sustained.

2   BY MR. BOYD:

3        Q.   Who had you construct this device?

4        A.   It was constructed in consultation with the -- the

5   field -- FBI field office as well as the assistant U.S.

6   Attorneys.

7        Q.   And when you're constructing devices like these, I

8   noticed in the video you were pointing.  You clearly

9   constructed this as to provide demonstration.

10        A.   That's correct.  It was for demonstrative purposes.

11        Q.   And you knew you would likely be testifying?

12        A.   I knew there was that possibility.  Yes.

13        Q.   How long did it take the glue to dry?

14        A.   I don't recall.

15        Q.   Well, doesn't that enter into the time it takes to

16   build the device?

17        A.   It could if you want the glue to completely dry.

18        Q.   And so when you built the device and you -- one of

19   the parts of the device was adding BBs?

20        A.   Correct.

21        Q.   And making sure those BBs remained in place?

22        A.   We poured the shotgun pellets on top of the powder.

23        Q.   But that's not what the instructions required, was

24   it?

25        A.   The instructions were essentially all over the place

Cross-Examination of Richard Stryker by Mr. Boyd    517

1    with the placement of fragmentation.  In one case it talks

2    about gluing nails in a glue matrix kind of having this rubber

3    sheet of glue and nails and putting on the outside of a

4    container.  Then it talks about gluing them to the inside of a

5    container.  And the placement of it is really not going to --

6    in this case going to give you any great difference on

7    fragmentation and that's not what you saw in the demonstration

8    as well.

9        Q.   Well, let's talk about the gluing for a second.  You

10   decided arbitrarily to use the 16 quart; is that correct?

11       A.   Essentially.

12       Q.   And is this the 16 quart?

13       A.   Yes.

14       Q.   Okay.  Now, if you're going to glue the BBs to the

15   outside, right?

16       A.   You're pointing to the inside?

17       Q.   To the side wall.  If you're going to do that, you're

18   going to have to pretty much leave it on its side, pour in some

19   BBs and glue it, correct?

20       A.   Not necessarily.  You could coat the inside, pour the

21   BBs in there, roll it around, let them stick to the glue.  Some

22   of them may fall off.  It depends on how pretty you want to

23   make it look I guess.

24       Q.   But you didn't use the glue in any of the tests that

25   you did, did you?

1      A.   We used some of the glue to essentially clog up some

2 of the fittings on the lid.

3      Q.   But you didn't use it to put in place any BBs, did

4 you?

5      A.   No.  We didn't.

6      Q.   Because that would take time, wouldn't it?

7      A.   I actually didn't exclude the glue for that reason.

8      Q.   And the real reason that time is such an important

9 factor is what you first testified to.  You wanted to be able

10 to testify to this thing was -- let me get it as you quoted --

11 readily able to be assembled into a destructive device, right?

12      A.   Correct.

13      Q.   And that's the reason you left out the glue because

14 if the time was longer, then it's not readily assembleable?

15      A.   That's absolutely not true.

16      Q.   Well, let's continue through my example then.

17      MR. BOYD:  Your Honor, may I approach the witness?

18      THE COURT:  Yes, sir.

19 BY MR. BOYD:

20      Q.   With respect to letting the glue dry over one

21 iteration, one period of time, does that indicate to allow the

22 glue to dry 15 to 20 minutes on each surface?

23      A.   I think this is talking about using the glue on two

24 surfaces that you're going to stick together.  In this case it

25 really doesn't apply since you're just talking about putting

Cross-Examination of Richard Stryker by Mr. Boyd

1   BBs on one surface.  On Step 5 it says allow both surfaces to

2   dry 15 to 20 minutes depending on temperature and humidity.  If

3   surfaces are not assembled within two hours, adhesive can be

4   reactivated by applying an additional coat of gel original

5   contact cement.

6       Q.   So certainly you would agree with me that a BB has a

7   surface?

8       A.   Yes.

9       Q.   And this pot has a surface?

10      A.   That's correct.

11      Q.   So to attach a BB to this pot, according to these

12   instructions, these instructions say wait 15 to 20 minutes,

13   right?

14      A.   That's what the instructions say.  Yes.

15      Q.   And if you're going to do that all the way around,

16   it'll either take one, two, three, four iterations at 15 to 20

17   minutes each assuming a good outcome or it will take maybe less

18   time if you only did two iterations and did half of it at a

19   time?  About half that time?  20 to 40 minutes?

20      A.   If you were going to take an individual pellet and

21   glue that pellet and stick it to a glued surface, it would take

22   much longer.

23      Q.   Okay.  And you'd also have to use the brush as well

24   to get the glue applied to start with, right?

25      A.   You wouldn't necessarily have to, but it would make

1    it easier to apply the cement.

2          Q.   And y'all didn't do that?

3          A.   We did not.

4          Q.   Now, with respect to the Inspire magazine article --

5          MR. BOYD:  Could you bring up Exhibit No. 67, please?

6    BY MR. BOYD:

7          Q.   Now, this is the section in the Inspire magazine

8    article that talks about the substances used to create what is

9    referred to in the article as an inflammable substance,

10   correct?

11         A.   Yes.

12         Q.   And as you noted, there's a difference between match

13   heads and sugar, right?

14         A.   Yes.

15         Q.   Match heads don't have an oxidizer associated with

16   them, do they?

17         A.   Yes.  They do.

18         Q.   They do?  Why would the sugar be added to the match

19   heads in these cases?

20         A.   I don't really know why they specified that.

21         Q.   Well, you really do.  It's because it serves as an

22   oxygen source.  It serves as a fuel source for when the match

23   heads start to burn, right?

24         A.   No.

25         Q.   Okay.  So what is the purpose of an oxidizer?

1     A.    Purpose of an oxidizer is -- in an explosive

2   formulation is to provide the source of oxygen to combine with

3   a fuel in a match head mixture those two substances, the fuel

4   and the oxidizer, they're already present which is why when you

5   strike it to a friction surface you create heat through

6   friction and it combusts.  So all fuel and -- or all explosive

7   mixtures are some balance of fuel and an oxidizer.  In this

8   case sugar is a fuel.  Sugar is often used as a source of fuel

9   for homemade explosive mixtures but in this it's not necessary

10  because you already have a match head composition mixture.  It

11  really serves not to add to the explosive capability of it.

12  Would the sugar burn in that mixture?  It would burn.  You'd

13  get caramelized sugar essentially, but it's not really adding

14  to it because you don't need it.

15     Q.    Did you test that --

16     A.    I did not test that mixture.

17     Q.    But you certainly had the ability to?

18     A.    We could have tested it if we needed to.

19     Q.    Or if you even wanted to, right?

20     A.    If I wanted to, I could have.  Yes.

21     Q.    Okay.  Now, in regards to the pressure cooker that's

22  listed in the article, it says to then fill the cooker with the

23  inflammable material, correct?

24     A.    It says to fill in.

25     Q.    It says then fill in the cooker with the inflammable

Cross-Examination of Richard Stryker by Mr. Boyd          522

1  material, correct?

2       A.   Yes.

3       Q.   And when you created the device that you created, you

4  didn't fill in the pressure cooker with inflammable material.

5  There was still space left, wasn't there?

6       A.   There was space left.  Again if you read --

7       Q.   Because -- because the six pounds of material isn't

8  enough to construct the device that is listed and provided for

9  in this article; isn't that correct?

10      A.   No.  That's not correct.

11      Q.   And that's because you want to offer a different

12 definition of fill in?

13      A.   Not necessarily.

14      Q.   You -- this is a device that requires pressure,

15 right?

16      A.   Yes.

17      Q.   And, hence, that's why a pressure cooker or a pipe is

18 suggested, correct?

19      A.   Yes.

20      Q.   And a layperson using this would fill up the device,

21 wouldn't they?

22      MR. SCHNEIDER:  Objection as to what a layperson would do,

23 Your Honor.

24      THE COURT:  Sustained.

25 BY MR. BOYD:

1    Q.   You never tested this device all the way filled up,

2    did you?

3    A.   No.

4    Q.   You never tested this device using the sugar, did

5    you?

6    A.   No.  We didn't use sugar.

7    Q.   And that sugar is also a filler, isn't it?

8    A.   It's --

9    Q.   Takes up space?

10   A.   Sure.  Yes.  It would take up space.

11   Q.   So it's a filler?

12   A.   It would help fill up the void in whatever container

13   it's put in.  Yes.

14   Q.   Okay.  And with respect to creating an accurate

15   result to show this jury, it would have been prudent to

16   construct the device according more closely with this article?

17   A.   This article specifies specifically with the use of a

18   pressure cooker that it essentially would take a heck of a lot

19   of matches to do so.  So perhaps a better alternative would be

20   to use gun powder.  When it suggests the use of gun powder, it

21   does not add or say anything about, oh, don't forget the sugar.

22   Q.   It also doesn't say, oh, you don't need to add the

23   sugar though, does it?

24   A.   It doesn't say that you have to add the sugar, but

25   when you're using gun powder or smokeless powder, it's common

1    sense that you don't need to add anything.  When people reload

2    with smokeless powder, they put the smokeless powder in the

3    cartridge casing.  They don't add a pinch of this or a dash of

4    that.  They just put the smokeless powder in there.  I think

5    everyone knows that it is an explosive, a low explosive that

6    burns rapidly.

7        Q.   So if you view it as common sense that you don't need

8    to add sugar because somehow gun powder is different than match

9    heads, then why earlier did you indicate that match heads just

10   didn't need the sugar?

11       A.   Because they don't.  The article, you know, talks

12   about the sugar.

13       Q.   Well, then along those same lines, the gun powder

14   wouldn't need the sugar, right?

15       A.   Correct.  Neither --

16       Q.   But --

17       A.   -- match head or --

18       Q.   -- you just stated that it's common sense you don't

19   need to add anything and that's because if you add sugar to the

20   gun powder, you're potentially creating an inert device, right?

21       A.   I would say with the amount of sugar that was

22   specified which was approximately a quarter by volume or

23   weight -- I don't remember which -- it would not be sufficient

24   to dilute the smokeless powder to a point where it wouldn't

25   ignite.

1      Q.   But you didn't use the amount of stuff specified

2   throughout your construction of the device.  So you want to

3   assume that someone who created a device that never made it

4   into existence would not just fill up the rest with all of the

5   sugar.  That's what you want to assume, right?

6      A.   Again the article didn't specify the use of sugar.

7      Q.   If I added this much sugar to this much gun powder,

8   it's going to affect it, isn't it?

9      A.   It could have an effect if you add that much sugar.

10      Q.   And it's going to have an adverse effect, isn't it?

11      A.   It potentially could if you added that much sugar to

12   six pounds, but again I don't know.

13      Q.   And so if you had tested everything you received in

14   trying to fill up this void of space so as to create a pressure

15   device, you can't tell this jury what would have happened?

16      MR. SCHNEIDER:  Objection, Your Honor.  He's already asked

17   the witness about the sugar and how he tested the device.

18   BY MR. BOYD:

19      Q.   Hypothetically can you explain what would happen if

20   you had tested the device?

21      MR. SCHNEIDER:  Same objection, Your Honor.

22      THE COURT:  He hasn't asked a question yet I don't think.

23      Was that a question, Mr. Boyd?

24      MR. BOYD:  Your Honor, I was going to go along the same

25   lines.

1       THE COURT:  Well, then the same objection would apply.  It

2   will be sustained.

3       MR. SCHNEIDER:  Yes, Your Honor.

4   BY MR. BOYD:

5       Q.   Let's talk about this electric match.  It's your

6   testimony that the reason for using an electric match is

7   safety, right?

8       A.   Yes.

9       Q.   I want to think through that with you for a second.

10  You said that you remotely detonated the device that you showed

11  the jury, right?

12      A.   Yes.

13      Q.   Which means the ignition source at the device won't

14  get a charge or an electric load until whoever is at that

15  remote location initiates it, correct?

16      A.   That's correct.

17      Q.   And with regards to using the Christmas tree light

18  bulb, there is no different safety involved in the placement of

19  that Christmas tree light bulb and applying a load to that as

20  opposed to a load from afar to the electric match except for it

21  would be inconvenient for you to have to reproduce a video

22  should that filament fail, right?

23      A.   No.  The safety issue that essentially comes into

24  play is safety/reliability.  Again the filament is relatively

25  delicate.  So if we were to get a misfire if we tried to

Cross-Examination of Richard Stryker by Mr. Boyd ———527———

1    initiate the device remotely and it failed to function, then we

2    have to reapproach this device.  We have to wait awhile and

3    reapproach it and it's never a fun thing to go back down on a

4    device that should have functioned and then to try to figure

5    out why because you have to disassemble it and there's a degree

6    of risk that's involved with doing that.  So we want to ensure

7    that it's reliable by using an electric match.  And again we

8    demonstrated that a match essentially does the same thing as a

9    Christmas tree bulb with igniting that powder.  So it was a

10   matter of safety.  Not convenience.

11       Q.   But you didn't use -- well, it's also a matter of

12   convenience?

13       MR. SCHNEIDER:  Objection, Your Honor.  He's just answered

14   the question.

15       THE COURT:  Sustained.  You're arguing with the witness,

16   Mr. Boyd.

17       MR. BOYD:  Yes, Your Honor.

18   BY MR. BOYD:

19       Q.   Let's go to the bulb right quick.  You never tested

20   these bulbs, did you?  You tested it to see if it would work,

21   but you didn't use any of these bulbs in the test, right?

22       A.   That's correct.

23       Q.   But you were able to clip a bulb out, make sure it

24   lit up and use the bulb for that.  Why didn't you go ahead and

25   use a bulb to test your device?

1    A.   There was a decision made early on that we weren't

2  going to consume any of the evidence in the construction of the

3  device.  We were going to buy similar or like components.  So

4  the bulb from that is -- functions the same way that any

5  Christmas tree bulb does of that size and manufacturer of bulb.

6    Q.   Did the same person manufacture the bulb that you

7  used?

8    A.   I don't know.

9    Q.   Was the filament made out of the same material in the

10 bulb that you used versus -- that is contained in that exhibit?

11   A.   They were visually consistent with one another except

12 for the color of the bulb.

13   Q.   Did you test the metal?

14   A.   Did not test the metal.

15   Q.   Did you test the filament?

16   A.   No.

17   Q.   So you do not know?

18   A.   I don't know if they were made by the same person in

19 the same plant in China on -- I don't know.  But we didn't do

20 any forensic testing of the filament of the bulb or the glass

21 or the plastic to say that they're some sort of exact match.

22 They're Christmas tree bulbs.

23   Q.   You used your expertise to create the biggest

24 pyrotechnic display that you could create to demonstrate to

25 this jury what you wanted to happen, didn't you?

1       A.   No.  We used the materials that were provided to

2   construct a device to best represent the materials that were

3   seized during the search.

4       Q.   And lastly there was no nail ever recovered from the

5   scene, was there?

6       A.   There was no nail submitted as evidence.  I don't

7   know what was or wasn't at the scene when the search occurred.

8       Q.   There was no nail submitted to you, was there?

9       A.   No.

10      Q.   And clearly a nail is called for in the ignition

11  device for the device built according to the article, isn't

12  there?

13      A.   There's a nail called for but not necessary.

14      Q.   And that's because you determined it not to be

15  necessary, right?

16      A.   The reason that we didn't use a nail was in the clock

17  that is depicted in the magazine -- I received a black and

18  white copy of the magazine article.  When it shows that clock,

19  there's circles around where that nail is.  To me that looked

20  like a hole was drilled in what -- I don't know what kind of

21  clock they used in this magazine, whether it was a plastic

22  face.  I assumed it was a plastic face where you could drill a

23  hole through the plastic face.  The clocks that we received had

24  glass faces.  And although you could drill through glass, we

25  didn't receive any glass drill bit or ceramic bit.  So we

1    simply removed the face of that clock that piece of glass and

2    again could I have put a nail after that point?  Yeah, but they

3    showed it to me which looked like a hole through the plastic.

4    So I just simply put a piece of wire at the contact point that

5    I desired and taped it to the clock.  It's the functional

6    equivalent of having a nail with a piece of wire twisted to it

7    at whatever point you would desire that to make contact with

8    the other arm of the clock.

9         Q.   And so you used your expert experience to get around

10   a fundamental problem that you identified with the items you

11   were presented, right?

12        A.   My expertise didn't necessarily come into play here.

13   It's common sense.

14        Q.   And you're taking into account that it is your

15   opinion that everyone would have this common sense?

16        A.   I would think that most people to construct a device

17   with the instructions provided and the material present.

18   Could everyone on the globe do it?  Probably be some people

19   that would fail in an attempt, but the vast majority of people

20   without any, you know, disability I suppose would be able to do

21   that.

22        Q.   My point is, sir, you have said common sense

23   repeatedly.  You have said common sense in regard to using gun

24   powder and that people have this common sense in regards to how

25   to use gun powder and you're necessarily speculating as to

1    whoever has that article that they have common sense in regards

2    to gun powder, aren't you?

3         A.   I would think so.  If somebody -- somebody has this

4    article and their desire is to build a bomb, I would think that

5    they're probably going to have some additional common sense

6    that maybe a layperson or other person doesn't.  I think with

7    all instructions that you received there's a certain amount of

8    applied common sense that one ought to have before they read

9    the instructions, and I don't think there's a lot of it

10   required to follow these instructions.

11        Q.   But you yourself didn't follow them completely, did

12   you?

13        A.   We followed them again to make the functional

14   equivalent.

15        MR. BOYD:  Nothing further.

16        MR. SCHNEIDER:  Your Honor, I just have about three or

17   four questions.

18                      REDIRECT EXAMINATION

19   BY MR. SCHNEIDER:

20        Q.   Agent Stryker, when you give your expert opinion as

21   to whether the items that you received can be readily assembled

22   into a destructive device, when you look at the term "readily

23   assemble," does it matter whether it can be readily assembled

24   in under seven minutes or from seven to ten minutes or in 20

25   minutes or where those items --

1       MR. BOYD:  Your Honor, I'm going to object.  Calls for a

2  legal conclusion.

3       THE COURT:  I'm sorry?

4       MR. BOYD:  Your Honor, I'm going to object.  That calls

5  for a legal conclusion.

6       THE COURT:  Overruled.

7  BY THE WITNESS:

8       A.   There's no time period that's specified for what can

9  be readily assembled.  If you have the instructions, the

10 materials and that's a simple thing to build, it's readily

11 assembled.

12 BY MR. SCHNEIDER:

13      Q.   And going back to the Inspire article that gives the

14 instructions on how to build this device, is it fair to say

15 that that article is like a recipe for baking a cake in that

16 there are different ways in a recipe?  You might use chocolate

17 frosting.  You might use vanilla frosting.  Is that a fair

18 comparison to the way this article read and the way you read

19 it?

20      A.   Yes.  It doesn't have to be followed exactly to build

21 a device.  There can be some slight variances in how one does

22 things.  It doesn't specify, you know, the length of the wire

23 or other things.  So common sense plays into it, but it's --

24 you know, you could vary some things and still get it to work.

25      MR. SCHNEIDER:  Nothing further, Your Honor.

1                        RECROSS-EXAMINATION

2    BY MR. BOYD:

3        Q.   In regards to the slight variances you just talked

4    about, slight variances can make a big difference, can't they?

5        A.   They could.

6        Q.   For instance, connecting the ignitor to the top as

7    indicated in the article versus connecting it to the bottom

8    would have different outcomes, wouldn't it?

9        A.   It could depending on how much powder was added or

10   the orientation of the pressure cooker.

11       Q.   And that's especially important in this case because

12   you chose to connect it at the bottom, right?

13       A.   We did.  We drove a hole in the bottom of the

14   pressure cooker.

15       Q.   And the original instructions had it coming in from

16   the top, right?

17       A.   Again, this -- it did, but this is where that -- this

18   variance comes in.  If you were -- no matter where you would

19   have put it, the side, the top, the bottom, again, common sense

20   applies that you would still want to orient it so that your

21   powder was in contact with your initiator so you get that heat

22   transfer to cause it to ignite.  But regardless of where it

23   was, it makes it no less of a bomb.

24       Q.   With respect to that, the place you placed it has a

25   tendency actually to create the effect of a chafe charge,

1   doesn't it?

2       A.   No.

3       Q.   And that's what you see in the video.  You actually

4   see a lid fly off and bend because the shards are coming up and

5   out because you've placed it at the bottom instead of placing

6   it at the top which would have a different effect as it

7   deflagrated, wouldn't it?

8       A.   Absolutely not.

9       MR. BOYD:  Nothing further.

10      MR. SCHNEIDER:  Nothing further, Your Honor.

11      May this witness be excused?

12      THE COURT:  Yes, sir.

13      You may step down.  You may be excused.

14      MR. FRAZIER:  May we have just a brief moment, Your Honor?

15      (Conference between government counsel.)

16      MR. FRAZIER:  The United States rests, Your Honor.

17      THE COURT:  Members of the jury, at this point in every

18  trial there are legal matters that I need to take up.  So I'm

19  going to ask you to retire to the jury room and it's about time

20  for the morning recess anyway.

21      LAW CLERK:  All rise.

22      (Jury exited the courtroom at 10:17.)

23      THE COURT:  Be seated, everyone.

24      Mr. Boyd, I'm assuming you have legal matters you wish to

25  present?

1       MR. BOYD:  Yes, Your Honor.  I do.

2       Your Honor, the first legal matter I'd like to take up is

3   I'd like to make an offer of proof in regards to what the

4   testimony of Ms. Matrono would have been -- Ms. Catherine

5   Matrono would have been had I been able to have her as a

6   witness.  Specifically I would ask the Court to enter as

7   Court's No. 1 the conscientious objector packet that she

8   reviewed in arriving at her decision to grant conscientious

9   objector status to Mr. Abdo.  I would further offer to the

10  Court that she would testify that after reviewing the entire

11  process that Mr. Abdo went through that, number one, initially

12  there was a delay in processing his conscientious objector

13  packet.  Number two, once the process began, there was an

14  investigating officer appointed who approved initially that

15  conscientious objector status be granted.  Subsequent to that

16  there are a series of two board processes that occurred and

17  both of the resulting board processes recommended disapproval

18  of the conscientious objector packet.  And then ultimately it

19  went to Ms. Matrono who as the approval authority and signature

20  authority for the Department of the Army in regards to ultimate

21  approval of the conscientious objector packet reviewed the

22  packet and determined that conscientious objector status should

23  be granted.  This goes to the theory of the defense that we are

24  unable to put on at this time because we were unable to have

25  Ms. Matrono served by the U.S. Marshals as the Court views this

1    as irrelevant.  I would ask at this time for the Court to allow

2    me to have the opportunity to get Ms. Matrono available to the

3    Court so that I can offer this in defense.  That may require a

4    recess in this proceeding so that I can get her and try to get

5    her by VTC.

6        THE COURT:  You're offering this as a bill of exception, I

7    assume?

8        MR. BOYD:  Yes, Your Honor.  Bill of exception and offer

9    of proof.

10       THE COURT:  It will be admitted as a bill of exception.

11       MR. BOYD:  And with respect to --

12       THE COURT:  Your other request of course will be denied.

13       MR. BOYD:  Thank you, Your Honor.

14       The second bill of exception offer of proof that I have is

15   in regards to the testimony that would have been provided by

16   Lieutenant Colonel Bavornack.  He is one of the staff judge

17   advocates in the Army.  Specifically he is the staff judge

18   advocate for the Fort Campbell 101st Airborne Division.  He

19   would be providing testimony that the child pornography charges

20   that were charged against Mr. Abdo were determined by him as

21   opined by him in September of 2011 to be without probable

22   cause.  This also goes to the theory of defense that I am

23   unable to put on with regards to the effect of undergoing a

24   month long investigation for child pornography by my client

25   that he always maintained was without merit and ultimately

1    proved to be without probable cause.  The reason that I am

2    unable to call him as a witness is because we had requested

3    again that he be served by the U.S. Marshals.  This Court

4    determined his testimony to be irrelevant.  I would ask that

5    this be noted in the record and secondly I would ask that I be

6    given time to get Lieutenant Colonel Bavornack before the jury

7    in some form or capacity, even by VTC, such that I can present

8    this to the jury in defense of my client.

9         THE COURT:  You've demonstrated quite well that that would

10   be irrelevant.  So that will be denied.

11        MR. BOYD:  Your Honor, the third offer of proof I have is

12   in regards to the defense expert Mr. Ludwizack.  Specifically I

13   have previously provided -- and if I can grab my computer, I'll

14   grab it right quick.

15        Specifically I have provided the Court in my second sealed

16   ex parte motion for more funding for the previously appointed

17   expert witness with 24 points which I believe would be of

18   assistance to the jury which I believe are necessary in

19   providing Mr. Abdo with the defense that cover the fact that

20   Mr. Ludwizack would indeed if placed under oath and if asked

21   questions opine that the FBI constructed a device that the

22   FBI's creation simply did not exist.

23        Number two, that allowing to view the video of the

24   deflagration resulting from the device built by the FBI even as

25   a demonstrative aid would mislead the jury precisely because

1   there was no device built by Mr. Abdo.

2        Number three, that allowing the jury to view the video of

3   the deflagration resulting from the device built by the FBI

4   even as a demonstrative aid would mislead the jury because the

5   FBI only built one device and not two, thereby creating a

6   result that even more enhanced than it should have been

7   especially considering that the FBI built a device based on its

8   own explosives expertise as opposed to building its device

9   based solely on the information contained in the article which

10  was available to Mr. Abdo.

11       Number four, that allowing the jury to view the video of

12  the deflagration resulting from the device built by the FBI

13  even as a demonstrative aid would mislead the jury because the

14  FBI's device was assembled based upon the FBI's expert

15  experience and not solely on the information contained in the

16  article available to Mr. Abdo.

17       Number five, the FBI used its vast expertise in building

18  its device and that level of expertise simply would not be

19  available to Mr. Abdo even if he had built a device.

20       Number six, the effect of the FBI's expertise was the

21  ability to construct a device that worked to any degree at all,

22  as the FBI's device simply was not based solely on the article

23  available to Mr. Abdo.

24       Number Seven, the FBI's device did not explode.

25       Number eight, the FBI's device experienced what is

1   referred to as a deflagration which in laymen's terms is

2   essentially a pyrotechnic display of burning powder as opposed

3   to an explosion.

4       Number nine, the FBI's knowledge concerning the necessity

5   of sealing the holes on the FBI's device and how to properly

6   seal the holes on the FBI's device are key factors in creating

7   a device that worked to any degree at all by using only the

8   materials available.  Such knowledge is possessed by explosives

9   experts and is not knowledge that would be possessed by Mr.

10  Abdo.

11      Number 10, an expert would show the extremely difficult --

12  the extreme difficulty in achieving an explosion by building a

13  device using only the materials available and based only on the

14  article.

15      Number 11, the FBI's knowledge as to where and how to

16  place the ignition source is a key factor that would require

17  expert knowledge not possessed by Mr. Abdo.

18      Number 12, the FBI's placement of the ignition source in

19  their device on the bottom could create a shape charge effect,

20  thereby enhancing and increasing the effects of the device

21  built by the FBI.  (The shape charge effect in all

22  likelihood --

23      THE COURT:  What are you reading, Counsel?

24      MR. BOYD:  Your Honor, I'm reading the findings that my

25  expert would testify to.

1      THE COURT:  Do you have that in writing so you can just

2  present it without having to stand up there and read all of

3  that nonsense?

4      MR. BOYD:  Your Honor, if the Court will take the 24 items

5  that I have included in my previously filed second motion for

6  expert funds and include that as part of the record.

7      THE COURT:  It is for the record, is it not?

8      MR. BOYD:  Yes, Your Honor.  But for clarity's sake what

9  I'm referring to is Pages 4, 5, 6 and 17 of that ex parte

10  sealed motion that I filed.  And if that suffices for the

11  Court's purposes, I am referring to Items 1 through 24

12  representing to the Court that those items 1 through 24 are

13  items which my expert would testify to as an expert under oath

14  before this Court in assisting the defense.

15      Furthermore, not in conjunction to these 24 --

16      THE COURT:  Rather -- just -- I think it'd be quicker for

17  you to just go ahead and read what you were reading, Mr. Boyd.

18  Forget my suggestion that you submit it in writing.  Just go

19  ahead and read it.

20      MR. BOYD:  Your Honor, I'll go back to the shape charge

21  effect in all likelihood caused the gun powder to be expelled

22  from the container when the seal of the pressure cooker was

23  broken such that the powder burned as it caught fire, thereby

24  creating a deflagration rather than explosion.

25      Thirteen, the FBI spent tens of thousands dollars if not

1    $100,000 and numerous hours preparing, planning, building and

2    testing their device.

3         Number 14, the effect of the FBI's expertise was to create

4    a device from available materials as opposed to all materials

5    that would cause as much damage as possible based upon the

6    FBI's expert knowledge of explosive devices as opposed to being

7    based solely on the article available to Mr. Abdo.

8         Number 15, the FBI utilized some but not all components

9    purportedly available to Mr. Abdo in building its device.

10        Number 16, if the FBI had used all of the components

11   available to Mr. Abdo and followed the article that the

12   government claims as being used by Mr. Abdo, the result would

13   have been a nonfunctioning device.

14        Number 17, the design in the article was so sophomoric

15   that it is highly questionable whether anyone could put

16   together any device based entirely on the article that would

17   detonate and explode.

18        Number 18, considering all of the items the FBI had

19   located in the hotel taken in their then current state, the

20   items did not form or begin to form an explosive device or

21   weapon of mass destruction.

22        Number 19, the FBI clearly did not use the sugar in the

23   construction of the FBI's device, as doing so would have caused

24   the FBI's device to completely fail to function.

25        Number 20, the sugar would traditionally serve as an

1    oxidizer but based on the alleged components supposedly found

2    in the hotel room, adding such an oxidizer to the particular

3    type of powder alledgedly found in the hotel room would not

4    result in the creation of an explosive device.

5        Number 21, the FBI only built one device, not two as the

6    government claims Mr. Abdo was attempting to build.

7        Number 22, attempting to build two devices from all

8    materials recovered in the hotel room would have met with even

9    less of a pyrotechnic display than the one device which was

10   built to the best of the FBI's ability.

11       Number 23, taking apart Christmas tree lights by a novice

12   for the purpose of creating an ignition source is very tedious

13   and the methodology required in taking apart a Christmas tree

14   light by a novice is likely to result in a torn or damaged

15   filament which would in turn make any device requiring such an

16   ignition source inoperable.

17       Number 24, based on observations concerning the clock,

18   nail, wire, electrical system and the conductivity of the

19   clock, nail, wire system it is doubtful that a non expert could

20   get the clock, nail, wire system to work due to the material

21   the clock arms are made of or due to a combination of the

22   materials the clock arms are made of and coatings on those

23   clock arms and the device, had it worked at all, would most

24   likely have resulted in a flash fire with a bright flame, heat

25   and no serious bodily injuries or deaths.

1        This, Your Honor, concludes my offer in respect to what my

2   expert would have testified to.  Furthermore, he would have

3   been able to assist me in court in providing a better

4   cross-examination of Mr. Stryker and of the previous witness

5   that was rendered by the government in regards to explosives

6   expertise.  I just ask that that be taken into consideration

7   and I further ask that I have the ability to have more funds

8   and to contact my expert so that I can put him on in front of

9   this jury in some form of or fashion so as to provide my client

10  with that defense.

11       THE COURT:  Does the government wish to respond in any

12  way?

13       MR. FRAZIER:  Well, just briefly, Your Honor.  First of

14  all, most of the points that he made would be legal

15  determinations that the Court would have to make as to whether

16  the evidence would qualify as being probative or a waste of

17  time or unduly prejudicial or misrepresenting something to the

18  jury.  But in addition to that, Your Honor, because this was

19  all filed ex parte, we've not seen the motion.  We're not aware

20  of it.  But I am aware of the fact that a report was submitted

21  by Mr. Stryker that this Court did provide defense counsel

22  funds for an expert.  The report of Mr. Stryker was 12 pages

23  long.  12 pages.  That was it, five of which were just

24  basically a detail, a list of the items he received in the lab.

25  It was a very short report.  It was specific and to the point.

1   We made the videos available to defense counsel which I'm

2   assuming he made available to his expert.  The -- oh, and the

3   prior defense counsel was actually in attendance at the test

4   and was given the opportunity to ask questions, to give input,

5   to -- and to bring his own expert if he so choose which took

6   place in December of last year.  And finally Mr. Dorsett -- I

7   mean -- excuse me -- Mr. Boyd has had the opportunity to

8   essentially cross-examine Mr. Stryker on all of the points that

9   he's raised that his expert would provide for him.  He did it

10  here in court today asking those very questions.

11         Our position is, Your Honor, that -- as far as the record

12  is concerned that -- as far as the record is concerned

13  regarding this particular expert that no showing -- a

14  substantial showing has been made that any of these matters

15  that he raises that the expert would say would even be -- would

16  even be admissible by the Court because they go essentially to

17  the legal determinations and essentially wouldn't have any

18  effect on whether the definition that's used under 921 that the

19  items he had -- the items Mr. Abdo had in the hotel room were a

20  destructive device because by definition any combination

21  which -- from which a destructive device may be readily

22  assembled is sufficient under the law to be a destructive

23  device.  So it wouldn't change the matter, wouldn't change the

24  fact that even if they built the items and put everything in it

25  that Mr. Boyd was suggesting should be done wouldn't change

1   anything.  If the clock wires connected and nothing happened,

2   there was still an attempt.  And so our position would be that

3   it would not be relevant and that's all we have.

4       THE COURT:  Well, for the record I recall that the main

5   problem with this was this witness lived somewhere in the

6   Midwest and the expense -- his fees were astronomical and Mr.

7   Boyd was given -- was told he could hire an expert but not at

8   the expense this particular individual was willing to charge or

9   demanding.

10      Anything further in the way of bill of exception you wish

11  to present?

12      MR. BOYD:  Your Honor, I'd just like to remind the Court

13  that previously when I first asked for this expert the Court

14  granted me this expert and the Court said I could use him in a

15  consulting and testifying capacity.  Then the Court provided at

16  the first instance $1,000.  Second to that after we had

17  expended those funds and I had gotten the expert to continue to

18  assist me even over those funds, I approached the Court again

19  and asked for more funds and highlighted the costs associated

20  with that.  At that time the Court gave me an additional $2,500

21  which essentially went to cover the work that he had performed

22  for me in good faith in regards to providing Mr. Abdo a

23  defense.  Then I came back to the Court a third time and I

24  asked for more funds just so I could have him testify, not so

25  that I can have him perform any more work and I presented the

1   Court with three different options in regards to trying to

2   control the cost because I am aware that cost is a concern and

3   I'm doing the best I can in regards to that and in regards to

4   my duty to provide Mr. Abdo a proper defense.

5        THE COURT:  That does sound accurate and does clear things

6   up.

7        MR. BOYD:  Thank you, Your Honor.

8        THE COURT:  Demonstrates that you did get quite a bit of

9   assistance.  Anything else you wish to present?

10       MR. BOYD:  Not in regards to offers of proof or bills of

11  exceptions, Your Honor.  I would request a brief time period

12  where I can meet with my client and the court reporter outside

13  the presence of other people to put one thing on the record.

14       THE COURT:  That's not appropriate, Counsel.

15       MR. BOYD:  Yes, Your Honor.

16       THE COURT:  I don't know what you mean.  You and the court

17  reporter and your client.  That's all -- that's not --

18       MR. BOYD:  Yes, Your Honor.

19       THE COURT:  -- something I've ever heard anybody

20  attempting to do.  If you want to exclude the -- I don't know.

21  Approach the bench and let me know what you -- what's up.

22       (On-the-record bench conference, to wit:

23       THE COURT:  What are you trying to do?

24       MR. BOYD:  Your Honor, I'm simply trying to preserve my

25  client's choice as to whether or not he wants to testify or not

1   before we go into the defense of the case.

2       THE COURT:  Well, you can't do that with just you and the

3   court reporter and your client.

4       MR. BOYD:  Well, I mean, I'm fine.  I mean, I don't want

5   it revealed to the prosecution what that decision is going to

6   be, Your Honor.

7       THE COURT:  Why not?  They're going to find out as soon as

8   you do.

9       MR. BOYD:  I don't even know right now, Your Honor.

10      THE COURT:  That's what I said.  They're going to find out

11  as soon as you do.

12      MR. BOYD:  And that's --

13      THE COURT:  You need to talk to him privately certainly.

14      MR. BOYD:  Yes, Your Honor.  I was just trying to preserve

15  it on the record.

16      THE COURT:  Well, you can do that but not just you and the

17  court reporter and -- I mean, we can exclude the U.S.

18  Attorney's office I guess.  I don't know.

19      MR. FRAZIER:  I can step out and do what you need to do.

20      MR. BOYD:  Okay, Judge.

21      THE COURT:  We can clear the courtroom if you want to do

22  that.

23      MR. BOYD:  Yes, Judge.  That's what I would request.

24      THE COURT:  Well, I need to be here.

25      MR. BOYD:  Yes, Judge.  I was not trying to exclude the

1    Court.  I misspoke.

2         (End of bench conference.)

3         THE COURT:  All right.  Let's take a brief recess and we

4    need to clear the courtroom.

5         LAW CLERK:  All rise.

6         Court will stand in recess.

7         (A break was taken from 10:41 to 10:46.)

8         (Government counsel not present.)

9         LAW CLERK:  All rise.

10        THE COURT:  Be seated, everyone.

11        Mr. Boyd?

12        MR. BOYD:  Your Honor, at this time I would like to advise

13   on my record -- on the record the perils that I think my client

14   has in taking the stand to testify.  Advise him against

15   testifying and also allow him to know the right that he can

16   choose to testify or he can choose not to testify.

17        Mr. Abdo, what is it that is your choice in regards to

18   testifying or not testifying?

19        THE COURT:  Well, let me make that as clear as I can.

20        Mr. Abdo, you have the right to testify.  The absolute

21   right to testify.  You have the absolute right not to testify,

22   and if you elect not to testify, then I will instruct the jury

23   that they are not to make any inference or suggestion of your

24   guilt because you didn't testify.  That's part of the

25   instructions the Court always gives if a defendant elects not

1  to testify.  It's strictly your choice based on your advice of

2  your attorney but essentially you are the one that makes the

3  choice.

4      MR. BOYD:  Mr. Abdo, knowing that, what is it your choice

5  to do?

6      THE DEFENDANT:  I'm going to take Mr. Boyd's advice and

7  not testify.

8      MR. BOYD:  Your Honor, with that all I've got is I'd

9  request we bring the prosecutor back in so I can make a Rule 29

10  motion and then I'll conclude.

11      THE COURT:  We can let everybody back in except the jury.

12      (Government counsel entered the courtroom.)

13      MR. BOYD:  Your Honor, my last pretrial matter before we

14  bring the jury back is pursuant to Rule 25 to request that the

15  Court dismiss the charges.

16      THE COURT:  25 or 29?

17      MR. BOYD:  Rule 29, Your Honor.  I apologize.  I misspoke.

18      THE COURT:  Whichever you prefer.

19      MR. BOYD:  I prefer 29.

20      THE COURT:  29 is better.

21      MR. BOYD:  I think 29 gets me a little further, Your

22  Honor.

23      The government just failed to prove its case in chief,

24  Your Honor.  Specifically it has failed to prove the component

25  piece in regards to the components being available and readily

1   assembleable into a device.  And I think that because that

2   makes their first and fourth counts fail that that also

3   necessarily makes their second, third, fifth and sixth counts

4   fail as a matter of law.

5          I would further offer to the Court that the way the

6   statute is written is unconstitutional in that it allows

7   Mr. Abdo to be convicted for his mens rea alone and not for

8   mens rea and act his rea because in effect is what's happening

9   is to charge him under Count One they're first having to find

10  an attempt to build a device and secondly they're having to

11  find that that attempt to build the device is a subsequent

12  attempt to cause harm to others and that -- that goes

13  throughout each of the counts, thereby making all of the counts

14  fail as a matter of law, Your Honor, and I would respectfully

15  submit that to the Court for its consideration and at this

16  point to dismiss the charges against Mr. Abdo.

17         THE COURT:  That motion will not be granted.

18         Are we ready to bring the jury in and proceed with the

19  defense?

20         MR. BOYD:  Yes, Your Honor.

21         THE BAILIFF:  All rise.

22         (The jury entered the courtroom at 10:52.)

23         THE COURT:  Be seated, everyone.

24         All right.  Ladies and gentlemen, the government has

25  rested.  We've taken care of the legal matters we needed to

Direct Examination of Anita Rinehart by Mr. Boyd          551

1    take care of and we're ready to begin the defense.  Mr. Boyd

2    has stepped outside to find his first witness though.  We'll

3    wait a second until he locates him or her.

4         MR. BOYD:  Your Honor, I'm going to call Detective

5    Rinehart at this time.

6         (The witness was sworn.)

7                        DIRECT EXAMINATION

8    BY MR. BOYD:

9         Q.   Detective Rinehart, on the 27th day of July 2011 do

10   you remember what you were doing?

11        A.   Yes, sir.

12        Q.   And were you driving a vehicle that was equipped with

13   a camera and recording device?

14        A.   Yes.  I was.

15        Q.   And specifically the camera and recording device that

16   is in the vehicle that you were driving, was it functioning

17   that day?

18        A.   Yes.  It was.

19        Q.   And is that a recording device that has a camera on

20   it?

21        A.   Yes.  It does.

22        Q.   And does it also have an audio component on it?

23        A.   Yes.  It does.

24        Q.   And does it have a microphone that is a wireless

25   microphone that kind of looks like a pager?

1          A.    Yes.  It does.

2          Q.    With respect to the device in that car, does the

3   camera rotate?

4          A.    Yes.

5          MR. SOFER:  Objection as to relevance, Your Honor.

6          THE COURT:  Overruled.

7   BY MR. BOYD:

8          Q.    Does the camera rotate?

9          A.    Yes.  It does.

10         Q.    And so that if you were to want to videotape an

11  entire arrest sequence or interaction with a citizen, you can

12  point it where you need to point it as an officer and then

13  stand next to them with the mic activated so that you could

14  record that entire encounter?

15         A.    Yes.

16         Q.    Previously it has been -- there has been information

17  regarding the vehicle you were in not having a camera that

18  turns.  Are you absolutely certain that the camera in that

19  vehicle swivelled and turned?

20         A.    Yes.  I am because I was driving that vehicle for a

21  time and if I conducted a traffic stop or any citizen contact

22  and if that was off my view I could go and adjust the camera to

23  actually pick up my contact.

24         Q.    And so not only can you adjust the view, you can --

25  you can even review it to make sure that you've got the framing

Direct Examination of Anita Rhehart by Mr. Boyd ———553———

1   correct for what you're trying to accomplish?

2        A.   Yes.  There's a monitor in the car.

3        Q.   And with regard to the mic system on that car, it's

4   an older style unit, correct?

5        A.   Yes.  It is.

6        Q.   And by that I mean in the front of the car there's a

7   camera and a camera system and then wires run through the car

8   and in the trunk of the car in a vault is essentially a VCR,

9   correct?

10       A.   Yeah.  I don't know all the technical stuff that

11  comes behind all that.  I do know that there's a vault in the

12  trunk of the vehicle.

13       Q.   Okay.  And so when you hit the record button on the

14  device for the pager like device, when you do that, is there a

15  slight lag time?

16       A.   Yes.  There is.

17       Q.   And that slight lag time is only a few seconds,

18  correct?

19       A.   I believe so.  Yes.

20       Q.   It's not an extended period of time?

21       A.   It depends on what you mean by extended.

22       Q.   Well, I mean, for instance if you had hit the button

23  and then Mirandized somebody, at some point you would hear some

24  of the Mirandization?

25       A.   Well, I mean, it depends if it was immediately after

Direct Examination of Anita Rinehart by Mr. Boyd

1    you -- one activates the mic or are we talking about minutes

2    after?

3        Q.   No.  I'm talking you hit the button.  You're not

4    aware of the lag time and then you begin to read the Miranda

5    warning from a card.  I'm not saying you get the whole Miranda

6    warning but you would at least get part of it?

7        A.   That's possible.  Yes.

8        Q.   Okay.  Now, with respect to the day in question, you

9    showed up on scene, right?

10       A.   Yes.

11       Q.   And at what point did you have an interaction with

12   Detective Wingfield?

13       MR. SOFER:  Objection as to relevance again, Your Honor.

14       THE COURT:  Overruled.

15   BY MR. BOYD:

16       Q.   At what point did you have interaction with Detective

17   Wingfield?

18       A.   From the beginning of shift which is 0700.

19       Q.   Okay.  And at the time you arrived in the vehicle you

20   arrived in, did you have the opportunity to tell him what to do

21   in regards to Mirandization?

22       A.   Prior to our arrival?

23       Q.   No.  When you arrived on scene and first interacted

24   with him.

25       A.   Not immediately.  No.

1      Q.   At some point did you tell him to make sure before

2   any questions got asked of Mr. Abdo that Detective Wingfield

3   Mirandize him?

4      A.   A time later, yes.  After we detained -- when we

5   detained Abdo and he was already in the car.  Of course we were

6   running around doing all kind of things trying to secure the

7   building.  I do recall going to the vehicle where Detective

8   Wingfield was and reassured that we weren't questioning or

9   talking to the subject without first Mirandizing him.

10     Q.   And you gave him a Miranda card for him to accomplish

11  that?

12     A.   He had the card.  Yes.

13     Q.   And that was one you'd provided him?

14     A.   No.  I didn't provide him the card.  He had a card.

15     Q.   Okay.  And for the rest of the day while you were on

16  scene did you ever see any explosives -- any explosive device,

17  a bomb even partially built?

18     A.   I did not.  I wasn't near the area when that was

19  exposed.

20     Q.   Okay.  Did you see the backpack?

21     A.   Yes.  I did.

22     Q.   And did you ever see any sort of functioning device

23  in the backpack?

24     A.   No.  We did not open the backpack at that time.

25     MR. BOYD:  Okay.  No further questions.

Direct Examination of Willie Wingfield by Mr. Boyd

1       MR. SOFER:  None from the government, Your Honor.

2       May the witness be excused?

3       MR. BOYD:  Yes, Your Honor.

4       THE COURT:  Yes.  You may be excused, ma'am.

5       MR. BOYD:  Your Honor, I'll call Detective Wingfield next.

6       (The witness was sworn.)

7                       DIRECT EXAMINATION

8  BY MR. BOYD:

9       Q.  Officer Wingfield, good morning.  Please state your

10  name for the record.

11      A.  Willie Wingfield.

12      Q.  And were you working on the morning of -- or on the

13  day of July the 27th, 2011?

14      A.  Yes, sir.

15      Q.  And do you remember that day?

16      A.  Yes, sir.

17      Q.  Were you working with Detective Rinehart that day?

18      A.  Yes, sir.

19      Q.  At some point were you called to the America's Best

20  Value Inn?

21      A.  Yes, sir.

22      Q.  And at that time did you come into contact with

23  Mr. Abdo?

24      A.  Yes, sir.

25      Q.  Were you the person who initially talked with

Direct Examination of Willie Wingfield by Mr. Boyd ———557

 1   Mr. Abdo?

 2        A.    Initially, yes, sir.

 3        Q.    And so after he was placed into custody and arrested,

 4   you were the first person to talk with him regarding anything?

 5        A.    After we detained him I spoke with him at the -- at

 6   the car, read him his rights.

 7        Q.    Okay.  And when you read him his rights, did you turn

 8   the video camera so that it would be on him so that you could

 9   document that?

10        A.    No, sir.  I didn't.

11        Q.    And why didn't you do that?

12        A.    All I did was activate the camera.  I didn't turn it

13   around or anything like that.  The vehicle that I was in was an

14   older vehicle and wasn't too familiar with that vehicle.  I was

15   used to driving the newer model vehicles and that vehicle was

16   an older vehicle.

17        Q.    What does that mean?  Does that mean that somehow

18   that -- you're representing to the jury that that camera didn't

19   move?

20        A.    No, sir.  I'm not saying that.

21        Q.    Previously you've represented that camera didn't

22   move?

23        A.    I'm saying that I didn't have any knowledge that it

24   moved.  I didn't attempt to turn it or anything like that.  No.

25   I didn't.

Direct Examination of Willie Wingfield by Mr. Boyd ———558———

1      Q.   But previously you've indicated that that camera

2   didn't have the ability to move, right?

3      A.   To my knowledge it didn't.  I didn't know that it

4   turned around.

5      Q.   And the fact is that that camera did move?

6      A.   Okay.

7      Q.   Is that correct?

8      A.   Possibly.

9      Q.   Have you had a chance to ride in that vehicle since?

10     A.   No, sir.

11     Q.   So you haven't been in Officer Rinehart's vehicle

12  since that day?

13     A.   Probably after that day but it's been -- it's been

14  awhile since I've been in a patrol vehicle.

15     Q.   With respect to the rest of the recording, there is a

16  pager looking device that serves as a microphone, correct?

17     A.   Yes, sir.

18     Q.   And that pager device once you activate it and hit it

19  allows you to record the contact you have with whoever you

20  might be having contact with?

21     A.   That's correct.

22     Q.   So when you had contact with Mr. Abdo, you hit the

23  recording device and then started your contact, right?

24     A.   Yes, sir.

25     Q.   But nowhere on any of those tapes do we hear a

Direct Examination of Willie Wingfield by Mr. Boyd ——559

1    Miranda warning, do we?

2        MR. FRAZIER:  Judge, I'm going to object to first leading

3    and second this is irrelevant.

4        THE COURT:  Overruled.

5    BY THE WITNESS:

6        A.   That's correct.

7    BY MR. BOYD:

8        Q.   And it takes some period of time to read a Miranda

9    card, doesn't it?

10       A.   A few seconds.

11       Q.   And you read -- you read your Miranda warning from a

12   card that you have, right?

13       A.   Yes, sir.

14       Q.   Isn't it true that you really didn't read that

15   Miranda warning?

16       A.   No, sir.  That's not true.

17       MR. BOYD:  No further questions.

18       MR. FRAZIER:  We have no questions of this witness, Your

19   Honor.

20       THE COURT:  You may step down.

21       MR. BOYD:  Your Honor, I'll call Officer Bradley next.

22       Your Honor, at this time I'm going to offer into evidence

23   Defense Exhibit No. 6 which is a clip of the arrest sequence

24   and the detention sequence from America's Best Value Inn.

25       MR. FRAZIER:  Your Honor, we have no objections to the

1    extent it has any relevance.

2         THE COURT:  It will be admitted then.

3         (Exhibit(s) admitted:  D6)

4                         DIRECT EXAMINATION

5    BY MR. BOYD:

6         Q.   Officer Bradley, do you recall the day of July the

7    27th, 2011?

8         A.   Yes, sir.

9         MR. BOYD:  And I'm going to ask that we bring up the first

10   clip on Defense Exhibit No. 6.  And if you would just hit pause

11   for right now.

12   BY MR. BOYD:

13        Q.   Now, you've seen these series of videos in regards to

14   America's Best Value Inn before, correct?

15        A.   Yes, sir.

16        Q.   And what -- what do they show?

17        A.   This particular one shows him exiting going down the

18   hallway toward the exit of the building.

19        MR. BOYD:  Okay.  Would you please hit play?

20        (Video played.)

21        MR. BOYD:  And would you please show me the next clip?

22   Clip No. 2?

23   BY MR. BOYD:

24        Q.   And this next clip what does it show?

25        (Video played.)

 1   BY THE WITNESS:

 2        A.   It's the subject exiting the front lobby of the

 3   business.

 4   BY MR. BOYD:

 5        Q.   And as he is exiting the front lobby, what --

 6        MR. BOYD:  Pause it right there.

 7   BY MR. BOYD:

 8        Q.   What is happening right there?

 9        A.   He's exiting the lobby.  Lieutenant Boone and I have

10   observed him leaving, recognize him as the suspect that we were

11   looking for and as Lieutenant Boone is exiting he's drawn his

12   pistol.

13        Q.   As he was walking, he wasn't walking in a suspicious

14   manner, was he?

15        A.   No, sir.

16        Q.   And he wasn't behaving in a suspicious way, was he?

17        A.   At that moment, no, sir.

18        MR. BOYD:  And continue the clip.

19        (Video played.)

20   BY MR. BOYD:

21        Q.   And at the end of that clip did it actually show

22   Lieutenant Boone point his pistol at Mr. Abdo?

23        A.   I believe so.  Yes, sir.

24        MR. BOYD:  Next clip, please.

25        (Video played.)

1    BY MR. BOYD:

2        Q.   Now, this shows what's going on outside, correct?

3        A.   Yes, sir.

4        Q.   And it's happening up around 13, right?

5        A.   Yes, sir.

6        Q.   Can you indicate on the screen -- can you touch it

7    and indicate where all this is happening?  It should be up by

8    the --

9        A.   Up by the time stamp, sir.  Right underneath the

10   13:04.

11       Q.   If you'll touch the screen I believe it'll make a

12   mark.  Or maybe -- there we go.  And that's where everything's

13   happening, correct?

14       A.   Yes, sir.

15       Q.   And so over a period of a few seconds what happens?

16       A.   The subject exited the business.  Lieutenant Boone

17   had him at gunpoint.  Initially I did not based on the fight or

18   flight in case I had to give chase.  When the subject initially

19   had his arms up, then put them down somewhat, I did draw my

20   pistol also and we ordered him into a prone position face down

21   on the ground.

22       Q.   And he immediately went down, correct?

23       A.   Yes, sir.

24       Q.   And then at some point an officer comes out and what

25   does that officer do a few seconds later?

Direct Examination of Eric Bradley by Mr. Boyd

1      A.   Detective Wingfield came out.  I had him remove the

2  backpack from the subject and Detective Wingfield did place him

3  into handcuffs.

4      Q.   And where did the backpack go?

5      A.   Initially adjacent to where they were at and a little

6  bit later I had Detective Wingfield move the backpack between

7  the pillars.

8      Q.   And this is the same backpack that nothing in regards

9  to a device was located in, correct?

10     A.   There were items in the backpack but not a device in

11 the backpack.

12     Q.   There was nothing that could explode in the backpack?

13     A.   No, sir.

14     Q.   Did you come to know where he was headed through your

15 investigation?

16     A.   No, sir.  I remember that the cab was there for him.

17 I'm not -- I don't recall what his destination was at that

18 point.

19     Q.   Did you ever know?

20     A.   Not directly, sir.  No.  I did not ask him that.

21     Q.   Okay.  And are you the officer again that essentially

22 questioned him first?

23     A.   Yes.

24     MR. BOYD:  Now, if we could play the next clip.

25     (Video played.)

Direct Examination of Eric Bradley by Mr. Boyd

1   BY MR. BOYD:

2       Q.   In this last clip which vehicle is that pulling up

3   right there?

4       A.   That's one of our Killeen Police Department patrol

5   vehicles that was being utilized by Detective Anita Rinehart

6   and Detective Wingfield that day.

7       Q.   And the purpose of that was to get him out of the

8   public eye into y'all's area where y'all could kind of control

9   the situation a little better?

10      A.   That among other things.

11      Q.   And then you -- it's hard to see, but basically

12  someone gets out of the car.  Someone walks around the car.

13  He's placed in the car.  The car backs up and then parks in the

14  sunlight right outside that shed?

15      A.   Yes, sir.

16      (Video played.)

17      MR. BOYD:  And you can stop the playback.

18  BY MR. BOYD:

19      Q.   Now, previously you had testified that you had had a

20  conversation with Detective Wingfield telling him how to move

21  items around and that testimony kind of indicated it took a

22  little bit of time.

23      A.   I'm not sure of the exact time.  I had him initially

24  remove the backpack from the suspect.  Detective Wingfield

25  placed the suspect into handcuffs and a short time later I did

Direct Examination of Eric Bradley by Mr. Boyd

1    have him move the backpack away from where we were located.

2        Q.   And by short time, that's really just a few seconds,

3    correct?

4        A.   I don't remember the exact time line.

5        Q.   I mean, this --

6        A.   It was within moments of us placing him in the

7    handcuffs.

8        Q.   I mean, this accurately depicts the time?

9        A.   Yes, sir.

10       Q.   The amount of time of -- that it actually took for

11   all of that to happen?

12       A.   Yes, sir.

13       Q.   And at this point in the video you didn't -- you had

14   Mr. Abdo in custody and you had a backpack sitting there in the

15   public and that was about 1:00 p.m.?

16       A.   Yes, sir.  I believe that's the --

17       Q.   At what point did EOD show up?

18       A.   It was a while later.

19       Q.   So there wasn't a big concern about the backpack?

20       A.   Yes, sir.  There was.

21       Q.   So if there was such a big concern, why did it take

22   several hours?

23       MR. FRAZIER:  Judge, I'm going to object to the relevance

24   of the questioning.

25       THE COURT:  Overruled.

Direct Examination of Eric Bradley by Mr. Boyd — 566 —

1   BY THE WITNESS:

2      A.   Because we made initial notification through the Bell

3   County Communication Center to Fort Hood EOD and they have

4   their own time line to which they respond to those incidents as

5   far as a recall and getting the equipment and getting to our

6   location, but EOD was called immediately.

7   BY MR. BOYD:

8      Q.   Okay.  With respect to people going in and going out

9   of the room, either 230 or 248, who went into the Room 230

10  before EOD?

11     THE COURT:  What room are you talking about, Counsel?

12     MR. BOYD:  Room 230 where the -- where the majority of

13  these items were located.

14  BY MR. BOYD:

15     Q.   Who went in before EOD went in?

16     A.   Nobody to my recollection, sir.

17     Q.   Why would the room be open when EOD got there?

18     A.   I'm not sure, sir.

19     Q.   Would that typically indicate entry had been made?

20     A.   Or the door wasn't locked or closed when it -- when

21  the person last left it.

22     Q.   Do you believe a person that had these items in a

23  room would leave a door --

24     MR. FRAZIER:  I'm going to object to speculation, Your

25  Honor.

Cross-Examination of Eric Bradley by Mr. Frazier

1          THE COURT:  Sustained.

2          MR. BOYD:  No further questions, Your Honor.

3                        CROSS-EXAMINATION

4   BY MR. FRAZIER:

5          Q.   Yesterday we showed the Dash Cam 55?

6          A.   Yes, sir.

7          Q.   Government's Exhibit No. 55.  The time stamp that's

8   on the dash cam, is that a correct or incorrect statement of

9   the time?  Was it off?

10         A.   It was off.  Yes, sir.

11         Q.   By several minutes?

12         A.   Yes, sir.  It was a significant amount of time.

13         Q.   Okay.  But it did not indicate the actual correct

14  time?

15         A.   It did not.

16         MR. FRAZIER:  All right.  That's all I have.  Thank you.

17                      REDIRECT EXAMINATION

18  BY MR. BOYD:

19         Q.   Did you ever locate a device in either Room 230, 248

20  or in the backpack?

21         A.   I did not, sir.

22         MR. BOYD:  Nothing further.

23         MR. FRAZIER:  Nothing further, Your Honor.

24         THE COURT:  You may step down, sir.

25         MR. FRAZIER:  May this witness be excused?

1          MR. BOYD:  Yes, Your Honor.

2          THE COURT:  Yes.  You may.

3          (Conference between Mr. Boyd and defendant.)

4          MR. BOYD:  Your Honor, ladies and gentlemen of the jury,

5     defense rests.

6          THE COURT:  Any rebuttal, Mr. Frazier?

7          MR. FRAZIER:  United States rests and close, Your Honor.

8          THE COURT:  Members of the jury, that completes the

9     evidence in this case.  The next order of business would be for

10    me to read to you the Court's instructions, for the attorneys

11    to make their final summations and then for you to deliberate

12    upon a verdict.  Preparing those instructions is something

13    that's ongoing throughout the trial, but it can't be completed

14    until the evidence is closed.  So that's going to take a little

15    while.  It's almost 11:30.  So it's an appropriate time to

16    recess a little early for lunch anyway.  The lawyers and I will

17    be working on that legal document while you're enjoying a

18    leisurely lunch and I'll ask you to be back at 1:00 o'clock and

19    we'll make every effort to be ready to proceed at that point.

20    I can't promise we will, but we'll do our best.  You'll be in

21    recess till 1:00 o'clock.

22         LAW CLERK:  All rise.

23         (Jury exited the courtroom at 11:24.)

24         THE COURT:  Counsel, let me get a proposed final charge

25    ready as soon as I can.  We'll bring copies of that out to you

1   momentarily.

2       LAW CLERK:  Court will stand in recess till 1:00 o'clock.

3       (A break was taken from 11:24 to 12:30.)

4       THE COURT:  Okay.  Does the government have any objections

5   to the charge?

6       MR. FRAZIER:  No objections, Your Honor.

7       THE COURT:  Mr. Boyd?

8       MR. BOYD:  Your Honor, I have one objection on Page 16.

9   Pursuant to the language in United States v. Sanchez at 667

10  F.3d 555 -- well, it's actually at 563 in that decision out of

11  the Fifth Circuit in 2012.  I would object to the language that

12  it starts second colon:  That the defendant did enact

13  constituting a substantial step towards the commission of each

14  crime which strongly corroborates the defendant's intent.

15  Pursuant to U.S. v. Sanchez I think that it needs to state and

16  amounts to more than mere preparation as the finding in U.S. v.

17  Sanchez in regards to that point is in short a substantial step

18  must both be, one, an act strongly corroborative of the actor's

19  criminal intent and, two, an amount -- and to amount to more

20  than mere preparation.

21      So what I'm objecting to and asking for is just the lack

22  of including the mere preparation language and asking that that

23  be included at that location.

24      THE COURT:  What specifically you want to do is you wanted

25  to add after intent.  You said something specific.

1      MR. BOYD:  And amounts to more than mere preparation, Your

2 Honor.

3      THE COURT:  I don't see a problem with that.

4      MR. FRAZIER:  Our only response would be, Judge, it's

5 already contained on Page 17 in the explanation of it.  Mere

6 preparation without more is not an attempt --

7      THE COURT:  It doesn't hurt to say it twice.

8      MR. FRAZIER:  Okay.

9      THE COURT:  Say it again, Mr. Boyd.

10      MR. BOYD:  Your Honor, and amounts to more than mere

11 preparation.

12      That's everything, Your Honor.

13      THE COURT:  How long do you want to argue then?  How long

14 do you request for argument?

15      MR. FRAZIER:  45 minutes.

16      THE COURT:  45 what?

17      MR. FRAZIER:  Minutes.

18      MR. BOYD:  Your Honor, I don't think it'll take that long.

19      THE COURT:  I don't either.  30 minutes aside.

20      LAW CLERK:  All rise.

21      (A break was taken from 12:34 to 1:03.)

22      LAW CLERK:  All rise.

23      (The jury entered the courtroom at 1:03.)

24      THE COURT:  Be seated, everyone.

25      Ladies and gentlemen, as I mentioned earlier, the next

1    order of business is for me to read to you the Court's

2    instructions.  It is a lengthy legal document.  Each of you has

3    a copy of it to follow along with me if you wish and you may

4    take that with you to the jury room.  Let me assure you that I

5    enjoy having to read this about as much as you're going to

6    enjoy having to listen to me, but the law requires it.

7         (Jury instructions were read by the Court.)

8         THE COURT:  The remaining two pages, ladies and gentlemen,

9    I will read to you after the attorneys have made their

10   summations since those deal with how you should go about your

11   deliberations.

12        Mr. Frazier, are you going to open for the government?

13        MR. FRAZIER:  Mr. Schneider's going to open for the United

14   States.  I'll be closing, Your Honor.

15        THE COURT:  Mr. Schneider, shall I give you a warning

16   after you've used any particular amount of time?

17        MR. SCHNEIDER:  Yes, Your Honor, at the 20 minute mark,

18   please.

19        THE COURT:  Yes, sir.

20             OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

21        MR. SCHNEIDER:  May it please the Court, defense counsel,

22   ladies and gentlemen of the jury.  First of all, on behalf of

23   the government I'd like to thank you all for your time and

24   attention and your service during the last few days.  You've

25   gone and heard a lot of witnesses.  You've seen a lot of

1    evidence in court and we're going to go through a little bit of

2    that today before you deliberate.

3         Now, your first witness that you heard was Special Agent

4    Mike Owens from the FBI and he told you about the interviews he

5    conducted after that defendant was arrested on July 27th of

6    2011.  We learned a lot of information from those interviews

7    because the defendant told Agent Owens everything over several

8    hours on the first day July 27th and then they met again the

9    second day July 28th to continue those interviews with Agent

10   Owens where he continued to lay out what his plans were.  So

11   I'm going to review with you some of the things we learned just

12   from the defendant's own statements.  And things that we later,

13   through the introduction of other witnesses and all the other

14   evidence, what we were able to corroborate of what the

15   defendant said to Agent Owens.

16        The first thing we have is that the defendant intended to

17   conduct an attack on soldiers from Fort Hood.  I'm showing you

18   a small clip from Government's Exhibit No. 55.  We'll back that

19   up.

20        (Video played.)

21        MR. SCHNEIDER:  Now, that was the statement that the

22   defendant made in the back of the patrol car to Sergeant

23   Bradley.  Sergeant Bradley testified and told you about his

24   interview in the back of that patrol car.  That's the

25   defendant's own words about what his intent was in order to

1   conduct an attack on Fort Hood.

2       We also know from the defendant's own words that he

3   intended to build a bomb.  And looking at Government Exhibit

4   150 we know from Clip 2 -- and this is a shortened clip -- that

5   he intended to --

6       (Video played.)

7       MR. SCHNEIDER:  And if we can play Clip 3 also from

8   Government 150.

9       (Video played.)

10      MR. SCHNEIDER:  Ladies and gentlemen, the defendant's own

11  words.  We know what his intent is.  We don't have to guess at

12  it.

13      He has also explained his motivation for building the bomb

14  and why he wanted to commit murder in this case.  Also in the

15  conversation he had with his mother, this was a conversation he

16  had with his mother after he was arrested in this case.  That's

17  part of Exhibit 150.

18      And if we can play Clip No. 4.

19      (Video played.)

20      MR. SCHNEIDER:  Once again the defendant's own words.

21      We know from his statements that he bought the components

22  himself.  We've been able to corroborate that.  You saw many

23  witnesses here about -- who testified about the components that

24  he bought.  You had witnesses from Walmart who testified about

25  the items he purchased in Walmart.  You had surveillance video

1  from Walmart.  You had a witness who testified from Lowe's

2  about the items he bought there, including the Lowe's boxes and

3  the Christmas lights.  The Christmas lights which were a

4  component of the bomb that he intended to build.

5      You heard from the store employee Mr. Hutton at Surplus

6  City where he bought the uniform with the name Smith.  Part of

7  his plan to conduct an attack.

8      You heard from the witnesses Ms. Cathy Cheadle and

9  Mr. Greg Ebert from Guns Galore about his purchase of the

10 powder and the ammunition at the Guns Galore store in Killeen.

11     We know he tried to hide the fact that he bought the

12 items.  He paid in cash.  He wore sunglasses in these stores.

13 Sunglasses when he was inside and it made no sense to wear

14 sunglasses.  Sunglasses that in most cases he never took off.

15     We know he was following the instructions on how to build

16 a bomb from Inspire magazine, an article put out by Al-Qaeda in

17 the Arabian Peninsula geared for the person that has no

18 explosives experience.  The article is entitled How To Build A

19 Bomb In The Kitchen Of Your Mom and it's geared for people to

20 take household items and build a bomb to commit these kind of

21 attacks exactly what that defendant wanted to do, to commit an

22 attack, to build a bomb and kill as many people as he could.

23     We know he had planned to execute attacks within a day of

24 being arrested.  How do we know?  Because the defendant told

25 Agent Owens after he was arrested.  He originally had planned

1    to do it the day before his arrest and then he changed his

2    plan.  The day he was arrested he had all the components in

3    that hotel room.  You heard from Special Agent Stryker, the

4    bomb expert in that case, who said that in his expert opinion

5    all the necessary components to build that bomb were present in

6    the room.  He also said that following the instructions in that

7    article would have led to a working bomb, and you saw the video

8    of what that bomb might have looked like.  We know he had the

9    article.  It was in the backpack when he was arrested.

10        According to his statements the day he was arrested, he

11   was also going to do recon around the area to pick out which

12   Chinese buffet restaurant or other restaurant he was going to

13   use for the attack.  Remember in the testimony of Agent Owens

14   that what he wanted to do was find a restaurant that was

15   crowded between the hours of 11:00 and 2:00 when most soldiers

16   are at lunch and get literally the most bang for his buck.  He

17   wanted to kill as many people as he could in that restaurant.

18   Civilians would be collateral damage.  That's what Agent Owens

19   testified to as to what the defendant said.  And what was the

20   defendant going to do while he was outside that Chinese

21   restaurant?  He was going to wait outside with that handgun,

22   the handgun you've seen in evidence.  And how many rounds of

23   ammunition did he have?  143 rounds of ammunition.  He was

24   going to kill anybody that came out of that restaurant.

25        We also know in his plans to execute the attack the

1  following day which he had said that he had planned to leave

2  the hotel early.  We heard from the hotel clerk at the

3  America's Best Value Inn who said that originally when the

4  defendant checked in he checked in for a certain number of

5  nights and then he shortened his stay and got a refund.  So he

6  had planned on moving up this attack and conducting it sooner.

7      We know from his statements and from the other evidence

8  you've heard and seen that he was giving up his old life.  His

9  old life in Fort Campbell in Kentucky.  He left Fort Campbell

10  where he was an active duty soldier and he didn't return.

11      He abandoned his Cadillac at the truck wash at the Waffle

12  House in Oak Grove, Kentucky.  A fairly new car that he

13  abandoned.  He abandoned all the items that you've seen in

14  evidence.  He abandoned the handcuffs, the cattle prod, the

15  body bag, the body bag carrier, the masks, the gloves, the

16  bleach, the shovel, all the things that he intended to use for

17  his first murder operation.  That was interrupted and he had to

18  go on the run and he abandoned that life.  He abandoned

19  everything he had in his car.

20      What else did he have in his car?  He had basically all

21  the documents for his entire life, his social security number

22  card, his passport.  He had his enlistment papers, his training

23  certificates from the Army, his marriage certificates.

24  Everything you would collect in your life he left in that car.

25  He left the car keys on the seat.  He took the black backpack

1   and he got out of there on foot.  What was his reasoning for

2   doing that?  Well, part of it is what he told to Agent Owens.

3   He said that he intended to die a martyr.

4       He took his roommate's identification Asher Pluto and he

5   traveled under that name eventually getting to Texas.  Along

6   the way he bought that gun from Abraham Wherry, the individual

7   who testified that he sold the gun.  He bought that gun under

8   the name Asher Pluto and he gave that name and that ID for the

9   notarization at the UPS.  He checked in the hotel in Killeen

10  under Asher Pluto.

11      We know his intent to kill U.S. soldiers went as far back

12  as July 3rd of 2011 when he was still in Fort Campbell and in

13  Exhibit 149 we're going to play two clips.

14      (Video played.)

15      MR. SCHNEIDER:  We know his plan was interrupted.  That's

16  when he left Fort Campbell and he made his way to Texas.

17      He said in one of the clips which we're not going to play

18  that he utilized all his resources.  Over the course of those

19  23 days from July 4th to July 27th he traveled by bus and taxi

20  to Nashville to buy the gun and then to Texas where he

21  ultimately stopped in Killeen.  He purchased the gun.  He used

22  his cash, $460 for the gun alone.  He spent thousands of

23  dollars on all these purchases at Walmart.  There were several

24  three and $400 purchases at Walmart.  He went to all these

25  stores to buy the components.  And when all was said and done,

1   we know that the defendant knew he committed federal crimes.

2   In Exhibit 150, Clip No. 5 the defendant acknowledged that in a

3   call with his mother.

4       (Video played.)

5       MR. SCHNEIDER:  Now, looking at the counts in the

6   indictment, I'm going to walk you quickly through the counts in

7   the indictment.  Count One, attempt to use a weapon of mass

8   destruction.  There's no question that this occurred on the

9   date July 27.  There's been no question that it happened in the

10  Western District of Texas, Waco Division in the United States.

11  There's no question that it was knowingly or unlawfully.  He

12  stated he intended to build a bomb and he had the instruction

13  and the components to do it.  There's no question that he

14  planned to use the bomb against a person or property within the

15  United States.  He said he planned to kill soldiers.  He said

16  he planned to detonate a bomb in Killeen in a restaurant.

17  That's property as well.  We know that the results of the

18  offense would have affected interstate commerce.  You heard the

19  testimony of Ronald Stamper from Fort Hood on all the actions

20  that Fort Hood would have taken to affect interstate commerce.

21  You know from your common sense that it would have affected

22  interstate commerce.  You know from the testimony of Special

23  Agent Jason Cromartie what the actions of the FBI would have

24  been had there been an explosion in that restaurant and how

25  that would have affected interstate commerce and you saw the

1   video of the replica of the bomb that Special Agent Stryker did

2   and what it would have done to that restaurant.

3        The defense has tried to dispute that this was an attempt.

4   Let's look briefly at the steps the defendant took to conduct

5   his planned attack.  He used fake ID to avoid detection.  He

6   purchased the 40-caliber handgun in Nashville.  He downloaded

7   the Inspire magazine article on how to build the bomb.  He

8   purchased all the bomb components which are more than 30

9   different items related to this plan.  He traveled from

10  Nashville to Dallas and then to Fort Hood.  He purchased six

11  pounds of gun powder and shells at Guns Galore.  He purchased

12  the Christmas lights, the contact cement, the tape and the

13  boxes at Lowe's.  He bought the uniform to fit in under a

14  different name Smith and a different rank.  He was a private

15  first class.  He got a sergeant rank.  He got a hotel room in

16  Killeen.  What was he going to do in the hotel room?  He was

17  going to build a bomb there.  That's part of the steps that he

18  took to build this thing.  He opened the pressure cooker box

19  that he had bought at Walmart.  He then in the floor of that

20  hotel room began assembling this.  He cut open five shotgun

21  shells and removed the powder and the shotgun pellets from

22  those shells.  He placed the shot in a plastic cup.  He poured

23  some of the gun powder and the shot inside the pressure cooker.

24  He started making this bomb in the hotel room.  There's no

25  doubt about it from the testimony of Sergeant Grimes who was

1  the first person to enter that room and saw the pressure cooker

2  on the floor opened and with these items in it.  He conducted a

3  test burn of the powder on the plastic razor that you've seen.

4  He had three of the four magazines for the gun loaded with some

5  ammunition in it.  He planned to do recon on the restaurants

6  and finally choose a restaurant.  He changed his hotel checkout

7  date because he had figured out when he was going to plan the

8  attack and he spent over $2,000 on this plan.

9      Count Two, the attempt to kill members of the U.S. Army.

10  From July -- the beginning of July until at least the 27th of

11  July when he was arrested, there's no question about that, the

12  date.  He says he planned to kill soldiers at Fort Campbell in

13  early July.  So we know it starts in early July.  His plan was

14  interrupted which he's admitted.  And it continued until his

15  arrest.  There's no question that this also happened in the

16  Western District of Texas and elsewhere.

17      The attempt to kill are the same as all the steps he took

18  for his attempt to use a weapon of mass destruction.  Plus he

19  had the gun.  He was going to kill with that gun.  If he walked

20  into that restaurant and he filled that bomb with sugar and not

21  gun powder and it fizzled and it didn't go off, he had a gun

22  with 143 rounds of ammunition that he was going to use to kill

23  anybody he could.  Four magazines, 143 rounds of ammunition.

24  There's no question about the premeditation or the malice

25  aforethought in this case.  He had the murder kit, all those

1    murder items for the operation, in his words, that he planned

2    to conduct at Fort Campbell and then all of his planning in

3    Texas.  He's already admitted multiple times that he was

4    targeting members of the uniformed services.  He was targeting

5    soldiers because he didn't like what the Army was doing in

6    Afghanistan.  That's on account of their official duties.  He

7    was targeting soldiers, not civilians.  Civilians would be

8    collateral damage.  All that straight from his confession.

9         Counts Three and Five relate to the possession of the gun.

10   You've seen the testimony of the gun.  It's operable according

11   to the experts from the lab.  They've identified the gun as a

12   Springfield Armory 40-caliber semiautomatic pistol.  It was in

13   his possession.  There's no question about that or the date

14   when he possessed it July 27th, 2011 or that it was in the

15   Western District of Texas.  The pistol was sold to him by

16   Mr. Wherry.  The serial number was on that pistol.  It was the

17   same pistol.  It was in his backpack and loaded when he was

18   arrested.

19        Was it in furtherance of a crime?  Of course it was in

20   furtherance of a crime, ladies and gentlemen.  It was in

21   furtherance of both of the crimes of attempted use of a WMD, a

22   weapon of mass destruction, an attempted murder of the

23   soldiers.  He's told us why he had the gun in his interviews.

24   It was to shoot the survivors.  It was part of his plan.  But

25   he also had it on him as he was walking around in the backpack.

1   He didn't leave it in the room with the bomb components.  Why?

2   Because he had to have protection.  That was also part of the

3   plan.  He was carrying that gun with him.  He had it with him

4   when he was arrested.  That wasn't just for the plan.  That was

5   also protection.

6       Counts Four and Six, the final two counts in the

7   indictment.  Legally you've already been told that a firearm

8   not only includes a handgun but it also includes a destructive

9   device and you've heard from Agent Stryker that once you have

10  the components of a destructive device and they're readily able

11  to be assembled then make a destructive device and you have

12  that intent, that is a destructive device.  So just having the

13  parts is a destructive device under that definition.

14      In Counts Four and Six the firearm can also be a

15  destructive device.  So it shouldn't be confusing that Counts

16  Four and Six relates to the bomb, the destructive device.  The

17  components were there.  They could be readily assembled.  There

18  was no requirement that it be readily assembled in three

19  minutes or ten minutes or 12 minutes as long as it can be

20  readily assembled.

21      The bomb was certainly in furtherance of his attempted use

22  of a weapon of mass destruction and his attempt to murder

23  soldiers.

24      The date is not an issue.  We know he possessed those

25  components in his hotel room and in his backpack on July 27th

1   of 2011.  We know it happened in the Western District of Texas.

2   And we know he possessed it.  None of that is disputed, the

3   date, the place or that he possessed it.

4       And you've heard the expert testimony of not only Sergeant

5   Stryker -- Sergeant Grimes and Special Agent Stryker from the

6   lab about whether those components could be readily assembled

7   into a destructive device.  Both experts in explosives both

8   said that they could easily be assembled into a destructive

9   device.

10      Based on all that evidence, ladies and gentlemen, the

11  testimony you've heard which I submit to you is credible, we

12  will ask you to return a verdict, the only verdict consistent

13  with the evidence and the law, and that is a verdict of guilty

14  on all six of these counts.  Thank you.

15              CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

16      MR. BOYD:  Your Honor, ladies and gentlemen of the jury.

17      THE COURT:  Mr. Boyd, do you want me to warn you when you

18  have two minutes left?

19      MR. BOYD:  That's fine, Your Honor.  I don't think I'm

20  going to go anywhere near it.

21      THE COURT:  Okay.

22      MR. BOYD:  Ladies and gentlemen of the jury, defense

23  counsel -- prosecution.  I apologize.  It's been a long four

24  days.

25      Y'all have heard a lot.  And I'm going to pick up right

1    where I left off.  I'm glad that the prosecution is now talking

2    about applying the evidence to the law because that's what I'm

3    going to ask you to do and I'm going to ask you when I sit down

4    to return a verdict of not guilty, and the reason I'm going to

5    ask you to return a verdict of not guilty is because under the

6    law the government hasn't proven its case.  They haven't gotten

7    there.

8        There's a lot of stuff here.  There's a whole lot of stuff

9    here.  Having a plan is different than attempting.  Everything

10   that you just heard the prosecution talk about was having a

11   plan.  And the police got there before the plan could be

12   executed, before the attempt could occur.  That's why this is

13   such a difficult case because I don't pretend for one minute

14   that any person sitting in the jury box likes anything that

15   they heard about Mr. Abdo during the course of these last four

16   days.

17       But as the Judge said in his charge, it is so important

18   that in this case our society is and must be ruled by law and

19   not by men.  When we look at the evidence, I return you to the

20   idea I first talked with y'all about, the analogy of attempted

21   suicide.  What the government would have you believe, as I

22   started off, is that to commit the offense of attempted

23   suicide, let's say again by using a knife, if that person

24   didn't have a knife and that person went out and bought a knife

25   and intended to use that knife, that mere purchase would be

1   attempted suicide.  That just goes against common sense.  An

2   attempted suicide wouldn't occur until the knife got placed to

3   skin, until it got put into effect.  Same analogy only if you

4   commit suicide by using a bomb, the first -- the government

5   would have you believe that at the point the first item got

6   purchased that that was an attempt.  Common sense tells us that

7   is not an attempt.

8        Now, let's look at everything that you heard.  You heard

9   from all of the witnesses from all of the stores that nothing

10  sold was illegal.  Nothing purchased was illegal.  That's

11  important.  Every one of us has things in our houses that could

12  cause harm to other people.  They keep talking about a plan to

13  wait outside and kill survivors and it was a plan.  It didn't

14  happen.  It didn't come into fruition.

15       When they arrested him, he had a backpack.  Didn't have a

16  device in it.  It had a couple of clocks, some wire.  There was

17  a gun in there.  There was some ammunition in there.  No plan

18  was being put into effect.  Then they try to point some recon

19  that's scheduled.  That's hoping to get them a little bit

20  closer because, you know, once we have a recon, wow.  That

21  plan's going to be starting to get close.  Even by the

22  prosecution's own argument to y'all just now, no recon had

23  occurred.  No target had been selected.  They can't point --

24  they can't show you a picture and say, you see this restaurant

25  right here?  That's what he was going to attack.  They can't do

1   that, and because they can't do that, they can't stand up here

2   and tell you with any degree of reliability that a plan had

3   progressed past beyond mere preparation.  That's so important.

4       The Judge also said, among the things when you're judging

5   credibility and believability of the witnesses, did the witness

6   have any relationships either with the government or the

7   defense?  And that's so important.  Of course an expert is

8   going to say that the components could readily be assembled.

9   He's an expert, but that same expert wants y'all all to believe

10  that everyone has this innate knowledge regarding gun powder

11  and how it can be used.  And I'm sorry, but that's just not

12  believable.  It's just not.  People don't come pre equipped

13  with knowledge on gun powder.  The government in its closing

14  argument acknowledged that even if the sugar were placed in the

15  pressure cooker and it fizzled.  That's important.  Those

16  little things, they're important because the government surely

17  never presented this jury a device built entirely off of the

18  article entitled How To Build A Bomb In The Kitchen Of Your

19  Mom.  And that's not right.  You shouldn't convict somebody of

20  an attempted crime when they bring you a picture of a

21  speculated event and say, look at all this bad stuff that can

22  happen.  Sure.  Maybe it could have happened.  Maybe it

23  couldn't have happened.  They didn't bother testing any other

24  way except for the one way that they wanted y'all to see, the

25  one path that they wanted y'all to go down and that is because

1   if y'all don't go down that one path, their entire argument

2   fails.  And if their entire argument fails, then you have to

3   return a verdict of not guilty.

4        Count One the Judge instructed you for you to find the

5   defendant guilty of this crime you must be convinced that the

6   government has proved each element of the following beyond a

7   reasonable doubt:  First, that the defendant knowingly

8   attempted to use a weapon of mass destruction without lawful

9   authority and, second, that the defendant knowingly attempted

10  to do so against the person -- against a person or property

11  within the United States and the offense or the results of the

12  offense affected interstate commerce.

13       There was no evidence put on that anything that occurred,

14  that actually occurred affected interstate commerce.  They

15  talked about what could have happened, but they didn't talk

16  about what did happen.  According to this charge that the Judge

17  read you, because of that alone they didn't prove their case.

18       All of the other charges start to relate back to that, but

19  when you look at the language of what is a weapon of mass

20  destruction contained on Page 20 of the charge, it's either a

21  bomb, a whole bunch of other stuff or any combination of parts

22  intended for use and converting any device into any destructive

23  device and from which a destructive device may readily be

24  assembled.  They were trying to get that time down as low as

25  possible because they know it's important.  Common sense tells

1   us readily -- for something to be in such a position such that

2   it may be readily assembled would be such that you can grab it,

3   assemble it, go and do whatever it is you're going to do with

4   it.  You know, you weren't going to just sit there and work and

5   work and work and have to create something.  That's different.

6   That's a lot different.  Common sense tells us that that's

7   different.  That they mentioned it in closing shows that that's

8   very important to them.  And if you just do the math by the

9   example that I showed y'all on had he actually built the device

10  based on the way the article said to build the device, it

11  surely would have taken more than 30 minutes.  Mr. Abdo is no

12  expert.  Mr. Abdo is no Sergeant First Class Grimes who can do

13  wondrous things in building bombs at record speeds.  To assume

14  that is not right.  They said from the witness stand, you know,

15  expert Mr. Stryker, you know, he said, well, he didn't really

16  track how long it took him.  I would argue that there was a

17  great deal of time, probably hours, that went into their

18  creation and testing and analysis and that to represent

19  anything other than that to you, the good members of this jury,

20  is inaccurate.

21      It is okay to follow your common sense.  It is okay to

22  follow the law, and it is okay to require the government to

23  prove each and every element beyond a reasonable doubt.

24      In regards to the first count of attempting to use a

25  weapon of mass destruction against a person or property -- I'm

1    sorry.  In regards to the first count in terms of attempting to

2    use a weapon of mass destruction, I ask for the jury, you good

3    people, to do the hard thing, to stand up and say not guilty

4    because that's what the law demands.

5        Count Two, because he never got to the attempt in regards

6    to Count One, also fails.  He's not guilty of unlawful attempt

7    to kill with premeditation officers of the United States.

8    Employees of the United States.

9        Count Three, it also fails because the first count fails.

10   He didn't attempt to use a weapon of mass destruction against

11   anyone.  He just didn't attempt it.

12       Count Four alleges he possessed a firearm in furtherance

13   of a crime for which he may be prosecuted.  Again it refers to

14   Count One.  They can't prove Count One, they can't prove Count

15   Four.

16       Count Five.  They can't prove Count One, they can't prove

17   Count Five.

18       Count Six.  They can't prove it.  That's asking y'all to

19   find that the destructive device in One should be used to find

20   a crime there and later.  It's circular logic.  It doesn't

21   work.  It's all linked together.  If you can't prove Count One,

22   you can't prove Count Six.

23       I know that what I'm asking you to do probably wars with

24   each of you inside of your gut.  But I want you to look hard at

25   the evidence and I want you to look hard at whether or not he

1    got past more than mere preparation, and you know that he

2    didn't.  And you know that he didn't precisely because the

3    government is screaming so much about everything else.  They're

4    bringing in stuff from Kentucky and holding up body bags that

5    have nothing do with anything in Texas and they're trying to

6    say that's an extension of this plan.  Nothing happened in

7    Kentucky.  Nobody charged him in Kentucky.  Those officers told

8    you they didn't charge him in Kentucky.  Because there's no

9    crime in Kentucky.  And they're holding it up and acting like

10   it is in this federal courthouse.  They're doing it to scare

11   you.  Please follow the law.  Please be just and please find

12   Mr. Abdo not guilty.

13        MR. FRAZIER:  Your Honor, could I have a warning when I

14   have two minutes left?

15        THE COURT:  Yes, sir.

16        MR. FRAZIER:  Thank you.

17             <u>CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT</u>

18        MR. FRAZIER:  May it please the Court, counsel for

19   defendant.

20        Ladies and gentlemen of the jury, good afternoon.  I'm

21   just going to take a few minutes to conclude the argument today

22   to go over some of the evidence, but in particular I want to

23   talk about attempt because Counsel wants to give you an

24   interpretation of attempt that's not following the law at all.

25   It's not the correct interpretation of the law because the

1   Court tells you what attempt is.

2       Like any man making a cake in a kitchen, it could

3   sometimes be a very dangerous thing, but I'm thinking about a

4   cake.  That may be mere preparation.  If I go into the kitchen

5   and I get out the cake mix and I get out the eggs and I get out

6   the sugar and I get out the salt, I get out the nutmeg,

7   whatever cake I'm going to make and I lay it all out and I

8   start opening things up and I get the mixer in and I start

9   pouring things in the mixer, the door bell rings and I get

10  sidetracked doing something else and never come back to it, I'm

11  attempting to make a cake.  I may not have gotten very far.  I

12  may have not completed all the steps I needed to do, but I'm

13  attempting to make a cake.

14      Now, instead of putting two cups of sugar in that cake,

15  let's say I screw up and put two cups of salt in that cake and

16  I complete the process.  I stick it in the oven and come out

17  and it is completely inedible.  Doesn't work.  It doesn't

18  change the fact that I attempted to make a cake.

19      It doesn't really matter whether or not Mr. Abdo had the

20  knowledge, the correct knowledge, the right knowledge, expert

21  knowledge, novice knowledge, whatever the case may be to put

22  all of this stuff -- if he put all the sugar, if he went

23  outside and got some dirt and put it in there, stuck the drill

24  in there, stuck everything just to fill the canister and he

25  packaged it all up, took it to a Chinese restaurant, set the

1    timer to go off and it didn't go off, it doesn't change the

2    fact that he attempted to detonate a destructive device.  He

3    attempted to build and to detonate a destructive device.  It

4    doesn't change anything.

5         All the law requires is that he have the components

6    necessary to readily construct a destructive device.  That's

7    what the charge tells you.  The Court tells you in the jury

8    instructions on the definition.  This is found on Page -- of

9    the jury charge on Page 20.  It says:  Weapon of mass

10   destruction includes a destructive device which is any

11   explosive -- and it skips down -- explosive bomb or similar

12   device -- which is about four lines down -- semicolon after

13   about the third line down that says:  And any -- this is the

14   very last line of that paragraph or last sentence -- and any

15   combination of parts intended for use in converting any device

16   into any destructive device and from which a destructive device

17   may be readily assembled.  It doesn't matter what his level of

18   knowledge is.  The objective standard -- what the law tells you

19   to do is look at it objectively.  Could a bomb be readily

20   assembled?  Agent Stryker told you yes.  Sergeant Grimes told

21   you yes.  A destructive device could be readily assembled from

22   the components he had and in fact one was done.  That's

23   sufficient.  That then becomes a destructive device.  Whether

24   it's all put in the canister at the same time, whether it's put

25   in the canister according to the Inspire online article, really

1    doesn't matter as long as he has those components and that can

2    be readily assembled -- and you heard that he did -- that in

3    and of itself is a destructive device and under law that

4    destructive device is a firearm because you see on the very

5    next page Page 21 a firearm means any weapon that will or is

6    designed to -- may readily be converted to expel a projectile

7    by the action of an explosive -- that's a regular gun like a

8    pistol that we all think about.  And then it also goes on to

9    say, the term "firearm" also includes the frame or receiver of

10   any such weapon or any firearm, muffler or firearm silencer or

11   destructive device.  So by law a firearm is a destructive

12   device.  So each of those counts -- that would be Three, Four,

13   Five and Six -- that mention the term "firearm," destructive

14   device, combination of parts whether assembled or not is

15   sufficient for firearm.  So under the law the defendant should

16   be found guilty of each of those counts based on that

17   definition.

18        Now, let's review for just a moment the counts of the

19   indictment.  Let's talk about Count One.  Counsel pointed out

20   that you should find the defendant not guilty because the

21   government failed to prove that the offense or the results of

22   the offense would affect interstate commerce.  Now, recall what

23   the offense is in this particular case.  The offense that he's

24   charged with is attempt.  The results of the offense -- that

25   would be if the offense had been completed because you recall

1   the questions I had of the witness I was asking him.  And

2   Mr. Sofer asked the witness if the offense was completed, what

3   would happen?  That's what that means on the definition of the

4   second prong of that test.  Would the result of the offense,

5   the completed offense affect interstate commerce?  And we had

6   two witnesses who testified that it would.  But to the extent

7   for some reason you didn't believe that was correct, in this

8   particular case you know that this offense in and of itself

9   affected interstate commerce.  You heard testimony that

10  evidence was sent from the State of Texas to the State of

11  Virginia to the FBI crime lab in Quantico to be analyzed.  You

12  heard experts who traveled in interstate commerce to testify.

13  That in and of itself is an effect on commerce.  Putting aside

14  the much more damaging and serious consequences of what would

15  have happened if the offense had been completed.  So don't let

16  Mr. Boyd get you sidetracked on that second element because

17  that's what the second element means -- the second prong of

18  that one means.

19      But the definition of attempt which is found -- which is

20  going to deal with the next two charges I'm going to talk about

21  is found on Page -- starting on Page 15.  At the bottom of the

22  page the Court tells you the two elements that we have to prove

23  for an attempt of the offense.  These are just basically

24  instructions that are on top of the other two charges of Count

25  One, attempt to build and detonate a weapon of mass destruction

1    and the attempted murder of officers and employees of the

2    United States.

3        First, that the defendant intended to commit the offense

4    of attempted use of a weapon of mass destruction as in Count

5    One or attempted murder in Count Two.  Intended to commit the

6    offense, that is, he had the criminal intent and then, number

7    two, that he did an act, an act, an action, one act

8    constituting a substantial step toward the commission of each

9    crime which strongly corroborates the defendant's criminal

10   intent and amounts to more than mere preparation.

11       Let's go back to the cake.  If I get an ingredient out and

12   I put it on the shelf and I open it up, I'm taking a step.  I'm

13   taking an action.  Get the next ingredient out.  Open it up.

14   Put it on the shelf.  I'm taking the next action.  Oops.  My

15   recipe calls for buttermilk.  I found out there's a way you can

16   make buttermilk, a homemade version of buttermilk.  You don't

17   have to have buttermilk.  So you may be out of buttermilk but

18   you put in some substitute.  Maybe the recipe that I had for

19   called for nutmeg to be used but I didn't want to use nutmeg.

20   I wanted to use cinnamon instead.  So I substitute that in the

21   recipe.  The end result was the same, but the steps I took to

22   get there were still part of the attempt.  They were still part

23   of the process of me putting together the cake.  Just like we

24   talked about at the beginning in the voir dire examination.

25   Attempt is not like a swing and a miss or pushing a button and

1    it fizzles.  It's the ongoing process leading up to the -- till

2    it's completed because if the process were completed, we

3    wouldn't be here on an attempted offense.  We'd be talking

4    about a much more serious offense.

5         Look at the steps Mr. Abdo took.  Mr. Schneider reviewed

6    them for you.  17 substantial steps he took starting back in

7    Tennessee.  17 substantial steps because he's already formed

8    his criminal intent.  You know he did that by July 4th of last

9    year when he planned the execution of a soldier at Fort

10   Campbell, Kentucky.  His intent never changed.  The plan got

11   interrupted just like the plan got interrupted in Killeen,

12   Texas.

13        THE COURT:  You have two minutes, Mr. Frazier.

14        MR. FRAZIER:  Thank you.

15        But the intent never changed, ladies and gentlemen.  It

16   was always the same.  So those same factors regarding his

17   substantial steps are the same factors you would use in Count

18   Two to determine whether or not the defendant had the

19   predisposition to kill another person, and you know that he

20   attempted to kill uniformed service members, those are people

21   who are part of the Department of the Defense and employees and

22   officers of the United States, on Page 13, that he did so with

23   malice aforethought and those attempted killings were

24   premeditated.  Those same steps show you that he had malice

25   aforethought and the attempt to kill in this particular case

1   and you know what the substantial steps were just based on the

2   evidence.  But attempt does not require police to wait, to

3   watch the defendant and see what he does.  It does not require

4   them to watch to see if he builds a bomb or moves it in a

5   restaurant.  No.  As long as you can see what his criminal

6   intent was and he's taken one substantial step, then that's it.

7   That's sufficient under the law to convict.  That's it.  Beyond

8   a reasonable doubt.  And in this particular case common sense

9   tells you that's what the result would be in this particular

10  case.  Nothing happened back in Kentucky because it's charged

11  as part of this offense.  That's why it's included in this

12  indictment.

13      And I want to close and leave with this thought.  This

14  case, ladies and gentlemen, I know it was quick and I'm not

15  going to talk about much more of the evidence in this case, but

16  this is a case about good police work and a very thorough

17  investigation, but none of it would have ever happened without

18  the vigilance of citizens who stepped forward and did the hard

19  thing but the right thing regarding Mr. Abdo.  Elizabeth

20  Gilliland, Cathy Cheadle and Greg Ebert deserve a lot of

21  recognition and praise for the steps that they took that kept

22  this crime from happening.  But without for this offense being

23  interrupted by those good citizens coming forward, this would

24  be a lot more serious offense.

25      Ladies and gentlemen, go back and do the right thing.  Do

1   your duty in this case.  Find the defendant guilty of all six

2   counts because he is guilty beyond a reasonable doubt on all

3   six of the counts of the indictment.  Thank you for your time.

4        THE COURT:  Members of the jury, at this stage in every

5   trial I have a function to perform that I sincerely dislike.

6   We select 13 people to serve as a jury, 12 and one alternate.

7   We do that so that if somebody becomes ill or has a family

8   emergency we can continue the trial with 12 jurors.

9        ███████████, you were the alternate in this case.  The law

10  does not allow but 12 people to deliberate.  So I have no

11  choice but to excuse you at this point.  I'm sure you'd rather

12  prefer and deliberate with the rest of the jurors and they'd

13  probably prefer to have you do that, but we simply can't allow

14  it.  So you're free to go at this time.  You're free to come

15  back and stay in the courtroom and see what happens if you wish

16  to.  It's your preference.  Thank you very much for being here.

17       (Further jury instructions were read by the Court.)

18       THE COURT:  Ladies and gentlemen, we will bring to you in

19  the jury room these things as quickly as we can gather them

20  together:  All of the exhibits which were admitted into

21  evidence, the verdict form that you will need when you've

22  reached a conclusion and some forms to use to communicate with

23  me if you need to send me a note.  If you'll go now to the jury

24  room and begin your deliberations by selecting your presiding

25  juror.

1    LAW CLERK:  All rise.

2    (Jury exited the courtroom for deliberations at 2:21.)

3    LAW CLERK:  Court will stand in recess.

4    (A break was taken from 2:21 to 3:39.)

5    LAW CLERK:  All rise.

6    (The jury entered the courtroom at 3:39.)

7    THE COURT:  Be seated, everyone.

8    ████████, I have your note that indicates the jury has

9    reached a verdict.  I need to ask you a couple of questions.

10   First of all, was the jury's verdict unanimous?

11   JUROR:  Yes, sir.

12   THE COURT:  Have you signed the verdict form as presiding

13   juror?

14   JUROR:  Yes, sir.

15   THE COURT:  Would you hand it then to the marshal, please?

16   Publish the verdict, please, Ms. Willis.

17                              VERDICT

18   MS. WILLIS:  We, the jury, unanimously find the defendant,

19   Naser Jason Abdo, guilty of the offense of attempted use of a

20   weapon of mass destruction as alleged in Count One of the

21   indictment.

22   We, the jury, unanimously find the defendant, Naser Jason

23   Abdo, guilty of the offense of attempted murder of officers and

24   employees of the United States as alleged in Count Two of the

25   indictment.

1        We, the jury, unanimously find the defendant, Naser Jason

2   Abdo, guilty of the offense of possession of a weapon,

3   Springfield Armory 40-caliber semiautomatic pistol, in

4   furtherance of a federal crime of violence, attempted use of a

5   weapon of mass destruction as alleged in Count Three of the

6   indictment.

7        We, the jury, unanimously find the defendant, Naser Jason

8   Abdo, guilty of the offense of possession of a weapon,

9   destructive device, in furtherance of a federal crime of

10  violence, attempted use of a weapon of mass destruction, as

11  alleged in Count Four of the indictment.

12       We, the jury, unanimously find the defendant, Naser Jason

13  Abdo, guilty of the offense of possession of a weapon,

14  Springfield Armory 40-caliber semiautomatic pistol, in

15  furtherance of a federal crime of violence, attempted murder of

16  officers or employees of the United States, as alleged in Count

17  Five of the indictment.

18       We, the jury, unanimously find the defendant, Naser Jason

19  Abdo, guilty of the offense of possession of a weapon,

20  destructive device, in furtherance of a federal crime of

21  violence, attempted murder of officers or employees of the

22  United States as alleged in Count Six of the indictment.

23       THE COURT:  Are there any post verdict matters at this

24  point, Counsel?

25       MR. FRAZIER:  None from the United States, Your Honor.

1      MR. BOYD:  Not at this time, Your Honor.

2      THE COURT:  Then, ladies and gentlemen of the jury, that

3  completes your work in this case.

4      Sentencing in this case, by the way, will be set for July

5  the 20th Friday at 9:00 a.m.

6      MR. BOYD:  Your Honor, if we could push that into August,

7  I've been selected to go to a course --

8      THE COURT:  You can take that up --

9      MR. BOYD:  Yes, Your Honor.

10      THE COURT:  -- with the court coordinator as soon as we

11  have an opportunity and we'll find a suitable date.

12      As I said, ladies and gentlemen, that completes your work

13  in this case.  We appreciate very much your service.  It's a

14  civic duty I realize, but it's also a civic duty that an awful

15  lot of people use some very imaginative reasons to try to get

16  out of.  I'm the one who's well aware of that because I'm the

17  one who reads some of the communications they send wanting to

18  get excused from jury duty.

19      It's never an easy thing to find a fellow human being

20  guilty of serious crimes, but as I said, it is your duty to

21  follow the evidence and render a verdict accordingly and you've

22  done that and we do appreciate it.  I speak on behalf of my

23  myself, the whole court system, I'm sure the prosecutors and

24  the defense.

25      I have told you numerous times through the trial that you

1    shouldn't talk with anybody about the case or allow anyone to

2    talk with you.  You're now completely removed from that

3    admonition.  That means that you have the absolute right to

4    talk with anyone you wish to, friends and neighbors, each

5    other, me, the lawyers, the media even, anybody at all.  But

6    bear in mind that you have an absolute right not to.  And if

7    anyone asks you to talk about the case and it's your preference

8    not to, then just politely decline.  Nobody's going to pressure

9    you in the least because that's strictly forbidden.

10        I make it a point to visit with juries after they've

11   reached a verdict to see if they have any questions that I can

12   answer for them now that the trial is over and I'll do that

13   with you.  I'll be back in just a few seconds.  I won't keep

14   you long.  But again on behalf of us all, thank you for your

15   service in this case.  You're now discharged.

16        LAW CLERK:  All rise.

17        (Jury exited the courtroom at 3:44.)

18        LAW CLERK:  Court is now in recess.

19        (Hearing adjourned at 3:44.)

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11      Certified to by me this 12th day of September 2012.

12

13                          */s/ Kristie M. Davis*
                            KRISTIE M. DAVIS
                            Official Court Reporter
14                          P.O. Box 20994
                            Waco, Texas 76702-0994
15                          (254) 754-7444
                            kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25

TABLE OF CONTENTS
May 21, 2012

                                                              Page

Pretrial motions........................................    2

Voir dire proceedings...................................   10

Opening instructions by the Court.......................   11

Government's Opening Statement by Mr. Sofer.............   24

Defendant's Opening Statement by Mr. Boyd...............   32

              EVIDENCE ON BEHALF OF THE GOVERNMENT

CHARLES MICHAEL OWENS

Direct Examination by Mr. Sofer.........................   34
Cross-Examination by Mr. Boyd...........................   63

ELIZABETH ANN GILLILAND

Direct Examination by Mr. Frazier.......................   70
Cross-Examination by Mr. Boyd...........................   87

GREGORY ELDRIDGE

Direct Examination by Mr. Schneider.....................   89

BO JASON CAMPBELL

Direct Examination by Mr. Frazier.......................   98
Cross-Examination by Mr. Boyd...........................  113

VICTOR LYNCH

Direct Examination by Mr. Frazier.......................  115
Cross-Examination by Mr. Boyd...........................  130

JOZEF A. ALTER

Direct Examination by Mr. Frazier.......................  131
Cross-Examination by Mr. Boyd...........................  143

STEPHEN C. HAUCK

Direct Examination by Mr. Frazier........................ 144
Cross-Examination by Mr. Boyd........................... 148

ROBERT MOTHERSHEAD

Direct Examination by Mr. Frazier........................ 149
Cross-Examination by Mr. Boyd........................... 165

ABRAHAM EUGENE WHERRY

Direct Examination by Mr. Schneider..................... 169

DEBORAH GREELEY

Direct Examination by Mr. Schneider..................... 183

HUSAM AL-QAYSI

Direct Examination by Mr. Sofer......................... 209
Cross-Examination by Mr. Boyd........................... 226

AARON BERNARDO

Direct Examination by Mr. Sofer......................... 229

CATHY CHEADLE

Direct Examination by Mr. Frazier........................ 240
Cross-Examination by Mr. White.......................... 261

DAVID RICHARD HUTTON

Direct Examination by Mr. Schneider..................... 263
Cross-Examination by Mr. White.......................... 276

ROSEMARY MANNING

Direct Examination by Mr. Frazier........................ 276
Cross-Examination by Mr. Boyd........................... 282

May 23, 2012

CAMERON CHESSER

Direct Examination by Mr. Schneider..................... 286
Cross-Examination by Mr. Boyd........................... 298

GREG EBERT

Direct Examination by Mr. Frazier......................... 298
Cross-Examination by Mr. Boyd............................ 304
Redirect Examination by Mr. Frazier...................... 305

RICHARD ERIC BRADLEY

Direct Examination by Mr. Frazier......................... 306
Cross-Examination by Mr. Boyd............................ 331
Redirect Examination by Mr. Frazier...................... 339
Recross-Examination by Mr. Boyd.......................... 339

BRAD GRIMES

Direct Examination by Mr. Sofer.......................... 340
Cross-Examination by Mr. Boyd............................ 400

JASON CROMARTIE

Direct Examination by Mr. Sofer.......................... 412
Cross-Examination by Mr. Boyd............................ 430

ERICH SMITH

Direct Examination by Mr. Schneider...................... 433

RONALD STAMPER

Direct Examination by Mr. Frazier......................... 448

ANTHONY MCCRAE

Direct Examination by Mr. Frazier......................... 458

KAREN ANDERSON

Direct Examination by Mr. Schneider...................... 463

RICHARD NICHOLAS STRYKER

Direct Examination by Mr. Schneider...................... 468
Voir Dire Examination by Mr. Boyd........................ 470
Direct Examination continued by Mr. Schneider............ 481

1          May 24, 2012

2    RICHARD NICHOLAS STRYKER

3    Direct Examination continued by Mr. Schneider........... 496
     Cross-Examination by Mr. Boyd.......................... 512
4    Redirect Examination by Mr. Schneider.................. 531
     Recross-Examination by Mr. Boyd........................ 533

5
     Government rests....................................... 534

6
     Rule 29 motion........................................ 549

7
                EVIDENCE ON BEHALF OF THE DEFENDANT

8    ANITA RINEHART

9
     Direct Examination by Mr. Boyd........................ 551

10
     WILLIE WINGFIELD

11
     Direct Examination by Mr. Boyd........................ 556

12
     ERIC BRADLEY

13
     Direct Examination by Mr. Boyd........................ 560
14   Cross-Examination by Mr. Frazier...................... 567
     Redirect Examination by Mr. Boyd...................... 567

15
     Defendant rests....................................... 568

16
     Government rests...................................... 568

17
     Objections to jury instructions....................... 569

18
     Jury Instructions..................................... 571

19
     Government's Opening Argument by Mr. Schneider......... 571

20
     Defendant's Closing Argument by Mr. Boyd.............. 583

21
     Government's Closing Argument by Mr. Frazier.......... 590

22
     Jury retired for deliberations........................ 599

23
     Jury Verdict.......................................... 599

24
     Adjournment........................................... 602

25

1    Court Reporter's Certificate.............................. 603

2                           EXHIBIT INDEX

3                        Government's Exhibits

4    No.   Description                                     Admitted

5    1     Advice of Rights 7-27-11..........................   40

6    2     Advice of Rights 7-28-11..........................   42

7    3     Naser Jason Abdo's Orders.........................   83

8    4     One pair yellow leather gloves....................  118

9    5     One pair coated knit gloves.......................  118

10   6     Shovel............................................  118

11   7     Green body bag carrier............................  118

12   8     Brown neck gaiter.................................  118

13   9     One grey hood.....................................  118

14   10    USB cable.........................................  119

15   11    Black pouch with black material bed skirts.........  118

16   12    Black pouch with black material bed skirts.........  118

17   13    Green body bag....................................  118

18   14    Two black masks...................................  415

19   15    Photographs at scene – Dumpster:  16 pictures
              15A through 15P................................  110
20
     16    Two black plastic trash bags......................  118
21
     17    One container of bleach...........................  118
22
     18    One container of bleach...........................  118
23
     19    Blue Sanyo camera.................................  119
24
     20    Passport..........................................  138
25

21   SSN card.............................................. 138

22   Marriage certificate.................................. 138

23   Birth certificate..................................... 138

25   Transcript from Dallas County Community College:
       One page.......................................... 138

26   State Department Certification of School Records:
       Four pages........................................ 138

27   Vehicle pass, Fort Campbell:  One page.............. 138

28   Operator's permit copy:  One page................... 138

29   Enlistment documents:  Three pages.................. 138

30   Combatives Training Certification:  One page........ 138

31   Air Assault Certification:  Two pages............... 138

32   Ownership and insurance information:  Seven pages... 138

33   Receipt for handcuffs................................ 138

34   Three handcuff boxes................................. 142

35   One Jolt electric stock prod with tag............... 142

36   Bushnell binocular covers, front and back........... 142

37   One set car keys, three keys and one keyfob......... 142

38   United States Army hat, Abdo name tag............... 142

39   Garbage bag roll..................................... 142

40   Eight zip ties....................................... 142

41   Roll of electrical tape.............................. 142

42   Picture of items in car (16) Photographs 42A
       through 42N....................................... 123

43   Bill of Sale for 40-caliber Springfield pistol...... 177

44   Walmart receipt July 26, 2011 12:25 a.m............. 192

45   Surveillance video excerpts Walmart................ 187

46   Hotel receipts and copy of Pluto drivers license,
        three pages..................................... 237

47   Hotel surveillance video excepts:  Arrival,
        room change, detention, EOD..................... 232

48   Guns Galore stills (five stills.).................. 260

49   Guns Galore video................................. 249

50   Guns Galore receipts, actual...................... 255

51   Guns Galore receipt, annotated by Cheadle.......... 255

52   Surplus City video clips.......................... 268

53   Lowe's stills – three stills 53A, 53B, 53C......... 289

54   Lowe's receipt.................................... 293

55   KPD dashcam clip.................................. 327

56   Black backpack.................................... 360

57   Wall clock........................................ 360

58   Wall clock........................................ 360

59   Two 9v batteries.................................. 360

60   One spool 16 gauge wire blk....................... 360

61   One spool 16 gauge wire blk....................... 360

62   List of items including "red/black/green wire"...... 360

63   Internet article:  "How to shoot handgun
        accurately" July 7, 2011........................ 360

64   Internet article:  "Shooting technique and
        practice" July 7, 2011.......................... 360

65   Internet blog:  "Please help me, new XD-40
        jamming a lot" July 7, 2011..................... 360

66   Internet article:  "Basic firearms course,
        Sections 5 and 6" July 7, 2011.................. 360

67   Internet article:  Inspire magazine:  "How to build
        a bomb in the kitchen of your mom"................ 360

68   Composition book with writings..................... 360

69   Atlas with writings................................ 360

70   Loaded 40-caliber Springfield XD magazine with
        seven rounds in bag............................. 360

71   Two boxes Winchester shotgun ammunition, six
        individual bags of cut shotgun shells, gunpowder
        and pellets..................................... 360

72   Acer Notebook computer with box battery charger
        and documents................................... 360

73   Springfield Armory XD-40 handgun in box, .40 caliber 360

74   Tennessee ID card for Asher Pluto.................. 323

75   Pictures of items from backpack: (2) Photographs
        75A through 75B................................. 330

75   Pictures of items from backpack: (2) Photographs
        75C through 75D................................. 347

75   Picture of items from backpack: 75E................ 352

75   Pictures of items from backpack: 75F............... 362

75   Picture of items from backpack: 75G................ 363

76   Tracfone box, packaging and adapter................ 397

77   Walmart receipt, July 26, 2011 - 12:13 a.m......... 192

78   Handwritten list - includes:  "Sugar, powder,
        Gorilla..."..................................... 397

79   Tracfone calling card and International calling card 397

80   Clothing tag (Walmart.)............................ 397

81   Electrical tape, empty packaging (Walmart.)........ 397

82   White floppy hat................................... 397

83   Two clothing tags (Walmart.)....................... 397

84   Photographs from Room 248:  (10) Photographs 84A
        through 84J.......................................... 393

85   Black & Decker electrical drill...................... 384

86   Black & Decker electrical drill cardboard box....... 384

87   Skil drill bit set.................................. 384

88   Wall clock.......................................... 384

89   Wall clock.......................................... 384

90   Bottle of smokeless powder – IMR4198................ 384

91   Bottle of smokeless powder – HS-6................... 384

92   Bottle of smokeless powder – H414.................. 384

93   Bottle of smokeless powder – LIL'GUN............... 384

94   Bottle of smokeless powder – H4350................. 384

95   Bottle of smokeless powder – HS-7.................. 384

96   Walmart receipt July 25, 2011, 9:56 p.m............. 192

97   Leatherman utility knife and blades from utility
        knife.............................................. 384

98   One Kodak Playsport video camera.................... 384

99   Packaging and wiring for Kodak camera............... 384

100  Five cut shotgun shells and box..................... 384

101  Springfield magazine with four rounds ammunition.... 384

102  Springfield magazine with ten rounds ammunition..... 384

103  Springfield magazine with no ammunition............. 384

104  Gorilla tape........................................ 384

105  Two 9v batteries with packaging and 3AA batteries... 384

106  Two-inch paint brush................................ 384

107  One roll black electrical tape...................... 384

108   Assorted zip ties................................... 384

109   Screwdrivers and allen wrench, six piece set........ 384

110   Pressure cooker regulator........................... 384

111   Two spools 18 gauge wire -- one red, one black...... 384

112   One box Domino sugar................................ 384

113   One box Domino sugar................................ 384

114   Two boxes 40-caliber ammunition..................... 384

115   One bag loose ammunition 40-caliber................. 384

116   One XD magazine package - empty..................... 384

117   Four razor blades in packaging...................... 384

118   Five shotgun shells -- two uncut, three cut open.... 384

119   Shotgun pellets and powder in plastic cup........... 384

120   Contents of pressure cooker- shotgun pellets and
         powder........................................... 384

121   Army ACU uniform with "Smith" name tag, boots, two
         belts (tan and black), hat with "Smith" name tag.. 384

122   One medical assistant uniform and lanyard........... 384

123   Three identification cards for Naser Jason Abdo;
         one for Rania Raed Anani.......................... 384

124   One 16 quart pressure cooker bottom................. 384

125   One 16 quart pressure cooker lid.................... 384

126   One pressure cooker bottom.......................... 384

127   One pressure cooker lid............................. 384

128   One pressure cooker regulator....................... 384

129   One 16 quart pressure cooker box.................... 384

130   One instruction manual for pressure cooker (smaller,
         not 16 quart.)................................... 384

131  Zap Double Trouble Stun Gun......................... 384

132  Bushnell binoculars................................. 384

133  Tracfone chargers, manuals and accessories......... 384

134  Christmas lights with one light removed from strand. 384

135  One University of Texas Longhorn T-shirt............ 384

136  Page ripped from phone book, "Guns and Gunsmiths-
         Guns Galore"................................... 384

137  Melted razor and metal lid, plastic and pressure
         cooker booklets................................ 384

138  Contact cement...................................... 384

139  Two Bic cigarette lighters.......................... 384

140  Bed skirt........................................... 384

141  Head lamp........................................... 384

142  Two hotel room keys - Room 230 and Room 248......... 384

143  One Visa checkcard "Naser Abdo"..................... 384

144  Two Lowe's boxes.................................... 384

145  Clothing Defendant wearing when arrested,
         July 27, 2011 (shorts and undergarments.)......... 321

146  Clothing defendant wearing when arrested,
         July 27, 2011 (hat, watch, sunglasses.)........... 321

147-1
     Photograph of items inside of Room 230.............. 366

147-2
     Photograph of items inside of Room 230.............. 366

147  Photograph of items inside of Room 230:
         (43) Photographs 147-3 through 147-45............. 385

149  CD of telephone call to Carly Gordon................ 462

150  CD of the video and audio of Clarisa Morland visit
         with Abdo....................................... 466

151   Video and audio of test burns and two angles of
      test of device.................................... 509

152   Video of high speed camera test fire of device...... 509

153   Two photographs Naser Jason Abdo:  153A and 153B.... 38

154   Photograph of Outside of Guns Galore................ 261

155   Photograph of outside of Surplus City............... 274

Defendant's Exhibits

No.   Description                                    Admitted

6     Clip of arrest/detention sequence................... 560